# 24-

# United States Court of Appeals

*for the*

# Second Circuit

In Re MORGAN STANLEY, MORGAN STANLEY SMITH BARNEY LLC, AND MORGAN STANLEY COMPENSATION MANAGEMENT DEVELOPMENT AND SUCCESSION COMMITTEE,

*Petitioners.*

PETITION FOR A WRIT OF MANDAMUS TO THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK IN CASE NO. 1:20-cv-11047-PGG

## ADDENDUM TO PETITION FOR A WRIT OF MANDAMUS
## Volume 1 of 3 (Pages ADD-1 to ADD-296)

PAMELA A. MILLER
ANTON METLITSKY
O'MELVENY & MYERS LLP
Times Square Tower
Seven Times Square
New York, New York 10036
(212) 326-2000

MEAGHAN VERGOW
BRIAN D. BOYLE
O'MELVENY & MYERS LLP
1625 Eye Street NW
Washington, DC 20006
(202) 383-5300

*Attorneys for Petitioners*

i

# TABLE OF CONTENTS

**Page**

Motion for Leave to File Plaintiff's Notice of
Supplemental Authority in Support of His
Opposition to Defendants' Motion to Compel
Arbitration, dated November 8, 2021 .................... ADD-1

Exhibit A to Motion –
Plaintiff's Notice of Supplemental Authority in
Support of His Opposition to Defendants' Motion
to Compel Arbitration, dated November 8, 2021 .. ADD-5

Exhibit 1 to Notice –
*Ferguson v. Ruane Cuniff & Goldfarb Inc*.,
2021 U.S. Dist. LEXIS 154930, 2021 WL
3667979 (S.D.N.Y. Aug. 17, 2021).................... ADD-10

Exhibit 2 to Notice –
*Cedeno v. Argent Trust Co*., 2021 U.S. Dist.
LEXIS 212926, 2021 WL 5087898 (S.D.N.Y.
Nov. 2, 2021)...................................... ADD-22

Defendants' Response to Plaintiff's Notice of
Supplemental Authority in Support of His
Opposition to Defendants' Motion to Compel
Arbitration, dated November 16, 2021 ................. ADD-28

Plaintiffs' Amended Class Action Complaint, dated
March 24, 2022.................................... ADD-31

Notice of Motion, by Defendants, for an Order
Compelling Arbitration and for a Stay of
Proceedings, dated May 9, 2022........................... ADD-62

Memorandum of Law in Support of Defendants'
Motion to Compel Arbitration and to Stay
Proceedings, dated May 9, 2022........................... ADD-64

ii

**Page**

Declaration of Keith Porco, for Defendants, in
  Support of Motion to Compel Arbitration and to
  Stay Proceedings, dated May 6, 2022.................... ADD-87

Exhibit A to Porco Declaration –
Morgan Stanley Financial Advisor/Private Wealth
Advisor Compensation Plan, Growth Award and
Recognition Programs 2015, dated
January 12, 2015.................................................... ADD-90

Exhibit B to Porco Declaration –
Growth Award Bonus Agreement between
Plaintiff Matthew T. Shafer and Morgan Stanley
Smith Barney LLC, dated February 6, 2015..........ADD-122

Exhibit C to Porco Declaration –
Growth Award Bonus Agreement between
Plaintiff Mace Tamse and Morgan Stanley Smith
Barney LLC, dated February 18, 2014 .................ADD-134

Exhibit D to Porco Declaration –
Growth Award Bonus Agreement between
Plaintiff Mark Loftus and Morgan Stanley Smith
Barney LLC, dated February 18, 2014 .................ADD-144

Declaration of Jessica Krentzman, for Defendants,
  in Support of Motion to Compel Arbitration and
  to Stay Proceedings, dated May 6, 2022................ADD-154

Exhibit A to Krentzman Declaration –
Employment Agreement of Steven Nadler, dated
April 28, 2008 ....................................................ADD-159

Exhibit B to Krentzman Declaration –
Convenient Access to Resolution for Employees
("CARE") Guidebook, in effect before 2015 ........ADD-168

iii

**Page**

Exhibit C to Krentzman Declaration –
Email from Morgan Stanley to Employees, dated
September 2, 2015 ................................................ADD-183

Exhibit D to Krentzman Declaration –
CARE Guidebook, operative since
October 2, 2015 ....................................................ADD-186

Exhibit E to Krentzman Declaration –
CARE Agreement, operative since
October 2, 2015 ....................................................ADD-209

Reply Memorandum in Support of Defendants'
Motion to Compel Arbitration and to Stay
Proceedings, dated June 29, 2022 ..........................ADD-218

Letter from Meaghan VerGow to the Honorable
Paul G. Gardephe, dated June 29, 2022 .................ADD-234

Plaintiffs' Memorandum of Law in Opposition to
Defendants' Motion to Compel Arbitration and to
Stay Proceedings, dated June 8, 2022 ....................ADD-235

Declaration of Mathew P. Jasinski in Opposition to
Defendants' Motion to Compel Arbitration and to
Stay Proceedings, dated June 8, 2022 ....................ADD-263

Exhibit 1 to Jasinski Declaration –
Morgan Stanley Compensation Incentive Plan
Wealth Management Financial Advisor/Private
Wealth Adviser Awards 2016 Discretionary
Retention Awards Award Certificate......................ADD-266

Exhibit 2 to Jasinski Declaration –
Morgan Stanley Compensation Incentive Plan......ADD-284

Motion for Leave to File Plaintiffs' Notice of
Supplemental Authority in Support of Their
Opposition to Defendants' Motion to Compel
Arbitration, dated December 20, 2022 .................ADD-297

iv

**Page**

Exhibit A to Motion –
Plaintiffs' Notice of Supplemental Authority in
Support of Their Opposition to Defendants'
Motion to Compel Arbitration, dated
December 20, 2022 .................................................ADD-301

    Exhibit 1 to Notice –
    *Lloyd v. Argent Trust Co.*, No. 22-cv-4129,
    2022 U.S. Dist. LEXIS 219964, 2022 WL
    17542071 (S.D.N.Y. Dec. 6, 2022) ....................ADD-305

Defendants' Response to Plaintiffs' Second Notice
   of Supplemental Authority in Support of Their
   Opposition to Defendants' Motion to Compel
   Arbitration, dated January 9, 2023 ........................ADD-311

Motion for Leave to File Plaintiffs' Second Notice
   of Supplemental Authority in Support of Their
   Opposition to Defendants' Motion to Compel
   Arbitration, dated March 21, 2023 ........................ADD-314

    Exhibit A to Motion –
    Plaintiffs' Second Notice of Supplemental
    Authority in Support of Their Opposition to
    Defendants' Motion to Compel Arbitration, dated
    March 21, 2023 ....................................................ADD-318

    Exhibit 1 to Notice –
    *Harrison v. Envision Mgmt. Holding, Inc. Bd.*
    *of Dir.*, 59 F.4th 1090 (10th Cir. Feb. 9, 2023)...ADD-322

Defendants' Response to Plaintiffs' Second Notice
   of Supplemental Authority in Support of Their
   Opposition to Defendants' Motion to Compel
   Arbitration, dated April 3, 2023 ...........................ADD-339

Order of the Honorable Paul G. Gardephe, dated
   September 15, 2023 ..............................................ADD-343

v

**Page**

Letter from Mathew P. Jasinski to the Honorable
Paul G. Gardephe, dated September 15, 2023 .......ADD-346

Exhibit A to Letter –
Compensation Committee's Charter as of
October 13, 2020 ....................................................ADD-348

Exhibit B to Letter –
2018 FA Compensation Plan...................................ADD-352

Exhibit C to Letter –
2015 FA Compensation Plan...................................ADD-383

Exhibit D to Letter –
Morgan Stanley Compensation Incentive Plan......ADD-414

Exhibit E to Letter –
2017 Award Certificate ..........................................ADD-426

Exhibit F to Letter –
2015 Award Certificate ..........................................ADD-443

Exhibit G to Letter –
2016 Award Certificate ..........................................ADD-460

Exhibit H to Letter –
Morgan Stanley Executive Compensation Plan.....ADD-477

Exhibit I to Letter –
RSU Award Certificate ..........................................ADD-489

Exhibit J to Letter –
2017 Award Summary Description........................ADD-514

Letter from Mathew P. Jasinski to the Honorable
Paul G. Gardephe, dated September 20, 2023 .......ADD-521

Letter from Meaghan VerGow to the Honorable
Paul G. Gardephe, dated September 20, 2023 .......ADD-526

vi

**Page**

Exhibit A to Letter –
FINRA Resolution Award, dated
September 19, 2023 ...............................................ADD-531

Memorandum Opinion and Order of the Honorable
  Paul G. Gardephe, dated November 21, 2023 .......ADD-538

Notice of Motion, by Defendants, for
  Reconsideration or Clarification, dated
  December 5, 2023 ..................................................ADD-594

Memorandum of Law in Support of Defendants'
  Motion for Reconsideration or Clarification,
  dated December 5, 2023 ........................................ADD-596

Plaintiffs' Memorandum of Law in Opposition to
  Defendants' Motion for Reconsideration or
  Clarification, dated January 9, 2024 .....................ADD-628

Reply Memorandum of Law in Support of
  Defendants' Motion for Reconsideration or
  Clarification, dated January 30, 2024 ...................ADD-654

Letter-Motion from Meaghan VerGow to the
  Honorable Paul G. Gardephe, dated April 2, 2024 ADD-670

Declaration of Meaghan VerGow in Support of
  Defendants' Motion for Reconsideration or
  Clarification, dated April 2, 2024 .........................ADD-675

Exhibit A to VerGow Declaration –
Arbitration Award in *Morgan Stanley v. Souma*,
FINRA Case No. 20-03838, dated
March 8, 2023 .......................................................ADD-679

Exhibit B to VerGow Declaration –
Excerpts from the Hearing Transcript in *Serrano
v. Morgan Stanley*, FINRA Case No. 22-02150,
dated February 26, 2024 ........................................ADD-687

vii

**Page**

Exhibit C to VerGow Declaration –
Excerpts from the Hearing Transcript in *Serrano
v. Morgan Stanley*, FINRA Case No. 22-02150,
dated February 27, 2024 .......................................ADD-707

Exhibit D to VerGow Declaration –
Excerpts from the Hearing Transcript in *Serrano
v. Morgan Stanley*, FINRA Case No. 22-02150,
dated February 28, 2024 .......................................ADD-742

Exhibit E to VerGow Declaration –
Excerpts from the Hearing Transcript in *Serrano
v. Morgan Stanley*, FINRA Case No. 22-02150,
dated February 29, 2024 .......................................ADD-761

Exhibit F to VerGow Declaration –
Arbitration Award in *Serrano v. Morgan Stanley*,
FINRA Case No. 22-02150, dated
March 22, 2024.....................................................ADD-813

Exhibit G to VerGow Declaration –
Printout from
https://www.morganstanleycompensation.com .....ADD-821

Letter from Mathew P. Jasinski to the Honorable
    Paul G. Gardephe, dated April 5, 2024 .................ADD-823

Letter from Meaghan VerGow to the Honorable
    Paul G. Gardephe, dated April 26, 2024 ...............ADD-826

ADD-1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MATTHEW T. SHAFER, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED, | Civil Action No. 1:20-cv-11047 |
| Plaintiff, | |
| vs. | |
| MORGAN STANLEY, MORGAN STANLEY SMITH BARNEY LLC, MORGAN STANLEY COMPENSATION MANAGEMENT DEVELOPMENT AND SUCCESSION COMMITTEE, and John/Jane Does 1-20, | CLASS ACTION |
| Defendants. | |

**MOTION FOR LEAVE TO FILE**
**PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY**
**IN SUPPORT OF HIS OPPOSITION TO**
**DEFENDANTS' MOTION TO COMPEL ARBITRATION**

PLEASE TAKE NOTICE that Plaintiff Matthew T. Shafer will respectfully move this Court before the Honorable Paul G. Gardephe, at the United States Courthouse, 40 Foley Square, Courtroom 705, New York, New York 10007, at such time as counsel may be heard, for leave to file the notice of supplemental authority attached as Exhibit A.

Defendants moved to compel arbitration on March 24, 2021. (ECF Nos. 42-43, filed May 5, 2021.) Plaintiff responded on April 21, 2021. (ECF No. 70, filed May 5, 2021.) Defendants replied on May 5, 2021. (ECF No. 71, filed May 5, 2021.)

On August 17, 2021, Judge Andrew Carter of the Southern District of New York entered an opinion in *Ferguson v. Ruane Cuniff & Goldfarb Inc.*, 2021 U.S. Dist. LEXIS 154930, 2021 WL 3667979 (S.D.N.Y. Aug. 17, 2021). *See* Exhibit 1 to *Plaintiff's Notice of Supplemental Authority in Support of His Opposition to Defendants' Motion to Compel Arbitration.* This opinion

1

involves several issues raised by Defendants' motion to compel arbitration in this case, including whether ERISA § 502(a)(2) claims for breach of fiduciary duty relate to a plaintiff's employment, whether such claims can be individually arbitrated, and whether ERISA §502(a)(2) provides a remedy for individual injuries distinct from plan injuries.

On November 2, 2021, Judge John Koeltl of the Southern District of New York entered an opinion in *Cedeno v. Argent Trust Co.*, 2021 U.S. Dist. LEXIS 212926, 2021 WL 5087898 (S.D.N.Y. Nov. 2, 2021). *See* Exhibit 2 to *Plaintiff's Notice of Supplemental Authority in Support of His Opposition to Defendants' Motion to Compel Arbitration*. This opinion involves several issues raised by Defendants' motion, including whether an individual participant in a defined contribution plan has a statutory right under ERISA to seek plan-wide relief for plan losses or whether the participant can seek relief only for that individual's personal losses in an individual account.

Defendants do not oppose this Motion,[1] as long as they are allowed to respond to the notice.

WHEREFORE, Plaintiff respectfully requests that the Court grant his *Motion for Leave to File Plaintiff's Notice of Supplemental Authority in Support of His Opposition to Defendants' Motion to Compel Arbitration*.

---

[1] In accordance with Section IV.C of the Court's Individual Rules of Practice, Plaintiff is therefore filing the Motion on ECF without awaiting a response.

2

ADD-3

Dated: November 8, 2021                    Respectfully submitted,


                                           _/s/ Mathew P. Jasinski_____
Robert A. Izard (*pro hac vice*)           William H. Narwold
Mark P. Kindall (*pro hac vice*)           Mathew P. Jasinski
Douglas P. Needham                         MOTLEY RICE LLC
IZARD, KINDALL & RAABE LLP                 27 Church Street, 17th Floor
29 South Main Street, Suite 305            Hartford, CT  06103
West Hartford, CT  06107                   Telephone: (860) 882-1681
Tel: (860) 493-6292                        Facsimile: (860) 882-1682
Fax: (860) 493-6290                        bnarwold@motleyrice.com
rizard@ikrlaw.com                          mjasinski@motleyrice.com
mkindall@ikrlaw.com
dneedham@ikrlaw.com                        *New York Office*:
                                           777 Third Avenue, 27th Floor
                                           New York, New York 10017


David S. Siegel (*pro hac vice*)           Thomas R. Ajamie
John S. "Jack" Edwards, Jr. (*pro hac vice*)   AJAMIE LLP
Dona Szak (*pro hac vice*)                 460 Park Avenue, 21st Floor
AJAMIE LLP                                 New York, NY  10022
Pennzoil Place - South Tower               Telephone: (713) 860-1600
711 Louisiana, Suite 2150                  Facsimile: (713) 860-1699
Houston, TX  77002                         tajamie@ajamie.com
Telephone: (713) 860-1600
Facsimile: (713) 860-1699
dsiegel@ajamie.com
jedwards@ajamie.com
dszak@ajamie.com

ADD-4

**CERTIFICATE OF SERVICE**

I hereby certify that on November 8, 2021, a copy of the foregoing *Motion for Leave to File Plaintiff's Notice of Supplemental Authority in Support of His Opposition to Defendants' Motion to Compel Arbitration* was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

*/s/ Mathew P. Jasinski*
Mathew P. Jasinski

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MATTHEW T. SHAFER, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED, | Civil Action No. 1:20-cv-11047 |
| Plaintiff, | |
| vs. | |
| MORGAN STANLEY, MORGAN STANLEY SMITH BARNEY LLC, MORGAN STANLEY COMPENSATION MANAGEMENT DEVELOPMENT AND SUCCESSION COMMITTEE, and John/Jane Does 1-20, | CLASS ACTION |
| Defendants. | |

PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY
IN SUPPORT OF HIS OPPOSITION TO
__DEFENDANTS' MOTION TO COMPEL ARBITRATION__

Plaintiff Matthew T. Shafer files this notice of supplemental authority in support of his opposition to *Defendants' Motion to Compel Arbitration and to Stay Proceedings* (ECF Nos. 42-43).

Plaintiff briefed his opposition to the pending motion on April 21, 2021 (ECF No. 44, entered May 5, 2021). On August 17, 2021, an opinion issued that supports Plaintiff's opposition and shows that the motion should be denied. *See* Exhibit 1, *Ferguson v. Ruane Cuniff & Goldfarb Inc.*, 2021 U.S. Dist. LEXIS 154930, 2021 WL 3667979 (S.D.N.Y. Aug. 17, 2021). Also, on November 2, 2021, an opinion issued that supports Plaintiff's opposition and shows that the motion should be denied. *See* Exhibit 2, *Cedeno v. Argent Trust Co.*, 2021 U.S. Dist. LEXIS 212926, 2021 WL 5087898 (S.D.N.Y. Nov. 2, 2021).

1

ADD-7

Plaintiff previously argued in his opposition that the Morgan Stanley Arbitration Provision did not cover his ERISA § 502(a)(2) claims for breach of fiduciary duty because those claims did not relate to his compensation.  ECF No. 44, pp. 6-9.  In *Ferguson v. Ruane Cuniff & Goldfarb Inc*., the court addressed a similar arbitration clause, and found it was bound by *Cooper v. Ruane Cunniff & Goldfarb Inc.*, 990 F.3d 173 (2d Cir. 2021), to conclude that the arbitration clause did not apply because the plaintiff's breach-of-fiduciary-duty claim did not relate to his employment.  2021 U.S. Dist. LEXIS 154930, at *7, *9-11.

Plaintiff also previously argued in his opposition that his ERISA § 502(a)(2) claims for breach of fiduciary duty could not be individually arbitrated.  ECF No. 44, pp. 9-11.  In *Ferguson*, the court held that the individual arbitration of such claims "runs afoul" of *Coan v. Kaufman*, 457 F.3d 250 (2d Cir. 2006), which "requires parties suing on behalf of the plan to demonstrate their suitability to serve as representatives of the interests of other plan stakeholders."  *Ferguson*, 2021 U.S. Dist. LEXIS 154930, at *11.  The *Ferguson* court explained that "'§502(a)(2) does not provide a remedy for individual injuries distinct from plan injuries.'"  *Id*. (quoting *LaRue v. DeWolff, Boberg & Assocs., Inc*., 552 U.S. 248, 256 (2008)).  Thus, the court denied the motion to compel individual arbitration.

Plaintiffs also previously argued that the Morgan Stanley Arbitration Provision was invalid because it constituted a prospective waiver of his statutory right under ERISA to pursue plan-wide remedies.  ECF No. 44, pp. 14-15.  In *Cedeno v. Argent Trust Company*, the court held that, by requiring the individual arbitration of ERISA § 502(a)(2) claims for breach of fiduciary duty, an arbitration clause was invalid because it sought to "waive prospectively" the plaintiff's statutory right to recover for all plan losses.  2021 U.S. Dist. LEXIS 212926, at *11.  "The plaintiff has the right under [ERISA] §§ 409(a) and 502(a)(2) to recover for the Plan as a whole.  That right is not

2

waivable. [The arbitration clause], which purports to waive that right, is therefore invalid." *Id.* at *14-15.

Thus, the opinions in *Ferguson* and *Cedeno* further show that this Court should deny *Defendants' Motion to Compel Arbitration and to Stay Proceedings*.

Dated: November 8, 2021                           Respectfully submitted,

                                                   */s/ Mathew P. Jasinski*
Robert A. Izard (*pro hac vice*)                   William H. Narwold
Mark P. Kindall (*pro hac vice*)                   Mathew P. Jasinski
Douglas P. Needham                                 MOTLEY RICE LLC
IZARD, KINDALL & RAABE LLP                         27 Church Street, 17th Floor
29 South Main Street, Suite 305                    Hartford, CT  06103
West Hartford, CT  06107                           Telephone: (860) 882-1681
Tel: (860) 493-6292                                Facsimile: (860) 882-1682
Fax: (860) 493-6290                                bnarwold@motleyrice.com
rizard@ikrlaw.com                                  mjasinski@motleyrice.com
mkindall@ikrlaw.com
dneedham@ikrlaw.com                                *New York Office*:
                                                   777 Third Avenue, 27th Floor
                                                   New York, New York 10017

David S. Siegel (*pro hac vice*)                   Thomas R. Ajamie
John S. "Jack" Edwards, Jr. (*pro hac vice*)       AJAMIE LLP
Dona Szak (*pro hac vice*)                          460 Park Avenue, 21st Floor
AJAMIE LLP                                           New York, NY  10022
Pennzoil Place - South Tower                       Telephone: (713) 860-1600
711 Louisiana, Suite 2150                          Facsimile: (713) 860-1699
Houston, TX  77002                                 tajamie@ajamie.com
Telephone: (713) 860-1600
Facsimile: (713) 860-1699
dsiegel@ajamie.com
jedwards@ajamie.com
dszak@ajamie.com

ADD-9

**CERTIFICATE OF SERVICE**

I hereby certify that on November 8, 2021, a copy of the foregoing *Plaintiff's Notice of Supplemental Authority in Support of His Opposition to Defendants' Motion to Compel Arbitration* was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

*/s/ Mathew P. Jasinski*
Mathew P. Jasinski

ADD-10

# Exhibit 1

 Caution
As of: November 5, 2021 9:34 PM Z

## Ferguson v. Ruane Cuniff & Goldfarb Inc.

United States District Court for the Southern District of New York

August 17, 2021, Decided; August 17, 2021, Filed

17-CV-6685 (ALC)

**Reporter**
2021 U.S. Dist. LEXIS 154930 *; 2021 WL 3667979

MICHAEL L. FERGUSON ET AL, Plaintiffs, -against- RUANE CUNIFF & GOLDFARB INC., Defendants.

**Subsequent History:** Appeal filed, 08/30/2021

Appeal filed, 08/31/2021

**Prior History:** Ferguson v. Ruane Cuniff & Goldfarb Inc., 2019 U.S. Dist. LEXIS 55916, 2019 WL 1434435 (S.D.N.Y., Mar. 29, 2019)

## Core Terms

Arbitration, Plaintiffs', Claimants, class action, settlement, class certification, fiduciary, arbitration agreement, breached, motions, breach of fiduciary duty, third amended complaint, preliminary approval, class member, quotation, marks, parties, adjudications, commonality, numerosity, settlement agreement, fiduciary duty, Defendants', adequacy, arbitration provision, named plaintiff, question of law, contributions, injunctive, violations

## Case Summary

### Overview

HOLDINGS: [1]-The court granted class certification in plaintiffs' action alleging a breach of fiduciary duty under the Employee Retirement Income Security Act, 29 U.S.C.S. § 1132, because plaintiffs met the requirements of Fed. R. Civ. P. 23(a) and they also met the requirements of Rule 23(b)(1) as the allegations in the complaint intended to remedy fiduciary breaches and other misconduct on behalf of the plan, and allowing multiple actions seeking similar or the same relief from defendants on behalf of the plan would potentially prejudice individual class members and would threaten to create incompatible standards of conduct for the defendants; [2]-Because plaintiffs' motion for class certification was granted, they were granted leave under Fed. R. Civ. P.

15(a)(2) to file a third amended complaint only to the extent of adding class allegations.

### Outcome

Motion for class certification granted. Motion for leave to file amended complaint granted. Preliminary approval of class action settlements denied.

## LexisNexis® Headnotes

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Adequacy of Representation

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Numerosity

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Typicality

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Commonality

Civil Procedure > Special Proceedings > Class Actions > Certification of Classes

**HN1[↓] Prerequisites for Class Action, Adequacy of Representation**

Under Fed. R. Civ. P. 23, members of a class may sue as representational parties only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). Said differently, in order to qualify for class

Ferguson v. Ruane Cuniff & Goldfarb Inc.

certification, plaintiffs in the proposed class must demonstrate that they satisfy four requirements: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation.

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Typicality

**HN2[⤓]  Prerequisites for Class Action, Typicality**

The third class certification factor, typicality, requires that the claims of the class representatives be typical of those of the class and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability. Part of the typicality requirement (or a separate requirement implicit in Fed. R. Civ. P. 23(a), as it is sometimes viewed), is that the proposed class representatives be members of the class they seek to represent. In addition, there is an implied requirement of ascertainability, which demands that a class be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member. In the Second Circuit, that requires only that a class be defined using objective criteria that establish a membership with definite boundaries.

Civil Procedure > Special Proceedings > Class Actions > Certification of Classes

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Maintainability

**HN3[⤓]  Class Actions, Certification of Classes**

If the requirements of Fed. R. Civ. P. 23(a) are met, the district court must also find that the action can be maintained under Rule 23(b)(1), (2), or (3). Plaintiffs need establish only one basis for certification under Rule 23(b). For certification under Rule 23(b)(1), individual adjudications as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Rule 23(b)(1)(B).

Pensions & Benefits Law > ... > Remedies > Damages > Extracontractual Damages

**HN4[⤓]  Damages, Extracontractual Damages**

Section 502(a)(2) of the Employee Retirement Income Security Act does not provide a remedy for individual injuries distinct from plan injuries.

Civil Procedure > Special Proceedings > Class Actions > Certification of Classes

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Numerosity

**HN5[⤓]  Class Actions, Certification of Classes**

The numerosity requirement for class certification is met if the class is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). Although the practicality of joinder depends on all the circumstances surrounding a case, not on mere numbers, the Second Circuit has stated that courts are likely to conclude that the numerosity requirement is satisfied when the class comprises 40 or more members.

Civil Procedure > Special Proceedings > Class Actions > Certification of Classes

Pensions & Benefits Law > ... > Civil Litigation > Causes of Action > Breach of Fiduciary Duty

Healthcare Law > ... > Insurance Coverage > Health Insurance > ERISA

Pensions & Benefits Law > ERISA > Civil Litigation > Class Actions

**HN6[⤓]  Class Actions, Certification of Classes**

The commonality requirement for class certification is met if the plaintiffs' grievances share a common question of law or of fact. In general, the question of defendants' liability for Employee Retirement Income Security Act (ERISA) violations is common to all class members because a breach of a fiduciary duty affects all participants and beneficiaries. By their very nature, ERISA actions often present common questions of law and fact, and are therefore frequently certified as class actions.

Civil Procedure > ... > Class Actions > Prerequisites for

Ferguson v. Ruane Cuniff & Goldfarb Inc.

Class Action > Typicality

Pensions & Benefits Law > ... > Civil Litigation > Causes of Action > Breach of Fiduciary Duty

Pensions & Benefits Law > ERISA > Civil Litigation > Class Actions

**HN7[↓]  Prerequisites for Class Action, Typicality**

The third Fed. R. Civ. P. 23(a) requirement, typicality, is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability. In many contexts, the commonality and typicality requirements of Rule 23(a) tend to merge. In Employee Retirement Income Security Act (ERISA) breach of fiduciary duty cases, however, courts sometimes break the typicality requirement into three elements. The first element is that the claims largely arise from the same course of events — the parties' participation in the plan. Second, the plaintiffs must make similar legal arguments to prove liability — that the defendants mismanaged the plan in violation of ERISA. The third element is, effectively, that each plaintiff invested in at least one of the subject funds.

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Commonality

Pensions & Benefits Law > ... > Civil Litigation > Causes of Action > Breach of Fiduciary Duty

Pensions & Benefits Law > ERISA > Civil Litigation > Class Actions

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Typicality

**HN8[↓]  Prerequisites for Class Action, Commonality**

The typicality requirement for class certification is often met in putative class actions brought for breaches of fiduciary duty under the Employee Retirement Income Security Act. Typicality requires a common thread linking the proposed class members. When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims. The commonality and typicality requirements of Fed. R. Civ. P. 23(a) tend to merge.

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Adequacy of Representation

Civil Procedure > Special Proceedings > Class Actions > Certification of Classes

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Typicality

**HN9[↓]  Prerequisites for Class Action, Adequacy of Representation**

Generally, adequacy of representation requirement for class certification entails inquiry as to whether: (1) the plaintiff's interests are antagonistic to the interest of other members of the class and (2) the plaintiff's attorneys are qualified, experienced and able to conduct the litigation. There is no simple test for determining if a class will be adequately represented by a named plaintiff. Each case must be approached on an individual basis. The court should consider the representative's understanding and involvement in the lawsuit, the willingness to pursue the litigation, and any conflict between the representative and the class. The analysis required for Fed. R. Civ. P. 23(a)(4)'s adequacy requirement is analogous to that required for typicality: the class representative must fairly and adequately protect the interest of the class. Rule 23(a)(4).

Civil Procedure > Parties > Intervention > Conditional Right to Intervene

Civil Procedure > ... > Notice of Class Action > Content of Notice > Opt Out Provisions

**HN10[↓]  Intervention, Conditional Right to Intervene**

Because Fed. R. Civ. P. 23(b)(1) does not provide opt-out protections, class actions brought under this rule are often referred to as mandatory class actions.

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Adequacy of Representation

Civil Procedure > Special Proceedings > Class Actions > Certification of Classes

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Maintainability

Ferguson v. Ruane Cuniff & Goldfarb Inc.

**HN11**[⬇] **Prerequisites for Class Action, Adequacy of Representation**

Where the plaintiffs have satisfied the requirements of Fed. R. Civ. P. 23(a), the court is required to assess the class under Rule 23(b)(1) for adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications. Rule 23(b)(1)(B).

> Civil Procedure > Special Proceedings > Class Actions > Certification of Classes
>
> Pensions & Benefits Law > ERISA > Civil Litigation > Class Actions

**HN12**[⬇] **Class Actions, Certification of Classes**

The derivative nature of § 502(a)(2) of the Employee Retirement Income Security Act claims makes them paradigmatic examples of claims appropriate for certification as a Fed. R. Civ. P. 23(b)(1) class because any decision regarding whether the defendants breached their fiduciary duties would necessarily affect the interests of other participants.

> Civil Procedure > ... > Pleadings > Amendment of Pleadings > Leave of Court

**HN13**[⬇] **Amendment of Pleadings, Leave of Court**

Under Fed. R. Civ. P. 15(a)(2), the court should freely give leave to amend when justice so requires.

> Torts > ... > Settlements > Multiple Party Settlements > Indemnity
>
> Torts > ... > Multiple Defendants > Contribution > Particular Actions

**HN14**[⬇] **Multiple Party Settlements, Indemnity**

Because of the importance of settlement to America's litigation system, and because an unlimited right to seek contribution would surely diminish the incentive to settle, courts may approve provisions in settlement agreements that bar contribution and indemnification claims between the settling defendants and nonsettling defendants so long as there

is a provision that gives the non-settling defendants an appropriate right of set-off from any judgment imposed against them. Without the ability to limit the liability of settling defendants through bar orders it is likely that no settlements could be reached. Nonetheless, a settlement bar should not be approved unless it is narrowly tailored and preceded by a judicial determination that the settlement has been entered into in good faith and that no one has been set apart for unfair treatment.

> Pensions & Benefits Law > ... > Civil Litigation > Causes of Action > Breach of Fiduciary Duty
>
> Pensions & Benefits Law > ERISA > Civil Litigation > Standing

**HN15**[⬇] **Causes of Action, Breach of Fiduciary Duty**

Section 502(a)(2) of the Employee Retirement Income Security Act (ERISA) authorizes the Secretary of Labor a participant, beneficiary, or fiduciary to bring a civil action for breach of fiduciary duty. The Secretary has an independent and unqualified right to sue and seek redress for ERISA violations on the basis that ERISA plans significantly affect the national public interest. A private litigant's settlement does not bar a Secretary's independent action to address ERISA violations; it is well-established that the government is not bound by private litigation when the government's action seeks to enforce a federal statute that implicates both public and private interests. Endorsement of a private settlement attempting to bar the Secretary's action in a particular case would effectively undermine the ERISA enforcement scheme carefully constructed by Congress.

**Counsel:** **[*1]** For Michael L. Ferguson, Myrl C. Jeffcoat, Deborah Smith, on behalf of the DST SYSTEMS, INC. 401(K) PROFIT SHARING PLAN, Plaintiffs: Chiharu Gina Sekino, Shepherd, Finkelman, Miller & Shah, LLC, San Diego, CA; James Edward Miller, Shepherd, Finkelman, Miller & Shah, LLP, Chester, CT; Kolin C. Tang, Shepherd, Finkelman, Miller & Shah, LLC, New York, NY; Monique Olivier, PRO HAC VICE, Duckworth Peters Lebowitz Olivier LLP, San Francisco, CA; Nathan C. Zipperian, Shepherd, Finkelman, Miller & Shah, LLP, Fort Lauderdale, FL; Ronald Scott Kravitz, Shepherd, Finkelman, Miller & Shah, LLP, San Francisco, CA; Laurie Rubinow, Shepherd, Finkelman, Miller & Shah, LLC, Chester, CT.

For Ruane Cuniff & Goldfarb Inc., Defendant: Frank Walter Olander, Robert J. Ward, Ronald E. Richman, LEAD ATTORNEYS, Schulte Roth & Zabel LLP (NY), New York,

Ferguson v. Ruane Cuniff & Goldfarb Inc.

NY.

For DST Systems, Inc., The Advisory Committee of the DST Systems, Inc. 401(K) Profit Sharing Plan, The Compensation Committee of the Board of Directors of DST Systems, Inc., Defendants: Scott D. Musoff, LEAD ATTORNEY, Alexander C Drylewski, Skadden, Arps, Slate, Meagher & Flom LLP (NYC), New York, NY; James R. Carroll, Skadden, Arps, Slate, Meagher & Flom, L.L.P., **[\*2]** Boston, MA; Michael S. Hines, Skadden, Arps, Slate, Meagher & Flom LLP (MA), Boston, MA.

For Stephanie Ostrander, individually and as representative of a class of similarly situated persons, Intervenor Plaintiff: Joshua B Katz, LEAD ATTORNEY, Kent, Beatty & Gordon, LLP, New York, NY; Andrew Schermerhorn, PRO HAC VICE, The Klamann Law Firm, Kansas City, MO.

**Judges:** ANDREW L. CARTER, JR., United States District Judge.

**Opinion by:** ANDREW L. CARTER, JR.

# Opinion

## MEMORANDUM AND ORDER

Michael L. Ferguson, Myrl C. Jeffcoat and Deborah Smith collectively, ("Plaintiffs"), individually and on behalf of the DST Systems, Inc. 401(k) Profit Sharing Plan (the "Plan"), bring this action under 29 U.S.C. § 1132 against Ruane Cuniff & Goldfarb Inc. ("RCG"); DST Systems, Inc. ("DST"); The Plan's Advisory Committee; and the Compensation Committee of the Board of Directors of DST Systems, Inc.; (collectively, "Defendants"), for breach of fiduciary duties and other violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq. Pending before the Court are Plaintiffs' motions for leave to file a third amended complaint, class certification, and preliminary approval of the class action settlement agreements. For the reasons that follow, Plaintiffs' motions to file a third amended complaint and for **[\*3]** class certification are granted. Plaintiffs' motions for preliminary approval of the class action settlements are denied.

## BACKGROUND

DST is a global provider of technology-based information processing and servicing solutions who offered its employees the opportunity to participate in the DST Systems, Inc. 401(k)

Profit Sharing Plan (the "Plan") — a vehicle for retirement savings designated to produce retirement income for its participants. SAC ¶ 12. Plaintiffs are Plan Participants. *Id.* at ¶¶ 9-11.

The Plan is a defined-contribution retirement plan, funded through employee-directed contributions, DST matching contributions, and DST's voluntary profit-sharing contributions. SAC ¶¶ 4,12. The Plan was originally composed of two components: 1) a Profit Sharing Account ("PSA"), in which DST made contributions on behalf of employees and delegated investment management responsibilities to RCG; and 2) a 401(k) participant-directed portion of the Plan, where participants allocate the employee and employer matching contributions into any investment option available under the Plan as determined by the Advisory Committee ("401(k) portion of the plan"). *Id.* at ¶¶ 4 n.1, 22-23, 27.

DST is the Plan's **[\*4]** sponsor, administrator, and a designated fiduciary. SAC ¶ 14. The Advisory Committee and Compensation Committee are named fiduciaries under the Plan, and DST administered the Plan through the Compensation and Advisory Committees. *Id.* at ¶¶ 14-16, 18.

With respect to the PSA portion of the Plan, Plaintiffs allege, *inter alia*, that RCG breached its fiduciary duties under ERISA by concentrating an enormous and imprudent amount of the Plan assets in the Valeant Pharmaceuticals International Inc. stock ("VRX"), which caused the Plan to suffer over $100 million in losses when VRX's share price declined in 2015. SAC ¶¶ 5, 24-50. As Plan fiduciaries, the DST Defendants had a duty to monitor RCG, and thus breached that duty by both failing to protect the Plan from RCG's imprudent investment strategy and even supporting RCG when its strategy imploded. *Id.* at ¶¶ 51-53, 55. According to Plaintiff, the DST Defendants engaged in such nonfeasance and malfeasance to preserve its longstanding financial relationship with RCG. *Id.* at ¶¶ 35-40.

### Proposed Class

Plaintiffs seek to certify and be appointed as representatives of the Class that includes:

> All participants and beneficiaries of the DST Systems, Inc. **[\*5]** 401(k) Profit Sharing Plan from March 14, 2010 through July 31, 2016 (the "Class Period"), excluding the Defendants and all other individuals who are or have ever been a member of the Advisory Committee of the DST Plan, the Compensation Committee of the Board of Directors of DST or

Ferguson v. Ruane Cuniff & Goldfarb Inc.

otherwise served as fiduciaries of the DST Plan during the Class Period.
See Pls.' Class Certification Mem. of Law at 7.

Plaintiffs allege that the Class includes more than 9,000 members and joinder is impracticable; there are questions of law and fact common to the Class regarding Defendants' fiduciary duties to the Plan and the participants and beneficiaries; Plaintiffs' claims are typical of the class because they were all participants in the plan during the period and all Participants in the Plan were harmed by Defendants' misconduct; and Plaintiffs are adequate representatives of the Class because they were Participants in the Plan during the Class Period and have no conflicts with the Class. *See* Pls.' Class Certification Mem. of Law; Proposed Third Am. Compl. at ¶¶ 61-64.

Moreover, Plaintiffs allege that prosecution of separate actions by individual participants and beneficiaries would create the risk **[*6]** of inconsistent and varying adjudications, and adjudications by individual participants and beneficiaries would be dispositive of the interests of the participants and beneficiaries not parties to the adjudications, or would impede those participants' and beneficiaries' ability to protect their interests. Therefore, Plaintiffs allege the action should be certified as a class action pursuant to Rules 23(a) and 23(b)(1). *Id.*

**PROCEDURAL HISTORY**

Plaintiffs filed their Original Complaint on September 1, 2017, an Amended Complaint on November 20, 2017, the Second Amended Complaint on November 5, 2018, and leave to file the Third Amended Complaint on April 10, 2020. (ECF Nos. 1, 9, 82, 124). Plaintiffs moved to certify the class on April 10, 2020 (ECF No. 126), and on January 12, 2021, Plaintiffs moved for preliminary approval of the class action settlement agreements with the RCG and DST defendants. (ECF Nos. 265, 266.)

The RCG Defendants opposed both the motion to file a third amended complaint and the motion for class certification. (ECF Nos. 138, 140.) Similarly, the arbitration claimants opposed the motion for class certification and the motions for preliminary approval of the class action settlement agreements. **[*7]** (ECF Nos. 183, 271), and the Secretary of Labor opposed the injunctive provisions in Plaintiffs' class action settlement agreement. (ECF No. 269.)

On March 4, 2021, the Second Circuit Court of Appeals found that a similar plaintiff's breach of fiduciary duty claim brought on behalf of the plan did not relate to his employment and

thus did not require arbitration under the terms of the arbitration agreement. *Cooper v. Ruane Cunniff & Goldfarb Inc.*, 990 F.3d 173, 175 (2d Cir. 2021). The Court then denied Plaintiffs' motions for class certification and to file a third amended complaint without prejudice. The Court gave Plaintiffs an opportunity to refile their motions, and directed the parties to address what, if any, effect the Copper opinion has on the motion for class certification and motion for leave to file a third amended complaint. Plaintiffs then refiled their motions on April 5, 2021. (ECF Nos. 298, 300.) The arbitration Claimants opposed the motions, and the DST Defendants filed a motion in support of class certification on May 3, 2021. (ECF Nos. 304, 306.) Plaintiffs replied on May 10, 2021. (ECF No. 309.) The Court considers these motions fully briefed.

**DISCUSSION**

**I. Standard of Review**

**HN1[↑]** Under Rule 23, members of a class may sue as representational parties **[*8]** "only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). "Said differently, in order to qualify for class certification, plaintiffs in the proposed class must demonstrate that they satisfy four requirements: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244 (2d Cir. 2007).

**HN2[↑]** The third factor, typicality, "requires that the claims of the class representatives be typical of those of the class and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." Id. at 245 (internal quotation marks omitted). Part of the typicality requirement (or a separate requirement implicit in Rule 23(a), as it is sometimes viewed, *see* 1 Newberg on Class Actions § 3:1 (5th ed., June 2019 update)) is that the proposed class representatives be members of the class they seek to represent. *See id.*; *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348-49, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011). In addition, **[*9]** there is an "implied requirement of ascertainability . . ., which demands that a class be sufficiently definite so that it is administratively feasible for the court to

Ferguson v. Ruane Cuniff & Goldfarb Inc.

determine whether a particular individual is a member." *In re Petrobras Sec.*, 862 F.3d 250, 260 (2d Cir. 2017) (internal quotation marks omitted). In the Second Circuit, that "requires only that a class be defined using objective criteria that establish a membership with definite boundaries." *Id.* at 264.

**HN3**[⬆] If the requirements of Rule 23(a) are met, "the district court must also find that the action can be maintained under Rule 23(b)(1), (2), or (3)." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011). Plaintiffs need establish only one basis for certification under Rule 23(b). *See Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017).

Here, Plaintiffs seek to certify the class under Rule 23(b)(1), "where individual adjudications 'as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.'" *Wal-Mart*, 564 U.S. at 361 n.11 (quoting Rule 23(b)(1)(B)). The Court shall address each element in turn.

**II. The Second Circuit's Decision in Cooper**

As an initial matter, the Court finds that the Second Circuit's decision in *Cooper* made clear that the claims at issue in this matter are not covered by the arbitration agreement. In *Cooper*, the Second Circuit [*10] found that Plaintiff's claim for breach of fiduciary duty on behalf of the plan did not relate to his employment and thus did not require arbitration under the terms of the arbitration agreement. *Cooper*, 990 F.3d at 173.

Here, the arbitration claimants put forth several arguments. The arbitration claimants argue that the Second Circuit did not have the opportunity to consider the plan's adoption of the arbitration agreement which states that "the arbitration policy applies to all claims arising out of or relating to the Plan", and since the agreement was adopted, *Cooper* is inapposite. Arbitration Claimants' Mem. of Law at 3-5. The Arbitration claimants further argue that they are not seeking to bring claims on behalf of the plan. Rather, the arbitration claimants argue that they are asserting individual claims in arbitration for the fiduciary breaches that damaged the value of their individual plan assets in their defined contribution plans. *Id.*

The Court finds both of these arguments unavailing. The arbitration provision that RCG and DST used to compel arbitration is the arbitration provision that was before the Second Circuit as well as the arbitration provision that is at issue in this matter. Thus, the [*11] Court is not in the position to question what was before the Second Circuit, and the Court does not find that the Second Circuit applied a countertextual reading to the arbitration agreement as the Arbitration Claimants suggest.

Additionally, even if the Court were to consider the Plan's adoption of the amended Arbitration Agreement, the Court would still find that claims for fiduciary breach are not covered by the Arbitration Agreement. The Arbitration Claimants' assertion that the adopted language bars class certification runs afoul of *Coan v. Kaufman*, 457 F.3d 250 (2d Cir. 2006), which requires parties suing on behalf of the plan to demonstrate their suitability to serve as representatives of the interests of other plan stakeholders. Thus, as the Second Circuit stressed in *Cooper*, if the Court were to take the Arbitration Claimants' version of the Arbitration Agreement, it is unclear how "an employee can bring an ERISA fiduciary claim that satisfies *Coan*'s adequacy requirement, while concurrently applying with the agreement[.]"

Moreover, while *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 256, 128 S. Ct. 1020, 169 L. Ed. 2d 847 (2008) authorizes recovery for fiduciary breaches that "impair the value of plan assets in a participant's individual account," these claims are still on behalf of the plan. *LaRue* did not expand [*12] § 502(a)(2) to allow individual claims that are not based on losses to plan assets. **HN4**[⬆] In fact, the Court explicitly warned that "§502(a)(2) does not provide a remedy for individual injuries distinct from plan injuries . . . ." *See id.* at 256. Thus, as previously stated, the Court finds that the Second Circuit's decision in *Cooper* made clear that the claims at issue in this matter are not covered by the Arbitration Agreement.

**III. Rule 23(a)**

The Court shall next address Plaintiffs' class certification motion. Plaintiffs seek to certify and be appointed as representatives of the Class that includes:

> All participants and beneficiaries of the DST Systems, Inc. 401(k) Profit Sharing Plan from March 14, 2010 through July 31, 2016 (the "Class Period"), excluding the Defendants and all other individuals who are or have ever been a member of the Advisory Committee of the DST Plan, the Compensation Committee of the Board of Directors of DST or otherwise served as fiduciaries of the DST Plan during the Class Period.

**i. Numerosity**

Ferguson v. Ruane Cuniff & Goldfarb Inc.

**HN5**[⬆] The numerosity requirement is met if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Although the practicality of joinder "depends on all the circumstances surrounding a case, not on mere **[\*13]** numbers," the Second Circuit has stated that "courts are likely to conclude that the numerosity requirement is satisfied when the class comprises 40 or more members." _Novella v. Westchester Cty._, 661 F.3d 128, 143-44 (2d Cir. 2011) (internal quotation marks omitted); _see, e.g._, _Shahriar v. Smith & Wollensky Rest. Grp._, Inc., 659 F.3d 234, 252 (2d Cir. 2011) (numerosity requirement is met for class of 275 people); _Moreno v. Deutsche Bank Americas Holding Corp._, No. 15 Civ. 9936, 2017 U.S. Dist. LEXIS 143208, 2017 WL 3868803, at \*4 (S.D.N.Y. Sept. 5, 2017) (numerosity requirement met in derivative ERISA suit where the plan had 22,000 participants and 10,000 former participants).

Here, Plaintiffs allege that the class consists of over 9,000 members. Therefore, Because the class here consists of potentially thousands of members, the numerosity requirement is plainly met.

### ii. Commonality

**HN6**[⬆] Next, the "commonality requirement is met if plaintiffs' grievances share a common question of law or of fact." _Central States II_, 504 F.3d at 245 (internal quotation marks omitted). "In general, the question of defendants' liability for ERISA violations is common to all class members because a breach of a fiduciary duty affects all participants and beneficiaries." _In re Glob. Crossing Sec. & ERISA Litig._, 225 F.R.D. 436, 452 (S.D.N.Y. 2004) (internal quotation marks omitted); _see also_ _In re Marsh ERISA Litig._, 265 F.R.D. 128, 142-43 (S.D.N.Y. 2010) ("By their very nature, ERISA actions often present common questions of law and fact, and are therefore frequently certified as class actions.").

Here, the questions of law and fact — including "(1) whether Defendants **[\*14]** were fiduciaries of the Plan; (2) whether Defendants breached their fiduciary duties; (3) whether the Plan and its participants and beneficiaries were injured by Defendants' breaches; and (4) whether the Class is entitled to damages and, if so, the proper measure of damages" — are "common questions [that] satisfy Plaintiffs' burden under Rule 23(a)(2)." _In re Marsh_, 265 F.R.D. at 143; _see_ SAC ¶ 72; _see also_ _Moreno_, 2017 U.S. Dist. LEXIS 143208, 2017 WL 3868803, at \*4 ("Typically, the question of defendants' liability for ERISA violations is common to all class members."). Accordingly, the commonality requirement is met here.

### iii. Typicality

**HN7**[⬆] The third Rule 23(a) requirement — typicality — is satisfied when "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." _Central States II_, 504 F.3d at 245 (internal quotation marks omitted). In many contexts, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." _Wal-Mart_, 564 U.S. at 349 n.5. In ERISA breach of fiduciary duty cases, however, courts sometimes break the typicality requirement into three elements. _See, e.g._, _Moreno_, 2017 U.S. Dist. LEXIS 143208, 2017 WL 3868803, at \*7; _see also_ _Cunningham v. Cornell Univ._, No. 16 Civ. 6525, 2019 U.S. Dist. LEXIS 10357, 2019 WL 275827, \*7 (S.D.N.Y. Jan. 22, 2019) (breaking down into first two components). The first element is that the claims largely "arise from the same course of events — the[ parties'] participation in the Plan." _Moreno_, 2017 U.S. Dist. LEXIS 143208, 2017 WL 3868803, at \*7. Second, **[\*15]** plaintiffs must make "similar legal arguments to prove liability — that Defendants mismanaged the Plan in violation of ERISA." Id. The third element is, effectively, that each plaintiff invested in at least one of the subject funds. _See id._

The Arbitration Claimants and Canfield and Mendon Claimants argue that the named Plaintiffs' claims are atypical of class as they are not bound by the arbitration agreement and thus cannot represent the absent class members, the majority of which are bound by arbitration agreements and/or currently in arbitration proceedings.

Here, Plaintiffs' claims are typical of the class. Notably, _Cooper_ made clear that the claims at issue in the matter are not covered by the arbitration agreement. Thus, while a significant portion of the proposed class—approximately 95% according to the Arbitration Claimants—were subject to the arbitration agreement and/or are currently engaged in arbitration proceedings, this, alone, does not defeat Plaintiffs' typicality arguments.[1]

As the arbitration agreement is not a barrier to typicality, the Arbitration Claimants are not in a different position than the named Plaintiffs because the arbitration provision that they rely **[\*16]** on was found not to relate to their employment and

---

Ferguson v. Ruane Cuniff & Goldfarb Inc.

thus did not require arbitration under the terms of the agreement. Additionally, the Arbitration Claimants do not have defenses that the named Plaintiffs cannot argue on their behalf, and there is no circumstance where the arbitration provisions would be applicable to the Arbitration Claimants and not applicable to the named Plaintiffs.

**HN8[**⬆**]** The typicality requirement 'is often met in putative class actions brought for breaches of fiduciary duty under ERISA." *In re Marsh*, 265 F.R.D. at 143 (citing *Koch v. Dwyer*, 2001 U.S. Dist. LEXIS 4085, 2001 WL 289972, at *3 (S.D.N.Y. Mar. 23, 2001)); *see also LARRY W. JANDER, RICHARD J. WAKSMAN, & all other individuals similarly situated, Plaintiffs, v. RETIREMENT PLANS COMMITTEE OF IBM, RICHARD CARROLL, MARTIN SCHROETER, & ROBERT WEBER, Defendants.*, No. 15 CV 3781, 2021 U.S. Dist. LEXIS 136958, 2021 WL 3115709, at *5 (S.D.N.Y. July 22, 2021). Typicality requires a "common thread linking the proposed class members," *see In re J.P. Morgan Stable Value Fund ERISA Litig.*, No. 12 CV 2548, 2017 U.S. Dist. LEXIS 59264, 2017 WL 1273963, at *9 (S.D.N.Y. Mar. 31, 2017), and the common thread here is that RCG breached its fiduciary duties under ERISA by concentrating an enormous and imprudent amount of the Plan assets in the VRX, and as Plan fiduciaries, the DST Defendants had a duty to monitor RCG, and thus breached that duty by failing to protect the Plan from RCG's investment strategy. *Id.* at ¶¶ 51-53, 55. *See Robidoux v. Celani*, 987 F.2d 931, 936-937 (2d Cir. 1993)). "When it is alleged that **[*17]** the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims;" *see also Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982). "The commonality and typicality requirements of Rule 23(a) tend to merge." Thus, for the reasons discussed in reviewing plaintiffs' commonality arguments, plaintiffs have satisfied the typicality requirement.

**iv. Adequacy of Representation**

**HN9[**⬆**]** "Generally, adequacy of representation entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000). There is "no simple test for determining if a class will be adequately represented by a named plaintiff." *In re LILCO Sec. Litig.*, 111 F.R.D. 663, 672 (E.D.N.Y. 1986). "Each case must be approached on an individual basis." *Id.* The Court should consider "the

representative's understanding and involvement in the lawsuit," "the willingness to pursue the litigation," and "any conflict between the representative and the class." *Id.* (citing *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 562-63 (2d Cir. 1968). The analysis required for Rule 23(a)(4)'s adequacy requirement is analogous to that required for **[*18]** typicality: the class representative must "fairly and adequately protect the interest of the class." FED. R. CIV. P. 23(a)(4); *Gen. Tel. Co. of Sw.*, 457 U.S. at 157, n. 13.

Plaintiffs allege that there are no conflicts with other class members and that their interests with the class are aligned by the very nature of the claims that Plaintiffs bring, seeking to recover damages on behalf of the plan. The Arbitration Claimants argue that Plaintiffs do not represent the interest of the class as they have a right to arbitrate, choose their own counsel, and opt out of any class and have their own day in Court. Arbitration Claimants Mem. of Law at 16-19.

As the Court discussed *Supra*, all members of the proposed Class allege claims arising from the same conduct, that is that RCG breached its fiduciary duties under ERISA by concentrating an enormous and imprudent amount of the Plan assets in the VRX, and as Plan fiduciaries, the DST Defendants had a duty to monitor RCG, and thus breached that duty by both failing to protect the Plan from RCG's investment strategy. *Id.* at ¶¶ 51-53, 55. These claims would potentially vindicate the interests of the entire Class. While the Arbitration Claimants argue that they have a right to arbitrate, as well **[*19]** as this Court has found that the claims at issue here are not covered by the arbitration agreement. Additionally, as the Court will discuss below, this class is properly certified under Rule 23(b)(1). **HN10[**⬆**]** Therefore, Because Rule 23(b)(1) does not provide opt-out protections, class actions brought under this rule "are often referred to as 'mandatory' class actions." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 833 n. 13, 119 S. Ct. 2295, 144 L. Ed. 2d 715 (1999). Thus, the Court cannot credit the Arbitration Claimants' arguments regarding the right to opt out of the class action. The Adequacy of Representation requirement is plainly met.

**IV. Rule 23(b)(1)**

**HN11[**⬆**]** As Plaintiffs have satisfied the requirements of Rule 23(a), the Court is required to assess the class under Rule 23(b)(1) for "adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications." Fed. R. Civ. P. 23(b)(1)(B); *see* Pls.' Class Certification Mem. of Law at 16. **HN12[**⬆**]** The

Ferguson v. Ruane Cuniff & Goldfarb Inc.

"derivative nature of ERISA § 502(a)(2) claims makes them paradigmatic examples of claims appropriate for certification as a Rule 23(b)(1) class . . . because any decision regarding whether the defendants breached their fiduciary duties would necessarily affect the interests of other participants." 2 Newberg on Class Actions § 4:21 (5th ed., June 2019 update) **[*20]** (internal quotation marks omitted); *see also Coan, 457 F.3d at 261*("[A] breach of trust by . . . [a] fiduciary . . . similarly affecting the members of a large class of beneficiaries . . . [is] among the classic examples of Rule 23(b)(1)(B) class actions." (internal quotation marks omitted)); *In re Glob. Crossing, 225 F.R.D. at 453* ("Because of ERISA's distinctive representative capacity and remedial provisions, ERISA litigation of this nature presents a paradigmatic example of a (b)(1) class." (internal quotation marks omitted)).

As the requirements of Rule 23(a) are met, the class is properly certified under Rule 23(b)(1)(B). Plaintiffs purport to bring this action as a breach of fiduciary duty brought under § 1132(a)(2) on behalf of the Plan. The allegations in the Complaint intend to remedy fiduciary breaches and other misconduct on behalf of the Plan. Allowing multiple actions, each of which would seek similar or the same relief from the Defendants on behalf of the Plan, would potentially prejudice individual class members and would threaten to create "incompatible standards of conduct" for the Defendants. These are issues that Rule 23(b)(1) seeks to avoid. Because plaintiffs' allegations are brought with respect to breaches of fiduciary duties to the Plans as a whole, defendants' duties rise and fall **[*21]** with all plaintiffs. In sum, because the management of the Plans has an effect on all Plan-participants, the class is properly certified under Rule 23(a) and Rule 23(b)(1)(A) or 23(b)(1)(B). *See Clark v. Duke Univ., No. 16 CV 1044, 2018 U.S. Dist. LEXIS 62532, 2018 WL 1801946, at \*9 (M.D.N.C. Apr. 13, 2018); Sacerdote v. New York Univ., No. 16 CV 6284, 2018 U.S. Dist. LEXIS 23540, 2018 WL 840364 (S.D.N.Y. Feb. 13, 2018).*

### V. Plaintiffs' Motion to Amend

Plaintiffs seek leave to file a third amended complaint to add class allegations. As the Court granted Plaintiffs' motion for class certification, the Court grants Plaintiffs leave to file a third amended complaint only to the extent of adding class allegations. **HN13**[⬆] Under Rule 15(a)(2), the Court should "freely give" leave to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2).

### VI. Plaintiffs' Motion for Preliminary Approval of their

### Class Action Settlement with the RCG and DST Defendants

Plaintiffs move for preliminary approval of their Class Action Settlement with the RCG and DST Defendants. The Court will not approve the agreements. Plaintiffs' settlement agreements include an injunctive provision that states:

> In further aid of and to protect the Court's jurisdiction to review, consider, implement, and enforce the Settlement, the Court preliminarily enjoins and bars (i) Plaintiff releasors, the Secretary, and any Person purporting to represent them or pursue Claims on their behalf, and (ii) any participant who has been excluded **[*22]** from the Settlement Class, from bringing or prosecuting in any forum any Claim that arises from, relates to, or is connected with: (i) the conduct alleged in the Complaint.

While Plaintiffs argue that the purported bar order/injunction is a commonplace provision in class action settlements, the above provision is far more than a common bar order and cannot be approved by this Court. As the caselaw Plaintiffs cited in support of the provision explained, bar orders typically involve contribution and indemnification between settling defendants. The Court stated the following in *In re WorldCom, Inc. ERISA Litig., 339 F. Supp. 2d 561 (S.D.N.Y. 2004)*:

**HN14**[⬆] Because of the importance of settlement to our litigation system, and because an unlimited right to seek contribution would "surely diminish the incentive to settle," ... courts may approve provisions in settlement agreements that bar contribution and indemnification claims between the settling defendants and nonsettling defendants so long as there is a provision that gives the non-settling defendants an appropriate right of set-off from any judgment imposed against them. *In re Ivan F. Boesky Sec. Litig., 948 F.2d 1358, 1368-69 (2d Cir.1991).* Without the ability to limit the liability of settling defendants through bar orders "it is likely that no settlements could be reached." *Id. at 1369* **[*23]** . Nonetheless, "[a] settlement bar should not be approved unless it is narrowly tailored and preceded by a judicial determination that the settlement has been entered into in good faith and that no one has been set apart for unfair treatment." *Masters Mates, 957 F.2d at 1031.*

Plaintiffs' injunctive provision seeks to enjoin non-parties, including the Secretary of Labor, from bringing or prosecuting their claims. While Plaintiffs attempt to characterize this as a traditional bar order, it is plainly not. **HN15**[⬆] Section 502(a)(2) authorizes "the Secretary [of

Ferguson v. Ruane Cuniff & Goldfarb Inc.

Labor] . . . a participant, beneficiary, or fiduciary" to bring a "civil action" for breach of fiduciary duty, and Plaintiffs have failed to cite any case law in this circuit or otherwise that have approved such an overbroad provision in an ERISA Section 502(a)(2) case. Thus, approving the settlement's injunction provision would circumvent the Secretary's independent and unqualified right to sue and seek redress for ERISA violations on the basis that ERISA plans significantly affect the "national public interest." *See Herman v. South Carolina Nat'l Bank*, 140 F.3d 1413, 1423-25 (11th Cir.1998) (holding that a private litigant's settlement does not bar a Secretary's independent action to address ERISA violations; observing that it is well-established that the government is not bound **[*24]** by private litigation when the government's action seeks to enforce a federal statute that implicates both public and private interests); *Agway, Inc. Employees' 401(k) Thrift Inv. Plan v. Magnuson*, 409 F. Supp. 2d 136, 146 (N.D.N.Y. 2005) (stating that "endorsement of a private settlement attempting to bar the Secretary's action in a particular case would effectively undermine the ERISA enforcement scheme carefully constructed by Congress.") Accordingly, the Court denies Plaintiffs' motions for preliminary approval of the class action settlements. (ECF Nos. 265, 266.)

**CONCLUSION**

For the reasons set forth above, Plaintiff's motion for leave to file a third amended complaint is granted. (ECF No. 298.) Plaintiffs' motion for class certification pursuant to Rule 23 is granted. (ECF No. 300.) Additionally, Plaintiffs' motions for preliminary approval of the class action settlements are denied. (ECF Nos. 265, 266.) Likewise, the identical motion for preliminary approval of the class settlement in 20 CV 7092 (ECF No. 8) is denied for the reasons above.

**SO ORDERED**.

**Dated:** August 17, 2021

New York, New York

/s/ Andrew L. Carter, Jr.

**ANDREW L. CARTER, JR.**

**United States District Judge**

End of Document

ADD-22

# Exhibit 2

No *Shepard's* Signal™
As of: November 5, 2021 8:43 PM Z

# Cedeno v. Argent Trust Co.

United States District Court for the Southern District of New York

November 2, 2021, Decided; November 2, 2021, Filed

20-cv-9987 (JGK)

**Reporter**

2021 U.S. Dist. LEXIS 212926 *

RAMON DEJESUS CEDENO, individually and on behalf of a class of all other persons similarly situated, Plaintiffs, - against - ARGENT TRUST COMPANY et al., Defendants.

## Core Terms

arbitration, fiduciary, arbitration procedure, plan-wide, remedies, invalid, breaches, losses, arbitration agreement, individual account, arbitration provision, compel arbitration, authorizes, benefits, parties, waive

**Counsel:** **[*1]** For Ramon Dejesus Cedeno, individually and on behalf of a class of all other persons similarly situated, Plaintiff: Gregory Y. Porter, LEAD ATTORNEY, Ryan T. Jenny, Bailey & Glasser LLP, Washington, DC; Laura Babiak, Bailey & Glasser, Charleston, WV; Patrick Owen Muench, Bailey & Glasser, Chicago, IL.

For Ryan Sasson, Daniel Blumkin, Ian Behar, Strategic Financial Solutions, LLC, Duke Enterprises LLC, Twist Financial LLC, Blaise Investments LLC, Defendants: Jeremy Paul Blumenfeld, LEAD ATTORNEY, Morgan, Lewis & Bockius LLP (Philadelphia), Philadelphia, PA; Antonia Moran, Philadelphia, Philadelphia, PA.

For Argent Trust Company, Defendant: Lars C. Golumbic, LEAD ATTORNEY, Paul Rinefierd, Groom Law Group, Chartered, Washington, DC; Michael Joseph Prame, LEAD ATTORNEY, Groom Law Group, Washington, DC; Sarah Adams, Washington, DC.

**Judges:** John G. Koeltl, United States District Judge.

**Opinion by:** John G. Koeltl

## Opinion

**MEMORANDUM OPINION AND ORDER**

**JOHN G. KOELTL, District Judge:**

The plaintiff, Ramon Dejesus Cedeno, brought this putative class action alleging violations of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq., ("ERISA") by the defendants: Argent Trust Co., Ryan Sasson, Daniel Blumkin, Ian Behar, Duke Enterprises LLC, Twist Financial LC, Blaise Investments **[*2]** LLC, and Strategic Financial Solutions, LLC. Compl., ECF No. 17. The plaintiff sought to represent a class of the participants in his retirement plan. The defendants moved to compel individual arbitration and to stay the case. ECF No. 59. However, the arbitration agreement at issue in the retirement plan at issue, which is governed by ERISA, from seeking relief for the plan as a whole, a form of relief that is otherwise provided for by ERISA. Because this provision is invalid and is not severable from the arbitration provision in the plan, the motion to compel arbitration is **denied**.

**I.**

"In deciding motions to compel, courts apply a standard similar to that applicable for a motion for summary judgment." Nicosia v. Amazon.com, Inc., 834 F.3d 220, 229 (2d Cir. 2016).[1] Thus, a court should "consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits." Id. The Court must draw all reasonable inferences against the moving party. Id. In this case, there has been no discovery, and there is no

---

[1] For clarity, unless otherwise specified, this Memorandum Opinion and Order refers directly to sections of ERISA and the FAA, rather than to provisions of the United States Code, and uses the section symbol (§) to do so. It uses the word "section" to refer to sections of the Plan Document. Unless otherwise noted, in quotations from cases, this Memorandum Opinion and Order omits all alterations, brackets, citations, emphases, and internal quotation marks.

Cedeno v. Argent Trust Co.

dispute as to the following facts.

The plaintiff is an employee of Strategic Financial Solutions, LLC. Compl. ¶ 18. He **[\*3]** is a participant in its strategic employee stock ownership plan (the "Plan"), id., a type of retirement plan covered by ERISA, see § 407(d)(6). The Plan is a defined contribution plan which means that participants have individual accounts within the Plan from which their retirement benefits will be paid. Compl. ¶ 42.

In his complaint, the plaintiff alleges that the defendants breached their fiduciary duties under ERISA, thereby causing the Plan to suffer losses. Compl. ¶ 13. The complaint alleges that the defendant Argent Trust Co caused the Plan to buy shares of Strategic Family, Inc. for more than fair market value, thereby damaging the Plan and its participants, including the plaintiff. The complaint seeks to order each defendant to make good to the Plan the losses resulting from the breaches of ERISA and restore to the Plan any profits that the defendants made through use of the assets of the Plan. The complaint also seeks certain declaratory relief.

ERISA § 409(a) provides that:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to **[\*4]** the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

ERISA § 502(a)(2) provides that "[a] civil action may be brought . . . by the Secretary, or by a participant, beneficiary, or fiduciary for appropriate relief under [§ 409]."

The Plan, adopted in 2017, Compl. ¶ 18, is governed by an instrument called the Plan Document. Williams Decl. Ex. A, ECF No. 61-1. Section 17.10 of the Plan Document, entitled "Mandatory and Binding Arbitration," sets forth a procedure for resolving disputes, namely, the Arbitration Procedure, and includes three sections that are relevant to deciding this motion.

Section 17.10(b) provides that participants commit to "settl[ing] by binding arbitration" any claims arising out of the Plan, for breaches of the Plan, or for violations of ERISA. Section 17.10(g) provides that:

> If a . . . Claim is brought under ERISA section 502(a) (2)

to seek relief under ERISA section 409, the Claimant's remedy, if any, shall be limited to (i) the alleged losses to the Claimant's Accounts resulting from the alleged breach of fiduciary **[\*5]** duty, (ii) a pro-rated portion of any profits allegedly made by a fiduciary through the use of Plan assets where such pro-rated amount is intended to provide a remedy solely for the benefit of the Claimant's Accounts, or (iii) such other remedial or equitable relief as the arbitrator deems proper, so long as such remedial or equitable relief does not include or result in the provision of additional benefits or monetary relief to any Employee, Participant or Beneficiary other than the Claimant.

(emphasis added). The effect of section 17.10(g) is to limit an arbitration to providing a remedy solely with respect to a participant's individual account and to prevent the arbitrator from awarding any relief for the benefit of the Plan that goes beyond a benefit for the individual participant's account.

Section 17.10(h) in turn provides that:

> [Section] 17.10(g) shall . . . be a material and non-several term of the Arbitration Procedure. If an arbitrator(s) or a court of competent jurisdiction finds these requirements to be unenforceable or invalid, then the entire Arbitration Procedure shall be rendered null and void in all respects. Except as to the applicability and enforceability of the requirements of Section[] . . . 17.10(g), the arbitrator(s) **[\*6]** shall have exclusive authority to resolve any dispute or issue of arbitrability with respect to the Arbitration Procedure, including as to the jurisdiction of the arbitrator(s) or relating to the existence, scope, validity enforceability or performance of the Arbitration Procedure or any of its provisions. Any dispute or issue as to the applicability or validity of the requirements of Section[] . . . 17.10(g) shall be determined solely by [a court.]

The defendants now move to compel arbitration pursuant to section 17.10. In response, the plaintiff argues that section 17.10(g) is void, and that because it is not severable from section 17.10, the entire Arbitration Procedure must fail, and the motion to compel arbitration must be denied. The defendants do not dispute that section 17.10(h) renders section 17.10(g) inseverable from the arbitration requirement in the Plan, and indeed that is the best reading of that provision.

The parties also appear to agree that the Court, not the arbitrator, should decide the issue of the "applicability and enforceability" of section 17.10(g). The Plan Document expressly provides that the applicability and enforceability of section 17.10(g) is beyond the scope of the arbitration. Plan

Cedeno v. Argent Trust Co.

Document section 17.10(h). Thus, the Plan Document requires the Court to **[\*7]** decide the enforceability of the clauses.

## II.

The defendants argue that a participant in a defined contribution plan does not have the statutory right to seek plan-wide relief and is limited to relief for that participant's individual account. That argument is contrary to the text of ERISA as well as to well-established precedent.

ERISA § 409(a) provides that a fiduciary who breaches fiduciary duties "shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which has been made through use of assets of the plan by the fiduciary." In other words, ERISA provides for restitution of the entire loss (or disgorgement of the entire gain) to the plan. See also LaRue v. DeWolff, Boberg & Assocs., Inc., 552 U.S. 248, 261, 128 S. Ct. 1020, 169 L. Ed. 2d 847 (2008) (Thomas, J., concurring in the judgment).

ERISA § 502(a)(2) in turn provides that "[a] civil action may be brought . . . by the Secretary, or by a participant, beneficiary, or fiduciary for appropriate relief under [§ 409]." The "appropriate relief under [§ 409]" includes restitution of the entirety of the loss to the plan. Thus, under the plain text of ERISA, a participant has the right to bring a civil action to obtain restitution of the entire loss to the plan.

That **[\*8]** interpretation is confirmed by the structure of § 502(a). ERISA § 502(a)(1) authorizes suits by a "participant or beneficiary" for individual relief including to recover benefits due to the participant or beneficiary under the terms of the plan. ERISA § 502(a)(2) by contrast authorizes suits by "the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief" under § 409. And reparation of losses to the plan was a core concern of the draftsmen of § 409. LaRue, 552 U.S. at 254; Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 142, 105 S. Ct. 3085, 87 L. Ed. 2d 96 (1985).

The defendants rely on the Supreme Court's decisions in Russell and LaRue to argue that the plaintiff cannot obtain Plan-wide relief. In particular, they argue that LaRue stands for the proposition that an individual participant in a defined contribution plan can seek relief only for that individual's personal losses, to that person's individual account. That is an incorrect reading of LaRue.

Russell involved a defined benefit plan, meaning that it had

no individual accounts, and paid a fixed benefit. See LaRue, 552 U.S. at 255. The plaintiff was temporarily denied benefits under her plan. Russell, 473 U.S. at 136. Suing under § 502(a)(2), the plaintiff sought consequential damages that had arisen from the delay in paying her benefits. LaRue, 552 U.S. at 250. The Court denied her claim. Russell, 473 U.S. at 148. The Court first emphasized that, under § 409(a), "the potential personal liability of the **[\*9]** fiduciary is . . . 'to the plan.'" Id. at 140. The Court noted that the "draftsmen [of ERISA] were primarily concerned with the possible misuse of plan assets, and with the remedies that would protect the entire plan, rather than with the rights of an individual beneficiary." Id. at 142. And it concluded that "Congress did not intend that section to authorize any relief except for the plan itself." Id. at 144. Because the plaintiff's relief would accrue only to her, without any benefit to the plan, the Court found that she lacked a cause of action under § 502(a)(2). Id.

In LaRue, the plaintiff, a participant in a defined contribution plan, alleged that certain acts by the plan fiduciary had specifically depleted the plaintiff's own account within the plan. LaRue, 552 U.S. at 250-51.

Unlike in Russell, the Court found that the plaintiff did have a cause of action under § 502(a)(2):

> [A]lthough § 502(a)(2) does not provide a remedy for individual injuries distinct from plan injuries, that provision does authorize recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account.

Id. at 256. LaRue reiterated the foundations of Russell: the language of § 409(a) emphasizes relief to the plan, and the legislative purpose was to prevent "misuse and mismanagement of plan assets by **[\*10]** plan administrators." Id. at 254 (quoting Russell, 473 U.S. at 140, 142). And the Court stressed that it drew no distinction between breaches that "diminishe[d] plan assets payable to all participants and beneficiaries, or only to persons tied to particular individual accounts." Id. at 256. Far from constraining relief under § 409(a) in a defined contribution plan, LaRue makes clear that relief is available wherever it would advance the protection of the entire plan.[2]

---

[2] The defendants point to Justice Stevens's statement in LaRue that "the 'entire plan' language from Russell which appears nowhere in § 409 or § 502(a)(2) does not apply to defined contribution plans." LaRue, 552 U.S. at 256. However, that statement was made in the context of a paragraph that made it clear that fiduciaries had liability for losses in an individual account in a defined contribution plan. It

Cedeno v. Argent Trust Co.

Consistent with this interpretation, courts, including the Court of Appeals for the Second Circuit, have granted plan-wide relief in the context of defined contribution plans such as the one at issue in this case. See, e.g., Browe v. CTC Corp., No. 19-677-cv, 2021 U.S. App. LEXIS 29417, 2021 WL 4449878, at *14 (2d Cir. Sept. 29, 2021); Brundle ex rel. Constellis Emp. Stock Ownership Plan v. Wilmington Tr., N.A., 919 F.3d 763, 781 (4th Cir. 2019), as amended (Mar. 22, 2019); Perez v. Bruister, 823 F.3d 250, 258 (5th Cir. 2016).

In short, the defendants' contention that ERISA does not confer a right to a plan-wide remedy for a participant in a defined contribution plan who claims that fiduciaries breached their duties to the plan is without merit.[3]

## III.

Despite the ERISA-conferred right to a plan-wide remedy, section 17.10(g) provides that the plaintiff cannot recover losses to the entire Plan. Section 17.10(g) purports to limit the available remedies that ERISA explicitly provides. This provision is invalid and unenforceable because it purports to limit the available [*11] remedies that ERISA explicitly provides.

The Supreme Court has stated that prospective waivers of statutory rights are impermissible. See, e.g., Am. Express Co. v. Italian Colors Rest., 570 U.S. 228, 236, 133 S. Ct. 2304, 186 L. Ed. 2d 417 (2013) (expressing a "willingness to invalidate . . . prospective waiver[s] of a party's right to pursue statutory remedies"); Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 637 n.19, 105 S. Ct. 3346, 87 L. Ed. 2d 444 (1985). The comments in Italian Colors and Mitsubishi were dicta because in neither case was the Court faced with a contractual provision that explicitly prevented the pursuit of a statutory remedy. The Supreme Court has, however, invalidated contractual provisions that purported to waive statutory rights. See, e.g., Alexander v. Gardner-Denver Co., 415 U.S. 36, 51, 94 S. Ct. 1011, 39 L. Ed. 2d 147 (19/4) (holding that Title VII rights may not be

prospectively waived).[4]

The Court of Appeals for the Seventh Circuit has explicitly held that a plaintiff's right to a plan-wide remedy under ERISA §§ 409(a) and 502(a) (2) cannot be prospectively waived. See Smith v. Bd. of Dirs. of Triad Manufs., Inc., 13 F.4th 613, 621 (7th Cir. 2021). That decision is persuasive.[5] Therefore, the provision in section 17.10(g) of the Plan that precludes an individual participant from seeking Plan-wide relief is invalid because it seeks to waive prospectively the statutory remedies in ERISA § 409(a) that a Plan participant is entitled to seek under ERISA § 502(a)(2).

## IV.

There is nothing in the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq., ("FAA") that suggests a different result. In Epic Systems Corp. v. Lewis, 138 S. Ct. 1612, 200 L. Ed. 2d 889 (2018), the Supreme Court explained that courts should attempt [*12] to reconcile provisions of the FAA with any apparently conflicting statutes. Id. at 1619. Epic involved arbitration clauses that included waivers of the right to proceed collectively in certain arbitrations, which the employees argued conflicted with the collective activities protected by the National Labor Relations Act ("NLRA"), Id. at 1619-20. The Supreme Court noted that Congress

---

did not imply that a participant who suffered losses in an account in a defined contribution plan could not seek plan-wide relief for the breach of fiduciary duties that brought about the loss to the individual account.

[3] The Court of Appeals for the Second Circuit has made it clear that a plan participant in a defined contribution plan who seeks to recover benefits for the plan must proceed in a representative capacity on behalf of the plan. See Coan v. Kaufman, 457 F.3d 250, 261 (2d Cir. 2006). The plaintiff has done so here by bringing a purported class action.

[4] The plaintiffs also rely on Cooper v. Ruane Cunniff & Goldfarb Inc., 990 F.3d 173 (2d Cir. 2021). In Cooper, the Court of Appeals for the Second Circuit pointed out that, under Coan v. Kaufman, 457 F.3d 250 (2d Cir. 2006), a claim for recovery for a plan under ERISA §§ 502(a) (2) and 409(a) must be brought in a representative capacity. Cooper, 990 F.3d at 184. Because the agreement in that case prevented such collective actions, the agreement made it impossible to pursue remedies provided for by the statute. Id. The Court of Appeals found that arbitration should not be required. Id. at 185. However, this was an alternative holding, because the Court had already found that the agreement to arbitrate did not cover the dispute at issue. Id.

[5] In Dorman v. Charles Schwab Corp., 780 F. App'x 510 (9th Cir. 2019), the Court of Appeals for the Ninth Circuit held that a waiver of class arbitration was valid because LaRue "recognized that [§ 502(a) (2)] claims are inherently individualized when brought in the context of a defined contribution plan." Id. at 514. The Court of Appeals for the Seventh Circuit in Smith did not find this language controlling. Smith, 13 F.4th at 623. Smith is more persuasive than Dorman. Simply because a participant in a defined contribution plan may only be able to recover the losses in that participant's individual account does not mean that the participant cannot seek recovery for the total losses to be reimbursed to the plan as a whole, and there is nothing in LaRue that would prevent such recovery.

Cedeno v. Argent Trust Co.

"specifically directed [courts] to respect and enforce the parties' chosen arbitration procedures." Id. at 1621 (citing FAA §§ 3-4). Indeed, FAA § 4 specifically protects the "manner" of arbitration described in an arbitration agreement. Because collective proceedings are a "manner" of arbitration, the waiver of class or collective actions in an arbitration is a provision pertaining to the manner of arbitration, and to fail to enforce that waiver provision would be to disregard the FAA. Id. A very compelling reason was needed to disregard a statute. Id. at 1624. An irreconcilable conflict with another statute might have provided such a reason, but faced with a potential conflict, the Court had a "duty" to "strive 'to give effect to both" statutes. Id. at 1619, 1624 (citing Morton v. Mancari, 417 U.S. 535, 551, 94 S. Ct. 2474, 41 L. Ed. 2d 290 (1974)). Because the NLRA was susceptible to an interpretation that it did not protect the right to proceed collectively in an arbitration, and because **[*13]** that interpretation would remove any conflict with the FAA, the Court was obligated to adopt that interpretation. Id. at 1619.

In this case, there is in fact a clear statutory right for a participant to seek Plan-wide relief under §§ 409(a) and 502(a)(2), and there is no conflict with the FAA because there is no provision of the FAA that prevents a participant from seeking such remedies.

The FAA does not protect the remedies sought in arbitration. Unlike the clause at issue in Epic, section 17.10(g) is not a clause about the "manner" of arbitration, but a clause about the remedies available to a participant in an ERISA plan. There is nothing in the FAA that directs a Court to defer to the remedies provided in an arbitration agreement. See Smith, 13 F.4th at 622-23 ("[T]he conflict in need of harmonization is not between the FAA and ERISA; it is between ERISA and the plan's arbitration provision . . ."). The defect in the parties' arbitration agreement in this case is not that it does not provide for a collective or class action — an issue of the manner of arbitration protected by the FAA — but that it precludes a statutory remedy provided for by ERISA.

FAA § 2 expressly provides that an arbitration agreement is not enforceable "upon such grounds as exist at law or **[*14]** in equity for the revocation of any contract." A general principle of contract law is that a clause is invalid if it is contrary to law. Van Bergh v. Simons, 286 F.2d 325, 326 (2d Cir. 1961). In this case, section 17.10(g) cannot be severed from the rest of the arbitration procedure, because the parties so agreed in section 17.10(h). And section 17.10(g) is clearly contrary to law, because it attempts to limit remedies that ERISA expressly provides. As such, a general principle of contract law invalidates the arbitration provision, and the FAA authorizes the Court to refuse to enforce it.

## V.

While specific clauses of an arbitration agreement are sometimes excised to allow an arbitration to proceed, the parties in this case specifically provided that if the Court found that the elimination of a Plan-wide remedy was unlawful, then the entire arbitration provision should be stricken. Plan Document section 17.10(h). Neither party contends that the provision is severable. Such an agreement must be honored. See, e.g., Smith, 13 F.4th at 623. Therefore, the arbitration provision must be stricken and the request to compel arbitration must be denied.

## Conclusion

The Court has considered all of the arguments of the parties. To the extent not specifically addressed, the arguments are either moot or without merit. The **[*15]** plaintiff has the right under §§ 409(a) and 502(a)(2) to recover for the Plan as a whole. That right is not waivable. Section 17.10(g), which purports to waive that right, is therefore invalid. Under section 17.10(h), section 17.10(g) is inseverable from the Arbitration Procedure. Therefore, voiding section 17.10(g) voids the entire Arbitration Procedure. Accordingly, the motion to compel arbitration is **denied**. The Clerk is directed to close Docket Nos. 59, 67, and 69.

**SO ORDERED**.

**Dated: New York, New York**

**November 2, 2021**

/s/ John G. Koeltl

**John G. Koeltl**

**United States District Judge**

End of Document

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MATTHEW T. SHAFER, on behalf of himself and all others similarly situated, | Civil Action No. 1:20-cv-11047-PGG |
| Plaintiff, | |
| -against- | |
| MORGAN STANLEY, MORGAN STANLEY SMITH BARNEY LLC, MORGAN STANLEY COMPENSATION MANAGEMENT DEVELOPMENT AND SUCCESSION COMMITTEE, and John/Jane Does 1-20, | |
| Defendants. | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION**

On November 8, Plaintiff Matthew T. Shafer moved for leave to file a notice of supplemental authority in support of his opposition to the motion to compel arbitration filed by Defendants Morgan Stanley, Morgan Stanley Smith Barney LLC, and Morgan Stanley Compensation Management Development and Succession Committee (together, "Morgan Stanley"). This Court granted that motion on November 10, 2021. Morgan Stanley respectfully submits this response.

Plaintiff's claim for individual benefits is undisputedly arbitrable, and will afford him complete relief if he succeeds in showing that Morgan Stanley's deferred compensation program is an ERISA plan. *See* Dkt. 48 at 4-5; Dkt. 43 at 10 n.6. Plaintiff's arbitration agreement also undisputedly delegates questions of arbitrability to the arbitrator. *See* Dkt. 48 at 2; Dkt. 43 at 7-10. Each of these concessions requires the pending motion to compel to be granted, and the two cases plaintiff submits with his notice of supplemental authority alter neither of them.

The cases also do not support the arguments plaintiff offers them for.  Plaintiff contends that *Ferguson v. Ruane Cuniff & Goldfarb Inc.*, 2021 WL 3667979 (S.D.N.Y. Aug. 17, 2021), supports his argument that his non-benefit claims do not fall within the scope of the Arbitration Agreement.  *See* Dkt. 52-1 at 2.  But the *Ferguson* court simply adopted the Second Circuit's ruling in *Cooper v. Ruane Cunniff & Goldfarb Inc.*, 990 F.3d 173, 175 (2d Cir. 2021), *see* 2021 WL 3667979, at *2-*3, which is inapposite for reasons Morgan Stanley has previously explained: *Cooper* considered a different kind of claim and different arbitration language.  *See* Dkt. 48 at 3-4; Dkt. 43 at 10 n.6.

Plaintiff also claims that both *Ferguson* and *Cedeno v. Argent Trust Co.*, 2021 WL 5087898 (S.D.N.Y. Nov. 2, 2021), support his argument that he has a right to litigate claims brought on behalf of the plan.  *See* Dkt. 52-1 at 2-3.  But unlike the plaintiffs in *Ferguson* or *Cedeno* or *Cooper*, plaintiff does not genuinely assert claims *on behalf of* an ERISA plan—rather, he seeks to recover benefits he claims are due *to* him, *from* the alleged plan.  This textbook claim for individual benefits is unquestionably arbitrable and these decisions do not suggest otherwise.  *See* Dkt. 48 at 4; Dkt. 43 at 10 n.6.  Moreover, and in any event, plaintiff is wrong to imply that the Second Circuit split from other courts of appeals to hold that fiduciary breach claims cannot be arbitrated.  While *Cooper* indicates that claims brought on behalf of a plan under ERISA § 502(a)(2) should afford the protections described in *Coan v. Kaufman*, 457 F.3d 250, 262 (2d Cir. 2006), those protections are not incompatible with arbitration and *Cooper* in no way holds to the contrary.  *See* Dkt. 48 at 4.

ADD-30

Dated: Washington, D.C.

November 16, 2021

Respectfully submitted,

O'MELVENY & MYERS LLP

By: /s/  Meaghan VerGow
Meaghan VerGow
Brian D. Boyle (*pro hac vice*)
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone:  (202) 383-5300
Facsimile:  (202) 383-5414
mvergow@omm.com
bboyle@omm.com

Pamela A. Miller
Karen Gillen
Times Square Tower
7 Times Square
New York, New York 10036
Telephone:  (212) 326-2000
Facsimile:  (212) 326-2061
pmiller@omm.com
kgillen@omm.com

*Attorneys for Defendants Morgan Stanley,*
*Morgan Stanley Smith Barney LLC, and*
*Morgan Stanley Compensation*
*Management Development and*
*Succession Committee*

ADD-31

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MATTHEW T. SHAFER, SHERI HAUGABOOK, PETER HEIDT, JEFFREY SHOVER, MACE TAMSE, GEORGE LIVANOS, MARK LOFTUS, JEFFREY SAMSEN, JEFFREY SHERESKY, STEVE SHERESKY, STEVE NADLER, AND SANDY JUKEL, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, | Civil Action No. 1:20-CV-11047 (PGG) |
| Plaintiff, | CLASS ACTION |
| vs. | |
| MORGAN STANLEY, MORGAN STANLEY SMITH BARNEY LLC, MORGAN STANLEY COMPENSATION MANAGEMENT DEVELOPMENT AND SUCCESSION COMMITTEE, and John/Jane Does 1-20, | |
| Defendants. | |

## PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT

Plaintiffs Matthew T. Shafer, Sheri Haugabook, Peter Heidt, Jeffrey Shover, Mace Tamse, George Livanos, Mark Loftus, Jeffrey Samsen, Jeffrey Sheresky, Steve Sheresky, Steve Nadler, and Sandy Jukel, on behalf of themselves and all others similarly situated, file this Class Action Complaint against Defendants Morgan Stanley, Morgan Stanley Smith Barney LLC ("MSSB") (together, "Morgan Stanley"), the Morgan Stanley Compensation Management Development and Succession Committee (the "Compensation Committee"), and John/Jane Does 1 thru 20, the individual committee members.[1]

---

[1]     On March 10, 2022, the Court granted Plaintiff Shafer's motion under Federal Rule of Civil Procedure 20(a)(1) to join Plaintiffs Haugabook, Heidt, Shover, and Tamse. (ECF No. 57.) Pursuant to Rule 15(a)(1), these Plaintiffs are exercising their right to amend to add Plaintiffs Livanos, Loftus, Samsen, Jeffrey Sheresky, Steve Sheresky, Nadler, and Jukel.

**INTRODUCTION**

1.      This is a class action under the Employee Retirement Income Security Act of 1974 ("ERISA") to recover the deferred compensation that financial advisors ("FAs") forfeited in violation of ERISA § 203(a), 29 U.S.C. § 1053(a), when they left Morgan Stanley.

2.      FAs' compensation is based on the revenue generated by their clients' investment activities, with Morgan Stanley automatically designating a portion of the very first dollar they earn as "deferred compensation" (the "FA Deferred Compensation Program").  Morgan Stanley allocates 75% of FAs' deferred compensation to the Morgan Stanley Compensation Incentive Plan (the "MSCIP"), which vests in six years (and previously vested in eight years), and 25% of their deferred compensation to the Morgan Stanley Equity Incentive Compensation Plan ("EICP"), which vests in four years.  Morgan Stanley causes FAs to forfeit their deferred compensation if they leave Morgan Stanley before these vesting dates (the "Cancellation Rule").

3.      The FA Deferred Compensation Program is an "employee benefit pension plan" under ERISA because it "results in a deferral of income by employees for periods extending to the termination of covered employment or beyond."  ERISA § 3(2)(A)(ii), 29 U.S.C. § 1002(2)(A)(ii).

4.      Specifically, the FA Deferred Compensation Program "results in a deferral of income" because FAs are paid for work (i.e., the revenue they generate) years after they perform the work.  The program also "results in" income being deferred "for periods extending to the termination of covered employment or beyond" because FAs receive their deferred compensation after their employment ends if they retire, become disabled, or go work for the government.

5.      Each of the Plaintiffs worked as an FA at Morgan Stanley and, when they left Morgan Stanley, Defendants invoked the Cancellation Rule to deny them the deferred compensation that they earned under the FA Deferred Compensation Program.

6.      Plaintiffs seek an Order from the Court under ERISA § 502(a)(3) declaring that the FA Deferred Compensation Program is subject to ERISA and that the Cancellation Rule violates ERISA's vesting and anti-forfeiture requirements. They seek the payment of their and the other class members' deferred compensation that was wrongfully forfeited. They also assert a claim against the Compensation Committee for breach of fiduciary duty under ERISA § 502(a)(2) and (a)(3) for applying the Cancellation Rule in violation of ERISA.  Alternatively, Plaintiffs seek an Order reforming the FA Deferred Compensation Program so that it complies with ERISA's vesting and anti-forfeiture requirements by, among other things, eliminating the Cancellation Rule. Plaintiffs also assert a claim under ERISA 502(a)(1)(B) to recover the benefits due to them and the other class members under the FA Deferred Compensation Program, as reformed.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and under 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA.

8.      This Court has personal jurisdiction over Defendants because they are headquartered, transact business, or reside in or have significant contacts with this District, and because ERISA provides for nationwide service of process.

9.      Venue is proper in this District under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all the violations of ERISA occurred in this District, and Defendants may be found in this District.  Venue is also proper in this District under 28 U.S.C. § 1391 because Defendants do business in this District, and a substantial part of the events or omissions giving rise to the claims asserted in this Complaint occurred within this District.

10.     Venue is also proper in this District because the MSCIP provides that any dispute arising in connection with the MSCIP shall be brought in the courts of New York.

**PARTIES**

**Plaintiffs**

11.     Plaintiff Matthew T. Shafer resides in the State of Florida.  He is a Certified Investment Management Analyst and a Certified Exit Planning Advisor, with more than 20 years of experience as a financial advisor.  Shafer worked as an FA at MSSB from 2009–2018.  When he left Morgan Stanley, he forfeited over $500,000 in deferred compensation as a result of the Cancellation Rule.

12.     Plaintiff Sheri Haugabook resides in the State of Georgia.  She has nearly 20 years of experience as a financial advisor.  Haugabook worked as an FA at MSSB from 2003–2017.  When she left Morgan Stanley, she forfeited over $80,000 in deferred compensation as a result of the Cancellation Rule.

13.     Plaintiff Peter Heidt resides in the State of Florida.  Heidt worked as an FA at MSSB from 2010-2020.  When he left Morgan Stanley, he forfeited over $100,000 in deferred compensation as a result of the Cancellation Rule.

14.     Plaintiff Jeffrey Shover resides in the State of Florida.  Shover worked as an FA at MSSB from 2009-2019.  When he left Morgan Stanley, he forfeited approximately $280,000 in deferred compensation as a result of the Cancellation Rule.

15.     Plaintiff Mace Tamse resides in the State of Florida.  Tamse worked as an FA at MSSB (or its predecessor) from 1996–2015. When he left Morgan Stanley, he forfeited approximately $250,000 in deferred compensation as a result of the Cancellation Rule.

16.     Plaintiff George Livanos resides in the State of North Carolina.  Livanos worked as an FA at MSSB from 2009–2016.  When he left Morgan Stanley, he forfeited approximately $150,000 in deferred compensation as a result of the Cancellation Rule.

17.     Plaintiff Mark Loftus resides in the State of Illinois.  Loftus worked as an FA at MSSB from 2009–2018.  When he left Morgan Stanley, he forfeited over $850,000 in deferred compensation as a result of the Cancellation Rule.

18.     Plaintiff Jeffrey Samsen resides in the State of New York.  Samsen worked as an FA at MSSB from 2013–2020.  When he left Morgan Stanley, he forfeited over $50,000 in deferred compensation as a result of the Cancellation Rule.

19.     Plaintiff Jeffrey Sheresky resides in the State of Connecticut.  Jeff Sheresky worked as an FA at MSSB from 2013–2020.  When he left Morgan Stanley, he forfeited over $230,000 in deferred compensation as a result of the Cancellation Rule.

20.     Plaintiff Steve Sheresky resides in the State of Connecticut.  Steve Sheresky worked as an FA at MSSB from 2013–2020.   When he left Morgan Stanley, he forfeited over $230,000 in deferred compensation as a result of the Cancellation Rule.

21.     Plaintiff Steve Nadler resides in the State of New York.  Nadler worked as an FA at MSSB from 2009–2018.   When he left Morgan Stanley, he forfeited over $800,000 in deferred compensation as a result of the Cancellation Rule.

22.     Plaintiff Sandy Jukel resides in the State of Florida.  Jukel worked as an FA at MSSB from 2009–2019.  When he left Morgan Stanley, he forfeited over $500,000 in deferred compensation as a result of the Cancellation Rule.

**Defendants**

23.    Defendant Morgan Stanley is a Delaware corporation with a principal place of business in New York, New York.  Morgan Stanley is a global financial services firm that, through its subsidiaries and affiliates, including MSSB, provides financial advisory services to clients.

24.    Defendant Compensation Committee is a committee of Morgan Stanley's Board of Directors formed to discharge the Board's responsibilities related to compensation and to "oversee plans for management development and succession."[2]   The Compensation Committee is an unincorporated association with its principal place of busines in New York.

25.    John and Jane Does 1-20 are the individual members of the Compensation Committee during the Class Period.

26.    Defendant Morgan Stanley Smith Barney LLC ("MSSB") is a Delaware limited liability company with its principal place of business in New York, New York.

## SUBSTANTIVE ALLEGATIONS

A.    **Morgan Stanley's Deferred Compensation Program for FAs.**

1.    **The FA Compensation System.**

27.    During all relevant times, the FA compensation structure is explained in a document titled "Financial Advisor/Private Wealth Advisor Compensation Plan" (the "FA Compensation Plan"), which Morgan Stanley publishes each year.  FAs receive a combination of salary and commissions on the revenue generated through their clients' investment activities.

28.    To calculate commissions, MSSB applies a specified percentage to the amount of revenue an FA generated.  *In re Morgan Stanley Smith Barney LLC Wage & Hour Litig.*, No. 2:11-

---

[2]    Compensation Committee Charter as of October 13, 2020, *available at* www.morganstanley.com/about-us-governance/comchart.

cv-3121, 2013 WL 6255697, at *1 (D.N.J. Dec. 4, 2013). Specifically, the FA's revenue is multiplied by a percentage, called a "Credit Rate," which is in a fixed schedule, called a "Grid," to determine how many "Total Credits" the FA earns as commissions each month.[3] *See*, *e.g.*, 2018 FA Compensation Plan at 2-3; 2015 FA Compensation Plan at 4.

29.    "Total Credits" consist of "Deferred Credits" and "Cash Credits." Deferred Credits are the FA's deferred compensation. Under the FA Compensation Plan, Morgan Stanley automatically designates a percentage of an FA's Total Credits each month—the "Deferral Ratio"—as Deferred Credits. 2018 FA Compensation Plan at 4; 2015 FA Compensation Plan at 5.

30.    The Deferral Ratio that Morgan Stanley applies is in a fixed schedule in the FA Compensation Plan, and depends on how much revenue FAs generated over the previous twelve-month period (e.g., the revenue generated between June 1, 2017, and May 31, 2018, dictates the ratio applied in June 2018). The Deferral Ratio requires FAs to defer a portion of their Total Credits—i.e., commissions—starting with the first dollar of revenue generated each month. The Deferral Ratios that applied in 2018 are shown below:

---

[3]    The applicable Credit Rate increases as FAs generate more revenue. The thresholds separating each Credit Rate are commonly referred to as "Hurdles" and are widely reported in the financial industry. *See*, *e.g.*, "2020 Comp: Morgan Stanley Raises Pay Hurdles, Intensifies Financial Plan Push," discussing how Morgan Stanley increased the Hurdle for FAs to receive a Credit Rate of 41% from $485,000 to $535,000 in 2020, *available at* https://advisorhub.com/2020-comp-morgan-stanley-raises-pay-hurdles-intensifies-financial-plan-push.

| Deferral Ratio Schedule | |
| Trailing 12-month Gross Revenue ($) | Deferral Ratio (%) |
| --- | --- |
| 5,000,000+ | 15.5 |
| 3,300,000–4,999,999 | 14.0 |
| 2,750,000–3,299,999 | 13.0 |
| 2,400,000–2,749,999 | 12.5 |
| 1,800,000–2,399,999 | 11.5 |
| 1,200,000–1,799,999 | 10.0 |
| 975,000–1,199,999 | 8.5 |
| 900,000–974,999 | 7.5 |
| 725,000–899,999 | 6.5 |
| 600,000–724,999 | 5.5 |
| 485,000–599,999 | 5.0 |
| 425,000–484,999 | 4.0 |
| 360,000–424,999 | 3.5 |
| 300,000–359,999 | 2.5 |
| 240,000–299,999 | 1.5 |
| 0–239,999 | 1.5 |

2018 FA Compensation Plan at 4.

31.     Each January, the total of an FA's monthly Deferred Credits from the previous calendar year are granted to the FA "in the form of a deferred compensation award." Morgan Stanley automatically allocates 75% of the award to the MSCIP as a "cash-based deferred compensation award scheduled to be paid approximately six years after the grant date." The other 25% is automatically allocated to the EICP "in the form of a restricted stock unit ("RSU") award that is scheduled to convert to shares of Morgan Stanley common stock approximately four years after the grant date . . ." *Id*. at 5.

32.     "The remaining terms and conditions of the deferred compensation awards, including termination of employment and [the Cancellation Rule]," are determined by the

Compensation Committee and "set forth in the applicable award documentation."  *Id.*; *see also* 2015 FA Compensation Plan at 5.

33.     The other part of an FA's Total Credits are called "Cash Credits," a reference to the cash component of the commissions they receive each month.  Cash Credits equal the Total Credits that remain after Morgan Stanley deducts an FA's Deferred Credits.  The formula is simple:

$$\text{Cash Credits} = \text{Total Credits} - \text{Deferred Credits}$$

34.     Unlike Deferred Credits, FAs receive Cash Credits only if the amount of their Cash Credits exceeds their salary for that month.  2018 FA Compensation Plan at 5; 2015 FA Compensation Plan at 5.

**2.     The MSCIP and EICP.**

**a.     The MSCIP.**

35.     Morgan Stanley sponsors the MSCIP.  MSCIP Plan Document at § 2(a)(i).  The MSCIP consists of several compensation programs for the employees of Morgan Stanley and its subsidiaries, including MSSB.  MSCIP Document at Preamble.  The deferred compensation that FAs earn through the FA Compensation Plan is one of the MSCIP's programs.

36.     The terms that apply to FAs are in the FA Compensation Plan, the MSCIP Plan document, and the Award Certificates that Morgan Stanley issues to FAs when they are granted deferred compensation awards.  2018 FA Compensation Plan at 5; MSCIP Plan Document at §§ 1, 5.

37.     The Compensation Committee administers the MSCIP.  It has the authority to "create, terminate, expand or limit programs" under the MSCIP, and to determine the eligibility criteria for each program's awards.  MSCIP Plan Document at Preamble and §§ 3, 8(a) and (b).

38.     FAs have individual, notional accounts in the MSCIP for each award they receive, i.e., they have an account for each year's deferred compensation.  FAs can invest their accounts in notional investments, like in a 401(k) plan, with the value of their accounts tracking the performance of the selected investments.  2017 Award Certificate at § 1.

39.     FAs' awards are subject to a "cliff vesting" date—called the "Scheduled Vesting Date"—chosen by the Compensation Committee.  2016 MSCIP Document at § 5.  The Scheduled Vesting Date for awards granted in January 2016 (based on Deferred Credits earned in 2015) was January 22, 2024, i.e., an 8-year vesting schedule.  MSCIP 2015 Award Certificate at §§ 2(a), 17(s).  Awards in subsequent years vested in six years.  *See*, *e.g.*, *id.*

40.     According to the MSCIP Plan Document, Morgan Stanley pays FAs their deferred compensation that is in the MSCIP.  MSCIP Plan Document at § 9 ("Amounts payable under the [MSCIP] shall be satisfied solely out of the general assets of Morgan Stanley . . . ."); MSSB Consolidated Statement of Financial Condition as of June 30, 2020, at 4 (listing FAs' deferred compensation in the MSCIP as a liability of MSSB).  Morgan Stanley makes the payment on the applicable Scheduled Distribution Date, which is typically the same day as the Scheduled Vesting Date, subject to certain exceptions described below.  2016 Award Certificate at §§ 17(s) and (t).  FAs pay the taxes due on their deferred compensation on the Scheduled Distribution Date, with Morgan Stanley withholding the requisite amounts.  MSCIP Plan Document at § 11; 2017 Award Certificate at § 2(b).

41.     An FA must be employed by Morgan Stanley on the Scheduled Vesting Date to receive an award.  If an FA's employment ends before that date, Defendants invoke the Cancellation Rule, "cancel[ing] immediately" all of the FA's MSCIP accounts so that the FA never receives his or her deferred compensation.  2017 Award Certificate at § 7.

42.     The MSCIP and the FA Deferred Compensation Program's Award Certificates contain several exceptions to the Cancellation Rule.  *Id*. at § 7(a).  The Cancellation Rule does not apply if an FA's employment ends because of a physical or mental incapacity (a "Disability").  If this occurs, the FA's accounts vest when the FA's employment with Morgan Stanley ends (i.e., before the Scheduled Vesting Date) and the FA still receives his or her deferred compensation on the Scheduled Distribution Date.  *Id*. at § 16(g).

43.     The Cancellation Rule also does not apply to an FA whose employment ends because of a lay off (an "Involuntary Termination").  If this occurs, the FA's accounts vest on the date of Involuntary Termination and the FA still receives her or his deferred compensation on the Scheduled Distribution Date.  *Id*. at § 4(c).

44.     FAs who end their employment with Morgan Stanley to work for a governmental department or agency (a "Governmental Service Termination") are also exempt the Cancellation Rule.  Their accounts vest and they receive their deferred compensation on the date of their Governmental Service Termination.  *Id*. at § 5.

45.     The Cancellation Rule also does not apply to FAs who retire from Morgan Stanley after reaching a specified age, attaining a certain number of years of service, or holding certain positions.  FAs who leave Morgan Stanley after reaching age 65 or age 55 with five years of service qualify for "Retirement."  *Id*. at § 3.  FAs who work in Morgan Stanley's Private Wealth Management division with more than twenty years of service or after age 50 that held certain jobs for a specified number of years can also qualify for "Full Career Retirement." *Id*. at § 13.  FAs whose employment ends because of Retirement or Full Career Retirement automatically vest in their accounts, and they receive their deferred compensation on the Scheduled Distribution Date. *Id*. at §§ 3(d), 16(j) and (r).

46.     FAs who end their employment to work for another brokerage firm or change careers do not receive their deferred compensation in the MSCIP because of the Cancellation Rule. MSCIP Plan Document at Preamble and §§ 16(d) and (p)(3), (4),

          **b.     The EICP**

47.     Morgan Stanley sponsors the EICP.   The EICP provides employees with compensation in the form of stock options, stock appreciation rights, and RSUs in Morgan Stanley common stock.  EICP Plan Document at § 2.

48.     FAs receive RSUs in the EICP in January of each year through their accumulation of Deferred Credits in the previous calendar year under the FA Deferred Compensation Program. Each RSU equals one share of Morgan Stanley common stock.  *Id*. at § 8.

49.     The Compensation Committee administers the EICP and has the authority to determine, among other things, when FAs' RSUs vest.  *Id*. at § 5.  FAs' RSUs vest in four years (e.g., RSUs granted in January 2020 vest in January 2024).

50.     On the Scheduled Vesting Date, an FA's RSUs are converted to shares of Morgan Stanley common stock (the "Scheduled Conversion Date").  FAs can receive their awards as shares of Morgan Stanley common stock or in cash based on the stock's fair market value on the Scheduled Conversion Date.  *Id*. at § 8.  FAs pay taxes on their deferred compensation in the EICP on the Scheduled Vesting Date by having Morgan Stanley withhold the amount of shares or cash necessary to satisfy the tax obligation.  *Id*. at § 16(a); RSU Award Certificate for RSUs at § 11.

51.     The EICP has the same Cancellation Rule as the MSCIP.  EICP Award Certificate for RSUs at §§ 2(a), 10.  If an FA leaves Morgan Stanley before the Scheduled Vesting Date, Defendants cancel the FA's RSUs.  EICP Plan Document at § 2.

52.     The EICP has exceptions to the Cancellation Rule for FAs whose employment ends because of Disability, Involuntary Termination, Governmental Service Termination, or Full Career Retirement.  *Id.* at §§ 5, 6, 7, and 8.  FAs who qualify for Disability, Involuntary Termination, or Full Career Retirement receive their shares of Morgan Stanley common stock on the Scheduled Conversion Date, after their employment with Morgan Stanley has ended.  RSU Award Certificate at §§ 5(c), 6 and 8.  FAs who qualify for a Government Service Termination receive their shares of Morgan Stanley common stock when their employment ends.  RSU Award Certificate at 7(a).

**B.     The FA Deferred Compensation Program is an "Employee Benefit Pension Plan" Governed by ERISA.**

53.     ERISA covers any "employee benefit plan," ERISA § 4(a), 29 U.S.C. § 1003(a), a term that includes "employee pension benefit plans."  ERISA § 3(3), 29 U.S.C. § 1002(3).  An "employee benefit pension plan" is:

> any plan, fund, or program which . . . by its express terms or as a result of surrounding circumstances such plan, fund, or program—
>
> (i)     provides retirement income to employees, ***or***
>
> (ii)    results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,
>
> regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A) (emphasis added).

54.     As described below, the FA Deferred Compensation Program is an "employee benefit pension plan" under ERISA.

**1.       The FA Deferred Compensation Program is a "Plan, Fund or Program."**

55.       The phrase "plan, fund or program" under ERISA "means nothing more than a 'scheme decided upon in advance.'"  *Feifer v. Prudential Ins. Co.*, 306 F.3d 1202, 1209 (2d Cir. 2002) (citing *Pegram v. Hedrich*, 530 U.S. 211, 223 (2000)).   A "plan, fund or program" is "established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Grimo v. Blue Cross/Blue Shield of Vt.*, 34 F.3d 148, 151 (2d Cir. 1994).  A "plan, fund or program" does not be a formal written document and can be comprised of multiple documents.  *Id*. at 151; *Feifer*, 306 F.3d at 1209 ("However slap-dash, the Program Summary and the accompanying memorandum" established a plan that was governed by ERISA).

56.       The  FA  Deferred  Compensation  Program—which  consists  of  the  FA Compensation Plan, the MSCIP, the EICP, and the Award Certificates—is a "plan, fund or program" under ERISA.   The FA Compensation Plan identifies the intended benefits—deferred compensation—using a detailed, objective formula that determines how FAs earn benefits.  2018 FA Compensation Plan at 5.

57.       The FA Deferred Compensation Program also has an ascertainable class of beneficiaries.  Only FAs are eligible to participate in the program, and the Award Certificates that are issued to them about their deferred compensation are specific to FAs.  *Id*. at 4; 2017 Award Summary Description at 1-2.

58.       The FA Deferred Compensation Plan also has an identifiable source of financing. FAs' deferred compensation in the MSCIP is paid "out of the general assets of Morgan Stanley" on the Scheduled Distribution Date.  MSCIP Plan Document at § 9.  FAs' RSUs in the EICP are

converted to shares of Morgan Stanley common stock out of the 373,00,000 shares that Morgan Stanley specifically designated to pay these benefits.  EICP Plan Document at § 4(a).

**2.    The FA Deferred Compensation Program "Results in a Deferral of Income."**

59.    Subsections (i) and (ii) in Section 3(2)(A) of ERISA "set out independent tests" for whether a "plan, fund or program" is an "employee benefit pension plan."  *Pasternack v. Schrader*, 863 F.3d 162, 168 (2d Cir. 2017); *see also Tolbert v. RBC Capital Markets Corp.*, 758 F.3d 619, 624 (5th Cir. 2014) ("The plain language of the statute makes clear that subsection (ii) is separate and distinct from subsection (i).").  The second of these two independent tests—whether a "plan, fund or program" "results in a deferral of income" under ERISA § 3(2)(A)(ii), 29 U.S.C. § 1002(2)(A)(ii)—is "an effects-based inquiry rather than one based on purpose."  *Pasternack*, 863 F.3d at 170, n.5.

60.    The FA Deferred Compensation Program results in a deferral of FAs' income.  The first portion of an FA's Total Credits are designated as Deferred Credits, which the FA receives years later through either the MSCIP or EICP.  FAs receive their remaining Total Credits, i.e., their Cash Credits, at the end of the next month as cash compensation.  In other words, FAs defer the first portion of their compensation, instead of receiving it right away in cash.

61.    The terms of the FA Compensation Plan demonstrate that FAs defer part of their income.  The Plan section titled "Deferred Compensation" describes how FAs earn "deferred compensation awards" by generating revenue.  FA Compensation Plan at § 1.2.2.  While ERISA does not define the phrase "deferral of income," it has the same meaning as "deferred compensation."  *See*, *e.g.*, *Tolbert*, 758 F.3d at 625.  Accordingly, "by its express terms," Morgan Stanley's compensation program for FAs "results in a deferral of income."  *See*, *e.g.*, *id.* at 625-26 (plan covered by ERISA because it "contain[ed] provisions for both Voluntary Deferred

Compensation and Mandatory Deferred Compensation, terms that plainly refer to income that is deferred."); *Wilson v. Safelite Group, Inc.*, 930 F.3d 429, 434 (6th Cir. 2019) (ERISA applied "when a deferral of income by employees . . . arises as an effect, issue, or outcome from' the provisions of that plan.").

62.    In addition, Morgan Stanley describes the MSCIP and EICP as "Deferred Compensation Plans" in its audited financial statements.  Morgan Stanley Form 10-K for YE Dec. 31, 2019, at 137-38.    Likewise, MSSB describes the MSCIP and EICP as "Deferred Compensation Plans" in its financial statements.  MSSB Consolidated Statement of Financial Condition as of June 30, 2020, at 4-5.

63.    These descriptions are consistent with the dictionary definition of "deferred compensation" as (1) "[p]ayment for work performed, to be paid in the future or when some future event occurs," and (2) "an employee's earnings that are taxed when received or distributed rather than when earned . . . ." BLACK'S LAW DICTIONARY (11th ed. 2019).  Here, FAs defer part of their compensation for work performed (by generating revenue) until a later date and do not pay taxes on this compensation until it is distributed.  2018 FA Compensation Plan at 4; MSCIP Plan Document at § 11; EICP Plan Document at § 16(a).

### 3.    The Plans Result in a Deferral of Income "For Periods Extending to the Termination of Covered Employment or Beyond."

64.    The FA Deferred Compensation Program results in FAs deferring income "for periods extending to the end of covered employment or beyond."  ERISA § 3(2)(A)(ii), 29 U.S.C. § 1002(2)(A)(ii).  The phrase "end of covered employment" refers to when an employee stops working for a company.  *Wilson*, 930 F.3d at 435.

65.    A plan need *not* require employees to defer income until "the end of covered employment or beyond" in order to be governed by ERISA.  *Wilson*, 930 F.3d at 434.  ERISA

"covers plans containing terms that have as an effect, issue, or outcome—even if not a requirement—deferral of income by employees extending to the termination of covered employment or beyond." *Id*. at 435. As the court explained in *Wilson*,

> Subsection (ii) does not specify deferral of income "until termination" or "to termination;" rather it says "for periods extending to the termination." Thus, deferrals may occur for various periods, and those periods may last up to and/or beyond termination. Subsection (ii) covers a wide array of plans and does not exclude plans that give participants the option to receive in service distributions.

*Id*.

66.     The FA Deferred Compensation Program contains several provisions that contemplate FAs receiving their deferred compensation at or after the end of their employment with Morgan Stanley.

67.     FAs whose employment ends because of a Disability, Involuntary Termination, Retirement, or Full Career Retirement ***still receive their deferred compensation*** on the Scheduled Distribution Date under the MSCIP and on the Scheduled Vesting Date under the EICP—both of which occur after their employment with Morgan Stanley has ended. Meanwhile, FAs who qualify for a Government Service Termination receive their deferred compensation when they leave Morgan Stanley. Thus, "by design," *Tolbert*, 758 F.3d at 625, and "as an effect, issue or outcome from the provisions of the plan," *Wilson*, 930 F.3d at 434, Morgan Stanley pays FAs their deferred compensation on or after their termination of employment.

**D.     The Cancellation Rule Violates ERISA's Vesting Requirements.**

68.     ERISA has strict vesting rules that apply to "individual account plans" like the FA Deferred Compensation Program. Contributions to the FA Deferred Compensation Program are employee contributions and, therefore, 100% vested when made under ERISA § 203.

69.     Even if contributions to the FA Deferred Compensation Program were to be considered employer contributions under ERISA § 203(a)(2)(B), employees must be fully vested in their accounts plans after they have three years of service or, alternatively, gradually vested in their accounts under the following schedule:

| Years of Service | Nonforfeitable Percentage |
|------------------|---------------------------|
| 2                | 20                        |
| 3                | 40                        |
| 4                | 60                        |
| 5                | 80                        |
| 6 or more        | 100                       |

70.     The FA Deferred Compensation Program violates ERISA's vesting requirements because FAs vest in their deferred compensation in either six or eight years under the MSCIP and in four years under the EICP, with none of these vesting schedules impacted by the FA's years of service.

71.     Based upon their years of service, Plaintiffs should have been fully vested in their deferred compensation under ERISA.

**E.     The FA Deferred Compensation Program is Not a "Bonus Program."**

72.     The Department of Labor has promulgated regulations that "clarify the limits" of the term "employee pension benefit plan" under ERISA.  29 C.F.R. § 2510.3-2(a).  Employee pension benefit plans do not include "bonus programs," which are "payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees."  29 C.F.R. § 2510.3-2(c).

73.     FAs' deferred compensation in the FA Deferred Compensation Program is not a "bonus."

74.     A bonus is a "premium paid in addition to what is expected; esp., a payment by way of a division of a business's profits, given over and above normal compensation (year-end bonus.)." BLACK'S LAW DICTIONARY (11th ed. 2019).

75.     FAs do not have to do anything "in addition to what is expected" of them in order to earn Deferred Credits.  For example, they do not have to generate a specified amount of Total Credits or improve their previous year's production in order to earn Deferred Credits.  Indeed, FAs automatically earn Deferred Credits with the ***very first dollar of revenue*** they generate as part of their compensation structure.  Given that FAs are expected to generate revenue, their compensation for performing this core function—at the absolute minimum level—is not, and cannot, be a "bonus."

76.     Rather, FAs' compensation—including their deferred compensation—is a "commission."

77.     "A commission is a 'fee or percentage allowed to a sales representative or an agent for services rendered.'" *Wolfe v. Advance Ins. Co. of Kansas*, No. 07-1406-DWB, 2009 WL 2106138, at *8 (D. Kan. July 16, 2009) (quoting The American Heritage Dictionary (3d ed. 1992)).  A "'commission' is commonly understood to refer to those in the business of selling goods, services or real estate set typically as a percentage of the sales price." *Israel v. Voya Institutional Plan Servs. LLC*, No. 15-cv-11914-ADB, 2017 WL 1026416, at *4 (D. Mass. Mar. 16, 2017).

78.     FAs automatically earn "Total Credits," as a fixed percentage (i.e., the Credit Rate) of the revenue they generate under Morgan Stanley's "Grid."  FAs' Total Credits are "commissions."  *In re Morgan Stanley Smith Barney LLC Wage & Hour Litig.*, at Docket No. 42-1 at 6 (Morgan Stanley describing the FA Compensation Plan by stating "MSSB determined an FA's qualifying revenue each month, and multiplied it by the assigned Grid Rate percentage to

determine the amount of a monthly commission. . . ."); *In re Morgan Stanley Smith Barney LLC Wage & Hour Litig.*, 2013 WL 6255697, at *1 (finding that the FA Compensation Plan provided that FAs would receive "commissions" calculated by "apply[ing] a particular commission percentage to the amount of revenue [FAs] generated for MSSB."). Because Deferred Credits are a part of, and not in addition to, Total Credits, an FA's Deferred Credits are "commissions," a term that is distinct from a "bonus." *Israel*, 2017 WL 1026416, at *4.

79.    Indeed, the FA Compensation Plan distinguishes between FAs' "deferred compensation," which is a part of their commissions, and "bonuses," which are in addition to their commissions. FAs earn deferred compensation under a non-discretionary, uniformly applied "Grid" starting at the first dollar of revenue they generate. In contrast, FAs earn "year-end bonuses" by achieving individualized, performance-based goals such as increasing their prior year's revenue by specified percentages or cross-selling products to clients. FA Compensation Plan at 5. "Achieving individualized, performance-based goals is "in addition to what is expected," and, therefore, a classic bonus. *Israel*, 2017 WL 1026416, at *6.

**F.    The FA Deferred Compensation Program Is Not A "Top Hat" Plan.**

80.    The FA Deferred Compensation Program is not a "top hat" plan. A "top hat" plan is a "employee benefit plan" that "is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." ERISA § 201(2), 29 U.S.C. § 1051(2). "Top hat" plans are exempt from ERISA's vesting requirements. *Id.*

81.    To qualify as a "top hat" plan, a plan's participants must be part of a "select group of management or highly compensated employees." *Id.* This test that has quantitative and

qualitative factors. *Demery v. Extebank Deferred Comp. Plan (B)*, 216 F.3d 283, 287-88 (2d Cir. 2000).

82.    First, the plan must cover relatively few employees, a test often expressed as a percentage of the employer's workforce that participate.

83.    The relevant workforce would be that of MSSB, the entity that employs the FAs. Morgan Stanley's other subsidiaries—including Morgan Stanley & Co., LLC, Morgan Stanley & Co., International plc, Morgan Stanley India Primary Dealer Pvt. Ltd., Morgan Stanley Menkul Degerler A.S., and Bank Morgan Stanley AG—do not pay FAs' benefits or sponsor the FA Deferred Compensation Plan and thus are not an FA's "employer" under ERISA § 3(5), 29 U.S.C. § 1002(5).

84.    MSSB employs approximately 15,000 FAs. All or almost all of them participate in the FA Deferred Compensation Program because participation is mandatory and begins with the first dollar of revenue generated.

85.    Upon information and belief, the FAs who participate in the FA Deferred Compensation Program represent a significant percentage of the relevant workforce, which far exceeds the percentage allowed under ERISA. *Demery*, 216 F.3d at 289.

86.    Second, participation in the FA Deferred Compensation Program is not limited to "highly compensated" FAs or managers.

87.    To determine whether participants are "highly compensated," courts compare participants' compensation to that of non-participants. *Alexander v. Brigham & Women's Phys. Org., Inc.*, 513 F.3d 37, 46 (1st Cir. 2008). As explained in ¶¶ 16-20 above, FAs earn Deferred Credits, and thus deferred compensation awards, from the first dollar of revenue they generate. The FA Deferred Compensation Program includes FAs who generate minimal amounts of revenue

and are not highly compensated compared to other employees. Indeed, the FA Deferred Compensation Program includes the lowest compensated FAs.

88.    Participants in the FA Deferred Compensation Program are also not members of a "select group of management." The FAs who participate are not executives and most have no supervisory responsibility.

89.    Since the FA Deferred Compensation Program is not limited to "a select group of management or highly compensated employees," it is not a "top hat" plan under ERISA.

## CLASS ACTION ALLEGATIONS

90.    Plaintiffs bring this case as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and a class (the "Class") defined as follows:

> All former Morgan Stanley FAs who forfeited deferred compensation in the MSCIP or EICP from December 29, 2014, until the date of judgement because of the Cancellation Rule. Excluded from the Class are Defendants and any individuals who are subsequently determined to be fiduciaries of the MSCIP or EICP.

91.    The members of the Class are so numerous that joinder of all members is impractical. Upon information and belief, the Class includes thousands of persons.

92.    Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs' claims and the claims of all Class members arise out of the same policies and practices of Defendants as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct.

93.    There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class Members. Common legal and factual questions include:

(a)    Whether ERISA applies to the FA Deferred Compensation Program;

(b)    Whether the Cancellation Rule is invalid under ERISA;

(c)    Whether Class Members are entitled to equitable relief under ERISA § 502(a)(3);

(d)    Whether the Compensation Committee violated its fiduciary duties under ERISA § 502(a)(2) in selecting and enforcing a vesting schedule that violated ERISA; and

(e)    Whether Class Members should receive additional benefits under the FA Deferred Compensation Program.

94.    Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class actions. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in managing this litigation as a class action.

95.    This action may be properly certified under Rule 23(b)(1). Certification is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Certification is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

96.    Alternatively, certification is warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making final injunctive, declaratory, or other equitable relief appropriate to the Class as a whole.

97.     Alternatively, certification is warranted under Rule 23(b)(3) because questions of law or fact common to the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### Declaratory and Equitable Relief
### (ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3))

98.     Plaintiffs re-allege all prior allegations in the Amended Complaint.

99.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

100.    Under this section of ERISA, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiffs seek a declaration that the FA Deferred Compensation Program is an "employee benefit pension plan" under ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).

101.    Plaintiffs also seek orders from the Court providing a full range of equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), including:

(a)     A declaration that the FA Deferred Compensation Program and its Cancellation Rule violate ERISA's vesting and anti-forfeiture rules;

(b)     An injunction requiring Defendants to remedy their past violations of EISA's vesting rules, including reversing all past forfeitures caused by the application of the Cancellation Rule;

(c)     Surcharge;

24

(d)     An "accounting" of all deferred compensation wrongfully withheld from FAs because of the Cancellation Rule;

(e)     Disgorgement of all amounts wrongfully withheld;

(f)     Disgorgement of all profits Defendants earned on the amounts they wrongfully withheld;

(g)     A declaration that the amounts wrongfully withheld are in a constructive trust for the benefit of Plaintiffs and the Class;

(h)     An order granting Plaintiffs and the Class an equitable lien on Defendants' assets equal to the amount that Defendants' wrongfully withheld; and

(i)     All other relief the Court determines is just and proper under its equitable powers.

**SECOND CLAIM**
**Reformation of the FA Deferred Compensation Plan**
**and to Recover Benefits Under the Reformed Plan**
**(ERISA §§ 502(a)(1) and (3), 29 U.S.C. § 1132(a)(1) and (3))**

102.     Plaintiffs re-allege all prior allegations in the Amended Complaint.

103.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

104.     Defendants improperly denied Plaintiffs and the members of the Class their deferred compensation that should have been vested and not forfeited under ERISA. By denying Plaintiffs and the members of the Class their deferred compensation, Defendants violated ERISA § 203(a), 29 U.S.C. § 1053(a).

105.     Plaintiffs and the Class are entitled to reformation of the FA Deferred Compensation Program to require Defendants to comply with the vesting and anti-forfeiture requirements in ERISA § 203(a), 29 U.S.C. § 1053(a).

106.     ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), authorizes a participant or beneficiary to bring a civil action to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

107.     Plaintiffs and the Class are entitled to recover their vested benefits, enforce their rights to the payment of their past vested benefits, and clarify their rights to vested benefits under the FA Deferred Compensation Program after reformation.

**THIRD CLAIM**
**Breach of Fiduciary Duty Against the Compensation Committee Regarding the MSCIP and the EICP**
**(ERISA §§ 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3))**

108.     Plaintiffs re-allege all prior allegations in the Amended Complaint.

109.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other person who in fact performs fiduciary functions.   Thus, a person is a fiduciary if "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."   ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).   This is a functional test.   Neither "named fiduciary" status nor formal delegation

is required for a finding of fiduciary status, and contractual agreements cannot override a finding of fiduciary status when the statutory test is met.

110.    The Compensation Committee is a fiduciary under the FA Deferred Compensation Program because it is the administrator of the MSCIP and EICP and is responsible for, among other things, reviewing and establishing the rules and procedures of the FA Deferred Compensation Program, including the ability to determine that it is governed by ERISA.

111.    ERISA requires that fiduciaries discharge their duties to a plan solely in the interest of the participants and their beneficiaries. ERISA § 1104, 29 U.S.C. § 1104(a). Further, fiduciaries must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," and must discharge their duties to a plan in accordance with the documents and instruments governing the plan insofar as the plan is consistent with ERISA. *Id.*

112.    ERISA's fiduciary provision mandates that fiduciaries discharge their duties "in accordance with the documents and instruments governing the plan," but ***only if*** the plan's terms "are consistent" with ERISA's substantive requirements.   ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

113.    The Compensation Committee breached its fiduciary duty by selecting Scheduled Vesting Dates for the FA Deferred Compensation Program that violated ERISA's vesting requirements and then applying the Cancellation Rule to deny the FAs who left Morgan Stanley their deferred compensation that should have been vested under ERISA.

114.    Section 409 of ERISA provides that any person who is a fiduciary of a plan and who breaches any responsibility, obligation, or duty imposed on fiduciaries by ERISA shall be

27

personally liable to make good to the plan any losses to the plan resulting from any breach, and to restore to the plan any profits the fiduciary made using the plan's assets. 29 U.S.C. § 1109.  Section 409 of ERISA also provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate. *Id.*

115.    Section 502(a)(2) of ERISA permits a plan participant, beneficiary, or fiduciary to bring a suit for relief under Section 409 of ERISA. 29 U.S.C. § 1132(a)(2).

116.    Section 502(a)(3) of ERISA permits a plan participant, beneficiary, or fiduciary to (A) enjoin any act or practice that violates any provision of Title I of ERISA or the terms of a plan; or (B) obtain other appropriate equitable relief to (i) redress such violations, or (ii) enforce any provisions of Title I of ERISA or the terms of a plan. 29 U.S.C. § 1132(a)(3).

117.    Plaintiffs and the class seek the restoration of all deferred compensation that was illegally deemed forfeited by Defendants.

## **PRAYER FOR RELIEF**

For these reasons, Plaintiffs pray that judgment be entered against Defendants and requests that the Court award the following relief:

A.    Certification of this action as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    A declaration that the FA Deferred Compensation Program and the Cancellation Rule violates ERISA's vesting and anti-forfeiture rules;

C.    An injunction requiring Defendants to remedy their past violations of ERISA's vesting rules, including reversing all past forfeitures caused by the application of the Cancellation Rule;

D.    Surcharge;

E.      An "accounting" of all deferred compensation wrongfully withheld from Plaintiffs and the Class;

F.      Disgorgement of the amounts that have been wrongfully withheld from Plaintiffs and the Class;

G.      Disgorgement of the profits Defendants earned on the amounts wrongfully withheld from Plaintiffs and the Class;

H.      A declaration that the amounts wrongfully withheld are in a constructive trust for the benefit of Plaintiffs and the Class;

I.      An order granting Plaintiffs and the Class an equitable lien on Defendants' assets equal to the amount that has been wrongfully withheld;

J.      Reformation of the FA Deferred Compensation Program;

K.      An Order directing Defendants to remedy their past violations of ERISA, including the re-instatement and payment of forfeited amounts and benefits of Plaintiffs and the Class;

L.      An Order directing Defendants to pay all benefits improperly withheld under the FA Deferred Compensation Program as reformed;

M.      Compensatory damages;

N.      Awarding, declaring, or otherwise providing Plaintiffs and the Class all relief under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law that the Court deems proper;

O.      Attorneys' fees and expenses as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), or other applicable doctrine;

P.      Prejudgment and post-judgment interest; and

Q.      Any other relief the Court determines is just and proper.

ADD-60

Dated: March 24, 2022

Respectfully submitted,

*/s/ William H. Narwold*
William H. Narwold
Mathew P. Jasinski
MOTLEY RICE LLC
27 Church Street, 17th Floor
Hartford, CT  06103
Telephone: (860) 882-1681
Facsimile: (860) 882-1682
bnarwold@motleyrice.com
mjasinski@motleyrice.com

Thomas R. Ajamie
AJAMIE LLP
460 Park Avenue, 21st Floor
New York, NY  10022
Telephone: (713) 860-1600
Facsimile: (713) 860-1699
tajamie@ajamie.com

*New York Office*:
777 Third Avenue, 27th Floor
New York, New York 10017

David S. Siegel (*pro hac vice*)
John S. "Jack" Edwards, Jr. (*pro hac vice*)
Dona Szak (*pro hac vice*)
AJAMIE LLP
Pennzoil Place - South Tower
711 Louisiana, Suite 2150
Houston, TX  77002
Telephone: (713) 860-1600
Facsimile: (713) 860-1699
dsiegel@ajamie.com
jedwards@ajamie.com
dszak@ajamie.com

Robert A. Izard (*pro hac vice*)
Douglas P. Needham
IZARD, KINDALL & RAABE LLP
29 South Main Street, Suite 305
West Hartford, CT  06107
Tel: (860) 493-6292
Fax: (860) 493-6290
rizard@ikrlaw.com
dneedham@ikrlaw.com

ADD-61

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2022, a copy of the foregoing *Plaintiffs' Amended Class Action Complaint* was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

*s/ William H. Narwold*
William H. Narwold

ADD-62

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MATTHEW T. SHAFER, SHERI HAUGABOOK, PETER HEIDT, JEFFREY SHOVER, MACE TAMSE, GEORGE LIVANOS, MARK LOFTUS, JEFFREY SAMSEN, JEFFREY SHERESKY, STEVE SHERESKY, STEVE NADLER, AND SANDY JUKEL, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiffs,<br><br>-against-<br><br>MORGAN STANLEY, MORGAN STANLEY SMITH BARNEY LLC, MORGAN STANLEY COMPENSATION MANAGEMENT DEVELOPMENT AND SUCCESSION COMMITTEE, and John/Jane Does 1-20,<br><br>Defendants. | Civil Action No. 1:20-cv-11047-PGG<br><br>**NOTICE OF MOTION** |

**PLEASE TAKE NOTICE** that upon the accompanying Memorandum of Law in support of this motion, dated May 9, 2022; and the declarations of Keith Porco and Jessica Krentzman, dated May 6, 2022, and the exhibits attached thereto Defendants Morgan Stanley, Morgan Stanley Smith Barney LLC, and the Morgan Stanley Compensation Management Development and Succession Committee, pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*., will move this Court, before the Honorable Paul G. Gardephe, at the Thurgood Marshall United States Courthouse located at 40 Foley Square, Courtroom 705, New York, New York, at a date and time to be set by the Court, for an Order compelling arbitration of all claims brought by Plaintiffs filed in the above-captioned action and staying this action during the pendency of

ADD-63

the arbitration proceedings, with such other and further relief as this Court deems just and proper.

Dated: Washington, D.C.

      May 9, 2022

Respectfully submitted,

O'MELVENY & MYERS LLP

By: <u>/s/ Meaghan VerGow</u>
Meaghan VerGow
Brian D. Boyle (*pro hac vice*)
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone:  (202) 383-5300
Facsimile:  (202) 383-5414
mvergow@omm.com
bboyle@omm.com

Pamela A. Miller
Karen Gillen
Times Square Tower
7 Times Square
New York, New York 10036
Telephone:  (212) 326-2000
Facsimile:  (212) 326-2061
pmiller@omm.com
kgillen@omm.com

*Attorneys for Defendants Morgan Stanley, Morgan Stanley Smith Barney LLC, and Morgan Stanley Compensation Management Development and Succession Committee*

ADD-64

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MATTHEW T. SHAFER, SHERI HAUGABOOK, PETER HEIDT, JEFFREY SHOVER, MACE TAMSE, GEORGE LIVANOS, MARK LOFTUS, JEFFREY SAMSEN, JEFFREY SHERESKY, STEVE SHERESKY, STEVE NADLER, AND SANDY JUKEL, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiffs,<br><br>-against-<br><br>MORGAN STANLEY, MORGAN STANLEY SMITH BARNEY LLC, MORGAN STANLEY COMPENSATION MANAGEMENT DEVELOPMENT AND SUCCESSION COMMITTEE, and John/Jane Does 1-20,<br><br>Defendants. | Civil Action No. 1:20-cv-11047-PGG |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION AND TO STAY PROCEEDINGS**

Meaghan VerGow
Brian D. Boyle (*pro hac vice*)
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 383-5300
mvergow@omm.com
bboyle@omm.com

Pamela A. Miller
Karen Gillen
Times Square Tower
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
pmiller@omm.com
kgillen@omm.com

ADD-65

*Attorneys for Defendants Morgan Stanley,*
*Morgan Stanley Smith Barney LLC, and*
*Morgan Stanley Compensation*
*Management Development and*
*Succession Committee*

May 9, 2022

## TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................................... 1

BACKGROUND ......................................................................................................... 2

      A.    Plaintiffs' Employment With Morgan Stanley .......................................... 2

      B.    Plaintiffs' Binding Arbitration Agreements ............................................... 3

              1.    Shafer Must Arbitrate His Claims Under His 2015 Arbitration Agreement .......................................................... 4

              2.    Tamse And Loftus Must Arbitrate Their Claims Under Their 2014 Arbitration Agreements ....................................... 4

              3.    Nadler Must Arbitrate His Claims Under His Employment Agreement ........................................................... 5

              4.    The Remaining Plaintiffs Are Bound To Arbitrate Their Claims Through The CARE Program ............................ 6

      C.    Plaintiffs' Complaint ................................................................................ 7

ARGUMENT ............................................................................................................. 7

    I.      PLAINTIFFS ARE OBLIGATED TO ARBITRATE THE DISPUTES ASSERTED IN THEIR FIRST AMENDED COMPLAINT ............................... 7

      A.    Plaintiffs' Arbitration Agreements Are Valid ........................................... 8

              1.    Shafer, Tamse, Loftus, And Nadler's Arbitration Agreements Are Valid ........................................................... 9

              2.    The 2015 CARE Agreement Is A Valid Arbitration Agreement ......................................................... 10

      B.    The Agreements Encompass All Of Plaintiffs' Claims ........................... 12

      C.    Any Disagreement About The Arbitrability Of Plaintiffs' Claims Is Reserved For The Arbitrator ........................................................ 14

    II.     ALL PROCEEDINGS SHOULD BE STAYED PENDING ARBITRATION OF PLAINTIFFS' CLAIMS ................................................ 15

CONCLUSION ......................................................................................................... 16

## TABLE OF AUTHORITIES

Page(s)

__Cases__

*Amaprop Ltd. v. Indiabulls Fin. Servs. Ltd.*,
  2010 WL 1050988 (S.D.N.Y. Mar. 23, 2010) ..................................................... 2

*Antollino v. Morgan Stanley & Co. LLC*,
  2018 WL 10483434 (D. Conn. May 11, 2018) .................................................. 11

*Arnulfo P. Sulit, Inc. v. Dean Witter Reynolds, Inc.*,
  847 F.2d 475 (8th Cir. 1988) ......................................................................... 13

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333 (2011) ......................................................................................... 8

*Aviall, Inc. v. Ryder Sys., Inc.*,
  913 F. Supp. 826 (S.D.N.Y. 1996) .................................................................. 9

*Bird v. Shearson Lehman/Am. Express, Inc.*,
  926 F.2d 116 (2d Cir. 1991) ......................................................................... 13

*Cellular Tel. Co. v. 210 E. 86th Street Corp.*,
  839 N.Y.S.2d 476 (N.Y. App. Div. 2007) ...................................................... 9

*Clearfield v. HCL Am. Inc.*,
  2017 WL 2600116 (S.D.N.Y. June 15, 2017) ................................................ 11

*Coan v. Kaufman*,
  457 F.3d 250 (2d Cir. 2006) ......................................................................... 14

*Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*,
  58 F.3d 16 (2d Cir. 1995) ............................................................................. 12

*Cooper v. Ruane Cunniff & Goldfarb Inc.*,
  990 F.3d 173 (2d Cir. 2021) .............................................................. 12, 13, 14

*Dorman v. Charles Schwab Corp.*,
  934 F.3d 1107 (9th Cir. 2019) ...................................................................... 13

*First Options of Chi., Inc. v. Kaplan*,
  514 U.S. 938 (1995) ......................................................................................... 8

*Frommert v. Conkright*,
  433 F.3d 254 (2d Cir. 2006) ......................................................................... 14

*Gold v. Deutsche Aktiengesellschaft*,
  365 F.3d 144 (2d Cir. 2004) ........................................................................... 9

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
  561 U.S. 287 (2010) ......................................................................................... 8

## TABLE OF AUTHORITIES
### *(Continued)*

**Page(s)**

*Gupta v. Morgan Stanley Smith Barney, LLC*,
   934 F.3d 705 (7th Cir. 2019) ................................................. 11

*Henricks v. Flywheel Sports, Inc.*,
   2020 WL 1285453 (S.D.N.Y. Mar. 18, 2020) ..................... 2, 15

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
   139 S. Ct. 524 (2019) ........................................................... 14

*Holick v. Cellular Sales of N.Y., LLC*,
   802 F.3d 391 (2d Cir. 2015) ................................................... 8

*Isaacs v. OCE Bus. Servs., Inc.*,
   968 F. Supp. 2d 564 (S.D.N.Y. 2013) ................................... 11

*Katz v. Cellco P'ship*,
   794 F.3d 341 (2d Cir. 2015) ................................................. 15

*Lockette v. Morgan Stanley*,
   2018 WL 4778920 (S.D.N.Y. Oct. 3, 2018) ........................ 11

*Manigault v. Macy's E., LLC*,
   318 F. App'x 6 (2d Cir. 2009) ............................................. 11

*Mass. Mut. Life Ins. Co. v. Russell*,
   473 U.S. 134 (1985) ............................................................. 14

*Merrick v. UnitedHealth Grp. Inc.*,
   127 F. Supp. 3d 138 (S.D.N.Y. 2015) ................................. 12

*Moore v. Interacciones Glob., Inc.*,
   1995 WL 33650 (S.D.N.Y. Jan. 27, 1995) .......................... 16

*Nederlandse Erts-Tankersmaatschappij, N.V. v. Isbrandtsen Co.*,
   339 F.2d 440 (2d Cir. 1964) ................................................. 15

*Pelligrino v. Morgan Stanley Smith Barney LLC*,
   2018 WL 2452768 (S.D.N.Y. May 31, 2018) ...................... 11

*Register.com, Inc. v. Verio, Inc.*,
   356 F.3d 393 (2d Cir. 2004) ................................................. 11

*Rightnour v. Tiffany & Co.*,
   239 F. Supp. 3d 744 (S.D.N.Y. 2017) ................................. 11

*Sportvision, Inc. v. MLB Advanced Media, LP*,
   2020 WL 1957450 (S.D.N.Y. 2020) ................................... 12

**TABLE OF AUTHORITIES**
*(Continued)*

**Page(s)**

*Victorio v. Sammy's Fishbox Realty Co., LLC*,
   2015 WL 2152703 (S.D.N.Y. May 6, 2015) ................................................ 9

*VRG Linhas Aereas S.A. v. MatlinPatterson Glob. Opportunities Partners II L.P.*,
   717 F.3d 322 (2d Cir. 2013) ..................................................................... 15

*Williams v. Imhoff*,
   203 F.3d 758 (10th Cir. 2000) .................................................................. 13

*Winter Invs., LLC v. Panzer*,
   2015 WL 5052563 (S.D.N.Y. Aug. 27, 2015) ............................................ 16

*WorldCrisa Corp. v. Armstrong*,
   129 F.3d 71 (2d Cir. 1997) ....................................................................... 15

**Statutes**

9 U.S.C. § 1 ............................................................................................... 2

9 U.S.C. § 2 ............................................................................................... 8

9 U.S.C. § 3 ........................................................................................... 2, 15

9 U.S.C. § 4 ............................................................................................. 15

**Other Authorities**

21 *Williston on Contracts* § 57:25 (4th ed.) ............................................... 15

Defendants Morgan Stanley, Morgan Stanley Smith Barney LLC, and Morgan Stanley Compensation Management Development and Succession Committee (together, "Morgan Stanley") respectfully submit this memorandum of law in support of their motion to compel arbitration with plaintiffs Matthew Shafer, Sheri Haugabook, Peter Heidt, Jeffrey Shover, Mace Tamse, George Livanos, Mark Loftus, Jeffrey Samsen, Jeffrey Sheresky, Steve Sheresky, Steve Nadler, and Sandy Jukel and to stay proceedings pending resolution of the arbitration.

## INTRODUCTION

The only question presented by this motion is whether plaintiffs are obligated to arbitrate their dispute about compensation relating to their employment pursuant to arbitration agreements with Morgan Stanley that cover, *inter alia*, any claim related to or arising from their employment.  To state the question is to answer it:  Plaintiffs have agreed to arbitrate the claims they bring in this action.

Plaintiffs were all formerly employed by Morgan Stanley as financial advisors.  Morgan Stanley paid them salaries and incentive compensation during their employment, but also provisionally awarded plaintiffs deferred incentive compensation that, by its terms, would be paid only if plaintiffs remained employed with Morgan Stanley on the vesting date.  Each plaintiff chose to leave Morgan Stanley before their deferred compensation fully vested, and thus did not earn all of the compensation.  Plaintiffs filed claims with this Court seeking payment of the unearned compensation as a purported ERISA benefit.

Plaintiffs' arbitration agreements with Morgan Stanley preclude litigating these claims in court.  Those agreements broadly require plaintiffs to arbitrate claims arising out of or relating to their employment and compensation—but if there were any doubt as to whether the agreements encompassed plaintiffs' claims, that would be a question of arbitrability for the ***arbitrator*** to

resolve in the first instance, because each plaintiff also agreed that the arbitrator would resolve any dispute about the arbitrability of a claim.  This Court should compel plaintiffs to arbitrate pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* (the "FAA"), and stay this action pending the outcome of that arbitration.  9 U.S.C. § 3.

## BACKGROUND

### A.    Plaintiffs' Employment With Morgan Stanley

Morgan Stanley is a leading global financial services firm that provides a wide range of investment banking, securities, and investment management and wealth management services. *See* Declaration of Keith Porco ("Porco Decl.") ¶ 4.[1]  Morgan Stanley employs Financial Advisors ("FAs") who are compensated with a mix of salary, bonuses, and incentive compensation.  *See* Plaintiffs' First Amended Class Action Complaint ("FAC") (ECF No. 58) ¶ 27; Porco Decl. Ex. A ("2015 FA Compensation Plan").[2]  To encourage retention, Morgan Stanley provides some incentive compensation through deferred awards: an FA generally must be employed by Morgan Stanley on the scheduled vesting date in order to qualify for the deferred compensation award.  FAC ¶¶ 2, 30, 40; *see also* 2015 FA Compensation Plan at 5 ("Deferred compensation awards are contingent upon the FA … remaining employed through the grant and vesting dates of the award."); *id.* at 17 (discretionary Growth Awards are "designed to reward FA[s] who grow their business").  Deferred compensation is awarded in a mix of cash

---

[1] The Court can and should consider extrinsic evidence to decide a motion to compel arbitration.  *See Henricks v. Flywheel Sports, Inc.*, 2020 WL 1285453, at *2 (S.D.N.Y. Mar. 18, 2020) (Gardephe, J.) (granting defendants' motion to compel arbitration after considering exhibits attached to the motion); *Amaprop Ltd. v. Indiabulls Fin. Servs. Ltd.*, 2010 WL 1050988, at *1 (S.D.N.Y. Mar. 23, 2010) (same).

[2] All references to facts pleaded in the Amended Complaint are used for purposes of this motion only and are not admitted for purposes of any future proceeding.

and stock through the Morgan Stanley Compensation Incentive Plan ("MSCIP") (cash) and the Morgan Stanley Equity Incentive Compensation Plan ("EICP") (stock).  Awards generally vest six years and four years, respectively, from the date of the award.  FAC ¶¶ 2, 20; *see also* 2015 FA Compensation Plan at 3-6.

Plaintiffs worked as Morgan Stanley FAs at varying times between 1996 to 2020.  *See* FAC ¶¶ 11-22.[3]  While there, each plaintiff was provisionally awarded deferred compensation conditioned on certain express terms, including that the award would not be earned if the FA left Morgan Stanley before it vested.  Each plaintiff left Morgan Stanley before the vesting date and thus failed to earn some or all of their deferred compensation.  *See* FAC ¶¶ 11-22.

### B.    Plaintiffs' Binding Arbitration Agreements

Each plaintiff agreed to arbitrate any claims arising out of or relating to their employment in accordance with the terms of certain arbitration agreements:  (1) Plaintiff Shafer agreed to arbitrate in his 2015 Arbitration Agreement; (2) Plaintiffs Tamse and Loftus agreed to arbitrate in their 2014 Arbitration Agreements; (3) Plaintiff Nadler agreed to arbitrate in his employment agreement, and (4) the remaining plaintiffs (Haugabook, Heidt, Livanos, Shover, Samsen, J. Sheresky, S. Sheresky, Jukel) agreed to arbitrate through Morgan Stanley's Convenient Access to Resolutions for Employees ("CARE") Program.  As described below, each agreement encompasses the claims alleged in the Amended Complaint.[4]

---

[3] Shafer from 2009 to 2018, Haugabook from 2003 to 2017; Heidt from 2010 to 2020; Shover from 2009 to 2019; Tamse from 1996 to 2015; Livanos from 2009 to 2016; Loftus from 2009 to 2018; Samsen from 2013 to 2020; J. Sheresky from 2013 to 2020; S. Sheresky from 2013 to 2020; Nadler from 2009 to 2018; and Jukel from 2009 to 2019.

[4] Certain plaintiffs have entered multiple arbitration agreements with Morgan Stanley; this motion addresses agreements that are sufficient to demonstrate the arbitrability of each plaintiff's claims.  Morgan Stanley reserves the right to present to the arbitrator all arbitration agreements by which plaintiffs are bound.

### 1.   Shafer Must Arbitrate His Claims Under His 2015 Arbitration Agreement

In 2015, Shafer executed a Bonus Agreement in exchange for annual bonus payments. *See* Porco Decl., Ex. B ("2015 Bonus Agreement") § 1.  Shafer was paid a bonus of $12,288.72 in 2016 and $12,120.44 in 2017, in accordance with the terms of the 2015 Bonus Agreement. *See* Porco Decl. ¶ 7.  Shafer promised in the 2015 Bonus Agreement to arbitrate any claims "arising out of, or which arose out of or in any way relate[d]" to his employment, compensation, and the terms and conditions of his employment.  *See* 2015 Bonus Agreement § 7 ("2015 Arbitration Agreement").  The 2015 Arbitration Agreement provides that:

> ***Any controversy or claim*** arising out of or in any way relating to this Agreement or any benefits or payments available and/or due under this Agreement, as well as any controversy or claim between Employee and Morgan Stanley … ***based on, arising out of, or which arose out of or in any way relate to Employee's employment, compensation, and terms and conditions of employment with Morgan Stanley ["Covered Claims"]*** … including, but not limited to … any … federal, state, or local constitutional, statutory, regulatory, or common law claims or causes of action … ***will be resolved by final and binding arbitration before the Financial Industry Regulatory Authority ("FINRA")*** …   This arbitration agreement applies with respect to all Covered Claims, whether initiated by Employee or Morgan Stanley, and makes arbitration the required and exclusive forum for the resolution of all Covered Claims … .

*See* 2015 Arbitration Agreement § 7(a) (emphasis added).  The 2015 Arbitration Agreement explicitly provides that "[a]ny issue concerning arbitrability of a particular issue or claim pursuant to this arbitration agreement (except for issues concerning the validity or enforceability of the class action, collective action, or representative action Waivers) must be resolved by the arbitrator, not the court."  *Id.* § 7(d).

### 2.   Tamse And Loftus Must Arbitrate Their Claims Under Their 2014 Arbitration Agreements

In 2014, Tamse and Loftus executed Bonus Agreements in exchange for bonus payments. *See* Porco Decl. ¶¶ 8-11; *see also id.* Ex. C § 7 and *id.* Ex. D § 7 (together, "2014 Arbitration Agreements").  Pursuant to these agreements, Tamse was paid a bonus of $6,174.35 in 2015, and

4

Loftus was paid a bonus of $23,016.98 in 2015, $22,629.15 in 2016, $22,241.32 in 2017, and $21,853.48 in 2018.  *See* Porco Decl. ¶¶ 9, 11.

The 2014 Arbitration Agreements (which are identical in relevant part) mandate arbitration of any "claims arising out of or in any way relating to" their employment or its termination:

> Any controversy or claim arising out of or in any way relating to this Agreement or any benefits or payments available and/or due under this Agreement, ***as well as any controversy or claim arising out of or in any way relating to Employee's employment with Morgan Stanley or termination thereof***, including, but not limited to common law claims for breach of contract or tort, wage and hour claims, and/or statutory discrimination claims ["Covered Claims"], ***will be resolved by final and binding arbitration before [FINRA]*** … [N]otwithstanding the foregoing, any Covered Claim that arises in connection with an employee benefit plan subject to [ERISA] will be subject to the dispute resolution procedures set forth in the applicable ERISA plan document and paragraphs 7(c) through 7(e) below.

2014 Arbitration Agreements § 7(a) (emphasis added).  Like Shafer's 2015 Arbitration Agreement, the 2014 Arbitration Agreements provide that "[a]ny dispute as to the arbitrability of a particular issue or claim pursuant to this arbitration provision is to be resolved in arbitration," except that "any issue concerning the validity of the class action … waiver must be decided by a court."  *Id.* § 7(d).

>    3.    *Nadler Must Arbitrate His Claims Under His Employment Agreement*

In April 2008, Nadler signed an employment agreement promising to arbitrate claims "arising out of or relating to [his] employment":

> ***Any controversy or claim arising out of or relating to (i) your employment by Morgan Stanley*** … or (ii) this Agreement (or its breach), will be settled by ***arbitration before the Financial Industry Regulatory Authority ("FINRA")*** in accordance with their respective rules, and judgment upon an award issued by the arbitrator(s) may be entered in any court having jurisdiction.

Declaration of Jessica Krentzman ("Krentzman Decl.") Ex. A ("Nadler Employment Agreement") § 7.1 (emphasis added); *see* Krentzman Decl. ¶ 17.  As with the other agreements,

the Nadler Employment Agreement also provides that "[e]xcept as otherwise expressly agreed, any dispute as to the arbitrability of a particular issue or claim pursuant to this arbitration provision is to be resolved in arbitration."  Nadler Employment Agreement § 7.1

>    4.   *The Remaining Plaintiffs Are Bound To Arbitrate Their Claims Through The CARE Program*

Plaintiffs Haugabook, Heidt, Livanos, Shover, Samsen, J. Sheresky, S. Sheresky, and Jukel agreed to arbitrate "Covered Claims" under Morgan Stanley's CARE program.  Krentzman Decl. Ex. E ("2015 CARE Arbitration Agreement"); Krentzman Decl. ¶ 31 (explaining that these plaintiffs did not opt out of CARE).  CARE applies to all U.S. employees of Morgan Stanley, and a "CARE Guidebook" explaining the program is posted on Morgan Stanley's intranet site for employee access.  *Id.* ¶ 20; *see also id.* Ex. D ("2015 CARE Guidebook").  Beginning in 2015, the CARE program required arbitration of Covered Claims for any employee who elected to participate in CARE.  *See* 2015 CARE Arbitration Agreement § 1.

The scope of "Covered Claims" under the CARE agreement is broad:

> [T]o the fullest extent permitted by law, Covered Claims include any and all claims or disputes between you and Morgan Stanley or any of its current, former, and future directors, officers, employees, agents, managers, shareholders, *based on, arising out of, or which arose out of or in any way relate to your employment, compensation, and terms and conditions of employment with Morgan Stanley anywhere in the world, or the termination thereof* … [including] any and all other federal, state, or local constitutional, statutory, regulatory, or common law claims or causes of action … .

*Id.* § 2 (emphasis added).  The 2015 CARE Arbitration Agreement provides that "[a]ny issue concerning arbitrability of a particular issue or claim pursuant to this Arbitration Agreement (except for issues concerning the validity or enforceability of the class action, collective action, or representative action Waivers) must be resolved by the arbitrator, not the court."  *Id.* § 4.

C.     **Plaintiffs' Complaint**

This putative class action was initiated December 30, 2020, by plaintiff Shafer, who brought claims seeking payment of his unearned deferred compensation under the Employee Retirement Income Security Act of 1974 ("ERISA").  *See* ECF No. 1 (original complaint). Shafer sought to join additional plaintiffs after Morgan Stanley moved to compel arbitration of Shafer's claims.  ECF No. 37 at 3.  At the Court's direction (ECF No. 57), plaintiffs filed an amended complaint joining additional plaintiffs on March 24, 2022.  ECF No. 58.

Plaintiffs do not dispute that Morgan Stanley correctly applied the terms of their deferred compensation awards.  Rather, they argue that their deferred compensation awards constitute "retirement" compensation protected from forfeiture under ERISA and that the vesting requirements in the awards should therefore not be enforced as agreed.  FAC ¶¶ 3, 53-67.  The amended complaint asserts three claims on behalf of "[a]ll former Morgan Stanley FAs who forfeited deferred compensation in the MSCIP or EICP from December 30, 2014, until the date of judgement," FAC ¶ 90: (1) a claim for declaratory and equitable relief under ERISA § 502(a)(3), FAC ¶¶ 98-101; (2) a claim for benefits and for reformation of the FA Deferred Compensation Plan under ERISA § 502(a)(1) and § 502(a)(3), FAC ¶¶ 102-107; and (3) a claim on behalf of the putative plan against the Compensation Committee of Morgan Stanley's Board of Directors for fiduciary breach under ERISA § 502(a)(2), FAC ¶¶ 108-117.  Each claim seeks payment of the compensation that plaintiffs gave up when they left Morgan Stanley.

**ARGUMENT**

I.     **PLAINTIFFS ARE OBLIGATED TO ARBITRATE THE DISPUTES ASSERTED IN THEIR FIRST AMENDED COMPLAINT**

The parties entered into valid arbitration agreements that cover plaintiffs' claims and the Court should therefore grant Morgan Stanley's motion to compel arbitration.  If there were any

doubt about the agreements' scope, arbitration still would have to be compelled because the parties also agreed to arbitrate questions of arbitrability.

The FAA mandates that arbitration agreements "evidencing a transaction involving [interstate] commerce … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This statutory provision "reflect[s] both a 'liberal federal policy favoring arbitration' and the 'fundamental principle that arbitration is a matter of contract.'" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citations omitted). Thus, "courts must place arbitration agreements on an equal footing with other contracts and enforce them according to their terms." *Id.* (citation omitted). When resolving a motion to compel, a court's review is limited to whether the parties agreed to a valid arbitration provision and whether that provision covers the claims at issue. *See Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010); *Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 394 (2d Cir. 2015). Here, this analysis is straightforward.

### A.    Plaintiffs' Arbitration Agreements Are Valid

Each plaintiff entered into a valid agreement to arbitrate.[5]

---

[5] State law governs this part of the inquiry, *see First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995), and New York law applies here. *See* 2015 Bonus Agreement § 15 ("[T]he provisions of the arbitration agreement … shall be governed by and interpreted in accordance with the FAA. The remaining provisions of this Agreement shall be governed by and interpreted in accordance with the laws of the State of New York."); 2014 Bonus Agreement § 16 ("This Agreement shall be construed in accordance with the laws of the State of New York"); 2015 CARE Guidebook at 21 (provisions relating to arbitration "shall be governed by and interpreted in accordance with the [FAA]," and "[a]ll other provisions … shall be governed by and interpreted in accordance with the laws of the State of New York"); Nadler Employment Agreement § 9 ("This Agreement shall be governed by and construed in accordance with the laws of the state in which you signed this Agreement."); *see also id.* § 14 ("Signed in the state of New York").

        *1.*     *Shafer, Tamse, Loftus, And Nadler's Arbitration Agreements Are Valid*

Shafer, Tamse, and Loftus promised to arbitrate and waive class claims when they signed their Bonus Agreements, and Nadler promised the same when he signed his Employment Agreement. *See* Porco Decl. Ex. B at 11 (Shafer, signed on February 6, 2015); *id.* Ex. C at 9 (Tamse, signed on February 21, 2014); *id.* Ex. D at 9 (Loftus, signed on February 21, 2014); Krentzman Decl. Ex. A at 6 (Nadler, signed on April 25, 2008); *Victorio v. Sammy's Fishbox Realty Co., LLC*, 2015 WL 2152703, at *11 (S.D.N.Y. May 6, 2015) ("By supplying the Court with copies of each Plaintiff's signed arbitration agreement ... the Defendants satisfied their initial burden of establishing agreements to arbitrate.").

Shafer previously conceded that his Bonus Agreement constitutes a valid agreement, *see* ECF No. 44; ECF No. 48, and the same conclusion follows for Tamse, Loftus, and Nadler. New York contract law "presumes that a written agreement is valid and that it accurately reflects the intention of the parties, and imposes a heavy burden on the party seeking to disprove those presumptions." *Aviall, Inc. v. Ryder Sys., Inc.*, 913 F. Supp. 826, 831 (S.D.N.Y. 1996), *aff'd*, 110 F.3d 892 (2d Cir. 1997). Under those principles, "a party who signs or accepts a written contract ... is conclusively presumed to know its contents and to assent to them." *Gold v. Deutsche Aktiengesellschaft*, 365 F.3d 144, 149 (2d Cir. 2004) (quotation omitted) (compelling arbitration of claims by financial adviser who signed form contract and noting that "it was ultimately [the employee's] responsibility to ensure he understood the document that he signed"). That presumption of contractual validity applies "with even greater force" where, as here, the parties are "sophisticated." *Cellular Tel. Co. v. 210 E. 86th Street Corp.*, 839 N.Y.S.2d 476, 480 (N.Y. App. Div. 2007) (quotation omitted). Plaintiffs are financial advisors—credentialed professionals routinely called upon to understand and advise clients on complex matters. *See* Krentzman Decl. ¶ 19. Clearly, the presumption applies.

     2.    *The 2015 CARE Agreement Is A Valid Arbitration Agreement*

The remaining plaintiffs agreed to arbitrate and waive class claims when they agreed to participate in the CARE program. *See* Krentzman Decl. ¶ 31. Morgan Stanley's CARE program has been in place for more than a decade and applies to all U.S.-based Morgan Stanley employees. *See id.* ¶ 20. When Morgan Stanley amended its CARE program to include the operative arbitration agreement, all Morgan Stanley employees, including plaintiffs, were given an opportunity to opt out. *See id.* ¶¶ 22-31; *id.* Ex. C. Morgan Stanley sent employees an email on September 2, 2015 with the subject "Expansion of CARE Arbitration Program," which explained:

> Effective October 2, 2015, arbitration under the CARE Arbitration Program will be mandatory for all employees in the U.S., and all covered claims between the Firm and employees will be resolved through final and binding arbitration on a non-class, non-collective and non-representative action basis as more fully described in the Arbitration Agreement and CARE Guidebook. Please review the Arbitration Agreement and the CARE Guidebook. It is important that you read and understand the Arbitration Agreement and the CARE Guidebook as they describe the terms, features and details of this program.

*Id.* Ex. C at 1.[6] The email further explained: "By continuing your employment with Morgan Stanley, you accept and agree to, and will be covered and bound by the terms of the Arbitration Agreement and the arbitration provisions of the CARE Guidebook, unless you elect to opt out." *Id.* It included a link to the opt-out form, instructions for submitting that form, and the October 2, 2015, deadline for opting out. *See id.* at 2.

Plaintiffs Haugabook, Heidt, Livanos, Shover, Samsen, J. Sheresky, S. Sheresky, and Jukel all received this email, and none opted out of the CARE Program. *See* Krentzman Decl. ¶¶ 22-31 (each of the eight plaintiffs was active on email the day it was sent and none opted out);

---

[6] Morgan Stanley provided employees with access to the "CARE Guidebook" through Morgan Stanley's intranet. *See* Krentzman Decl. ¶ 20; *see also id.* Ex. B ("Pre-2015 CARE Guidebook").

*id.* Ex. C.  By continuing their employment without opting out of CARE, each of these plaintiffs
is bound to arbitrate under the CARE Program.  New York law presumes receipt of an email
when it is delivered to a person's email address in accordance with regular office procedures.
*See Clearfield v. HCL Am. Inc.*, 2017 WL 2600116, at *2 (S.D.N.Y. June 15, 2017).  And mutual
assent necessary to form a contract "may be by word, act, or conduct which evinces the intention
of the parties to contract."  *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004)
(emphasis and quotation omitted).  "An employee may consent to a modification to the terms of
employment by continuing to work after receiving notice of the modification."  *Manigault v.
Macy's E., LLC*, 318 F. App'x 6, 8 (2d Cir. 2009); *see also Isaacs v. OCE Bus. Servs., Inc.*, 968
F. Supp. 2d 564, 571 (S.D.N.Y. 2013) ("[E]mployee handbook revisions are binding when an
employee continues to work after receiving notice of the revisions.").  In that circumstance,
"continued employment serves as an objective manifestation of the employee's intent to be
bound."  *Rightnour v. Tiffany & Co.*, 239 F. Supp. 3d 744, 750-52 (S.D.N.Y. 2017) (quotation
omitted).

Multiple courts have already concluded that employees agreed to arbitrate disputes when
they received Morgan Stanley's September 2, 2015 CARE expansion email, did not opt out, and
continued their employment.  *See Lockette v. Morgan Stanley*, 2018 WL 4778920, at *4
(S.D.N.Y. Oct. 3, 2018) (New York law); *Pelligrino v. Morgan Stanley Smith Barney LLC*, 2018
WL 2452768 (S.D.N.Y. May 31, 2018) (New York law); *Gupta v. Morgan Stanley Smith
Barney, LLC*, 934 F.3d 705 (7th Cir. 2019) (Illinois law); *Antollino v. Morgan Stanley & Co.
LLC*, 2018 WL 10483434 (D. Conn. May 11, 2018) (Connecticut law).  The same conclusion
holds here.

**B.    The Agreements Encompass All Of Plaintiffs' Claims**

Plaintiffs agreed to arbitrate the claims they attempt to litigate in this action.  Each agreement requires arbitration of "any controversy or claim" "based on, arising out of, or which arose out of or in any way relate to" the employee's "employment, compensation, and terms and conditions of employment," 2015 CARE Arbitration Agreement § 2; 2015 Arbitration Agreement § 7(a); 2014 Arbitration Agreement § 7(a); or "[a]ny  controversy or claim arising out of or relating to" the employee's "employment by Morgan Stanley" or the employee's agreement with Morgan Stanley, Nadler Employment Agreement § 7.1.  Arbitration provisions applying to "any claim or controversy arising out of or relating to [an] agreement" are "the paradigm of a broad clause," and are therefore interpreted broadly in this Circuit.  *Sportvision, Inc. v. MLB Advanced Media, LP*, 2020 WL 1957450, at *5 (S.D.N.Y. 2020) (Gardephe, J.) (quoting *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995)); *see also Merrick v. UnitedHealth Grp. Inc.*, 127 F. Supp. 3d 138, 151 (S.D.N.Y. 2015) (collecting cases).

In response to Morgan Stanley's initial motion to compel arbitration, Shafer did not genuinely contest that the arbitration provision in his Bonus Agreement—materially indistinguishable from all the arbitration provisions now implicated by plaintiffs' claims—is paradigmatically broad.  *See* ECF No. 44, ECF No. 48.  Indeed, each of these agreements extends even further than provisions that the Second Circuit has recognized are capacious in reach—they apply not just to claims arising from or related to the operative agreement, but also to claims arising from or related to plaintiffs' employment.

Shafer nonetheless previously sought to avoid arbitration by arguing that he is asserting representative ERISA claims that are not subject to arbitration under the Second Circuit's decision in *Cooper v. Ruane Cunniff & Goldfarb Inc.*, 990 F.3d 173 (2d Cir. 2021).  This argument fails.

*First*, *Cooper* addressed both a different kind of claim and narrower arbitration language. The *Cooper* plaintiff challenged the investment decisions of his plan's outside investment manager, and the defendant argued only that the plaintiff's claims "related to" his employment. The Court concluded that to "relate to employment" a claim would have to "involve facts particular to an individual plaintiff's own employment"—which was not the case when the plaintiff sought only to prove that the manager's investment decision-making failed to meet basic standards of prudence. *Id.* at 184. Here, plaintiffs' contention that they are entitled to additional compensation—notwithstanding the agreement of each that they would not earn the compensation if they left Morgan Stanley before the awards vested—plainly implicates facts particular to them, including the terms and circumstances of their agreements. And plaintiffs' arbitration agreements are broader than the language discussed in *Cooper*, where the defendant forfeited the argument that the claims "arose out of" the plaintiff's employment. *Id.* at 180. There can be no serious question that plaintiffs' claims *at the very least* "arose out of" their employment with Morgan Stanley.

*Second*, contrary to plaintiffs' arguments, *Cooper* does not preclude arbitration of ERISA claims brought in a representative capacity on behalf of a plan, and other decisions of the Second Circuit (and other courts of appeals) have held that they may be arbitrated. *See Bird v. Shearson Lehman/Am. Express, Inc.*, 926 F.2d 116, 122 (2d Cir. 1991) (holding, in action brought on behalf of trust, that "statutory claims arising under ERISA may be the subject of compulsory arbitration"); *accord Dorman v. Charles Schwab Corp.*, 934 F.3d 1107, 1112 (9th Cir. 2019) (claims brought on behalf of plan); *Arnulfo P. Sulit, Inc. v. Dean Witter Reynolds, Inc.*, 847 F.2d 475, 479 (8th Cir. 1988) (same); *Williams v. Imhoff*, 203 F.3d 758, 767 (10th Cir. 2000) (claims asserting breach of fiduciary duties to plan). While dictum in *Cooper* indicated that claims

13

brought on behalf of a plan under ERISA § 502(a)(2) should afford the protections described in *Coan v. Kaufman*, 457 F.3d 250, 262 (2d Cir. 2006), the court did not render a holding on that question (having already decided the arbitration provision did not cover the plaintiff's claims), and such a rule would in any event not preclude arbitration of plan claims with appropriate protections, *see Cooper*, 990 F.3d at 188 (Sullivan, J., dissenting).

*Finally*—and most fundamentally—plaintiffs' claims are not brought **on behalf of** an ERISA plan.  Unlike the plaintiff in *Cooper*, plaintiffs are not seeking to recover a loss to the alleged plan, and as former employees of Morgan Stanley they do not even have a continuing interest in it.  *See id.* at 176-77 (majority opinion); *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 (1985).  Rather, plaintiffs are seeking to recover benefits that they claim are due **to** them, **from** the alleged plan.  That is a quintessential claim for benefits, which is indisputably arbitrable.  *See Frommert v. Conkright*, 433 F.3d 254, 270 (2d Cir. 2006) (claim purportedly for equitable relief requiring calculation of benefits "falls comfortably within the scope of § 502(a)(1)(B), which allows a plan participant 'to recover benefits due to him'").

**C.    Any Disagreement About The Arbitrability Of Plaintiffs' Claims Is Reserved For The Arbitrator**

Plaintiffs' valid agreements to arbitrate require plaintiffs to arbitrate their claims seeking payment of compensation they allegedly earned through their employment with Morgan Stanley.  But if the Court had any doubts about the arbitrability of plaintiffs' claims, arbitration still would be required because the parties expressly agreed that "[a]ny issue concerning arbitrability of a particular issue or claim pursuant to this Arbitration Agreement … must be resolved by the arbitrator, not the court."  2015 Arbitration Agreement § 7(d); *accord* 2014 Arbitration Agreement § 7(d); 2015 CARE Arbitration Agreement § 4; Nadler Employment Agreement § 7.1; *see Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 528 (2019); *VRG*

14

*Linhas Aereas S.A. v. MatlinPatterson Glob. Opportunities Partners II L.P.*, 717 F.3d 322, 325 (2d Cir. 2013); 21 *Williston on Contracts* § 57:25 (4th ed. 2021) ("[T]hose who wish to let an arbitrator decide which issues are arbitrable need only state that all disputes concerning the arbitrability … are committed to arbitration or words to that clear effect.").

## II.   ALL PROCEEDINGS SHOULD BE STAYED PENDING ARBITRATION OF PLAINTIFFS' CLAIMS

For the foregoing reasons, this Court should grant the motion to compel and order that "such arbitration proceed in a manner provided for in such agreement."  9 U.S.C. § 4.  Once this Court has compelled arbitration of plaintiffs' claims, a stay of proceedings is necessary.  *See, e.g.*, *Henricks v. Flywheel Sports, Inc.*, 2020 WL 1285453, at *3 (S.D.N.Y. Mar. 18, 2020) (Gardephe, J.) ("[T]he FAA 'requires a stay of proceedings when all claims are referred to arbitration and a stay is requested.'" (quoting *Katz v. Cellco P'ship,* 794 F.3d 341, 345 (2d Cir. 2015))); 9 U.S.C. § 3 ("If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court …, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had ….").

A stay would be warranted even if the Court determined to compel arbitration of only some of plaintiffs' claims.  *See, e.g.*, *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 76 (2d Cir. 1997) ("We have recognized that district courts, despite the inapplicability of the FAA, may stay a case pursuant to 'the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.'" (quoting *Nederlandse Erts-Tankersmaatschappij, N.V. v. Isbrandtsen Co.*, 339 F.2d 440, 441 (2d Cir. 1964))).  "A discretionary stay" of this kind "is particularly appropriate where there is significant

factual overlap between the remaining claims and the arbitrated claims." *Winter Invs., LLC v. Panzer*, 2015 WL 5052563, at *11 (S.D.N.Y. Aug. 27, 2015). Here, plaintiffs' claims "involve common issues of fact and law," and arbitration as to any of the claims "is likely to dispose issues common to" all claims. *Moore v. Interacciones Glob., Inc.*, 1995 WL 33650, at *7 (S.D.N.Y. Jan. 27, 1995). The arbitration will therefore inform the litigation of any claims in this Court, and must proceed first. *See Panzer*, 2015 WL 5052563, at *11.

## CONCLUSION

Morgan Stanley respectfully asks the Court to compel arbitration of plaintiffs' claims and to stay proceedings pending resolution of arbitration.

ADD-86

Dated: Washington, D.C.

     May 9, 2022

Respectfully submitted,

O'MELVENY & MYERS LLP

By: /s/ Meaghan VerGow
Meaghan VerGow
Brian D. Boyle (*pro hac vice*)
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone:  (202) 383-5300
Facsimile:  (202) 383-5414
mvergow@omm.com
bboyle@omm.com

Pamela A. Miller
Karen Gillen
Times Square Tower
7 Times Square
New York, New York 10036
Telephone:  (212) 326-2000
Facsimile:  (212) 326-2061
pmiller@omm.com
kgillen@omm.com

*Attorneys for Defendants Morgan Stanley,*
*Morgan Stanley Smith Barney LLC, and*
*Morgan Stanley Compensation*
*Management Development and*
*Succession Committee*

ADD-87

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MATTHEW T. SHAFER, SHERI HAUGABOOK, PETER HEIDT, JEFFREY SHOVER, MACE TAMSE, GEORGE LIVANOS, MARK LOFTUS, JEFFREY SAMSEN, JEFFREY SHERESKY, STEVE SHERESKY, STEVE NADLER, AND SANDY JUKEL, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, <br><br> Plaintiffs, <br><br> -against- <br><br> MORGAN STANLEY, MORGAN STANLEY SMITH BARNEY LLC, MORGAN STANLEY COMPENSATION MANAGEMENT DEVELOPMENT AND SUCCESSION COMMITTEE, and John/Jane Does 1-20, <br><br> Defendants. | Civil Action No. 1:20-cv-11047-PGG |

### DECLARATION OF KEITH PORCO IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION AND TO STAY PROCEEDINGS

I, Keith Porco, declare and state as follows:

1.      I am currently employed as an Executive Director within the Morgan Stanley Family Office business. Prior to January 1, 2022, I was an Executive Director within the Office of Business Management at Morgan Stanley. In that role I oversaw the Financial Advisor compensation policies. I joined Morgan Stanley in 2004, worked in the Office of Business Management role since 2014, and was named Executive Director in 2015.

2.      I submit this declaration in support of the motion of Defendants Morgan Stanley,

Morgan Stanley Smith Barney LLC, and the Morgan Stanley Compensation Management

Development and Succession Committee to compel arbitration.

3.      Based on my role and responsibilities at Morgan Stanley, I have personal

knowledge of the following facts and, if called and sworn as a witness, could and would testify

competently thereto.

4.      In connection with making this Declaration, I reviewed records compiled,

maintained, and relied on in the normal course of business by Morgan Stanley, and to which I

have access in my role as Executive Director of the Office of Business Management.

5.      Attached hereto as Exhibit A is a true and correct copy of a document titled

"Morgan Stanley Financial Advisor/Private Wealth Advisor Compensation Plan, Growth Award

and Recognition Programs 2015," dated January 12, 2015.

6.      Attached hereto as Exhibit B is a true and correct copy of the Growth Award

Bonus Agreement between plaintiff Matthew T. Shafer and Morgan Stanley Smith Barney LLC,

dated February 6, 2015.

7.      The firm's records show that pursuant to this Growth Award Bonus Agreement,

Morgan Stanley paid Mr. Shafer $12,288.72 in 2016 and $12,120.44 in 2017.

8.      Attached hereto as Exhibit C is a true and correct copy of the Growth Award

Bonus Agreement between plaintiff Mace Tamse and Morgan Stanley Smith Barney LLC, dated

February 18, 2014.

9.      The firm's records show that pursuant to this Growth Award Bonus Agreement,

Morgan Stanley paid Mr. Tamse $6,174.35 in 2015.

10.   Attached hereto as Exhibit D is a true and correct copy of the Growth Award Bonus Agreement between plaintiff Mark Loftus and Morgan Stanley Smith Barney LLC, dated February 18, 2014.

11.   The firm's records show that pursuant to this Growth Award Bonus Agreement, Morgan Stanley paid Mr. Loftus $23,016.98 in 2015, $22,629.15 in 2016, $22,241.32 in 2017, and $21,853.48 in 2018.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 6 day of May , 2022, in Purchase, New York.

Keith Porco

3

# Exhibit A

# Morgan Stanley

**As of January 12, 2015**

Financial Advisor/
Private Wealth Advisor
# Compensation Plan, Growth Award and Recognition Programs 2015

Compensation and Recognition Program

CONFIDENTIAL—FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

# Morgan Stanley

## » Financial Advisor / Private Wealth Advisor
### Compensation Plan, Growth Award and Recognition Programs 2015

**TABLE OF CONTENTS**

1.  Compensation Programs
    1.1 Salary....................................................... 2
    1.2 Incentive Compensation........................... 3
2.  Growth Award
    2.1 Growth Award........................................ 17
    2.2 Growth Premium .................................... 17
    2.3 Lending Award........................................ 20
3.  Other Programs
    3.1 Capital Accumulation Program................ 23
    3.2 Former Advisor Program ........................ 24
    3.3 Business Development Allowance............. 25
    3.4 Alternative Flexible Grid ........................ 25
    3.5 Discretionary Fee Waiver
        Allowance............................................... 26
4.  Recognition Programs
    4.1 Club Memberships for 2016 .................... 27
    4.2 Titles....................................................... 28
5.  Other
    5.1 Summary and Additional
        Information.............................................. 29
    5.2 Version History ....................................... 30

*This document will be periodically updated with any changes. To obtain the latest version, visit the 2015 FA/PWA Compensation website on 3DR > Practice > FA Compensation 2015. In addition, the most recent version of the detailed 2015 Product Appendix is available on the website.*

### Introduction

The Morgan Stanley Wealth Management Financial Advisor / Private Wealth Advisor ("FA/PWA") Compensation Plan provides FA/PWAs with a guaranteed salary as well as an opportunity to generate significant additional income through Incentive Compensation and the Growth Award.

### Incentive Compensation

Eligibility is based on Total Credits (based on the Credit Rate Schedule and Credit Rate Schedule Exceptions described in sections 1.2.1 & 1.2.6) derived from total annual Gross Revenue and the rules and conditions set forth in this Program. The Credit Rate Schedule provides the opportunity for increasing Incentive Compensation through a retroactive escalating grid. Incentive Compensation is comprised of Cash Credits which are awarded each month as an advance, and Deferred Credits which accrue each month and are awarded in early 2016.

### Growth Award

2015 Growth Award is comprised of the following components:

- **Growth Premium** is designed to reward FA/PWAs who grow their Gross Revenue. FA/PWAs who qualify for the Growth Premium are also eligible for:
    - **25% Additional Business Development Allowance ("BDA")** provided to invest even more in FA/PWA businesses that are growing
    - **Client Service Associate ("CSA") "Go for Growth" Award** provided to thank our CSAs who support their FA/PWA in their growth

- **Lending Award** is designed to reward FA/PWAs for utilizing Lending opportunities consistent with their clients' best interests

The Growth Premium and Lending Award are calculated annually and will be awarded in the first quarter of 2016.

Confidential- for internal Morgan Stanley Wealth Management use only. Not to be displayed or distributed to the general public

**SECTION 1: Compensation Programs**

### HOW IT ADDS UP:

**Total Potential Income and Growth Award**[1,2]

(Assumes Top 5% Positive Gross Revenue Growth by LOE band)

| Annual Gross Revenue ($) | Lending Growth ($) | Length of Service / Length of Experience (years) | | | | |
|---|---|---|---|---|---|---|
| | | 4 | 10 | 15 | 20 | 25 |
| 5,000,000 | 45,000,000 | 59.6% | 62.1% | 62.6% | 63.1% | 63.6% |
| 3,000,000 | 35,000,000 | 58.1 | 60.6 | 61.1 | 61.6 | 62.1 |
| 2,500,000 | 30,000,000 | 57.1 | 59.6 | 60.1 | 60.6 | 61.1 |
| 2,200,000 | 25,000,000 | 55.7 | 58.2 | 58.7 | 59.2 | 59.2 |
| 1,650,000 | 20,000,000 | 55.3 | 57.8 | 58.3 | 58.3 | 58.3 |
| 1,100,000 | 15,000,000 | 54.6 | 57.1 | 57.1 | 57.1 | 57.1 |
| 880,000 | 12,500,000 | 52.3 | 54.3 | 54.3 | 54.3 | 54.3 |
| 825,000 | 10,000,000 | 50.9 | 52.9 | 52.9 | 52.9 | 52.9 |
| 660,000 | 7,500,000 | 50.0 | 52.0 | 52.0 | 52.0 | 52.0 |
| 550,000 | 5,000,000 | 48.2 | 50.2 | 50.2 | 50.2 | 50.2 |
| 440,000 | 3,500,000 | 47.8 | 48.3 | 48.3 | 48.3 | 48.3 |
| 385,000 | 2,500,000 | 44.3 | 44.3 | 44.3 | 44.3 | 44.3 |
| 330,000 | 1,500,000 | 41.6 | 41.6 | 41.6 | 41.6 | 41.6 |
| 275,000 | 750,000 | 41.0 | 20.0 | 20.0 | 20.0 | 20.0 |
| 220,000 | 500,000 | 39.8 | 20.0 | 20.0 | 20.0 | 20.0 |

## 1.1 Salary

All FA/PWAs will receive a guaranteed monthly salary. Total compensation in any month will not be lower than their applicable monthly salary.

The salary for each FA/PWA is determined by the state in which the FA/PWA is employed. The table below summarizes the current FA/PWA salaries by state. However, the salaries are subject to adjustment throughout the year at Morgan Stanley Wealth Management's sole discretion, including changes based on applicable state law.

Monthly Salary by State

| State | FA/PWA Salary ($) |
|---|---|
| Alaska | 3,034 |
| California | 3,120 |
| Connecticut | 2,059 |
| Hawaii | 2,000 |
| New York | 2,844 |
| All Other | 1,972 |

---

[1] Chart reflects potential income or estimates and is not intended to reflect a guarantee of any level of remuneration or income

[2] Assumes FA/PWA was hired before January 1st, 2013, is not part of a Financial Advisor Associate (FAA) program, did not end 2015 with a 20% Credit Rate,  and opened six new Lending Units (PLA (excluding Letters of Credit), ECL, Tailored Lending, Mortgage (excluding HELOC)) in 2015 at the pre-split level

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 1: Compensation Programs**

## 1.2 Incentive Compensation

### 1.2.1 Total Credits

Subject to the terms outlined in this Program, an FA/PWA is allocated Total Credits based on his/her Credit Rate and Creditable Revenue. Each FA/PWA's Credit Rate is based on two factors: (1) full year Gross Revenue and (2) Length of Service ("LOS"), as shown in the Credit Rate Schedule below.

Credit Rate Schedule (%)

| Annual Gross Revenue ($) | Length of Service (years) | | | | | | |
|---|---|---|---|---|---|---|---|
| | 0 - 4.9 | 5 - 6.9 | 7 - 8.9 | 9 - 14.9 | 15 - 19.9 | 20 - 24.9 | 25+ |
| 5,000,000+ | 51.5% | 52.0% | 53.5% | 54.0% | 54.5% | 55.0% | 55.5% |
| 3,000,000–4,999,999 | 49.0 | 49.5 | 51.0 | 51.5 | 52.0 | 52.5 | 53.0 |
| 2,500,000–2,999,999 | 48.0 | 48.5 | 50.0 | 50.5 | 51.0 | 51.5 | 52.0 |
| 2,200,000–2,499,999 | 47.0 | 47.5 | 49.0 | 49.5 | 50.0 | 50.5 | 50.5 |
| 1,650,000–2,199,999 | 46.5 | 47.0 | 48.5 | 49.0 | 49.5 | 49.5 | 49.5 |
| 1,100,000–1,649,999 | 45.5 | 46.0 | 47.5 | 48.0 | 48.0 | 48.0 | 48.0 |
| 880,000–1,099,999 | 43.0 | 43.5 | 45.0 | 45.0 | 45.0 | 45.0 | 45.0 |
| 825,000–879,999 | 42.5 | 43.0 | 44.5 | 44.5 | 44.5 | 44.5 | 44.5 |
| 660,000–824,999 | 42.0 | 42.5 | 44.0 | 44.0 | 44.0 | 44.0 | 44.0 |
| 550,000–659,999 | 41.0 | 41.5 | 43.0 | 43.0 | 43.0 | 43.0 | 43.0 |
| 440,000–549,999 | 41.0 | 41.5 | 41.5 | 41.5 | 41.5 | 41.5 | 41.5 |
| 385,000–439,999 | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 |
| 330,000–384,999 | 36.0 | 36.0 | 36.0 | 36.0 | 36.0 | 36.0 | 36.0 |
| 275,000–329,999 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 |
| 220,000–274,999 | 32.0 | 32.0 | 32.0 | 32.0 | 32.0 | 32.0 | 32.0 |
| 0–219,999 | 28.0 | 28.0 | 28.0 | 28.0 | 28.0 | 28.0 | 28.0 |

FA/PWAs Registered for Less Than Five Years

| Annual Gross Revenue ($) | For All Length of Service |
|---|---|
| 275,000–329,999 | 36.0 |
| 220,000–274,999 | 35.0 |
| 0–219,999 | 34.0 |

FA/PWAs Registered for Nine or More Years

| Annual Gross Revenue ($) | For All Length of Service |
|---|---|
| 0–299,999 | 20.0 |

As the FA/PWA reaches a new Gross Revenue band in the Credit Rate Schedule, provided the FA/PWA did not change LOS bands, then the Total Credits earned for the current month in addition to each prior month in the current calendar year will be retroactively adjusted to apply the Credit Rate of the newly attained Gross Revenue band to the FA/PWA's year-to-date Total Credits.

If the FA/PWA reaches a new LOS band in the Credit Rate Schedule and remains in the same Gross Revenue band for the remainder of the year, then the newly attained Credit Rate will be applied to Gross Revenue generated in the month following that in which the LOS breakpoint was crossed, as well as prospectively. However, the Credit Rate will <u>NOT</u> be adjusted retroactively to bring the FA/PWA's year-to-date Total Credits to the newly-attained level.

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 1: Compensation Programs**

If the FA/PWA reaches a new LOS band in the Credit Rate Schedule and subsequently reaches a new Gross Revenue band during the same year, then year-to-date Total Credits will be retroactively adjusted to:

- Apply the Credit Rate of the newly-attained Gross Revenue band and previous LOS band to the Total Credits earned while in the previous LOS band; and

- Apply the Credit Rate of the newly-attained Gross Revenue band and new LOS band to the Total Credits earned while in the new LOS band

Retroactive Credit Rate Adjustments will only apply to Grid Revenue (not Flat-Rate Revenue or 0% Revenue).

**Total Credits** = Cash Credits + Deferred Credits

### 1.2.2 Deferred Compensation

A percentage of Total Credits are allocated to the FA/PWA as Deferred Credits based on a Deferral Ratio determined by the FA/PWA's full year Gross Revenue, as shown in the Deferral Ratio Schedule below.

**Deferred Credits** = Total Credits × Deferral Ratio

Deferral Ratio Schedule

| Annual Gross Revenue ($) | Deferral Ratio (%) |
|---|---|
| 5,000,000+ | 15.5 |
| 3,000,000–4,999,999 | 14.0 |
| 2,500,000–2,999,999 | 13.0 |
| 2,200,000–2,499,999 | 12.5 |
| 1,650,000–2,199,999 | 11.5 |
| 1,100,000–1,649,999 | 10.0 |
| 880,000–1,099,999 | 8.5 |
| 825,000–879,999 | 7.5 |
| 660,000–824,999 | 6.5 |
| 550,000–659,999 | 5.5 |
| 440,000–549,999 | 5.0 |
| 385,000–439,999 | 4.0 |
| 330,000–384,999 | 3.5 |
| 275,000–329,999 | 2.5 |
| 220,000–274,999 | 1.5 |
| 0–219,999 | 1.5 |

FA/PWAs with a Credit Rate equal to 20% will have a Deferral Ratio of 0%.

As the FA/PWA reaches a new Gross Revenue threshold in the Deferral Ratio Schedule during the year, the Deferral Ratio for each prior month, in addition to the current month, will be retroactively adjusted to bring the FA/PWA's total year-to-date Deferred Credits to the newly-attained level.

The value of the Deferred Credits for 2015 will not be paid to the FA/PWA in cash on a current basis, but will instead be awarded as deferred compensation shortly following year-end (provided the FA/PWA is employed on the grant date). Deferred Compensation will be awarded 25% in the form of an equity-based award that is scheduled to convert to shares during year 4 and 75% in the form of a cash-based award that is scheduled to be paid during year 8. The remaining terms and conditions of the deferred compensation awards, including vesting, cancellation provisions and sales restrictions, will be determined by the Compensation, Management Development and Succession Committee of Morgan Stanley's Board of Directors (the "Compensation Committee") on or prior to the grant date and will be set forth in the

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

ADD-96

**SECTION 1: Compensation Programs**

applicable award documentation. Deferred compensation awards are contingent upon the FA/PWA remaining employed through the grant and vesting dates of the award.

In the event that the FA/PWA's full-year 2015 Deferred Credit withholding is less than the year-end calculated Deferred Credit amount (defined as the FA/PWA's full-year 2015 Total Credits multiplied by the FA/PWA's year-end 2015 Deferral Ratio), the Firm will award the year-end calculated Deferred Credit amount as a deferred compensation award. The difference between the FA/PWA's year-end calculated Deferred Credit amount and the FA/PWA's full-year 2015 Deferred Credit withholding will be repaid to the Firm by the FA/PWA through a decrease in the FA/PWA's 2016 Cash Credit amount. The Firm reserves the right to make adjustments to the amounts withheld during the year pursuant to an FA/PWA's Deferral Ratio, provided that in all cases the amount of the deferred compensation award will equal the year-end Deferred Credit amount.

If an FA/PWA's Deferred Credits are equal to or less than $1,000, the Deferred Credits will be paid in cash on the date 2015 year-end bonuses are paid to Firm employees generally, but in no event later than March 15th, 2016, and will not be granted as a deferred compensation award.

Deferred compensation awards are not intended to provide for retirement income.

Associates/FAAs are not eligible to receive year-end deferred compensation awards.

### 1.2.3 Cash Compensation

The Total Credits remaining after Deferred Credits are allocated are then awarded to the FA/PWA as Cash Credits. An FA/PWA's Cash Credits are calculated monthly.

**Cash Credits** = Total Credits − Deferred Credits (including Retroactive Deferred Credit Adjustments)

**Example:**

An FA/PWA with a Length of Service (LOS) of 15 years produces $700,000 in Gross Revenue in 2015.

- Credit Rate is 44%
- Total Credits is $308,000  [$700,000 × 44.0%]
- Deferred Credits is $20,020  [$308,000 × 6.5%]
- Cash Credits is $287,980  [$308,000 − $20,020]

### Calculation of Cash Credit Advance

Cash Credit advance is the amount by which Cash Credits exceed FA/PWA salary for the month. An FA/PWA whose Cash Credits do not exceed his/her salary is not eligible to receive a Cash Credit advance. An FA/PWA's Cash Credit advance is calculated monthly and is paid, in arrears, on a monthly basis. Cash Credit advance is calculated based on the following:

1) <u>Creditable Revenue</u> – Creditable Revenue is the Gross Revenue attributable to the FA/PWA that is in excess of his/her Revenue Share

2) <u>Revenue Share</u> – Creditable Revenue that is allocated to Support Staff through Revenue Share arrangements

3) <u>Grid Revenue</u> – Grid Revenue is revenue where Credits are determined based on the Credit Rate Schedule including revenue subject to the Discounting Policy. Grid Revenue does not include Flat-Rate Revenue where Credits are determined based on a flat Credit Rate or 0% Revenue where Credits are determined based on a 0% Credit Rate

4) <u>Credits</u> – FA/PWAs are allocated Credits based on the Credit Rate Schedule (Section 1.2.1) and Credit Rate Schedule Exceptions (Section 1.2.6)

5) <u>Retroactive Credit Rate Adjustments</u> – Credits are adjusted upwards or downwards to reflect Retroactive Credit Rate Adjustments based on movements along the Credit Rate Schedule

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 1: Compensation Programs**

6) <u>Credit Adjustments</u> – Credits are adjusted upwards or downwards to reflect Incentive Compensation for which the FA/PWA did not receive proper Credits, or for which the FA/PWA received prior Credits that he/she should not have received. Under no circumstances is an FA/PWA to be allocated Credits or maintain Credits for transactions that were cancelled, that did not close, that were reversed, and/or where the FA/PWA was allocated Credits in error

7) <u>Total Credits</u> – Total Credits are the result of the Credits, Retroactive Credit Rate Adjustments, and Credit Adjustments as described in items 4, 5 and 6 above

8) <u>Deferred Credits</u> – Deferred Credits are Total Credits multiplied by the FA/PWA's Deferral Ratio as defined in Section 1.2.2

9) <u>Retroactive Deferred Credit Adjustments</u> – Deferred Credits are adjusted upwards or downwards to reflect Retroactive Deferred Credit Adjustments based on movements along the Deferral Ratio Schedule

10) <u>Length of Service ("LOS")</u> – LOS represents the amount of time an FA/PWA has been employed by Morgan Stanley Wealth Management plus the amount of time the FA/PWA was employed by legacy Morgan Stanley or legacy Smith Barney immediately preceding his or her employment with Morgan Stanley Wealth Management. LOS will not include any period of employment preceding employment at the immediately prior legacy firm, including prior employment at Morgan Stanley or Smith Barney. LOS for all purposes related to FA/PWA Compensation shall be defined exclusively as set forth in this paragraph and without reference to any other LOS definition that the firm may apply in other contexts, including, for example, for purposes of certain benefits calculations

11) <u>Length of Experience ("LOE")</u> – LOE represents the amount of time an FA/PWA has been a Registered Representative in the industry

Under no circumstances shall an FA/PWA be eligible to receive any Incentive Compensation under this Program unless and until the Incentive Compensation calculation is made and the FA/PWA meets all other conditions for receipt of such Incentive Compensation as determined by Morgan Stanley Wealth Management. In the event an FA/PWA who has been advanced Incentive Compensation because of fees that were charged to a customer in advance terminates, the FA/PWA's allocated Total Credits in the final month of employment will be adjusted to account for the unearned portion of the Cash Credit advance. In addition, an FA/PWA is obligated to repay Morgan Stanley Wealth Management any outstanding advanced but unearned Incentive Compensation after termination.

Morgan Stanley Wealth Management expects its FA/PWAs to demonstrate excellent guardianship at all times, including demonstrating the utmost professionalism and upholding the highest ethical and regulatory standards and its Incentive Compensation programs are premised on that expectation. Accordingly, Morgan Stanley Wealth Management reserves the right, on notice to the impacted individual, to make prospective downward adjustments to an individual FA/PWA's Credit Rate, or to make other downward adjustments as part of the calculation of Incentive Compensation at any time, where, in its sole judgment, such an adjustment is warranted based on the FA/PWA's conduct. The determination as to whether a downward adjustment is warranted on account of guardianship issues will be made by Morgan Stanley Wealth Management in its sole discretion, but may include, for example, significant trade errors, excessive customer complaints, regulatory or ethical lapses, or other conduct that is determined to be contrary to the best interests of the clients or the Firm.

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 1: Compensation Programs**

### 1.2.4 Team Compensation

In 2015, the Firm will continue to provide the opportunity for eligible FA/PWA Team members to receive an increased Credit Rate based on the Individual Eligibility or Team Eligibility Criteria below.

#### Individual Eligibility

To be considered for Team Compensation, FA/PWAs must meet the following eligibility criteria:

- Must be on a Registered Team
  – A Registered Team is considered a collection of shared revenue relationships (Joint Production Numbers) through which <u>each member of the relationship generated at least 50% of their individual T-12 Gross Revenue</u> and for which a formal Joint Production Agreement (JPA) has been completed and approved
- Generate T-12 Gross Revenue at or above the 50th percentile by Industry Length of Experience (LOE) thresholds[3] as published on the 2015 FA/PWA Compensation website
- Generate at least 10% of the Team's total T-12 Gross Revenue <u>OR</u> if the Team's Total T-12 Gross Revenue is more than $3,000,000, each FA/PWA must generate at least 5% of the Team's Total T-12 Gross Revenue

#### Team Eligibility

The Team as a whole can also qualify for Team Compensation. To be considered for Team Eligibility, the Team must meet the following eligibility criteria:

- Must be a Registered Team
- Team's total T-12 Gross Revenue must be at least $2,500,000 <u>AND</u> the average Gross Revenue per FA/PWA on the Team must be greater than $750,000
- There is no 50th percentile or percent of Team Gross Revenue requirement

FA/PWAs eligible for Team Compensation will receive the Credit Rate that corresponds to:

- The Gross Revenue band of the FA/PWA on the Team with the highest Gross Revenue;  <u>AND</u>
- The lower LOS band between (i) the FA/PWA on the Team with the highest Gross Revenue and (ii) the FA/PWA eligible for Team Compensation

Eligible FA/PWAs will receive the Deferral Ratio that corresponds to the Gross Revenue band of the FA/PWA on the Team with the highest Gross Revenue.

An FA/PWA's individual Credit Rate cannot be reduced because of Team Compensation nor can it be greater than the Credit Rate of the FA/PWA on the Team with the highest Gross Revenue.

FA/PWAs who do not meet year-end qualifications but whose T-12 Gross Revenue meets the Team Compensation requirements any time during 2015 will be eligible for Team Compensation beginning the month following their qualification. Where that occurs, Team Compensation will be available prospectively through the end of the year (provided that the Team continues to satisfy the Registered Team requirements identified above), but will <u>NOT</u> be awarded retroactively. Once an FA/PWA qualifies, he/she will continue to receive Team Compensation throughout the year as long as the FA/PWA's Team continues to satisfy the Registered Team requirements.

FA/PWAs on Teams that dissolve or who leave the Team will no longer be eligible to receive Team Compensation and will revert to their own Credit Rate for the remainder of the year; prior Team Compensation allocated will not be adjusted retroactively.

#### Recruits

Recruits will be treated in the same manner as an established FA/PWA by comparing the T-12 Gross Revenue listed on their recruit paperwork against the 50th percentile requirements.

---

[3] FA/PWA with the highest Gross Revenue on the Team must also generate T-12 Gross Revenue at or above the 50th percentile threshold by LOE band

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 1: Compensation Programs**

### Associates/FAAs

Associates/FAAs are not eligible for Team Compensation while still part of the Associate/FAA program.

**Example 1:**

The following FA/PWAs are on a Registered Team for all of 2015 and met their respective top 50th percentile by LOE threshold as of January 1st 2015:

- FA/PWA 1 produces $1,500,000 of Gross Revenue, has LOS of 20 years, a Credit Rate of 48.0%, and a Deferral Ratio of 10.0%
- FA/PWA 2 produces $400,000 of Gross Revenue, has LOS of 4 years, a Credit Rate of 38.0% and a Deferral Ratio of 4.0%

FA/PWA 2's Credit Rate will be determined using FA/PWA 1's Gross Revenue band and FA/PWA 2's LOS band. FA/PWA 2's Credit Rate will be 45.5% and Deferral Ratio will be 10.0%.

**Example 2:**

The following FA/PWAs are on a Registered Team for all of 2015 and met their respective top 50th percentile by LOE threshold as of January 1st 2015:

- FA/PWA 1 produces $1,200,000 of Gross Revenue, has LOS of 5 years, a Credit Rate of 46.0%, and a Deferral Ratio of 10.0%
- FA/PWA 2 produces $500,000 of Gross Revenue, has LOS of 7 years, a Credit Rate of 41.5% and a Deferral Ratio of 5.0%

FA/PWA 2's Credit Rate will be determined using FA/PWA 1's Gross Revenue band and FA/PWA 1's LOS band. FA/PWA 2's Credit Rate will be 46.0% and Deferral Ratio will be 10.0%

### 1.2.5 Start-Up Policy and Reset

At the start of each year, all FA/PWAs are assigned an advanced Credit Rate and Deferral Ratio.

### Advanced Credit Rate and Deferral Ratio

Advanced Credit Rates and Deferral Ratios are assigned as follows:

- FA/PWAs with prior year Gross Revenue of $1,100,000 or more are assigned an advanced Credit Rate and Deferral Ratio based on their 2014 Gross Revenue, December 2014 LOS and the 2015 Credit Rate and Deferral Ratio Schedules
- FA/PWAs with prior year Gross Revenue of less than $1,100,000 are assigned an advanced Credit Rate and Deferral Ratio based on their 2014 Gross Revenue and December 2014 LOS at one Gross Revenue band lower on the 2015 Credit Rate and Deferral Ratio Schedules, but not less than the lowest Gross Revenue band on the applicable Credit Rate or Deferral Ratio Schedules

*Please note that the advanced Credit Rate under this Start-Up Policy is an advance against FA/PWA Incentive Compensation.*

In July and October, if the Credit Rate corresponding to the FA/PWA's 2015 annualized Gross Revenue ("target rate") is less than the advanced Credit Rate assigned to the FA/PWA at the start of the year ("start-up rate"), then the Credit Rate and Deferral Ratio will be reset to one Gross Revenue band below the target rate as determined by the 2015 Credit Rate and Deferral Ratio Schedules. If the target rate is equal to or greater than the start-up rate, the advanced Credit Rate and Deferral Ratio will remain unchanged.

If the advanced Incentive Compensation amount exceeds the Incentive Compensation calculated under the terms of this Program, the difference will be subtracted from the FA/PWA's allocated Cash Credits in the last month of the year and any shortfall will be carried forward into the next year. If the advanced Deferred Credits exceed the Deferred Credits calculated under the terms of this Program, the difference will be added to the FA/PWA's allocated Cash Credits in the last month of the year.

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

ADD-100

**SECTION 1: Compensation Programs**

In the event the FA/PWA's employment terminates, the Credit Rate and Deferral Ratio will be retroactively adjusted based on the year-to-date Gross Revenue and the 2015 Credit Rate and Deferral Ratio Schedules. If the advanced Incentive Compensation amount exceeds the calculated Incentive Compensation under the terms of this Program, the difference will be subtracted from the FA/PWA's allocated Cash Credits in the final month of employment so that the FA/PWA will be paid in full based on the actual applicable Credit Rate for the year. In addition, an FA/PWA whose employment terminates is obligated to repay Morgan Stanley Wealth Management any outstanding advanced but unearned Incentive Compensation.

### 1.2.6 Credit Rate Schedule Exceptions

### Equity and Options Discounting

In situations where an FA/PWA exercises discretion to offer a discount to the client, the FA/PWA's Credit Rate will be reduced as per the tables below, subject to a minimum 10% Credit Rate. Cents-per-share trades will be converted to a percentage discount to determine application of the tables below:

Summary Table

| Pricing | Credit |
|---|---|
| Discount of 0% up to 20% | Credit Rate |
| Discount over 20% and up to 30% | Credit Rate minus 25bps per 1% of Discount over 20% |
| Discount over 30% and up to 45% | Credit Rate minus 40bps per 1% of Discount over 30% |
| Discount greater than 45% | Credit Rate minus 60bps per 1% of Discount over 45% |

Below is a detailed table showing the exact impact to Credit Rate based on the level of discount. All numbers shown are percentages:

Detailed Table

| Level of Discount | Credit Rate Reduction | Level of Discount | Credit Rate Reduction | Level of Discount | Credit Rate Reduction | Level of Discount | Credit Rate Reduction |
|---|---|---|---|---|---|---|---|
| 0 – 20% | 0.00% | 40% | 6.50% | 60% | 17.50% | 80% | 29.50% |
| 21 | 0.25 | 41 | 6.90 | 61 | 18.10 | 81 | 30.10 |
| 22 | 0.50 | 42 | 7.30 | 62 | 18.70 | 82 | 30.70 |
| 23 | 0.75 | 43 | 7.70 | 63 | 19.30 | 83 | 31.30 |
| 24 | 1.00 | 44 | 8.10 | 64 | 19.90 | 84 | 31.90 |
| 25 | 1.25 | 45 | 8.50 | 65 | 20.50 | 85 | 32.50 |
| 26 | 1.50 | 46 | 9.10 | 66 | 21.10 | 86 | 33.10 |
| 27 | 1.75 | 47 | 9.70 | 67 | 21.70 | 87 | 33.70 |
| 28 | 2.00 | 48 | 10.30 | 68 | 22.30 | 88 | 34.30 |
| 29 | 2.25 | 49 | 10.90 | 69 | 22.90 | 89 | 34.90 |
| 30 | 2.50 | 50 | 11.50 | 70 | 23.50 | 90 | 35.50 |
| 31 | 2.90 | 51 | 12.10 | 71 | 24.10 | 91 | 36.10 |
| 32 | 3.30 | 52 | 12.70 | 72 | 24.70 | 92 | 36.70 |
| 33 | 3.70 | 53 | 13.30 | 73 | 25.30 | 93 | 37.30 |
| 34 | 4.10 | 54 | 13.90 | 74 | 25.90 | 94 | 37.90 |
| 35 | 4.50 | 55 | 14.50 | 75 | 26.50 | 95 | 38.50 |
| 36 | 4.90 | 56 | 15.10 | 76 | 27.10 | 96 | 39.10 |
| 37 | 5.30 | 57 | 15.70 | 77 | 27.70 | 97 | 39.70 |
| 38 | 5.70 | 58 | 16.30 | 78 | 28.30 | 98 | 40.30 |
| 39 | 6.10 | 59 | 16.90 | 79 | 28.90 | 99 | 40.90 |

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

ADD-101

**SECTION 1: Compensation Programs**

**Example 1: Transaction with a commission charged to client of less than $350:**

An FA/PWA with a Credit Rate (based on Credit Rate Schedule) of 36% executes a trade with a commission of $400:

1) FA/PWA discounts this trade by 40% = commission of $240 [$400 – ($400 * 40%) = $240]
2) As seen in the Detailed Table above, the Credit Rate reduction on this trade is 6.5%
3) Credit rate on this trade is 29.5% [36% - 6.5% = 29.5%]
4) FA/PWA Total Credit is $70.80 [$240 * 29.5% = $70.80]

**Example 2: Transaction with a commission charged to client of less than $350 - 10% minimum Credit Rate:**

An FA/PWA with a Credit Rate (based on Credit Rate Schedule) of 36% executes a trade with a commission of $600:

1) FA/PWA discounts this trade by 80% = commission of $120 [$600 – ($600 * 80%) = $120]
2) As seen in the Detailed Table above, the Credit Rate reduction on this trade is 29.5%
3) Calculated Credit rate on this trade is 6.5% [36% - 29.5% = 6.5%] however, applicable Credit rate will be 10% due to minimum Credit Rate
4) FA/PWA Total Credit is $12 [$120 * 10% = $12]

The Equity and Options Discounting Policy shall not apply to the following:

| Discount Exceptions |
| --- |
| Employee Accounts |
| Employee-Related Accounts |
| Futures (the below Futures Discount Sharing policy applies) |
| Ladder Portfolios—All one-ticket, preplanned ladders in order-entry inventory |
| SOP Accounts / CSX Accounts / DSB Accounts |
| Strategic Equity Portfolio ("STEP") |
| CES-directed Brokerage |
| Flat-rate accounts are credited at lower of Credit Rate or flat-rate |
| Equity Transactions with commission amount of $350 or more (exemption does not apply to commissions priced at an effective rate of <4 cents per share) |
| Options Transactions with commission amount of $350 or more (exemption does not apply to commissions priced at less than $3.00 for contracts with premiums ≥$1.00 or to commissions priced at less than $1.00 for contracts with premiums <$1.00) |

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

ADD-102

**SECTION 1: Compensation Programs**

### Futures and Commodities Discounting

In situations where the FA/PWA exercises discretion to offer a discount to the client, the FA/PWA's Credit Rate will be reduced as per the tables below, subject to a minimum 10% Credit Rate.

Summary Table

| Commission Per Half-Turn Contract | Credit |
|---|---|
| Above and equal to $18.00 | Credit Rate |
| Less than $18.00 | Credit Rate minus 1% for each dollar, or portion of dollar, of commission per half-turn under $18.00 |

Below is a detailed table showing the exact impact to Credit allocation based on level of discount:

Detailed Table

| Commission Per Half-Turn Contract | Credit Rate Reduction | Commission Per Half-Turn Contract | Credit Rate Reduction |
|---|---|---|---|
| $17.00 to $17.99 | 1.0% | $8.00 to $8.99 | 10.0% |
| $16.00 to $16.99 | 2.0% | $7.00 to $7.99 | 11.0% |
| $15.00 to $15.99 | 3.0% | $6.00 to $6.99 | 12.0% |
| $14.00 to $14.99 | 4.0% | $5.00 to $5.99 | 13.0% |
| $13.00 to $13.99 | 5.0% | $4.00 to $4.99 | 14.0% |
| $12.00 to $12.99 | 6.0% | $3.00 to $3.99 | 15.0% |
| $11.00 to $11.99 | 7.0% | $2.00 to $2.99 | 16.0% |
| $10.00 to $10.99 | 8.0% | $1.00 to $1.99 | 17.0% |
| $9.00 to $9.99 | 9.0% | | |

Discounting below $1.00 per Half-Turn Contract is only allowed with prior approval from Capital Markets, and will result in a 17.0% Credit Rate reduction.

**Example:**

If an FA/PWA with a Credit Rate of 36% executes 10 Futures or Commodities contracts with half-turn commission of $10.25 per contract, the Credit Rate on this trade would be 28% [36.0% - 8.0% = 28.0%] and the FA/PWA's Total Credit would be $28.70 [$10.25 *10 * 28.0% = $28.70].

The Futures and Commodities Discounting policy shall not apply to tickets of $350 or more where the half turn is $5.00 or greater.

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 1: Compensation Programs**

**Small Households**

Any Household with asset levels less than the below mentioned thresholds for four consecutive months is considered a Small Household. Asset levels are calculated each month on the last trade date using the higher of: (a) the previous three months asset balance; or (b) the asset balance on the day prior to last trade date. Credit allocation for Consulting Group Revenue generated in Small Households will be based on the tables below:

Financial Advisor – Small Households Schedule

| Product | Household Asset Level ($) | Credit (%) |
|---|---|---|
| Consulting Group Products[4] | 75,000–99,999 | 20 |
| | 50,000–74,999 | 15 |
| | 0–49,999 | 10 |
| All Other Products | 0–99,999 | 0 |

From January 1st, 2015 to March 31st, 2015, Private Wealth Advisors ("PWAs") will be subject to the FA Small Households policy. Effective April 1st, 2015, Credit allocation for PWAs will be based on the PWA Small Households policy rules in the table below for Households where 50.01% or greater of the aggregate split of a FA number or Joint Production Number ("JPN") is credited to PWAs <u>AND</u> all of the accounts within the Household were opened on or after April 1st, 2015. Households with at least one account opened before April 1st, 2015 will be subject to the FA Small Households policy rules in the table above. Households with assets less than $100,000, regardless of the aggregate split of the JPN that is credited to PWAs, will be subject to the FA Small Households policy rules in the table above.

Private Wealth Advisor – Small Households Schedule

| Product | Household Asset Level ($) | Credit (%) |
|---|---|---|
| Consulting Group Products[4] | 100,000–1,999,999 | 20 |
| All Other Products | 100,000–1,999,999 | 0 |

Credit allocation for Non-Resident Client ("NRC") accounts will be based on the NRC Account Small Household policy rules in the table below. NRC accounts in Households with assets less than $100,000 will be subject to the FA Small Households policy rules in the table above:

Non-Resident Client Accounts – Small Households Schedule

| Product | Household Asset Level ($) | Credit (%) |
|---|---|---|
| Consulting Group Products[4] | 100,000–499,999 | 20 |
| All Other Products | 100,000–499,999 | 0 |

Revenue from products other than Consulting Group Products will receive Gross Revenue but no Credit.

---

[4] Consulting Group Products include: Fiduciary Services (FS), Consulting & Evaluation Services (CES), Investment Management Services (IMS), Select UMA, TRAK Fund Solution, TRAK CGCM, Portfolio Management, Consulting Group Advisor, Global Investment Solutions (GIS)

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 1: Compensation Programs**

The Small Households Policy shall not apply to the following:

| Small Households Exceptions |
| --- |
| Annuities |
| College Savings External 529 Plans |
| Delivery Versus Payment ("DVP") Accounts |
| Employee Benefits Trusts |
| Financial Planning Fees |
| Futures |
| Insurance |
| New Households (opened within previous 6 months) |
| Retirement Plan Trusts |
| SAR-SEP IRA accounts, SEP IRAs, SIMPLE Accounts, Simple IRAs, VIP/RPM Accounts |
| SOP Accounts / CSX Accounts / DSB Accounts |
| Consulting Group Non-Custody Accounts |
| First State Trust Company Accounts (Product Codes 532 and 533) |
| Households served by FAs (≥50.00% of the aggregate JPN split is credited to FAs) enrolled in OneView with greater than $250,000 in combined (external OneView + Morgan Stanley) assets [see OneView exemption section below] |
| Households served by PWAs (≥50.01% of the aggregate JPN split is credited to PWAs) enrolled in OneView with greater than $10,000,000 in combined (external OneView + Morgan Stanley) assets |

## OneView Exemption on Small Households Policy[5]

Any Gross Revenue from a client Household that is enrolled in OneView is eligible for exemption from the Small Households Policy provided that it meets the below criteria. This exemption eligibility from the Small Households Policy will apply for two years from the first day of the month following the date of the client's enrollment in OneView, regardless of the initial combined asset level in the Household or whether any transactions have occurred at the time of enrollment. At the end of two years, only assets held at Morgan Stanley will be considered, in accordance with the terms of the Small Households Policy in effect at that time.

Gross Revenue from Households enrolled in OneView that have less than $100,000 in Morgan Stanley assets but a <u>combined asset level</u> (external OneView assets[6] + Morgan Stanley assets) <u>of greater than $250,000 for FAs ($10,000,000 for PWAs) will be exempt from the Small Households Policy.</u>

If a Household enrolled in OneView (served ≥50% by FA(s)) has a combined asset level (external OneView assets + Morgan Stanley assets[5]) of greater than $250,000, but subsequently falls below the $250,000 threshold for four consecutive months, the Household will be subjected to the Small Households Policy until its combined asset level becomes greater than $250,000 again. The exemption eligibility period will remain as two years from the client's initial enrollment in OneView (i.e. the exemption eligibility period will not restart based on changes in the combined asset level).

For example, in February 2015 a client enrolls in OneView for the first time, with a total of $90,000 in Morgan Stanley assets and $200,000 in OneView assets. Starting with February month-end processing, the Household (which is served ≥50% by FA(s)) is eligible for exemption from the Small Households Policy. The two-year eligibility exemption period will begin March 2015 and last through the end of February 2017.

## Small Household Transfers to the Client Advisory Center before January 1st, 2015

For Small Households transferred to the Client Advisory Center ("CAC") in 2014, FA/PWAs will continue to receive credit in the form of Phantom Gross Revenue for the revenue generated in the 12 months following the date the account was transferred to the CAC. Phantom Gross Revenue will only be used to determine Club Memberships, Titles, and Expense Allowances.

---

[5] Morgan Stanley reserves the right to modify or terminate this exemption at any time, in its discretion, and apply such modification or termination immediately to affected households
[6] Does not include manual entries — the account types included in Morgan Stanley assets are considered for OneView external assets

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 1: Compensation Programs**

### Household Transfers & New Account Referrals to the CAC on or after January 1st, 2015

For existing Households transferred to the CAC after January 1st, 2015, as well as for new Households referred directly to the CAC after January 1st, 2015, FA/PWAs will receive a one-time Gross Revenue credit equal to 50 bps of the Household AUM, up to $250,000 of AUM. Household AUM will be evaluated at the end of the third month after the CAC receives the Household. The following Credit Rates will apply:

CAC Transfer & Referral Credit Rate Schedule

| Household AUM[7] | Credit Rate |
|---|---|
| <$100,000 | 20% |
| $100,000+ | Standard Credit Rate |

### Low-Priced Securities

FA/PWAs will not be allocated Credits on securities priced at $0.99 or less per share.

### Small Trades

Credit allocation for Small Trades will be based on the table below:

Small Trades Credit Rate Schedule

| Product | Transaction Amount ($) | Credit Rate (%) |
|---|---|---|
| Options[8] | 75.00–99.99 | 30 |
| | 50.00–74.99 | 20 |
| | 0–49.99 | 0 |
| All Other Products | 0–99.99 | 0 |

The Small Trades policy shall not apply to the following:

| Small Trades Exceptions |
|---|
| Annuities |
| Certificates of Deposit |
| Choice Select Program |
| College Savings External 529 Plans |
| Consulting Group Advisory[9] |
| Corporate Retirement Plan Products (Held-away) |
| Equity and Fixed Income Underwriting |
| Futures |
| Insurance |
| Ladder Portfolios—All one-ticket, preplanned ladders in order-entry inventory |
| Managed Futures |
| Mutual Funds |
| Options - Opening covered sell orders, regardless of size |
| Repurchase Agreements |
| SOP Accounts / CSX Accounts / DSB Accounts |
| Strategic Equity Portfolio ("STEP") |
| Treasury Bills |
| Unit Trusts |
| Vision-Directed Brokerage |
| Fixed Income Products[10] |
| For accounts on Flat-Rate Credit, FA/PWAs are credited the lesser of the assigned Flat-Rate or Small Ticket Rate |

---

[7] Household AUM will be evaluated at the end of the third month after the CAC receives the Household.
[8] Excludes exercise and assignments
[9] Consulting Group Products include: Fiduciary Services (FS), Consulting & Evaluation Services (CES), Investment Management Services (IMS), Select UMA, TRAK Fund Solution, TRAK CGCM, Portfolio Management, Consulting Group Advisor, Global Investment Solutions (GIS)
[10] All Global Currency Deposits are subject to the small trade policy

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 1: Compensation Programs**

### Fixed Income DVP Credit Rate

FA/PWAs are allocated Credits based on a fixed percentage on all Fixed Income business generated in DVP accounts. The Credit Rate is based on the total prior year Gross Revenue, as follows:

Credit Rate Summary

| Prior Year Gross Revenue ($) | Credit Rate (%) |
|---|---|
| 500,000 and over | 35 |
| 0–499,999 | 25 |

This Fixed Income DVP Policy shall not apply to CES-Directed Brokerage.

### Equity Syndicate

For Households where 70% or more of T-12 Gross Revenue is generated from Equity Syndicate business, FA/PWAs will receive a flat 20% Credit Rate on Equity Syndicate revenue. For Households where less than 70% of T-12 Gross Revenue comes from Equity Syndicate business, Equity Syndicate Gross Revenue will be credited at the standard Credit Rate (see Section 1.2.1) and all other Credit Rate Schedule exception policies will also apply.

The ratio of Equity Syndicate Gross Revenue to total Gross Revenue from a specific Household is calculated on a rolling 12 month basis at the end of each month. For example, if a Household generates $10,000 in T-12 Gross Revenue between May 2014 and April 2015, of which $8,000 is from Equity Syndicate business (80%), then any Equity Syndicate Gross Revenue from that Household for the month of April 2015 would be credited at a flat 20% Credit Rate. However, if at the end of the following month (May 2015) the same Household's T-12 Gross Revenue is $12,000, of which $8,000 is from Equity Syndicate business (~67%), all Equity Syndicate business will be credited at the standard Credit Rate for the month of May 2015 and all other Credit Rate Schedule exception policies will also apply; there will be no retroactive Credit back to April 2015.

"Equity Syndicate" business refers to equity syndicate IPOs, secondary offerings, follow-ons, and block trades. This policy does not affect selling concessions on structured investments, fixed income syndicate, preferred new issues, closed-end fund IPOs, or municipal syndicate offerings.

### Non-Resident Client Business

Non-Resident Client ("NRC") business includes all business done in accounts held by individuals or entities with a Non-U.S. legal address on the account (excluding SOP, CSX, and DSB accounts). For NRC accounts, there will be a 15% Credit Rate reduction for FA/PWAs who have less than $100,000 Gross Revenue in 2014 from NRC business (excluding SOP, CSX, and DSB accounts).

The 15% NRC Credit Rate reduction will not apply to any NRC accounts on JPNs between FA/PWA(s) and ICA(s), where the ICA(s) are receiving a minimum 50% split from that JPN.

In addition, if an FA/PWA exceeds $100,000 Gross Revenue from NRC business in 2015, then the 15% Credit Rate reduction will be credited back to the FA/PWA retroactive to January 1st, 2015.

For FA/PWAs receiving Team Compensation, the NRC Credit Rate reduction will be set according to the NRC Gross Revenue of the FA/PWA on the Team with the highest Gross Revenue. If the FA/PWA receiving Team Compensation has NRC Gross Revenue greater than $100,000, then his/her Credit Rate will not be reduced by 15% for NRC business.

This Non-Resident Client Policy shall not apply to SOP, CSX and DSB Accounts. The Equity and Options Discounting policy will apply.

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

## SECTION 1: Compensation Programs

**Example 1**:

An FA/PWA with $1,500,000 Gross Revenue in 2015, a LOS of 10 years, and $50,000 NRC Gross Revenue in 2014 will receive a Credit Rate of 33% (48% - 15%) on his/her NRC business; all other Credit Rate Schedule exception policies will also apply.

**Example 2**:

An FA/PWA with $1,500,000 Gross Revenue in 2015, a LOS of 10 years, and $50,000 NRC Gross Revenue in 2014, and partners with an ICA who receives a 50% split from that JPN, will receive a standard Credit Rate of 48% on his/her NRC business due to the ICA partnership, and all other Credit Rate Schedule exception policies will also apply.

**Example 3**:

An FA/PWA with $800,000 Gross Revenue in 2015 and $50,000 NRC Gross Revenue in 2014 is on a Registered Team with another FA/PWA who has $1,500,000 Gross Revenue in 2015 and $150,000 NRC Gross Revenue in 2014. The FA/PWA with $800,000 Gross Revenue will not receive a 15% Credit Rate reduction for the months that he/she is receiving Team Compensation.

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 2: Growth Award**

## 2.1 Growth Award

### Award Structure

The 2015 Growth Award consists of the Growth Premium, 25% Additional Business Development Allowance ("BDA") in 2016, $2,000 CSA "Go for Growth" Award, and Lending Award.

FA/PWAs who meet either the Individual Eligibility Criteria <u>OR</u> the Team Eligibility Criteria for the Growth Premium listed below will be eligible to receive the Growth Premium as well as receive 25% Additional BDA in 2016 and a $2,000 CSA "Go for Growth" Award.

FA/PWAs who meet either the Individual Eligibility Criteria <u>OR</u> the Team Eligibility Criteria for the Lending Award listed below will be eligible to receive the Lending Award.

### Award Schedule

The Growth Award will be issued to FA/PWAs as a 5-year bonus agreement. The bonus agreement will have terms and conditions which will include requirements relating to ongoing employment in good standing and other material terms, including, but not limited to, a general release of all claims against the Firm, which will be set forth in the applicable documentation in detail. Any award under $10,000 (total of Growth Premium and Lending Award) will be paid as cash in the first quarter of 2016.

The 25% Additional BDA portion will be funded along with 2016 BDA and will be 25% of the 2015 BDA amount. The CSA "Go for Growth" Award will be funded in the CSA compensation system in the first quarter of 2016 and FA/PWAs will be able to allocate accordingly to a CSA(s).

In order to be eligible to receive any award, FA/PWAs must be employed in good standing as of the payment/funding date.

### Loan Eligibility

The FA/PWA may also be eligible for an upfront loan in the first quarter of 2016, which would be subject to the same terms and conditions, including requirements related to ongoing employment in good standing, as the Growth Award.

## 2.2 Growth Premium

The Morgan Stanley Wealth Management Growth Premium is designed to reward FA/PWAs who grow their business in 2015 with respect to 2014. The Growth Premium is calculated annually.

### Growth Premium – Individual Eligibility Criteria

- FA/PWAs must be hired before January 1st, 2013; <u>AND</u>
- Not be part of the Financial Advisor Associate (FAA) program; <u>AND</u>
- Rank within the Top 10% in Gross Revenue growth percentage by LOE band (growth must be positive) in 2015 with respect to 2014, <u>OR</u> have at least $300,000 in absolute Gross Revenue growth in 2015 with respect to 2014; <u>AND</u>
- Not end the 2015 year with a 20% Credit Rate

To calculate the FA/PWA's Gross Revenue growth percent, calendar year 2015 Gross Revenue will be compared to calendar year 2014 Gross Revenue. FA/PWAs will be grouped into the LOE bands listed below and ranked according to Gross Revenue growth percent. FA/PWAs who rank within the Top 10% at the end of 2015 (revenue growth must also be positive in 2015 with respect to 2014) will be considered for the Growth Premium if the above Eligibility Criteria is also met.

If an FA/PWA does not end the year within the Top 10% of his/her LOE band in terms of Gross Revenue growth percentage, but does have Gross Revenue growth of at least $300,000 over 2014 and has satisfied all other Individual Eligibility Criteria for the 2015 Growth Premium, then he/she will be considered eligible for the 2015 Growth Premium.

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 2: Growth Award**

The following 2015 LOE groups will be used for ranking FA/PWAs' Gross Revenue growth percent: 1, 2, 3, 4, 5, 6, 7 & 8, 9 & 10, 11 through 14, 15 through 24, and 25+.

### Growth Premium – Team Eligibility Criteria

- FA/PWAs must be hired before January 1st, 2013; <u>AND</u>
- Not be part of the Financial Advisor Associate (FAA) program as of January 1st, 2015; <u>AND</u>
- On a Registered Team in the Team Registry as of January 1st, 2015; <u>AND</u>
- All eligible Team members must properly complete the Team Eligibility Criteria Opt-In Form which must be received by Home Office by the specified date at the time of communication, and in doing so waive their right to be evaluated on an individual basis for the 2015 Growth Premium and 2015 Lending Award; <u>AND</u>
- Aggregate Gross Revenue growth of all eligible FA/PWAs on the Registered Team at the end of 2015 exceeds the minimum Top 10% Gross Revenue growth percentage (aggregate growth must be positive) corresponding to the LOE band of the FA/PWA on the Registered Team with the highest 2015 Gross Revenue; <u>AND</u>
- No eligible FA/PWA on the Registered Team has transitioned to a non-producing role at Morgan Stanley at any time during 2015

To calculate the Team's aggregate Gross Revenue growth percent, the individual calendar year 2015 Gross Revenue of all eligible FA/PWA members on the Registered Team will be summed and compared to the sum of their individual calendar year 2014 Gross Revenue. In order to determine eligibility at the end of 2015, the Team's aggregate Gross Revenue growth percent will be measured against the minimum Top 10% Gross Revenue growth percent that corresponds to the LOE band of the FA/PWA on the Registered Team with the highest Gross Revenue in 2015. For Teams with aggregate Gross Revenue growth that rank within the Top 10%, all eligible FA/PWAs on the Team will receive the same Growth Premium payout percentage regardless of where they rank individually in terms of Gross Revenue growth.

In the event that the Registered Team does not qualify for the Growth Premium according to the Team Eligibility Criteria, but an eligible FA/PWA on the team has at least $300,000 in absolute Gross Revenue growth in 2015 over 2014 on an individual basis, then only that FA/PWA will be considered eligible for the 2015 Growth Premium. All other FA/PWAs of the Registered Team will not earn the 2015 Growth Premium, 25% Additional BDA in 2016, or CSA "Go for Growth" Award.

FA/PWAs who end the 2015 year with a 20% Credit Rate will be included in the Registered Team's aggregate metrics for qualification purposes, but will not be eligible to receive the 2015 Growth Premium, 25% Additional Business Development Allowance, or CSA "Go for Growth" Award.

The Firm reserves the right to monitor and review material revenue distribution changes within the Team and to make all decisions with regard to eligibility for and calculation of any award hereunder in order to effectuate the spirit and intent of this program, as determined by Morgan Stanley in its sole discretion.

For additional information about Team Eligibility Criteria including more examples, other requirements, and information about particular situations, see the 2015 Growth Award Team Eligibility Criteria section of the FAQ document on the 2015 FA/PWA Compensation website.

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 2: Growth Award**

## Growth Premium Calculation

The Growth Premium is calculated on total Grid Revenue, which excludes Flat-Rate Revenue and Zero % Revenue. At year-end, FA/PWAs will be eligible for an award based on the below schedule:

Growth Premium

| Rank of Gross Revenue Growth Percentage within LOE Band OR Gross Revenue Growth | Award (%) |
|---|---|
| Top 5% | 4.0 |
| Next 5% OR $300,000 year-over-year Gross Revenue growth | 2.0 |

### Growth Premium Individual Eligibility Criteria Example:

An FA/PWA with $1,000,000 Grid Revenue who ranks within the Top 5% of his/her LOE band in 2015 is eligible for $40,000 [$1,000,000 * 4.0%], if the FA/PWA also meets the Eligibility Criteria as defined above.

### Growth Premium Team Eligibility Criteria Example:

FA 1 and FA 2 are on a Registered Team together as of January 1st, 2015.

- FA 1 has 2015 Gross Revenue of $1,400,000 and 2014 Gross Revenue of $1,150,000, and a LOE of 28; FA 2 has 2015 Gross Revenue of $1,000,000 and 2014 Gross Revenue of $900,000, and a LOE of 21
- Aggregate metrics for the Team are 2015 Gross Revenue of $2,400,000, 2014 Gross Revenue of $2,050,000, and Gross Revenue growth of 17.07%
- The Gross Revenue growth percentage that corresponds to FA 1's LOE band will be used because FA 1 has the highest individual 2015 Gross Revenue on the Team; for illustrative purposes, assume that the Top 10% Gross Revenue growth percentage for FA 1 is 15.00% and the Top 5% Gross Revenue growth threshold for FA 1 is 25.00%

Therefore, the Team qualifies for the Growth Premium because the aggregate Gross Revenue growth (17.07%) is greater than the Top 10% Gross Revenue growth percentage (15.00%), and is then eligible to receive a 2.0% award on their Grid Revenue based on the Growth Premium payout schedule above.

## 25% Additional Business Development Allowance ("BDA")

FA/PWAs who meet the Growth Premium Eligibility Criteria are also eligible for 25% Additional BDA in 2016 based on the 2015 BDA policy. 25% Additional BDA will be funded in the first quarter of 2016. Please refer to Section 3.3 for further details on the BDA program.

## CSA "Go For Growth" Award

FA/PWAs who meet the Growth Premium Eligibility Criteria will have the opportunity to distribute $2,000 to a CSA(s) for supporting growth in the FA/PWA's business. The award will be funded through the CSA compensation systems in the first quarter of 2016. The award recipient must be in a support staff role that is eligible to receive compensation through AFG as of the date of payment, and both the award recipient and distributing FA/PWA must both be employed by the Firm, in good standing, as of the date of payment.

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 2: Growth Award**

### 2.3 Lending Award

The Morgan Stanley Wealth Management Lending Award is intended to reward FA/PWAs for expanding their Lending business consistent with the financial needs and investment objectives of clients. The program will consider total growth in PLA (excluding Letters of Credit), ECL, Tailored Lending, Margin, and Mortgage (excluding HELOC).

**Lending Award – Individual Eligibility Criteria**

- FA/PWAs must be hired before January 1st, 2013; <u>AND</u>
- Not be part of the Financial Advisor Associate (FAA) program; <u>AND</u>
- Have positive Gross Revenue growth in 2015 with respect to 2014; <u>AND</u>
- Have a minimum of $500,000 in total Lending growth for 2015; <u>AND</u>
- Open 6 new Lending units (PLA (excluding Letters of Credit), ECL, Tailored Lending, Mortgage (excluding HELOC)) in 2015 <u>at the pre-split level</u> (i.e. a new loan opened under a JPN will credit each FA/PWA member of that JPN with 1.0 new loan); <u>AND</u>
- Not end the 2015 year with a 20% Credit Rate

**Lending Award – Team Eligibility Criteria**

- FA/PWAs must be hired before January 1st, 2013; <u>AND</u>
- Not be part of the Financial Advisor Associate (FAA) program as of January 1st, 2015; <u>AND</u>
- On a Registered Team in the Team Registry as of January 1st, 2015; <u>AND</u>
- All eligible Team members must properly complete the Team Eligibility Criteria Opt-In Form which must be received by Home Office by the specified date at the time of communication, and in doing so waive their right to be evaluated on an individual basis for the 2015 Lending Award and 2015 Growth Premium; <u>AND</u>
- Aggregate Gross Revenue growth of all eligible FA/PWAs on the Registered Team at the end of 2015 must be positive; <u>AND</u>
- Have a minimum of $500,000 in total Lending growth at the individual level for 2015; <u>AND</u>
- On an individual basis, open 6 new Lending units (PLA (excluding Letters of Credit), ECL, Tailored Lending, Mortgage (excluding HELOC)) in 2015 <u>at the pre-split level</u> (i.e. a new loan opened under a JPN will credit each FA/PWA member of that JPN with 1.0 new loan); <u>AND</u>
- No eligible FA/PWA on the Registered Team has transitioned to a non-producing role at Morgan Stanley at any time during 2015

FA/PWAs who end the 2015 year with a 20% Credit Rate will be included in the Registered Team's aggregate metrics for qualification purposes, but will not be eligible to receive the 2015 Lending Award.

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 2: Growth Award**

**Lending Award Calculation**

The Lending Award will be calculated as follows:

*PLA (excluding Letters of Credit), ECL, Tailored Lending, and Margin 2015 Growth*: Average outstanding daily balances will determine month-end balances in 2014 and 2015. The average month-end balances for 2015 will be compared to the average month-end balances for 2014 to determine growth in 2015. For JPNs, month-end balances will be split to the members of the JPN based on the month-end JPN split percentages.

*Mortgage (excluding HELOC)*: All newly originated Morgan Stanley Private Bank, National Association ("MSPBNA") Mortgages closed and disbursed by December 30th, 2015 will be included in the Lending Award (baseline will be zero). Only Mortgages for which FA/PWAs are eligible for FA/PWA Compensation will be includable in the Lending Award (i.e. FA/PWAs that are not appropriately licensed and NMLS registered will not have the Mortgage(s) included in their Lending Award).

Employee Loans will be included in the Lending growth calculation, as well as count towards Lending units, as specified below. An Employee Loan is a Mortgage secured by a U.S. property and closed and disbursed by MSPBNA to individuals who are full-time or part-time U.S. based employees of Morgan Stanley. A personal Mortgage for an FA/PWA is a Mortgage for which the FA/PWA is a named borrower/co-borrower/obligor in the Mortgage.

A Mortgage is closed at the time all loan proceeds for such Mortgage are disbursed to the named borrower/co-borrower/obligor in the Mortgage:

- An Employee Loan, which is booked in a Primary or Secondary number or a JPN, and is not a personal Mortgage for an FA/PWA in a Primary or Secondary number or a JPN will count toward Lending growth and Lending unit credit
- An Employee Loan booked in a Primary or Secondary number that is the FA/PWA's personal Mortgage will not count toward Lending growth. The Employee Loan will count toward Lending unit credit
- An Employee Loan booked in a JPN where the Employee Loan is a personal Mortgage for an FA/PWA who is a member of the JPN, the FA/PWA related to such personal Mortgage will not receive Lending growth credit. The remaining members of the JPN will receive credit toward Lending growth. The Employee Loan will count toward Lending unit credit for all FA/PWA members of the JPN

To determine the Lending growth in 2015, growth in PLA (excluding Letters of Credit), ECL, Tailored Lending, and Margin as of December 31st, 2015 will be added to new Mortgages closed and disbursed by December 30th, 2015 (excluding HELOC). At year-end, every dollar of qualifying Lending growth is eligible for an award based on the below Lending Award Credit Rate Schedule.

Certain weightings may be applied to some products. Eligible balances and calculation methodology will be determined by the Firm, and the Firm's calculations and methodology will be final.

Lending Award Credit Rate Schedule

| Lending Growth as of 12/31/15 ($) | Net Award (bps) |
|---|---|
| 0–7,500,000 | 35 |
| 7,500,001–15,000,000 | 40 |
| 15,000,001–22,500,000 | 45 |
| 22,500,001–45,000,000 | 50 |

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 2: Growth Award**

**Lending Growth Example:**

FA/PWA has an average total month-end baseline of $45,000,000 in qualified PLA[11], ECL, Tailored Lending, and Margin products in 2014. With an average total month-end PLA[11], ECL, Tailored Lending, and Margin balances for 2015 of $70,000,000, and $10,000,000 in new MSPBNA Mortgages closed[12] as of December 30th, 2015 the FA/PWA will have $35,000,000 in Lending growth as calculated below. Assume the FA/PWA has opened 6 new loans in 2015.

Lending Growth Example

| Month | PLA[11], ECL, Tailored Lending, and Margin Month-End Balance ($) |
|---|---|
| 2014 Baseline | 45,000,000 |
| Jan 2015 | 75,000,000 |
| Feb 2015 | 80,000,000 |
| Mar 2015 | 70,000,000 |
| Apr 2015 | 60,000,000 |
| May 2015 | 90,000,000 |
| Jun 2015 | 75,000,000 |
| Jul 2015 | 50,000,000 |
| Aug 2015 | 40,000,000 |
| Sep 2015 | 75,000,000 |
| Oct 2015 | 70,000,000 |
| Nov 2015 | 80,000,000 |
| Dec 2015 | 75,000,000 |
| **Sum of Total Month-End Balances:** | **840,000,000** |
| **Average Total Month-End Balance:** | **840,000,000 / 12 = 70,000,000** |
| **PLA, ECL, Tailored Lending and Margin Balance Growth in 2015:** | **70,000,000 – 45,000,000 = 25,000,000** |
| **Period** | **New Mortgages Closed[12]** |
| Jan 1st – Dec 30th, 2015 | 10,000,000 |
| **Total Lending Growth:** | **25,000,000 + 10,000,000 = 35,000,000** |

**Lending Award Calculation Example:**

FA/PWA has $35,000,000 of qualifying Lending growth and is eligible for the following award if the FA/PWA also meets the eligibility criteria as defined above:

Lending Growth Example

| Lending Growth ($) | Net Award ($) |
|---|---|
| 7,500,000 at 35 bps | 26,250 |
| Next 7,500,000 at 40 bps | 30,000 |
| Next 7,500,000 at 45 bps | 33,750 |
| Next 12,500,000 at 50 bps | 62,500 |
| **Total:** | **152,500** |

Morgan Stanley Wealth Management reserves the full discretion to review all Lending activity and determine whether such activity is appropriate for exclusion and may, in its sole discretion, exclude any activity that it deems to be inconsistent with the spirit or intent of the Lending Award.

---

[11] Excluding Letters of Credit
[12] Excluding HELOC

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 3: Other Programs**

### 3.1 Capital Accumulation Program

The Capital Accumulation Program ("CAP") provides the opportunity for eligible FA/PWAs (including Producing Branch Managers and Resident Managers) to defer a portion of 2015 monthly Incentive Compensation on a pre-tax basis (up to 25%, in 5% increments) into Morgan Stanley stock units ("Basic Units") and receive a number of bonus stock units based on the amount of Basic Units awarded ("Bonus Units").

FA/PWAs are eligible to participate in CAP for 2015 if they achieved a minimum T-12 Gross Revenue (through September 30th, 2014) of $400,000 and had a minimum of five years of LOS as of December 31, 2014 (provided that, for FA/PWAs who are Chairman's Club members as of December 2014, the minimum service requirement is three years).

Contribution elections, which cannot exceed $200,000 annually, or, for Chairman's Club members as of December 2014, $300,000 annually, must be made by the end of 2014.

FA/PWAs who elect to participate in CAP will be awarded Bonus Units in an amount equal to either 25% (for Chairman's Club members as of December 2014) or 20% (for all other eligible FA/PWAs) of the number of Basic Units awarded.

The Basic Units and Bonus Units will be granted on the 15th day of the month following the end of each calendar quarter, with the number of Basic Units awarded based on the amount of the deferral divided by the fair market value of a share of Morgan Stanley common stock on such date (which is generally the average of the closing prices of Morgan Stanley stock on each of the three month-ends preceding the grant date). Subject to the FA/PWA satisfying the terms and conditions of the award, the Basic Units will vest on the grant date, the Bonus Units will vest on April 15th, 2018, and the Basic Units and Bonus Units will convert to shares of Morgan Stanley common stock on April 15th, 2018.

FA/PWAs must be continuously employed by the Firm through the grant date in order to be awarded the Basic Units and Bonus Units. Termination of employment for any reason prior to the Bonus Unit vesting date will generally result in the cancellation of all Bonus Units and, in general, the previously granted Basic Units will convert to shares of Morgan Stanley common stock on the original scheduled conversion date.

The Basic Units will not be subject to cancellation following grant, but Bonus Units will be subject to cancellation if the FA/PWA engages in certain prohibited activity prior to conversion as described in the award certificate. The stock units will also be subject to sales restrictions and other terms and conditions as set forth in the award certificate and the equity compensation plan under which the awards are granted.

Additional information may be found in the current prospectus, a copy of which may be obtained by accessing the Executive Compensation intranet website located at the following address: http://execcomp.corpms.com/site/execcomp/webapp/portfolio.jsp

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 3: Other Programs**

### 3.2 Former Advisor Program

Exceptional client service is the foundation of our business, which is why Morgan Stanley Wealth Management offers flexibility and assistance to FA/PWAs considering retirement. The Former Advisor Program ("FAP") was developed to ensure that eligible participants can be competitively compensated and the clients they worked hard to serve can receive a smooth transition and be well cared for.

The following five options, which may not be mutually exclusive, are currently offered:

- **Individual FA/PWA Option** for FA/PWAs with client accounts not under a Joint Production Agreement (JPA)
- **Joint Production Option** for FA/PWAs servicing accounts under a JPA for the duration required by current applicable policy
- **Teaming Option** for FA/PWAs who are members of a Registered Team, or FA/PWAs who join and transition their book of business to a Registered Team for the duration required by current applicable policy
  - Eligible to receive Team Compensation for 2, 3, or 4 years prior to retirement date, in addition to receiving Team Compensation Cash Credits on FAP
- **Enhanced Option** for FA/PWAs who, for at least 2 years, have been a member of a JPA or Registered Team from which more than 50% of their revenue is generated
- **Platinum Option** for President's or Chairman's Club FA/PWAs who, for at least two years, have been a member of a JPA or Registered Team from which more than 50% of their revenue is generated
  - Eligible to receive a 2, 3, or 4 year upfront loan-bonus arrangement equal to 50% of T-12 Gross Revenue, prior to retirement date, in addition to the Enhanced Option FAP after retirement

For more information on eligibility and conduct requirements / restrictions for retiring FA/PWAs ("Former Advisors") and Active FA/PWA(s) participants, please refer to the Former Advisor Program 2015 - Guide located on the 2015 FA/PWA Compensation website on 3DR > Practice > FA Compensation 2015 or contact your local Human Resources representative.

*Please be advised that FAP is subject to SEC, FINRA, and state regulatory requirements. The terms of the FAP are subject to change at the discretion of Morgan Stanley Wealth Management for any reason, including changes in applicable regulatory or legal requirements pertaining to such programs.*

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 3: Other Programs**

### 3.3 Business Development Allowance ("BDA") Program

Under the Business Development Allowance ("BDA") Program, eligible FA/PWAs will have access to corporate funds for business development purposes such as client entertainment, seminars and/or marketing. At year-end, any unused BDA will be forfeited and will not carry over into the following year. BDA allocations are determined in January 2015 and are based on 2014 Gross Revenue and the following schedule:

Business Development Allowance

| 2014 Gross Revenue ($) | Allowance ($) |
|---|---|
| 10,000,000+ | 25,000 |
| 5,000,000–9,999,999 | 20,000 |
| 2,500,000–4,999,999 | 15,000 |
| 1,650,000–2,499,999 | 12,000 |
| 1,100,000–1,649,999 | 10,000 |
| 825,000–1,099,999 | 5,000 |
| 550,000–824,999 | 3,000 |
| 440,000–549,999 | 1,000 |
| 330,000–439,999 | 500 |
| 0–329,999 | 250 |

Associate/FAAs generating Gross Revenue receive a BDA based on eligible Gross Revenue as per the policy above. Associate/FAAs who begin generating Gross Revenue in the current year receive a pro-rated BDA using the lowest revenue band.

The BDA allocation is subject to the Firm's policies and procedures for expenditures.

**Team BDA Transfer**

FA/PWAs who are part of a Registered Team will have the ability to transfer BDA to other FA/PWAs on their Registered Team, as well as certain qualified exempt support staff employees during the AFG Election period in December 2014. Additional details can be found on the 2015 FA/PWA Compensation website.

### 3.4 Alternative Flexible Grid

The Alternative Flexible Grid ("AFG") is a mechanism through which FA/PWAs, prior to the start of the year, may elect an effective Credit Rate adjustment for the year and, based on the election, direct the Firm to provide additional compensation to support staff as well as additional resources above those necessary to perform FA/PWA duties. In order to participate in the AFG Program, the FA/PWA must have a minimum $200,000 in Trailing-12 month eligible Gross Revenue (excludes Zero % Revenue).

The AFG is calculated via the AFG worksheet prior to the start of the year. In this worksheet, the effective Credit Rate adjustment is calculated by determining expected additional support staff compensation and additional luxury resources. With Branch Manager approval, this effective Credit Rate adjustment will be applied to all transactions for the following year. Upon the implementation of this Credit Rate adjustment, Incentive Compensation is determined as set forth in this Program.

The magnitude of the effective Credit Rate adjustment elected will determine the AFG amount. This amount will enable the FA/PWA to direct the Firm to provide additional support staff compensation and additional luxury resources. Any remaining balance at year-end will not be carried forward into the following year.

FA/PWAs will be provided a seven month check-point, during which they will be granted an open window to adjust their effective Credit Rate adjustment for the time remaining in the year. If an adjustment is made during the check-point, a new AFG worksheet must be completed.

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 3: Other Programs**

All AFG arrangements will be cancelled at year-end, and FA/PWAs must re-elect for the following year. No balance will be carried forward into the following year.

**Example:**

FA/PWA with Trailing-11 month Gross Revenue of $550,000 and expected additional support staff compensation/additional luxury resources election of $11,000**:**

- The effective Credit Rate adjustment is determined by dividing the $11,000 expected additional support staff compensation/additional luxury resources by Trailing-11 month Gross Revenue of $550,000. In this case, the Credit Rate adjustment is 2% ($11,000/$550,000)

FA/PWAs will have the option to enter a maximum funding amount for 2015 AFG during the AFG Election period in December 2014. The maximum funding amount must be the greater of $10,000 <u>OR</u> 110% of the contribution budget determined during the AFG Election period in December 2014.

Additional details on the 2015 Alternative Flexible Grid program can be found on the 2015 FA/PWA Compensation website.

### 3.5 Discretionary Fee Waiver Allowance

The Discretionary Fee Waiver Allowance ("DFWA") is provided to FA/PWAs to waive select Account and Service fees in client accounts. It is important to note that some of these fees are already waived as part of the Reserved Program. At year-end, any unused DFWA will be forfeited and will not carry over into the following year. Allowances are based on prior year Gross Revenue, as follows:

Discretionary Fee Waiver Allowance

| Prior Year Gross Revenue ($) | Discretionary Fee Waiver Allowance ($) |
|---|---|
| 2,200,000+ | 4,000 |
| 1,650,0000–2,199,999 | 3,000 |
| 1,100,000–1,649,999 | 2,750 |
| 825,000–1,099,999 | 2,500 |
| 550,000–824,999 | 2,000 |
| 275,000–549,999 | 1,500 |
| 110,000–274,999 | 500 |
| 0–109,999 | 0 |

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

ADD-118

## SECTION 4: Recognition Programs

### 4.1 Club Memberships for 2016

The Firm's recognition programs are designed to recognize outstanding performance by FA/PWAs. In addition to demonstrated leadership in the best practices of wealth management, the Firm's recognition Club Members must be in good standing and satisfy other aspects of the Firm's performance, conduct and compliance standards and expectations, as determined by the Firm.

At the beginning of 2016, Club Memberships will be assigned based on 2015 calendar year Gross Revenue OR 2015 calendar year Total Revenue Premium, as well as LOE and Assets Under Management ("AUM") for Pacesetter's Club only, as follows:

Club Memberships

| Club Type | Qualifying Criteria |
| --- | --- |
| Chairman's Club | Rank amongst the top 2% of the FA/PWA population in Gross Revenue for 2015 OR amongst the top 2% in Total Revenue Premium for 2015 |
| President's Club | Rank amongst the next 5% of the FA/PWA population (after Chairman's Club) in Gross Revenue for 2015 OR amongst the next 5% in Total Revenue Premium for 2015 |
| Master's Club | Rank amongst the next 10% of the FA/PWA population (after President's Club) in Gross Revenue for 2015 OR amongst the next 10% in Total Revenue Premium for 2015 AND achieve minimum Gross Revenue of $700,000 |
| Century Club | Rank in the next 10% of the FA/PWA population (after Master's Club) in Gross Revenue for 2015 OR amongst the next 10% in Total Revenue Premium for 2015 |
| Pacesetter's Club (FA/PWAs with an LOE of 5 and below will only be eligible for this Club) | Achieve minimum Gross Revenue of $100,000 OR minimum Total Revenue Premium of $140,000 AND minimum AUM of $8,000,000 for FA/PWAs with an LOE of 0, 1 |
| | Achieve minimum Gross Revenue of $200,000 OR minimum Total Revenue Premium of $280,000 AND minimum AUM of $15,000,000 for FA/PWAs with an LOE of 2 |
| | Achieve minimum Gross Revenue of $250,000 OR minimum Total Revenue Premium of $350,000 AND minimum AUM of $20,000,000 for FA/PWAs with an LOE of 3 |
| | Achieve minimum Gross Revenue of $300,000 OR minimum Total Revenue Premium of $420,000 AND minimum AUM of $25,000,000 for FA/PWAs with an LOE of 4 |
| | Achieve minimum Gross Revenue of $350,000 OR minimum Total Revenue Premium of $490,000 AND minimum AUM of $30,000,000 for FA/PWAs with an LOE of 5 |

Fixed dollar Gross Revenue and Total Revenue Premium qualification thresholds will be communicated in the second half of 2015 for Chairman's Club, President's Club, Master's Club, and Century Club levels.

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

ADD-119

**SECTION 4: Recognition Programs**

## 4.2 Titles

In addition to specific recognition clubs, the Firm also grants titles to recognize the outstanding performance of Morgan Stanley Wealth Management FA/PWAs. Titles are awarded based on achievement of specific Gross Revenue levels and the maintenance of high standards of the Firm, including being in good standing and satisfying the Firm's expectations for excellence in all areas, including, but not limited to, guardianship, personal conduct, and adherence to regulatory and compliance requirements.

**Managing Director, Wealth Management**

Eligibility: Minimum cumulative Gross Revenue of $8,800,000 OR Total Revenue Premium of $12,300,000 over the last three years[13].

FA/PWAs who meet the 3-year Gross Revenue OR Total Revenue Premium requirement are eligible for selection by the Firm for the Managing Director, Wealth Management title.

Additional criteria for Managing Director, Wealth Management includes:

- Exhibiting leadership both externally and internally
- Being an ambassador and role model of Morgan Stanley Wealth Management's vision and business principles
- Pursuing excellence and holding self and others to the highest standards
- Consistently exemplifying high standards of corporate guardianship

**Executive Director**[14]

Eligibility: Minimum cumulative Gross Revenue of $4,400,000 OR Total Revenue Premium of $6,150,000 over the last two years.

FA/PWAs who meet the 2-year Gross Revenue OR Total Revenue Premium requirement are eligible for selection by the Firm for the Executive Director title.

**Senior Vice President**

Eligibility: Minimum Prior Year Gross Revenue of $1,100,000 OR Total Revenue Premium of $1,550,000

**First Vice President**

Eligibility: Minimum Prior Year Gross Revenue of $825,000 OR Total Revenue Premium of $1,150,000

**Vice President**

Eligibility: Minimum Prior Year Gross Revenue of $550,000 OR Total Revenue Premium of $770,000

**Associate Vice President**[15]

Eligibility: Minimum Prior Year Gross Revenue of $440,000 OR Total Revenue Premium of $615,000

---

[13] Prior three year Total Revenue Premium will include Total Revenue Premium for 2015 and 2014, and 2013 Gross Revenue multiplied by the FA/PWA's average Total Revenue Premium to Gross Revenue ratio for 2015 and 2014 to derive 2013 Total Revenue Premium
[14] Upon achieving Executive Director status FA/PWAs may choose to remain Senior Vice President or take the Executive Director title
[15] Private Wealth Advisors are not eligible for Associate Vice President

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 5: Other**

## 5.1 Summary and Additional Information

Morgan Stanley Wealth Management provides one of the most comprehensive FA/PWA Compensation Plan, Growth Award and Recognition Programs in the securities industry.

This brochure summarizes the Morgan Stanley Wealth Management FA/PWA Compensation Plan, Growth Award and Recognition Programs in effect for 2015 unless otherwise noted. Morgan Stanley Wealth Management reserves the right to amend, modify, interpret or terminate all or any part of the Program for any year and at any time. Nothing in this brochure is a guarantee of continued employment or of any particular benefits or level of remuneration.

This Compensation Plan and the additional product guidelines and policies referenced in this Compensation Plan set forth guidelines only. Notwithstanding anything to the contrary contained in this Compensation Plan or elsewhere, Morgan Stanley Wealth Management has the sole discretion to determine whether to allocate Credit to an FA/PWA's Gross Revenue (or to provide compensation in any form) for any particular business and, if so, the amount of Credit to be allocated or the amount of compensation to be awarded, and further Morgan Stanley Wealth Management may adjust and/or decline to award future Credits towards Incentive Compensation where an FA/PWA has an unsatisfied obligation to the Firm. Under no circumstances is an FA/PWA eligible to receive any Credit to Gross Revenue or any compensation for any particular business unless and until Morgan Stanley Wealth Management receives the revenue associated with that business. Furthermore, if an FA/PWA is determined to have engaged in activity that is inconsistent with Morgan Stanley's expectations for good guardianship, or not in line with any policy, regulation or otherwise counter to the best interests of our clients, then such FA/PWA may be deemed, in Morgan Stanley's discretion, not to have qualified for compensation, growth awards or any bonus program listed herein. If an FA/PWA's employment terminates for any reason before Morgan Stanley Wealth Management receives the revenue for any particular business, the FA/PWA will not be eligible for any Credit to Gross Revenue or any compensation associated with that business and, in the event Morgan Stanley Wealth Management ultimately refunds all or a portion of such revenue for any reason, any associated Incentive Compensation paid on the basis of such revenue shall be deemed an overpayment to the FA/PWA. Additionally, an FA/PWA must be employed in good standing at the time that Morgan Stanley Wealth Management receives the revenue to be eligible for any Credit to Gross Revenue or any compensation associated with that business.

Morgan Stanley Wealth Management retains the full discretion and authority to interpret, modify, and/or terminate the Compensation Plan, or any of the individual guidelines described in the Compensation Plan, at any time, with or without notice, and to resolve any dispute arising out of or in any way related to the Compensation Plan. Morgan Stanley Wealth Management's interpretations and decisions shall be final and binding on all parties.

The information contained in this brochure briefly describes certain employee compensation programs and deferred incentive compensation awards and other arrangements. It is important to note that this brochure merely summarizes the provisions of those programs, awards and plans, and does not address all of their terms, conditions and restrictions. FA/PWAs should consult the pertinent compensation program, equity plan document or award certificate for a full explanation of their provisions. If there is a conflict between this brochure and any formal compensation program, equity plan document or award certificate, then the formal program, plan document or award certificate will control. All compensation and recognition plans are subject to changes due to tax laws and other legal requirements or at the discretion of Morgan Stanley Wealth Management.

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 5: Other**

## 5.2 Version History

This section tracks changes made to the FA/PWA Compensation Plan, Growth Award and Recognition Programs during 2015. The table below documents the date, page number and a brief description of the change for easy reference.

| Date | Page Number | Description |
|---|---|---|
| December 1, 2014 | | Initial Publication |
| January 12, 2015 | 6 | Clarification to LOS definition |

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

# Exhibit B

## GROWTH AWARD BONUS AGREEMENT

This Growth Award Bonus Agreement (the "Agreement") is made this 6th day of February 2015, by and between Morgan Stanley Smith Barney LLC, a Delaware limited liability company ("Morgan Stanley"), and SHAFER, MATTHEW ("Employee").

WHEREAS Employee is currently employed as a financial advisor/private wealth advisor by Morgan Stanley;

WHEREAS, Morgan Stanley has determined that Employee will be eligible to receive certain bonus payments as described in this Agreement, provided that Employee satisfies the terms and conditions set forth in this Agreement; and

WHEREAS, Employee desires to accept the terms and conditions of the bonus payments described in this Agreement, including agreeing to the release and restrictive covenants as set forth in this Agreement.

NOW THEREFORE, Morgan Stanley and Employee agree as follows:

1. In consideration of Employee's anticipated continued employment with Morgan Stanley and the recognition of the value of such services to be rendered by Employee with Morgan Stanley, and subject to the other provisions of this Agreement, if Employee remains continuously employed, in good standing, with Morgan Stanley, Morgan Stanley shall pay to Employee a bonus payment within fifteen (15) business days following March 15th, 2016, the amount of which shall be determined by Morgan Stanley, in its sole discretion, in February 2015 (the "Bonus Payment"), but which amount shall be not less than $11,447.34; provided that, to receive the Bonus Payment, Employee must be employed by Morgan Stanley, in good standing, on the date of payment of such Bonus Payment. Thereafter, on each March 15th thereafter, through and including March 15th, 2020, Morgan Stanley will pay to Employee the Bonus Payment within fifteen (15) business days following the applicable March 15th, provided that Employee continues to be employed by Morgan Stanley, in good standing, on the date of payment of the Bonus Payment. Any such Bonus Payment, when paid, may, at Morgan Stanley's discretion, be applied to repay any outstanding indebtedness owed by Employee to Morgan Stanley or any of its affiliates.

All payments hereunder shall be subject to withholding of all applicable Federal, state and local income taxes, as well as FICA, and all other employment taxes required by law to be withheld.

1

Employee shall be solely responsible for all income and employee-side employment taxes that result from Employee's receipt of the Bonus Payments. The Bonus Payments shall not be eligible for computation of benefits or compensation under any Morgan Stanley, or any related entity or affiliate compensation or benefits plans, including any wealth or capital accumulation plan.

2. No Bonus Payment shall become due and payable hereunder unless (a) Employee is continuously in the employ of Morgan Stanley, in good standing, from the date of this Agreement, to and including the date such payment is due and payable according to the schedule described in paragraph 1 above, and (b) Employee has maintained all licenses and registrations from the Financial Industry Regulatory Authority, exchanges, state securities commissions and other regulatory bodies as Morgan Stanley shall determine necessary in order to conduct securities or futures transactions; provided, that, in the event Employee has not obtained or retained all such licenses and registrations at the time the bonus is payable, such amounts scheduled to be paid will be forfeited. As used herein, the term "good standing" shall mean, among other things, that Employee is current on the payment of all outstanding financial obligations to the Firm. In the event Employee's employment terminates voluntarily or involuntarily for any reason or no reason prior to becoming employed by Morgan Stanley, Employee shall not be entitled to receive any Bonus Payment under this Agreement. In the event Employee's employment terminates voluntarily or involuntarily for any reason or no reason other than on account of death or Disability (as defined below) after this Agreement is executed by all parties hereto, Employee shall not be entitled to receive any future Bonus Payments under this Agreement. If Employee's employment with Morgan Stanley terminates on account of death or Disability, Morgan Stanley shall pay to Employee (or Employee's estate, in the event of death) a lump sum cash payment in an amount equal to the total Bonus Payments that would have been payable to Employee for the remainder of the period described in paragraph 1 above if Employee had remained employed in good standing with Morgan Stanley, which amount shall first be applied to repay any outstanding indebtedness owed by Employee to Morgan Stanley or any of its affiliates, and the remainder of which shall be paid to Employee (or Employee's estate, in the event of death). Such lump sum shall be paid within sixty (60) days following the date of Employee's termination of employment with Morgan Stanley on account of death or Disability. For purposes of this Agreement, the term "Disability" shall mean Employee has proven to be totally disabled under Morgan Stanley's long-term disability program whether or not Employee is covered under that program.

3. Other than as set forth herein, Employee agrees that Employee is not entitled to any other compensation from Morgan Stanley or any of its affiliated entities in connection with the Growth Award Program.

2

4. This Agreement does not prohibit or restrict Employee from lawfully (a) initiating communications directly with, cooperating with, providing relevant information to, or otherwise assisting in an investigation by: (i) the Securities and Exchange Commission ("SEC"), FINRA, or any other governmental or regulatory body or official(s) or self-regulatory organization ("SRO") regarding a possible violation of any federal law relating to fraud or any SEC rule or regulation; or (ii) the EEOC or any other governmental authority with responsibility for the administration of fair employment practices laws regarding a possible violation of such laws; (b) responding to any inquiry from such authority, including an inquiry about the existence of this Agreement or its underlying facts or circumstances; or (c) testifying, participating, or otherwise assisting in an action or proceeding relating to a possible violation of any such law, rule, or regulation. Further, nothing in this Agreement shall prohibit or restrict Employee (or Employee's attorney) from initiating communications directly with, or responding to any inquiry from, or providing testimony before, the SEC, FINRA, or any other SRO or any other federal or state regulatory authority, regarding this settlement or its underlying facts or circumstances, or regarding any potentially fraudulent or suspicious activities. Nor does this Agreement require Employee to notify Morgan Stanley or any of its affiliated entities of such communications or inquiry described in this paragraph 4.

5. This Agreement and any Bonus Payment payable hereunder shall not be subject to option or assignable either by voluntary or involuntary assignment or by operation of law including (without limitation) bankruptcy, garnishment, attachment or other creditors' process; provided, however, that the provisions of this paragraph 5. shall not apply to any successor, parent, affiliate or subsidiary of Morgan Stanley. Upon the purported grant by Employee of an option over, or purported assignment by Employee of, any Bonus Payment in contravention of the preceding sentence, the obligation of Morgan Stanley to pay such Bonus Payment shall be extinguished, and neither Employee nor any other party shall have any further right thereto.

6. This Agreement contains the entire agreement between the parties relating to Bonus Payments to be paid to Employee in connection with the present Growth Award Program, and supersedes any prior oral or written agreement relating to such payments. This Agreement cannot be altered or amended except by a written agreement executed by Morgan Stanley and Employee. Notwithstanding the foregoing, Morgan Stanley retains the right to make modifications to this Agreement that it deems advisable, in its sole discretion, to allow it, its parents, and/or affiliates to comply with or satisfy any legal, regulatory, or governmental requirements or to qualify for any government loan, subsidy or other program.

3

7.  Arbitration Agreement

(a)  Any controversy or claim arising out of or in any way relating to this Agreement or any benefits or payments available and/or due under this Agreement, as well as any controversy or claim between Employee and Morgan Stanley, or any of Morgan Stanley's former, existing, and future domestic parents, subsidiaries, partners, predecessors, successors and affiliate corporations and business entities, or any of its or their current, former, and future directors, officers, employees, agents, managers, shareholders, and other representatives, based on, arising out of, or which arose out of or in any way relate to Employee's employment, compensation, and terms and conditions of employment with Morgan Stanley or any of Morgan Stanley's former, existing, and future domestic parents, subsidiaries, partners, predecessors, successors and affiliate corporations and business entities or the termination thereof, and claims based on, arising out of , or which arose out of or in any way relate to Employee's recruitment or application for employment and hiring, including, but not limited to contract, tort, defamation, breach of fiduciary duty and other common law claims, wage and hour claims, statutory discrimination, harassment and retaliation claims, and claims under, based on, or relating to any federal, state or local constitution, statute or regulation of any country, state or municipality, including, without limitation, the Fair Labor Standards Act ("FLSA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), the Worker Adjustment and Retraining Notification Act ("WARN"), the Equal Pay Act ("EPA"), the Americans With Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), and any other federal, state or local wage and hour, discrimination or employment law, and any and all other federal, state, or local constitutional, statutory, regulatory, or common law claims or causes of action now or hereafter recognized, including any claims or controversies based on, arising out of, or which arose out of or in any way relate to acts and omissions that occurred before Employee and Morgan Stanley entered into this Agreement, and regardless whether any such claim is initiated by Employee or Morgan Stanley (individually and collectively referred to herein as "Covered Claims"), will be resolved by final and binding arbitration before the Financial Industry Regulatory Authority ("FINRA") in accordance with the FINRA Code of Arbitration Procedure for Industry Disputes ("FINRA Arbitration Rules").[1]  This arbitration agreement applies with respect to all Covered Claims, whether initiated by Employee or Morgan Stanley, and makes arbitration the required and exclusive forum for the resolution of all Covered Claims.  By entering into this arbitration agreement, Employee and Morgan Stanley each acknowledge and agree that, to the fullest extent permitted by law, Employee and Morgan Stanley are giving up any right to a jury trial in any forum.  This

---

[1] Information about FINRA, including its arbitration rules, can be found at FINRA's website (www.finra.org).

4

arbitration agreement, including the Waivers set forth in paragraph 7(d) of this arbitration agreement, shall be governed by and interpreted in accordance with the Federal Arbitration Act ("FAA"). The terms set forth in this arbitration agreement applies to any Covered Claims or other causes of action in a class or collective action that Employee is a putative member of and which is pending on the date Employee enters into this Agreement, and any such Covered Claims or causes of action shall be governed by the agreement between Employee and Morgan Stanley in effect at the time such Covered Claim or cause of action was filed.

(c) If a Covered Claim may not be arbitrated before FINRA or is ineligible for or otherwise excluded from or not subject to arbitration before FINRA, then such Covered Claim will be resolved by final and binding arbitration conducted under the auspices and rules of JAMS in accordance with and subject to the JAMS Employment Arbitration Rules and Procedures and the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness ("JAMS Arbitration Rules"),[2] except as specified herein. In addition, employment discrimination claims under or based on any federal, state or local law (including claims of harassment and retaliation under those laws) will be resolved by final and binding arbitration conducted under the auspices and rules of JAMS in accordance with and subject to the JAMS Arbitration Rules, except as specified herein. To the extent any of the terms, conditions or requirements of the arbitration agreement in this paragraph 7 conflict with the JAMS Arbitration Rules or FINRA Arbitration Rules, the terms, conditions or requirements of this arbitration agreement shall govern. Except as specified herein, the applicable arbitration rules will be the rules of the selected arbitration forum as indicated above, or any successor rules or, if none exist, the rules most applicable to employment claims and disputes and, if the forum no longer exists, the successor forum or, if neither the forum nor a successor forum exists, the rules most applicable to employment claims and disputes of a similar forum.

(d) The following claims and disputes are not Covered Claims and are not subject to this arbitration agreement: (i) applications by any party for temporary or preliminary injunctive relief in aid of arbitration or for the maintenance of the status quo pending arbitration, (ii) claims for workers' compensation benefits, but not retaliation claims arising out of or relating to claims for workers' compensation benefits, (iii) claims for unemployment compensation benefits, (iv) claims under the National Labor Relations Act, as amended within the exclusive jurisdiction of the National Labor Relations Board, and (v) any claim that is expressly precluded from arbitration by a federal statute. Nothing in this Agreement shall prohibit Employee from filing a charge, complaint or claim or

---

[2] Information about JAMS, including its arbitration rules, can be found at JAMS' website (www.jamsadr.com).

communicating or cooperating with, providing information to, or participating in an investigation by the U.S. Equal Employment Opportunity Commission, the National Labor Relations Board, the U.S. Department of Labor, the Occupational Safety and Health Commission, or any other federal, state, or local administrative agency. Employee also has the right to challenge the validity of the terms and conditions of the arbitration agreement in this paragraph 7 on any grounds that may exist in law and equity, and Morgan Stanley shall not discipline, discharge, or engage in any retaliatory actions against Employee in the event Employee chooses to do so or engages in other protected legal activity. Morgan Stanley, however, reserves the right to enforce the terms and conditions of this Agreement in any appropriate forum.

(d) WAIVERS. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EMPLOYEE AND MORGAN STANLEY AGREE THAT NO COVERED CLAIMS MAY BE INITIATED, MAINTAINED, HEARD OR DETERMINED ON A CLASS ACTION, COLLECTIVE ACTION, OR REPRESENTATIVE ACTION BASIS EITHER IN COURT OR IN ARBITRATION, AND THAT EMPLOYEE IS NOT ENTITLED TO SERVE OR PARTICIPATE AS A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION MEMBER OR REPRESENTATIVE OR TO RECEIVE ANY RECOVERY FROM A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION INVOLVING COVERED CLAIMS EITHER IN COURT OR IN ARBITRATION. Employee further agrees that if Employee is included within any class action, collective action, or representative action in court or in arbitration involving a Covered Claim, Employee will take all steps necessary to opt-out of the action or refrain from opting in, as the case may be. Any issue concerning the validity or enforceability of any of the class action, collective action, and representative action waivers contained in this arbitration agreement ("Waivers") shall be governed by and determined under and in accordance with the FAA, and shall be decided by a court of competent jurisdiction, and not by an arbitrator. Any issue concerning arbitrability of a particular issue or claim pursuant to this arbitration agreement (except for issues concerning the validity or enforceability of the class action, collective action, or representative action Waivers) must be resolved by the arbitrator, not the court. Insofar as any Covered Claim is permitted to proceed on a class action, collective action, or representative action basis, it must do so in a court of competent jurisdiction and not in arbitration. Insofar as any Covered Claim is not eligible for arbitration or otherwise is excluded from or not subject to arbitration, for any reason, the class action, collective action, and representative action Waivers apply and remain valid and enforceable with respect to such Covered Claim. For the sake of clarity, nothing in this arbitration agreement shall preclude Employee from pursuing or participating in any claim, including any class action, collective action, or representative action in court where

6

Employee's claim is based solely on Employee's status as a customer or an investor and does not arise out of or in any way relate to Employee's employment relationship with Morgan Stanley.

(e) Arbitration shall be held in the county of Employee's current or last principal place of employment with Morgan Stanley or, if not practicable, in the county closest to Employee's current or last principal place of employment with Morgan Stanley where the arbitration can be held. If Employee's current or last principal place of employment with Morgan Stanley is outside of the U.S., the arbitration shall be held in New York, New York.

(f) Arbitrators are required to issue a written award and, subject to the parties' right to appeal or seek vacatur under applicable law, their awards shall be final and binding, and any judgment or award issued by the arbitrator may be entered in any court having competent jurisdiction. No arbitration award or decision will have any preclusive effect as to any issues or claims in any other arbitration or court proceeding unless each of the parties in such proceeding was also a named party in the arbitration.

(g) Arbitrators are authorized to award any party the full remedies that would be available to such party if the Covered Claim had been filed in a court of competent jurisdiction, including attorneys' fees and costs. Thus, for example, Employee shall be entitled to recover attorney's fees and costs in any arbitration in which Employee asserts and prevails on any statutory claims or counterclaims to the same extent as Employee could in court.

(h) Additional Provisions Applicable to Arbitration at JAMS

(i) Arbitrators. Any arbitration of Covered Claims before JAMS shall be conducted before a single arbitrator, unless all parties to the arbitration agree in writing to conduct the arbitration before a panel of three arbitrators.

(ii) Procedure. The parties may file and the JAMS arbitrator shall hear and decide at any point in the proceedings any motion permitted by the Federal Rules of Civil Procedure, including but not limited to motions to compel discovery, motions for protective orders, motions to dismiss, motions for summary judgment, and motions in limine. In addition, the arbitration shall be subject to the same rules of evidence, burdens of proof and statutes of limitations as if the Covered Claim was being heard in the appropriate federal or state court.

(iii) Awards. JAMS Arbitrators are required to issue a written award, which shall include a reasoned and detailed decision stating the reasons upon which it is based and supported by essential facts and

7

conclusions of law, and their awards shall be final and binding, and any judgment or award issued by an arbitrator may be entered in any court of competent jurisdiction. No arbitration award or decision will have any preclusive effect as to any other issues or claims in any other arbitration or court proceeding unless each of the parties in such proceeding was also a named party in the arbitration.

(iv) Arbitration Fees. Except as provided by law and as provided below for statutory claims and counterclaims, in any arbitration before JAMS, Employee shall be responsible for any filing fee required to initiate arbitration or to assert any counterclaims up to the amount of the filing fee if any Employee would have incurred had Employee filed such claims in court, and Morgan Stanley shall be responsible for all additional arbitration filing fees, forum fees, arbitrator fees, and other administrative fees and costs of the arbitration forum.

(i) Additional Provisions Applicable to Statutory Claims and Counterclaims. Subject to any applicable fee-shifting provisions, if Employee initiates arbitration of statutory claims with FINRA or JAMS or asserts any statutory claims as counterclaims, Employee shall be responsible for the filing fee required to initiate arbitration of such claims or to assert such counterclaims up to the amount of the filing fee Employee would have incurred had Employee filed such claims in court and Morgan Stanley shall be responsible for all additional arbitration filing fees, forum fees, and other administrative fees and costs of the arbitration forum.

(j) This paragraph 7 will not be deemed a waiver of Employee's or Morgan Stanley's right to seek temporary or preliminary injunctive relief from any court in aid of arbitration or to maintain the status quo pending arbitration. The provisions set forth herein shall be severable and, if any provision of this Agreement shall be determined to be legally unenforceable or void, such unenforceable or void provision shall not affect the legality, validity or enforceability of the remaining provisions hereof and may be severed from the remaining provisions as appropriate, to the extent permitted by law, except that, in the event any of the Waivers set forth in paragraph 7(d) above are determined to be invalid, unenforceable or void with respect to a particular Covered Claim, that Covered Claim and only that Covered Claim shall proceed in a court of competent jurisdiction and not in arbitration (and such court shall be the exclusive forum for such claim) and the Waivers set forth in paragraph 7(d) above shall remain effective and enforceable with respect to all other Covered Claims. If a court of competent jurisdiction determines that a particular provision set forth herein is invalid, unenforceable or void under the applicable law in a particular jurisdiction, such provision will not be enforced in that jurisdiction but shall remain effective and enforceable in all other jurisdictions.

8

(k) Employee and Morgan Stanley agree that the arbitration agreement in this paragraph 7 constitutes the entire agreement regarding the resolution of Covered Claims, superseding all prior written and oral agreements regarding the resolution of Covered Claims. Notwithstanding anything to the contrary contained in this Agreement, Employee and Morgan Stanley further agree that upon thirty (30) days' written notice to Employee, this paragraph 7 may be modified, amended, or otherwise changed, at Morgan Stanley's sole discretion. Any such modification, amendment, or change will only apply prospectively and will not apply to any Covered Claims already pending in arbitration pursuant to this paragraph 7.

8. All Bonus Payments payable under this Agreement are intended to be exempt from section 409A of the Internal Revenue Code of 1986, as amended (the "Code") in reliance on the short-term deferral exemption set forth in the final regulations issued thereunder. Notwithstanding the foregoing, if it is subsequently determined that the Bonus Payments payable under this Agreement are not so exempt, then this Agreement shall be administered and interpreted in a manner intended to cause the Bonus Payments to comply with section 409A of the Code, such that the accelerated taxation and tax penalty provisions of section 409A of the Code do not apply to the Bonus Payments. In addition, if the Bonus Payments constitute deferred compensation subject to the requirements of section 409A of the Code and such amounts are payable to Employee upon "separation from service" (within the meaning of section 409A(a)(2)(a)(i) of the Code and its corresponding regulations) from Morgan Stanley, then if Employee is a "specified employee" (as such term is defined in section 409A(2)(B)(i) of the Code and its corresponding regulations) as determined by Morgan Stanley (or any successor thereto), in its sole discretion, then all payments to Employee on separation from service pursuant to this Agreement shall be postponed for a period of six (6) months following Employee's separation from service from Morgan Stanley. The postponed amounts shall be distributed to Employee within thirty (30) days after the date that is six (6) months following Employee's separation from service from Morgan Stanley. No delay is required if Employee's separation from service is on account of death. In no event may Employee designate the calendar year in which the Bonus Payments will be paid. While the Bonus Payments payable under this Agreement are intended to be exempt from section 409A of the Code, neither Morgan Stanley or any of its affiliates has made any representation, warranty or guarantee of any federal, state or local tax consequences of Employee's receipt of the Bonus Payments hereunder, including, but not limited to, under section 409A of the Code.

9. Any obligation set forth hereunder to provide payment of the Bonus Payments to Employee is the obligation of Morgan Stanley. Morgan Stanley's affiliated entities shall have no obligation to provide

9

payment of the Bonus Payments to Employee, are not guaranteeing any such payments, and shall not have any liability to Employee with respect to such payments.

10. Any breach of this Agreement by Employee shall result in the forfeiture of Employee's right to further Bonus Payments pursuant to this Agreement.

11. This Agreement is not a contract of employment for any period of time. As a result, Employee's employment with Morgan Stanley is on an at-will basis and nothing herein shall be construed as a contract of employment for a definite term and Employee's employment can be terminated at any time for any reason or no reason.

12. All notices, requests, demands and other communications to be given to the Employee pursuant to this Agreement shall be in writing and shall be deemed to have been duly given if delivered by hand, e-mail or overnight courier or mailed by registered or certified mail, return receipt requested, postage prepaid addressed to the Employee's last known address or such other address as the Employee shall have designated by notice in writing to Morgan Stanley, or any successor thereto, in accordance with this paragraph. All notices, requests, demands and other communications to be given to Morgan Stanley pursuant to this Agreement shall be in writing and shall be deemed to have been duly given if delivered by hand, e-mail or overnight courier or mailed by registered or certified mail, return receipt requested, postage prepaid addressed to the address set forth in the corporate records or such other address as Morgan Stanley shall have designated by notice in writing to Employee in accordance with this paragraph.

13. This Agreement shall inure to the benefit of Morgan Stanley and its affiliates, parents, subsidiaries, successors, or assigns, whether through merger, acquisition, sale or other transfer. Morgan Stanley retains the right to assign its rights, title and interest in this Agreement as it may elect. Employee expressly consents to any such, or any subsequent, assignment.

14. Employee further acknowledges that the Bonus Payments payable under this Agreement exceed any payment or thing of value to which Employee is otherwise entitled, and are just and sufficient consideration for the waivers, releases, and commitments set forth herein.

15. As stated above, the provisions of the arbitration agreement in paragraph 7 hereof, including the Waivers set forth in paragraph 7(d) of the arbitration agreement, shall be governed by and interpreted in accordance with the FAA. The remaining provisions of this Agreement shall be governed by and

10

interpreted in accordance with the laws of the State of New York, without regard to conflicts of laws principles.

16. This Agreement is confidential.  As a further term of this Agreement, and to the extent permitted by law, except as permitted in paragraph 4 above, Employee agrees that Employee will not disclose the existence of this Agreement or terms of this Agreement to any persons or parties; provided, however, that this prohibition shall not apply to disclosures (i) to Employee's immediate family; (ii) to Employee's attorneys and/or tax advisors; (iii) in response to requests initiated by any state or federal regulatory agency or securities industry self-regulatory organization; (iv) in response to a validly issued subpoena or court order; (v) as otherwise permitted or required by law in connection with any court action, arbitration or other legal proceeding to enforce the provisions of this Agreement; or (vi) for those Employees employed in California, any statement as to the amount of compensation earned hereunder.  Any individuals to whom Employee makes any disclosure in accordance with items (i) and/or (ii) of this paragraph shall be advised by Employee of this confidentiality provision prior to any such disclosure, and shall agree to be bound by this confidentiality provision.  Except as provided in paragraph 4 above, and unless otherwise prohibited by applicable law, regulation or court order, prior to making any disclosure in accordance with items (iii), (iv) and/or (v) of this paragraph, Employee shall provide Employee's Regional Director with notice of the request, subpoena or court order, so that Morgan Stanley may have the opportunity to answer, object or otherwise respond to it.

IN WITNESS WHEREOF, the parties have caused this Agreement to be on the date first hereinabove written.

EMPLOYEE

_____          2/6/15
Signature                                          Date

MORGAN STANLEY SMITH BARNEY LLC


_____          _____
Chief Financial Officer                        Date

11

ADD-134

# Exhibit C

ADD-135

GROWTH AWARD BONUS AGREEMENT

This Growth Award Bonus Agreement (the "Agreement") is made this 18th day of February 2014, by and between Morgan Stanley Smith Barney LLC, a Delaware limited liability company ("Morgan Stanley"), and Mace Barry Tamse ("Employee").

WHEREAS Employee is currently employed as a financial advisor/private wealth advisor by Morgan Stanley;

WHEREAS, Morgan Stanley has determined that Employee will be eligible to receive certain bonus payments as described in this Agreement, provided that Employee satisfies the terms and conditions set forth in this Agreement; and

WHEREAS, Employee desires to accept the terms and conditions of the bonus payments described in this Agreement, including agreeing to the release and restrictive covenants as set forth in this Agreement.

NOW THEREFORE, Morgan Stanley and Employee agree as follows:

1. In consideration of Employee's anticipated continued employment with Morgan Stanley and the recognition of the value of such services to be rendered by Employee with Morgan Stanley, and subject to the other provisions of this Agreement, if Employee remains continuously employed, in good standing, with Morgan Stanley, Morgan Stanley shall pay to Employee a bonus payment within fifteen (15) business days following March 15th, 2015, the amount of which shall be determined by Morgan Stanley, in its sole discretion, in February 2014 (the "Bonus Payment"), but which amount shall be not less than $5,654.17 ; provided that, to receive the Bonus Payment, Employee must be employed by Morgan Stanley, in good standing, on the date of payment of such Bonus Payment. Thereafter, on each March 15th thereafter, through and including March 15th, 2019, Morgan Stanley will pay to Employee the Bonus Payment within fifteen (15) business days following the applicable March 15th, provided that Employee continues to be employed by Morgan Stanley, in good standing, on the date of payment of the Bonus Payment. Any such Bonus Payment, when paid, may, at Morgan Stanley's discretion, be applied to repay any outstanding indebtedness owed by Employee to Morgan Stanley or any of its affiliates.

All payments hereunder shall be subject to withholding of all applicable Federal, state and local income taxes, as well as FICA, and all other employment taxes required by law to be withheld.

1

Employee shall be solely responsible for all income and employee-side employment taxes that result from Employee's receipt of the Bonus Payments. The Bonus Payments shall not be eligible for computation of benefits or compensation under any Morgan Stanley, or any related entity or affiliate compensation or benefits plans, including any wealth or capital accumulation plan.

2.  No Bonus Payment shall become due and payable hereunder unless (a) Employee is continuously in the employ of Morgan Stanley, in good standing, from the date of this Agreement, to and including the date such payment is due and payable according to the schedule described in paragraph 1 above, and (b) Employee has maintained all licenses and registrations from the Financial Industry Regulatory Authority, exchanges, state securities commissions and other regulatory bodies as Morgan Stanley shall determine necessary in order to conduct securities or futures transactions; provided, that, in the event Employee has not obtained or retained all such licenses and registrations at the time the bonus is payable, such amounts scheduled to be paid will be forfeited.  As used herein, the term "good standing" shall mean, among other things, that Employee is current on the payment of all outstanding financial obligations to the Firm.  In the event Employee's employment terminates voluntarily or involuntarily for any reason or no reason prior to becoming employed by Morgan Stanley, Employee shall not be entitled to receive any Bonus Payment under this Agreement. In the event Employee's employment terminates voluntarily or involuntarily for any reason or no reason other than on account of death or Disability (as defined below) after this Agreement is executed by all parties hereto, Employee shall not be entitled to receive any future Bonus Payments under this Agreement. If Employee's employment with Morgan Stanley terminates on account of death or Disability, Morgan Stanley shall pay to Employee (or Employee's estate, in the event of death) a lump sum cash payment in an amount equal to the total Bonus Payments that would have been payable to Employee for the remainder of the period described in paragraph 1 above if Employee had remained employed in good standing with Morgan Stanley, which amount shall first be applied to repay any outstanding indebtedness owed by Employee to Morgan Stanley or any of its affiliates, and the remainder of which shall be paid to Employee (or Employee's estate, in the event of death). Such lump sum shall be paid within sixty (60) days following the date of Employee's termination of employment with Morgan Stanley on account of death or Disability.  For purposes of this Agreement, the term "Disability" shall mean Employee has proven to be totally disabled under Morgan Stanley's long-term disability program whether or not Employee is covered under that program.

3.  Employee agrees to release all claims against Morgan Stanley, and any and all of its former and existing parents, subsidiaries, predecessors, successors, and affiliated entities, and all of its respective current and former directors, officers, employees, agents, managers, shareholders, successors, assigns,

2

and other representatives, whether known or unknown to Employee, that Employee may have as of the date of Employee's execution of this Agreement. This release includes, but is not limited to, any tort or contract claim, any claim for wages, and any claim for discrimination or retaliation arising under any federal, state, or local law, including the Age Discrimination in Employment Act of 1967, as amended ("ADEA"), and the Older Workers Benefit Protection Act, as amended ("OWBPA"). If any released claim is brought on Employee's benefit or on Employee's behalf, Employee expressly waives any claim to any form of monetary or other damages, including attorneys' fees and costs or any other form of personal recovery or relief. This release does not (a) waive claims that arise after the date of Employee's execution of this Agreement, (b) release claims Employee has asserted on his or her own behalf in civil litigation that is filed and pending at the time Employee executes this Agreement, or (c) release claims asserted on behalf of Employee in a pending class action or collective action that has been certified prior to the time Employee executes this Agreement. If Employee has worked in California, Employee acknowledges that this is a full and final release of all such claims, whether those claims are now known or unknown, and Employee waives all rights or benefits that Employee may have or claim to have pursuant to the provisions of Section 1542 of the Civil Code of the State of California which provides as follows: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

4. This Agreement does not prohibit or restrict Employee from lawfully (a) communicating or cooperating with, providing relevant information to, or otherwise assisting in an investigation by: (i) any governmental or regulatory body or official(s) or self-regulatory organization regarding a possible violation of any federal law relating to fraud or any rule or regulation of the Securities and Exchange Commission; or (ii) the EEOC or any other governmental authority with responsibility for the administration of fair employment practices laws regarding a possible violation of such laws; (b) responding to any inquiry from such authority, including an inquiry about the existence of this Agreement or its underlying facts; or (c) testifying, participating, or otherwise assisting in an action or proceeding relating to a possible violation of any such law, rule, or regulation. Nor does this Agreement require Employee to notify Morgan Stanley or any of its affiliated entities of such communications or inquiry described in the preceding sentence. Employee acknowledges and agrees, however, that Employee is waiving any right to recover any monetary damages or any other form of personal relief n connection with any such action, investigation, or proceeding.

5. This Agreement and any Bonus Payment payable hereunder shall not be subject to option or assignable either by voluntary or involuntary assignment or by operation of law including (without

3

limitation) bankruptcy, garnishment, attachment or other creditors' process; provided, however, that the provisions of this paragraph 5 shall not apply to any successor, parent, affiliate or subsidiary of Morgan Stanley. Upon the purported grant by Employee of an option over, or purported assignment by Employee of, any Bonus Payment in contravention of the preceding sentence, the obligation of Morgan Stanley to pay such Bonus Payment shall be extinguished, and neither Employee nor any other party shall have any further right thereto.

6. This Agreement contains the entire agreement between the parties relating to Bonus Payments to be paid to Employee in connection with the present Growth Award Program, and supersedes any prior oral or written agreement relating to such payments. This Agreement cannot be altered or amended except by a written agreement executed by Morgan Stanley and Employee. Notwithstanding the foregoing, Morgan Stanley retains the right to make modifications to this Agreement that it deems advisable, in its sole discretion, to allow it, its parents, and/or affiliates to comply with or satisfy any legal, regulatory. or governmental requirements or to qualify for any government loan, subsidy or other program.

7. Resolution of Disputes

(a) Any controversy or claim arising out of or in any way relating to this Agreement or any benefits or payments available and/or due under this Agreement, as well as any controversy or claim arising out of or in any way relating to Employee's employment with Morgan Stanley or termination thereof, including, but not limited to common law claims for breach of contract or tort, wage and hour claims, and/or statutory discrimination claims (individually and collectively referred to herein as "Covered Claims"), will be resolved by final and binding arbitration before the Financial Industry Regulatory Authority ("FINRA") in accordance with the FINRA Code of Arbitration Procedure for Industry Disputes. Notwithstanding the foregoing, any Covered Claim that has been initiated or is being maintained on a class, collective, or representative action basis, or is otherwise brought on behalf of others, may not be submitted to arbitration before FINRA. Also, notwithstanding the foregoing, any Covered Claim that arises in connection with an employee benefit plan subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), will be subject to the dispute resolution procedures set forth in the applicable ERISA plan document and paragraphs 7(c) through 7(e) below.

(b) If a Covered Claim may not be arbitrated before FINRA or is otherwise excluded from or not subject to arbitration before FINRA, then such Covered Claim, other than claims that arise under ERISA, will

4

. .     .

be resolved by final and binding arbitration pursuant to a single arbitrator before the American Arbitration Association ("AAA"). Such arbitration, except as provided otherwise in this paragraph 7, will be carried out in accordance with the AAA Employment Arbitration Rules and Mediation Procedures. Any judgment or award issued by the arbitrator may be entered in any court having jurisdiction.

(c) Employee and Morgan Stanley agree to waive, and hereby waive, any right to a jury trial with respect to any Covered Claims. Employee and Morgan Stanley further agree that no Covered Claims may be initiated or maintained on a class action, collective action, or representative action basis either in court or in arbitration and any such Covered Claim will be decided as an individual claim only. With respect to any Covered Claim, Employee may not participate as a class or collective action representative or a class, collective, or representative action member, or be entitled to a recovery from a class, collective, or representative action. An arbitrator appointed under this paragraph 7 shall not conduct a class, collective, or representative action arbitration and shall not allow a person to serve as a representative of others in an arbitration conducted pursuant to this paragraph 7. Nothing in this paragraph 7 shall preclude Employee from pursuing or participating in a class action in court where the Employee's claim is based on Employee's status as a customer or investor.

(d) This paragraph 7 will not be deemed a waiver of Employee's or Morgan Stanley's right to seek injunctive or other provisional relief from any court in aid of arbitration or to maintain the status quo pending arbitration. In the event that any portion of this paragraph 7 is held to be in conflict with a mandatory provision of applicable law, the remainder of this paragraph 7 shall not be affected to the extent permitted by law. For example, if a court determines that a particular provision of this paragraph 7 is in conflict with a mandatory provision of applicable law in that jurisdiction, such provision(s) will not be enforced in that jurisdiction, but the exclusivity of the Agreement and its arbitration as the sole and exclusive forum for all Covered Claims within its scope shall not be affected. Any dispute as to the arbitrability of a particular issue or claim pursuant to this arbitration provision is to be resolved in arbitration. Notwithstanding the foregoing, any issue concerning the validity of the class action, collective action, or representative action waiver must be decided by a court, and an arbitrator does not have authority to consider the issue of the validity of the waiver. If for any reason the class action, collective action, or representative action waiver is found to be unenforceable, the class action, collective action, or representative action may only be heard in court and may not be arbitrated under this paragraph 7.

5

(e) Employee and Morgan Stanley agree that this paragraph 7 constitutes the entire agreement regarding the resolution of Covered Claims, superseding all prior written and oral agreements regarding the resolution of Covered Claims. Notwithstanding anything to the contrary contained in this Agreement, Employee and Morgan Stanley further agree that upon thirty (30) days' written notice to Employee, this paragraph 7 may be modified, amended, or otherwise changed, at Morgan Stanley's sole discretion. Any such modification, amendment, or change will only apply prospectively and will not apply to any Covered Claims already pending in arbitration pursuant to this paragraph 7.

8.  By executing this Agreement (and as more fully set forth in paragraph 3), Employee RELEASES AND WAIVES any and all claims asserted on Employee's behalf in any pending class action, collective action, or representative action which has not been filed prior to the date the Employee executes the Agreement. Employee IS PRECLUDED from future participation in any such class, collective, or representative action involving Covered Claims.

9.  All Bonus Payments payable under this Agreement are intended to be exempt from section 409A of the Internal Revenue Code of 1986, as amended (the "Code") in reliance on the short-term deferral exemption set forth in the final regulations issued thereunder.  Notwithstanding the foregoing, if it is subsequently determined that the Bonus Payments payable under this Agreement are not so exempt, then this Agreement shall be administered and interpreted in a manner intended to cause the Bonus Payments to comply with section 409A of the Code, such that the accelerated taxation and tax penalty provisions of section 409A of the Code do not apply to the Bonus Payments. In addition, if the Bonus Payments constitute deferred compensation subject to the requirements of section 409A of the Code and such amounts are payable to Employee upon "separation from service" (within the meaning of section 409A(a)(2)(a)(i) of the Code and its corresponding regulations) from Morgan Stanley, then if Employee is a "specified employee" (as such term is defined in section 409A(2)(B)(i) of the Code and its corresponding regulations) as determined by Morgan Stanley (or any successor thereto), in its sole discretion, then all payments to Employee on separation from service pursuant to this Agreement shall be postponed for a period of six (6) months following Employee's separation from service from Morgan Stanley. The postponed amounts shall be distributed to Employee within thirty (30) days after the date that is six (6) months following Employee's separation from service from Morgan Stanley. No delay is required if Employee's separation from service is on account of death. In no event may Employee designate the calendar year in which the Bonus Payments will be paid. While the Bonus Payments payable under this Agreement are intended to be exempt from section 409A of the Code, neither Morgan Stanley or any of its affiliates has made any representation, warranty or

6

. .    -

guarantee of any federal, state or local tax consequences of Employee's receipt of the Bonus Payments hereunder, including, but not limited to, under section 409A of the Code.

10. Any obligation set forth hereunder to provide payment of the Bonus Payments to Employee is the obligation of Morgan Stanley. Morgan Stanley's affiliated entities shall have no obligation to provide payment of the Bonus Payments to Employee, are not guaranteeing any such payments, and shall not have any liability to Employee with respect to such payments.

11. Any breach of this Agreement by Employee shall result in the forfeiture of Employee's right to further Bonus Payments pursuant to this Agreement.

12. This Agreement is not a contract of employment for any period of time. As a result, Employee's employment with Morgan Stanley is on an at-will basis and nothing herein shall be construed as a contract of employment for a definite term and Employee's employment can be terminated at any time for any reason or no reason.

13. All notices, requests, demands and other communications to be given to the Employee pursuant to this Agreement shall be in writing and shall be deemed to have been duly given if delivered by hand, e-mail or overnight courier or mailed by registered or certified mail, return receipt requested, postage prepaid addressed to the Employee's last known address or such other address as the Employee shall have designated by notice in writing to Morgan Stanley, or any successor thereto, in accordance with this paragraph. All notices, requests, demands and other communications to be given to Morgan Stanley pursuant to this Agreement shall be in writing and shall be deemed to have been duly given if delivered by hand, e-mail or overnight courier or mailed by registered or certified mail, return receipt requested, postage prepaid addressed to the address set forth in the corporate records or such other address as Morgan Stanley shall have designated by notice in writing to Employee in accordance with this paragraph.

14. This Agreement shall inure to the benefit of Morgan Stanley and its affiliates, parents, subsidiaries, successors, or assigns, whether through merger, acquisition, sale or other transfer. Morgan Stanley retains the right to assign its rights, title and interest in this Agreement as it may elect. Employee expressly consents to any such, or any subsequent, assignment.

15. Employee acknowledges that Employee has been advised to consult with an attorney before signing this Agreement. Employee has been extended a period of at least twenty-one (21) days to consider this Agreement prior to signing it and seven (7) days following signing to revoke this Agreement. If

7

Employee signs this Agreement prior to the twenty-one (21) day period, Employee acknowledges that Employee is signing this Agreement freely and voluntarily. Employee further acknowledges that the Bonus Payments payable under this Agreement exceed any payment or thing of value to which Employee is otherwise entitled, and are just and sufficient consideration for the waivers, releases, and commitments set forth herein.

16. This Agreement shall be construed in accordance with the laws of the State of New York, without regard to conflicts of laws principles.

17. This Agreement is confidential. As a further term of this Agreement, and to the extent permitted by law, Employee agrees that Employee will not disclose the existence of this Agreement or terms of this Agreement to any persons or parties; provided, however, that this prohibition shall not apply to disclosures (i) to Employee's immediate family; (ii) to Employee's attorneys and/or tax advisors; (iii) to requests initiated by any state or federal regulatory agency or securities industry self-regulatory organization; (iv) in response to a validly issued subpoena or court order; (v) as otherwise permitted or required by law in connection with any court action, arbitration or other legal proceeding to enforce the provisions of this Agreement; or (vi) for those Employees employed in California, any statement as to the amount of compensation earned hereunder. Any individuals to whom Employee makes any disclosure in accordance with items (i) and/or (ii) of this paragraph shall be advised by Employee of this confidentiality provision prior to any such disclosure, and shall agree to be bound by this confidentiality provision. Unless otherwise prohibited by applicable law, regulation or court order, prior to making any disclosure in accordance with items (iii), (iv) and/or (v) of this paragraph, Employee shall provide Employee's Regional Director with notice of the request, subpoena or court order, so that Morgan Stanley may have the opportunity to answer, object or otherwise respond to it.

IN WITNESS WHEREOF, the parties have caused this Agreement to be on the date first hereinabove written.

8

ADD-143

EMPLOYEE

_____          2/21/14
Signature                                _____
                                         Date

MORGAN STANLEY SMITH BARNEY LLC


_____          _____
Chief Financial Officer                  Date

ADD-144

# Exhibit D

GROWTH AWARD BONUS AGREEMENT

This Growth Award Bonus Agreement (the "Agreement") is made this 18th day of February 2014, by and between Morgan Stanley Smith Barney LLC, a Delaware limited liability company ("Morgan Stanley"), and Mark Loftus ("Employee").

WHEREAS Employee is currently employed as a financial advisor/private wealth advisor by Morgan Stanley;

WHEREAS, Morgan Stanley has determined that Employee will be eligible to receive certain bonus payments as described in this Agreement, provided that Employee satisfies the terms and conditions set forth in this Agreement; and

WHEREAS, Employee desires to accept the terms and conditions of the bonus payments described in this Agreement, including agreeing to the release and restrictive covenants as set forth in this Agreement.

NOW THEREFORE, Morgan Stanley and Employee agree as follows:

1. In consideration of Employee's anticipated continued employment with Morgan Stanley and the recognition of the value of such services to be rendered by Employee with Morgan Stanley, and subject to the other provisions of this Agreement, if Employee remains continuously employed, in good standing, with Morgan Stanley, Morgan Stanley shall pay to Employee a bonus payment within fifteen (15) business days following March 15th, 2015, the amount of which shall be determined by Morgan Stanley, in its sole discretion, in February 2014 (the "Bonus Payment"), but which amount shall be not less than $21,077.82 ; provided that, to receive the Bonus Payment, Employee must be employed by Morgan Stanley, in good standing, on the date of payment of such Bonus Payment. Thereafter, on each March 15th thereafter, through and including March 15th, 2019, Morgan Stanley will pay to Employee the Bonus Payment within fifteen (15) business days following the applicable March 15th, provided that Employee continues to be employed by Morgan Stanley, in good standing, on the date of payment of the Bonus Payment. Any such Bonus Payment, when paid, may, at Morgan Stanley's discretion, be applied to repay any outstanding indebtedness owed by Employee to Morgan Stanley or any of its affiliates.

All payments hereunder shall be subject to withholding of all applicable Federal, state and local income taxes, as well as FICA, and all other employment taxes required by law to be withheld.

1

Employee shall be solely responsible for all income and employee-side employment taxes that result from Employee's receipt of the Bonus Payments. The Bonus Payments shall not be eligible for computation of benefits or compensation under any Morgan Stanley, or any related entity or affiliate compensation or benefits plans, including any wealth or capital accumulation plan.

2.  No Bonus Payment shall become due and payable hereunder unless (a) Employee is continuously in the employ of Morgan Stanley, in good standing, from the date of this Agreement, to and including the date such payment is due and payable according to the schedule described in paragraph 1 above, and (b) Employee has maintained all licenses and registrations from the Financial Industry Regulatory Authority, exchanges, state securities commissions and other regulatory bodies as Morgan Stanley shall determine necessary in order to conduct securities or futures transactions; provided, that, in the event Employee has not obtained or retained all such licenses and registrations at the time the bonus is payable, such amounts scheduled to be paid will be forfeited.  As used herein, the term "good standing" shall mean, among other things, that Employee is current on the payment of all outstanding financial obligations to the Firm.  In the event Employee's employment terminates voluntarily or involuntarily for any reason or no reason prior to becoming employed by Morgan Stanley, Employee shall not be entitled to receive any Bonus Payment under this Agreement. In the event Employee's employment terminates voluntarily or involuntarily for any reason or no reason other than on account of death or Disability (as defined below) after this Agreement is executed by all parties hereto, Employee shall not be entitled to receive any future Bonus Payments under this Agreement. If Employee's employment with Morgan Stanley terminates on account of death or Disability, Morgan Stanley shall pay to Employee (or Employee's estate, in the event of death) a lump sum cash payment in an amount equal to the total Bonus Payments that would have been payable to Employee for the remainder of the period described in paragraph 1 above if Employee had remained employed in good standing with Morgan Stanley, which amount shall first be applied to repay any outstanding indebtedness owed by Employee to Morgan Stanley or any of its affiliates, and the remainder of which shall be paid to Employee (or Employee's estate, in the event of death).  Such lump sum shall be paid within sixty (60) days following the date of Employee's termination of employment with Morgan Stanley on account of death or Disability.  For purposes of this Agreement, the term "Disability" shall mean Employee has proven to be totally disabled under Morgan Stanley's long-term disability program whether or not Employee is covered under that program.

3.  Employee agrees to release all claims against Morgan Stanley, and any and all of its former and existing parents, subsidiaries, predecessors, successors, and affiliated entities, and all of its respective current and former directors, officers, employees, agents, managers, shareholders, successors, assigns,

and other representatives, whether known or unknown to Employee, that Employee may have as of the date of Employee's execution of this Agreement. This release includes, but is not limited to, any tort or contract claim, any claim for wages, and any claim for discrimination or retaliation arising under any federal, state, or local law, including the Age Discrimination in Employment Act of 1967, as amended ("ADEA"), and the Older Workers Benefit Protection Act, as amended ("OWBPA"). If any released claim is brought on Employee's benefit or on Employee's behalf, Employee expressly waives any claim to any form of monetary or other damages, including attorneys' fees and costs or any other form of personal recovery or relief. This release does not (a) waive claims that arise after the date of Employee's execution of this Agreement, (b) release claims Employee has asserted on his or her own behalf in civil litigation that is filed and pending at the time Employee executes this Agreement, or (c) release claims asserted on behalf of Employee in a pending class action or collective action that has been certified prior to the time Employee executes this Agreement. If Employee has worked in California, Employee acknowledges that this is a full and final release of all such claims, whether those claims are now known or unknown, and Employee waives all rights or benefits that Employee may have or claim to have pursuant to the provisions of Section 1542 of the Civil Code of the State of California which provides as follows: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

4. This Agreement does not prohibit or restrict Employee from lawfully (a) communicating or cooperating with, providing relevant information to, or otherwise assisting in an investigation by: (i) any governmental or regulatory body or official(s) or self-regulatory organization regarding a possible violation of any federal law relating to fraud or any rule or regulation of the Securities and Exchange Commission; or (ii) the EEOC or any other governmental authority with responsibility for the administration of fair employment practices laws regarding a possible violation of such laws; (b) responding to any inquiry from such authority, including an inquiry about the existence of this Agreement or its underlying facts; or (c) testifying, participating, or otherwise assisting in an action or proceeding relating to a possible violation of any such law, rule, or regulation. Nor does this Agreement require Employee to notify Morgan Stanley or any of its affiliated entities of such communications or inquiry described in the preceding sentence. Employee acknowledges and agrees, however, that Employee is waiving any right to recover any monetary damages or any other form of personal relief in connection with any such action, investigation, or proceeding.

5. This Agreement and any Bonus Payment payable hereunder shall not be subject to option or assignable either by voluntary or involuntary assignment or by operation of law including (without

3

limitation) bankruptcy, garnishment, attachment or other creditors' process; provided, however, that the provisions of this paragraph 5 shall not apply to any successor, parent, affiliate or subsidiary of Morgan Stanley. Upon the purported grant by Employee of an option over, or purported assignment by Employee of, any Bonus Payment in contravention of the preceding sentence, the obligation of Morgan Stanley to pay such Bonus Payment shall be extinguished, and neither Employee nor any other party shall have any further right thereto.

6.  This Agreement contains the entire agreement between the parties relating to Bonus Payments to be paid to Employee in connection with the present Growth Award Program, and supersedes any prior oral or written agreement relating to such payments. This Agreement cannot be altered or amended except by a written agreement executed by Morgan Stanley and Employee. Notwithstanding the foregoing, Morgan Stanley retains the right to make modifications to this Agreement that it deems advisable, in its sole discretion, to allow it, its parents, and/or affiliates to comply with or satisfy any legal, regulatory, or governmental requirements or to qualify for any government loan, subsidy or other program.

7.  Resolution of Disputes

(a) Any controversy or claim arising out of or in any way relating to this Agreement or any benefits or payments available and/or due under this Agreement, as well as any controversy or claim arising out of or in any way relating to Employee's employment with Morgan Stanley or termination thereof, including, but not limited to common law claims for breach of contract or tort, wage and hour claims, and/or statutory discrimination claims (individually and collectively referred to herein as "Covered Claims"), will be resolved by final and binding arbitration before the Financial Industry Regulatory Authority ("FINRA") in accordance with the FINRA Code of Arbitration Procedure for Industry Disputes. Notwithstanding the foregoing, any Covered Claim that has been initiated or is being maintained on a class, collective, or representative action basis, or is otherwise brought on behalf of others, may not be submitted to arbitration before FINRA. Also, notwithstanding the foregoing, any Covered Claim that arises in connection with an employee benefit plan subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), will be subject to the dispute resolution procedures set forth in the applicable ERISA plan document and paragraphs 7(c) through 7(e) below.

(b) If a Covered Claim may not be arbitrated before FINRA or is otherwise excluded from or not subject to arbitration before FINRA, then such Covered Claim, other than claims that arise under ERISA, will

4

be resolved by final and binding arbitration pursuant to a single arbitrator before the American Arbitration Association ("AAA"). Such arbitration, except as provided otherwise in this paragraph 7, will be carried out in accordance with the AAA Employment Arbitration Rules and Mediation Procedures. Any judgment or award issued by the arbitrator may be entered in any court having jurisdiction.

(c) Employee and Morgan Stanley agree to waive, and hereby waive, any right to a jury trial with respect to any Covered Claims. Employee and Morgan Stanley further agree that no Covered Claims may be initiated or maintained on a class action, collective action, or representative action basis either in court or in arbitration and any such Covered Claim will be decided as an individual claim only. With respect to any Covered Claim, Employee may not participate as a class or collective action representative or a class, collective, or representative action member, or be entitled to a recovery from a class, collective, or representative action. An arbitrator appointed under this paragraph 7 shall not conduct a class, collective, or representative action arbitration and shall not allow a person to serve as a representative of others in an arbitration conducted pursuant to this paragraph 7. Nothing in this paragraph 7 shall preclude Employee from pursuing or participating in a class action in court where the Employee's claim is based on Employee's status as a customer or investor.

(d) This paragraph 7 will not be deemed a waiver of Employee's or Morgan Stanley's right to seek injunctive or other provisional relief from any court in aid of arbitration or to maintain the status quo pending arbitration. In the event that any portion of this paragraph 7 is held to be in conflict with a mandatory provision of applicable law, the remainder of this paragraph 7 shall not be affected to the extent permitted by law. For example, if a court determines that a particular provision of this paragraph 7 is in conflict with a mandatory provision of applicable law in that jurisdiction, such provision(s) will not be enforced in that jurisdiction, but the exclusivity of the Agreement and its arbitration as the sole and exclusive forum for all Covered Claims within its scope shall not be affected. Any dispute as to the arbitrability of a particular issue or claim pursuant to this arbitration provision is to be resolved in arbitration. Notwithstanding the foregoing, any issue concerning the validity of the class action, collective action, or representative action waiver must be decided by a court, and an arbitrator does not have authority to consider the issue of the validity of the waiver. If for any reason the class action, collective action, or representative action waiver is found to be unenforceable, the class action, collective action, or representative action may only be heard in court and may not be arbitrated under this paragraph 7.

5

(e) Employee and Morgan Stanley agree that this paragraph 7 constitutes the entire agreement regarding the resolution of Covered Claims, superseding all prior written and oral agreements regarding the resolution of Covered Claims. Notwithstanding anything to the contrary contained in this Agreement, Employee and Morgan Stanley further agree that upon thirty (30) days' written notice to Employee, this paragraph 7 may be modified, amended, or otherwise changed, at Morgan Stanley's sole discretion. Any such modification, amendment, or change will only apply prospectively and will not apply to any Covered Claims already pending in arbitration pursuant to this paragraph 7.

8. By executing this Agreement (and as more fully set forth in paragraph 3), Employee RELEASES AND WAIVES any and all claims asserted on Employee's behalf in any pending class action, collective action, or representative action which has not been filed prior to the date the Employee executes the Agreement. Employee IS PRECLUDED from future participation in any such class, collective, or representative action involving Covered Claims.

9. All Bonus Payments payable under this Agreement are intended to be exempt from section 409A of the Internal Revenue Code of 1986, as amended (the "Code") in reliance on the short-term deferral exemption set forth in the final regulations issued thereunder. Notwithstanding the foregoing, if it is subsequently determined that the Bonus Payments payable under this Agreement are not so exempt, then this Agreement shall be administered and interpreted in a manner intended to cause the Bonus Payments to comply with section 409A of the Code, such that the accelerated taxation and tax penalty provisions of section 409A of the Code do not apply to the Bonus Payments. In addition, if the Bonus Payments constitute deferred compensation subject to the requirements of section 409A of the Code and such amounts are payable to Employee upon "separation from service" (within the meaning of section 409A(a)(2)(a)(i) of the Code and its corresponding regulations) from Morgan Stanley, then if Employee is a "specified employee" (as such term is defined in section 409A(2)(B)(i) of the Code and its corresponding regulations) as determined by Morgan Stanley (or any successor thereto), in its sole discretion, then all payments to Employee on separation from service pursuant to this Agreement shall be postponed for a period of six (6) months following Employee's separation from service from Morgan Stanley. The postponed amounts shall be distributed to Employee within thirty (30) days after the date that is six (6) months following Employee's separation from service from Morgan Stanley. No delay is required if Employee's separation from service is on account of death. In no event may Employee designate the calendar year in which the Bonus Payments will be paid. While the Bonus Payments payable under this Agreement are intended to be exempt from section 409A of the Code, neither Morgan Stanley or any of its affiliates has made any representation, warranty or

6

guarantee of any federal, state or local tax consequences of Employee's receipt of the Bonus Payments hereunder, including, but not limited to, under section 409A of the Code.

10. Any obligation set forth hereunder to provide payment of the Bonus Payments to Employee is the obligation of Morgan Stanley. Morgan Stanley's affiliated entities shall have no obligation to provide payment of the Bonus Payments to Employee, are not guaranteeing any such payments, and shall not have any liability to Employee with respect to such payments.

11. Any breach of this Agreement by Employee shall result in the forfeiture of Employee's right to further Bonus Payments pursuant to this Agreement.

12. This Agreement is not a contract of employment for any period of time. As a result, Employee's employment with Morgan Stanley is on an at-will basis and nothing herein shall be construed as a contract of employment for a definite term and Employee's employment can be terminated at any time for any reason or no reason.

13. All notices, requests, demands and other communications to be given to the Employee pursuant to this Agreement shall be in writing and shall be deemed to have been duly given if delivered by hand, e-mail or overnight courier or mailed by registered or certified mail, return receipt requested, postage prepaid addressed to the Employee's last known address or such other address as the Employee shall have designated by notice in writing to Morgan Stanley, or any successor thereto, in accordance with this paragraph. All notices, requests, demands and other communications to be given to Morgan Stanley pursuant to this Agreement shall be in writing and shall be deemed to have been duly given if delivered by hand, e-mail or overnight courier or mailed by registered or certified mail, return receipt requested, postage prepaid addressed to the address set forth in the corporate records or such other address as Morgan Stanley shall have designated by notice in writing to Employee in accordance with this paragraph.

14. This Agreement shall inure to the benefit of Morgan Stanley and its affiliates, parents, subsidiaries, successors, or assigns, whether through merger, acquisition, sale or other transfer. Morgan Stanley retains the right to assign its rights, title and interest in this Agreement as it may elect. Employee expressly consents to any such, or any subsequent, assignment.

15. Employee acknowledges that Employee has been advised to consult with an attorney before signing this Agreement. Employee has been extended a period of at least twenty-one (21) days to consider this Agreement prior to signing it and seven (7) days following signing to revoke this Agreement. If

7

Employee signs this Agreement prior to the twenty-one (21) day period, Employee acknowledges that Employee is signing this Agreement freely and voluntarily. Employee further acknowledges that the Bonus Payments payable under this Agreement exceed any payment or thing of value to which Employee is otherwise entitled, and are just and sufficient consideration for the waivers, releases, and commitments set forth herein.

16. This Agreement shall be construed in accordance with the laws of the State of New York, without regard to conflicts of laws principles.

17. This Agreement is confidential. As a further term of this Agreement, and to the extent permitted by law, Employee agrees that Employee will not disclose the existence of this Agreement or terms of this Agreement to any persons or parties; provided, however, that this prohibition shall not apply to disclosures (i) to Employee's immediate family; (ii) to Employee's attorneys and/or tax advisors; (iii) to requests initiated by any state or federal regulatory agency or securities industry self-regulatory organization; (iv) in response to a validly issued subpoena or court order; (v) as otherwise permitted or required by law in connection with any court action, arbitration or other legal proceeding to enforce the provisions of this Agreement; or (vi) for those Employees employed in California, any statement as to the amount of compensation earned hereunder. Any individuals to whom Employee makes any disclosure in accordance with items (i) and/or (ii) of this paragraph shall be advised by Employee of this confidentiality provision prior to any such disclosure, and shall agree to be bound by this confidentiality provision. Unless otherwise prohibited by applicable law, regulation or court order, prior to making any disclosure in accordance with items (iii), (iv) and/or (v) of this paragraph, Employee shall provide Employee's Regional Director with notice of the request, subpoena or court order, so that Morgan Stanley may have the opportunity to answer, object or otherwise respond to it.

IN WITNESS WHEREOF, the parties have caused this Agreement to be on the date first hereinabove written.

8

EMPLOYEE

_____       _____
Signature                                               Date

MORGAN STANLEY SMITH BARNEY LLC


_____       _____
Chief Financial Officer                                Date

9

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MATTHEW T. SHAFER, SHERI HAUGABOOK, PETER HEIDT, JEFFREY SHOVER, MACE TAMSE, GEORGE LIVANOS, MARK LOFTUS, JEFFREY SAMSEN, JEFFREY SHERESKY, STEVE SHERESKY, STEVE NADLER, AND SANDY JUKEL, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, | Civil Action No. 1:20-cv-11047-PGG |
| Plaintiffs, | |
| -against- | |
| MORGAN STANLEY, MORGAN STANLEY SMITH BARNEY LLC, MORGAN STANLEY COMPENSATION MANAGEMENT DEVELOPMENT AND SUCCESSION COMMITTEE, and John/Jane Does 1-20, | |
| Defendants. | |

## DECLARATION OF JESSICA KRENTZMAN IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION AND TO STAY PROCEEDINGS

I, Jessica Krentzman, declare and state as follows:

1. I am currently employed as Global Head of Employee Relations in Morgan Stanley's Human Resources Department. I have held this position since January 2018. Prior to this role, since February 2014, I was the Regional Head of Employee Relations, and I have worked on the Employee Relations team in Morgan Stanley's Human Resources Department since November 2012. Since April 2014, I have also served as Morgan Stanley's CARE Program Administrator.

2.     I submit this declaration in support of the motion of Defendants Morgan Stanley,

Morgan Stanley Smith Barney LLC, and the Morgan Stanley Compensation Management

Development and Succession Committee to compel arbitration.

3.     Based on my role and responsibilities at Morgan Stanley, I have personal

knowledge of the following facts and, if called and sworn as a witness, could and would testify

competently thereto.

4.     In connection with making this Declaration, I reviewed records compiled,

maintained, and relied on in the normal course of business by Morgan Stanley, and to which I

have access in my role as Global Head of Employee Relations.

5.     The firm's records show that Matthew T. Shafer was employed by Morgan

Stanley as a Financial Advisor ("FA") from June 1, 2009, until August 31, 2018.

6.     The firm's records show that Sheri Haugabook was employed by Morgan Stanley

as an FA from June 1, 2009, until August 4, 2017.

7.     The firm's records show that Peter Heidt was employed by Morgan Stanley as an

FA from October 21, 2010, until July 2, 2020.

8.     The firm's records show that Jeffrey Shover was employed by Morgan Stanley as

an FA from April 17, 2009, until September 6, 2019.

9.     The firm's records show that Mace Tamse was employed by Morgan Stanley as

an FA from March 7, 1994, until March 27, 2015.

10.     The firm's records show that George Livanos was employed by Morgan Stanley

as an FA from June 1, 2009, until October 14, 2016.

11.     The firm's records show that Mark Loftus was employed by Morgan Stanley as

an FA from June 1, 2009, until October 19, 2018.

2

12.    The firm's records show that Jeffrey Samsen was employed by Morgan Stanley as an FA from February 1, 2013, until May 14, 2020.

13.    The firm's records show that Jeffrey Sheresky was employed by Morgan Stanley as an FA from February 1, 2013, until May 14, 2020

14.    The firm's records show that Steve Sheresky was employed by Morgan Stanley as an FA from February 1, 2013, until May 14, 2020.

15.    The firm's records show that Steve Nadler was employed by Morgan Stanley as an FA from April 25, 2008, until March 16, 2018.

16.    The firm's records show that Sandy Jukel was employed by Morgan Stanley as an FA from March 7, 2008, until March 29, 2019.

17.    Morgan Stanley's records reflect that each plaintiff entered into an employment agreement with Morgan Stanley, outlining the terms of their employment.

18.    Attached hereto as Exhibit A is a true and correct copy of Steve Nadler's signed employment agreement, dated April 28, 2008.

19.    Morgan Stanley's records reflect that plaintiffs were credentialed financial professionals who were routinely called upon to understand and advise clients on complex matters.

20.    For more than ten years, Morgan Stanley has administered an alternative dispute resolution program called "CARE," short for Convenient Access to Resolution for Employees. CARE applies to all U.S. Morgan Stanley employees, and a CARE guidebook explaining the program is available to employees on Morgan Stanley's intranet site.

21.    Attached hereto as Exhibit B is a true and correct copy of the CARE guidebook in effect before 2015.

3

22.     In 2015, Morgan Stanley announced an expansion of the CARE program. Morgan Stanley notified all U.S. employees of the expansion via their individualized Morgan Stanley email accounts. These communications were sent in waves. Attached hereto as Exhibit C is a true and correct copy of the email sent by Morgan Stanley to many of its U.S. employees on September 2, 2015, announcing the expansion of the CARE program and describing the process through which employees could opt out of participating ("2015 CARE Expansion Email").

23.     The firm's records show that Ms. Haugabook received a copy of the CARE Expansion Email on September 2, 2015, and accessed her email and sent messages that day.

24.     The firm's records show that Mr. Heidt received a copy of the CARE Expansion Email on September 2, 2015, and accessed his email and sent messages that day.

25.     The firm's records show that Mr. Shover received a copy of the CARE Expansion Email on September 2, 2015, and accessed his email and sent messages that day.

26.     The firm's records show that Mr. Livanos received a copy of the CARE Expansion Email on September 2, 2015, and accessed his email and accepted a meeting invitation that day.

27.     The firm's records show that Mr. Samsen received a copy of the CARE Expansion Email on September 2, 2015, and accessed his email and sent messages that day.

28.     The firm's records show that Jeffrey Sheresky received a copy of the CARE Expansion Email on September 2, 2015, and accessed his email and sent messages that day.

29.     The firm's records show that Steve Sheresky received a copy of the CARE Expansion Email on September 2, 2015, and accessed his email and sent messages that day.

30.     The firm's records show that Mr. Jukel received a copy of the CARE Expansion Email on September 2, 2015, and accessed his email and sent messages that day.

31.     The firm's records show that Sheri Haugabook, Peter Heidt, Jeffrey Shover, George Livanos, Jeffrey Samsen, Jeffrey Sheresky, Steve Sheresky, and Sandy Jukel did not opt out of the CARE program and that Matthew Shafer, Mark Loftus, and Steve Nadler did opt out of the CARE program.

32.     Attached hereto as Exhibit D is a true and correct copy of the CARE guidebook operative since October 2, 2015.

33.     Attached hereto as Exhibit E is a true and correct copy of the CARE agreement operative since October 2, 2015.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 6 th day of May , 2022 in Purchase, New York.

JESSICA KRENTZMAN

# Exhibit A

**MORGAN STANLEY**                    FINANCIAL ADVISOR
                                     EMPLOYMENT AGREEMENT

This agreement (referred to as the, or this, "Agreement") is made between Morgan Stanley & Co. Incorporated, a Delaware Corporation, (referred to as "Morgan Stanley") and _____Steven Nadler_____.

In consideration of your compensation and employment by Morgan Stanley as a Financial Advisor, and for other good and valuable consideration, you hereby agree as follows:

1.   **AT-WILL EMPLOYMENT AND TERMINATION**

Nothing in this Agreement is a promise of employment for a fixed term. Your employment by Morgan Stanley is strictly at-will and may be terminated by either party, for any reason or for no reason, at any time, with or without notice, and with or without cause. As used in this Agreement, "termination" includes (1) voluntary or involuntary resignation, (2) retirement, (3) release due to a reduction in force or closing of a branch office, or (4) discharge by Morgan Stanley. _____ **(EMPLOYEE INITIALS)**

2.   **TRADE SECRETS AND OTHER CONFIDENTIAL INFORMATION**

2.1   In the course of your employment with Morgan Stanley, you will have access to information that has been acquired by expenditures of time, effort, and money by Morgan Stanley, and which is valuable and proprietary to Morgan Stanley because, among other reasons, this information it is not known by, or available to, the general public or persons or entities other than in the ordinary course of conducting business for Morgan Stanley and its affiliates. This information includes, but is not limited to: (a) customer files, lists, and holding pages; (b) the names, addresses, telephone numbers, and assets and obligations carried in the accounts of Morgan Stanley's customers; (c) Morgan Stanley customer account histories and customer risk profiles; (d) computer software or hardware for use in computer or word processing equipment; (e) all training material forwarded to you during your employment (including but not limited to books, papers, records, videotapes and recordings); (f) documents or computer programs prepared or generated by you, if any, using Morgan Stanley records or information; (g) Morgan Stanley's business or marketing plans and strategies; and (h) other information or materials subject to intellectual property protection that are highly confidential. All of the above described information and documents are hereinafter collectively referred to as "Trade Secrets." You acknowledge and agree that these Trade Secrets are unique, cannot lawfully be easily duplicated or acquired, and that Morgan Stanley views the Trade Secrets as highly confidential and takes all reasonable measures to maintain their confidentiality and secrecy. _____ **(EMPLOYEE INITIALS)**

2.2   In the course of your employment with Morgan Stanley, you will also have access to records, documents, and information concerning the business and affairs of Morgan Stanley and its employees (hereinafter "Company Records") that are and will always be the confidential and exclusive property of Morgan Stanley. Company Records include, but are

not limited to, Morgan Stanley books and records and excerpts or derivations thereof. Company Records also include information and documents described as Trade Secrets in Paragraph 2.1 above.  Company Records include the originals and all copies thereof (whether in hard copy, computerized, or any other form). ___ (EMPLOYEE INITIALS)

2.3    You agree that, during the course of your employment with Morgan Stanley or otherwise, you will not remove Trade Secrets or other Company Records from the premises of Morgan Stanley in either original or copied form, except in the ordinary course of conducting business for, and subject to approval by, Morgan Stanley.  You also agree that you will not use Trade Secrets or other Company Records for any purpose other than the purpose of conducting the business of Morgan Stanley.  You further agree that (a) your use of Trade Secrets and other Company Records will stop immediately upon the suspension or termination of your employment relationship with Morgan Stanley; (b) you will immediately deliver to Morgan Stanley, at the time of suspension or termination of your employment or at any other time upon Morgan Stanley's request, any Trade Secrets or other Company Records in your possession or control; and (c) you will permit Morgan Stanley to inspect, prior to removal, any materials you intend to take from Morgan Stanley offices when your employment with Morgan Stanley is suspended or terminated.  In addition, you agree that, should you decide to terminate your employment with Morgan Stanley, your use of Trade Secrets and other Company Records will stop immediately and permanently, unless otherwise agreed to by Morgan Stanley ___ (EMPLOYEE INITIALS)

2.4    You agree that, both during and subsequent to the course of your employment with Morgan Stanley, you will not disclose to any person or entity the contents, in whole or in part, of Trade Secrets or other Company Records, except in the ordinary course of conducting business for Morgan Stanley. ___ (EMPLOYEE INITIALS)

2.5    You will not at any time assert any claim of ownership or other property interest in Trade Secrets or other Company Records. ___ (EMPLOYEE INITIALS)

2.6    If you create, contribute to or conceive any copyrightable work within the scope of your employment at Morgan Stanley, Morgan Stanley may assert that such copyrightable work is a "work-made-for-hire," and you agree that, upon Morgan Stanley's assertion that a work is a "work-made-for-hire," Morgan Stanley shall own all such rights in the copyrightable work. ___ (EMPLOYEE INITIALS)

3.    UNFAIR COMPETITION

3.1    You acknowledge and agree that the resources, training, goodwill and reputation of Morgan Stanley are the primary and material factors in your ability to develop and service Morgan Stanley customers, and that all customers serviced by you on behalf of Morgan Stanley are customers of Morgan Stanley. ___ (EMPLOYEE INITIALS)

3.2    For a period of one year following termination of employment for any reason, you will not solicit or attempt to solicit, directly or indirectly, any of Morgan Stanley's customers who were served by you, or whose names became known to you, while in the employ of Morgan Stanley or as a result of your employment with Morgan Stanley, with respect to securities,

commodities, financial futures, insurance, tax advantaged investments, mutual funds or any other line of business in which Morgan Stanley or any of its affiliates is engaged. For purposes of this provision, the term "solicit" includes initiation of any contact with customers for the purpose of conducting business with or transferring accounts to any other person or firm that does business in any line of business in which Morgan Stanley or any of its affiliates is engaged. _____ (EMPLOYEE INITIALS)

3.3   For a period of one year following termination of employment for any reason, you will not, directly or indirectly, recruit or solicit any employee of Morgan Stanley for employment with any other organization which does business in securities, commodities, financial futures, insurance, tax advantaged investments, mutual funds or any other line of business in which Morgan Stanley or any of its affiliates is engaged. _____ (EMPLOYEE INITIALS)

4.   **RIGHT TO INJUNCTION**

4.1   In the event you breach any of your obligations concerning "Trade Secrets and Other Confidential Information" or "Unfair Competition" contained in paragraphs 2 or 3 of this Agreement, you agree that Morgan Stanley will be entitled to injunctive relief from a court of competent jurisdiction, or from any arbitration forum specified in this Agreement. You understand and agree that Morgan Stanley will suffer immediate and irreparable harm and that money damages will not be adequate to compensate Morgan Stanley or to protect and preserve the status quo pending arbitration (as provided for in paragraph 7 of this Agreement). Therefore, YOU CONSENT TO THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER OR A PRELIMINARY OR PERMANENT INJUNCTION ordering:

(a)   that you immediately return to Morgan Stanley all Trade Secrets and Company Records, whether original, duplicated, computerized, handwritten, or in any other form whatsoever, and that you be enjoined and restrained from using or disclosing any information contained in such materials; _____ (EMPLOYEE INITIALS)

(b)   that, for a period of one year following the termination of your employment, you be enjoined and restrained from soliciting or attempting to solicit, directly or indirectly, any of Morgan Stanley's customers who were served by you, or whose names became known to you, while in the employ of Morgan Stanley, with respect to securities, commodities, financial futures, insurance, tax advantaged investments, mutual funds or any other line of business in which Morgan Stanley or any of its affiliates is engaged; _____ (EMPLOYEE INITIALS) and

(c)   that, for a period of one year following termination of employment for any reason, you will not, directly or indirectly, recruit or solicit any employee of Morgan Stanley for employment with any other organization which does business in securities, commodities, financial futures, insurance, tax advantaged investments, mutual funds or any other line of business in which

ADD-163

Morgan Stanley or any of its affiliates is engaged. _____ **(EMPLOYEE INITIALS)**

4.2    You agree that Morgan Stanley's application to any court for an injunction or other provisional relief will not constitute a waiver by Morgan Stanley of its right to arbitration as provided for in paragraph 7.1 of this Agreement, and that any hearing on the merits in such dispute shall be conducted in arbitration. If, after issuance of a temporary restraining order or permanent injunction, the parties proceed to arbitration, you agree to consent to expedited hearing procedures for such arbitration. You further agree that any injunction or provisional order shall stay in full force and effect until a panel of arbitrators renders a full and final decision on the merits. _____ **(EMPLOYEE INITIALS)**

5.    **ADHERENCE TO APPLICABLE LAWS AND POLICIES**

You agree to become familiar with and abide by the rules, regulations, and policies of Morgan Stanley, the Financial Industry Regulatory Authority, and any other securities and commodities exchanges of which Morgan Stanley is a member. You also agree to become familiar with and abide by any applicable state and federal securities laws and regulations. _____ **(EMPLOYEE INITIALS)**

6.    **HOLD HARMLESS**

You agree to indemnify Morgan Stanley for, and hold it harmless from, any and all losses or liabilities incurred by Morgan Stanley caused by (a) your violation of applicable state or federal laws, duties, rules or regulations; (b) your violation of Morgan Stanley's policies; or (c) your breach of any of the provisions of this Agreement. You further agree to indemnify Morgan Stanley, consistent with and as permitted by law, for your commission deficits, other employee losses, or customer losses, that are caused or permitted by you. Consistent with and as permitted by applicable law, you authorize Morgan Stanley, with or without notice to you, to withhold amounts equal to any such losses or liabilities from amounts payable, due, or held in an account or otherwise for you, including, but not limited to, assets held by you in any investment or securities related account(s), and from any commissions, bonuses, deferred, incentive or other compensation (above minimum salary or draw). _____ **(EMPLOYEE INITIALS)**

7.    **ARBITRATION**

7.1    Any controversy or claim arising out of or relating to (i) your employment by Morgan Stanley (excluding statutory employment claims and other claims covered by Paragraph 7.2), or (ii) this Agreement (or its breach), will be settled by arbitration before the Financial Industry Regulatory Authority ("FINRA") in accordance with their respective rules, and judgment upon an award issued by the arbitrator(s) may be entered in any court having jurisdiction. Except as otherwise expressly agreed, any dispute as to the arbitrability of a particular issue or claim pursuant to this arbitration provision is to be resolved in arbitration.

This paragraph will not be deemed a waiver of Morgan Stanley's right to injunctive or provisional relief from any court, as provided for in this Agreement. _____ (EMPLOYEE INITIALS)

7.2   Notwithstanding the arbitration requirement of paragraph 7.1 above, you agree that certain other claims (including, but not limited to, statutory discrimination and other statutory employment claims) must be submitted to Morgan Stanley's Alternate Dispute Resolution Program, "Convenient Access to Resolutions for Employees" ('CARE'). Claims required to be submitted to CARE are recited in the CARE Guidebook maintained by the CARE Program Administrator's Office and in the CARE Program explanatory brochure. _____ (EMPLOYEE INITIALS)

8.   **SUCCESSORS, ASSIGNS AND AFFILIATES**

The provisions, benefits and obligations of this Agreement will run to the successors, affiliates and assigns of Morgan Stanley. _____ (EMPLOYEE INITIALS)

9.   **GOVERNING LAW**

This Agreement will be governed by and construed in accordance with the laws of the state in which you signed this Agreement. _____ (EMPLOYEE INITIALS)

10.   **WAIVER**

Morgan Stanley's failure to enforce a breach of any covenant of this Agreement will not constitute a waiver of Morgan Stanley's right to enforce any other breach of the same or any other covenant. _____ (EMPLOYEE INITIALS)

11.   **SEVERABILITY**

11.1   If any provision or portion of any provision of this Agreement is, for any reason, adjudged to be void, invalid or unenforceable by an arbitrator or arbitration panel, a regulatory body, or a court of competent jurisdiction, the remainder of the Agreement will remain in full force and effect. _____ (EMPLOYEE INITIALS)

11.2   If any of the covenants, including but not limited to restrictive covenants, contained in this Agreement or any part thereof are held to be unreasonable and/or unenforceable, the parties agree that the court or arbitrator(s) making such determination shall have the power to revise such provision(s), so as to render such provision(s) reasonable and enforceable, upon which such provision(s) shall then be enforceable. _____ (EMPLOYEE INITIALS)

12.   **ATTORNEYS' FEES**

ADD-165

In the event of a breach of any of the terms of this Agreement by you, you agree to pay all fees and costs, including reasonable attorneys' fees incurred by Morgan Stanley in connection with the enforcement of this Agreement. _____**(EMPLOYEE INITIALS)**

13. **ENTIRE AGREEMENT**

This writing constitutes the entire agreement of the parties with respect to the subject matter recited in this Agreement.  This Agreement may be amended only by a writing signed by both you and Morgan Stanley. _____**(EMPLOYEE INITIALS)**

14. **EMPLOYEE REPRESENTATION**

You represent as follows:

I HAVE READ AND REVIEWED THIS EMPLOYMENT AGREEMENT IN ITS ENTIRETY.  I HAVE BEEN GIVEN AN OPPORTUNITY TO ASK MORGAN STANLEY QUESTIONS ABOUT IT.  I FULLY UNDERSTAND THE TERMS OF THIS DOCUMENT AND KNOWINGLY AND FREELY AGREE TO ABIDE BY THEM.  MY INITIALS FOLLOWING THE ABOVE PROVISIONS INDICATE THAT I HAVE READ THEM.   MY SIGNATURE BELOW INDICATES MY AGREEMENT TO ALL PROVISIONS HEREIN WHETHER OR NOT I HAVE INITIALED THEM.

Signed in the State of _____ New York _____

_____          _____
Employee's Signature                      Date

MORGAN STANLEY & CO. INCORPORATED

_____          _____
Branch Manager's Signature             Date

Page 6 of 6

ADD-166

ADDENDUM OF FINANCIAL ADVISOR EMPLOYMENT AGREEMENT

1.   Paragraphs 2.1, 2.2, 2.3, 2.4, 2.5, and 4.1(a) of the Financial Advisor Employment Agreement ("Agreement") are hereby amended by adding the following at the end of said paragraphs:

> Notwithstanding anything to the contrary in paragraphs 2.1, 2.2, 2.3, 2.4, 2.5, and 4.1(a), upon termination of employment with Morgan Stanley for any reason, Employee may retain copies of and use customer contact information for those customers whom he serviced prior to his employment with Morgan Stanley. A list of such customers' names is attached to this Agreement as Exhibit "A." or any referral of said customers (burden of proof as to said referral shall fall upon Employee) or members of Employee's immediate family (an immediate family member includes parents, brothers, sisters, children, father-in-law, mother-in-law, sister-in-law, brother-in-law, and any other relatives who are financially supported by such customer). This exception to paragraphs 2.1, 2.2, 2.3, 2.4, 2.5, and 4.1(a), shall become effective only upon the payment by Employee of all sums owed to Morgan Stanley at the time of termination under any promissory note signed by Employee.

2.   Paragraphs 3.1, 3.2, and 4.1(b) of the Agreement are hereby amended by adding the following at the end of said paragraphs:

> Notwithstanding anything to the contrary in these paragraphs 3.1, 3.2, and 4.1(b), upon termination of employment for any reason, Employee may solicit those customers whom he/she serviced as a securities broker-dealer registered representative prior to employment with Morgan Stanley, a listing of whom is attached to this Agreement as Exhibit "A", or any referral of said customers (burden of proof as to said referral shall fall upon Employee) or members of Employee's immediate family (an immediate family member includes parents, brothers, sisters, children, father-in-law, mother-in-law, sister-in-law, brother-in-law, and any other relatives who are financially supported by such customer). This exception to paragraphs 3.1, 3.2, and 4.1(b) shall become effective only upon the payment by Employee of all sums owed to Morgan Stanley at the time of termination under any promissory note signed by Employee.

3.   Paragraph 6 of the Agreement is hereby amended by adding the following at the end of said paragraph:

> Notwithstanding anything to the contrary in this paragraph 6, your agreement indemnify Morgan Stanley for commission deficits, other employee losses, or customer losses is limited to monetary losses incurred by Morgan Stanley for unpaid commissions, monetary losses incurred by Morgan Stanley employees or monetary losses incurred by Morgan Stanley customers, each due to any act or omission caused, directly or indirectly, by your gross negligence, recklessness or willful misconduct. In addition, Morgan Stanley will provide you with written notice prior to withholding any amounts as permitted by this paragraph. Morgan Stanley will not withhold from any retirement, pension or 401K account.

ADD-167

4.   Paragraph 10 of the Agreement is hereby amended by adding the following at the end of said paragraph:

   Notwithstanding anything to the contrary in this paragraph 10, either party's failure to enforce a breach of any covenant of this Agreement will not constitute a waiver of each party's rights to enforce any other breach of the same or any other covenant.

5.   If there is any conflict between the Addendum and the Financial Advisor Employment Agreement, this Addendum all control.

6   Paragraph 3.3 of the Agreement is hereby amended by adding the following at the end of said paragraph:

   Notwithstanding anything to the contrary in this paragraph 3.3, upon termination of employment for any reason Employee may solicit or recruit any sales assistant affiliated with Employee.

7   This Addendum is confidential. As a further term of the Agreement, Employee agrees that he will not disclose the existence of this Addendum or terms of this Addendum to any persons or parties; provided, however that this prohibition shall not apply to disclosures ( i ) to Employee's immediate family; ( ii ) to Employee's attorneys and/or tax advisors; ( iii ) to requests initiated by any state or federal regulatory agency or securities industry self-regulatory organization; ( iv ) in response to a validly issued subpoena or court order; or (v) as otherwise permitted or required by law in connection with any court action, arbitration or other legal proceeding to enforce this provisions of this Agreement. Any individuals to whom Employee makes any disclosure in accordance with items ( i ) and/or  ( ii ) of this paragraph shall be advised by Employee of this confidentiality provision prior to any such disclosure, and shall agree thereafter to be bound by this confidentiality provision.  In addition, the prohibitions contained in this Addendum hereof shall not apply to disclosures (i) to requests initiated by any state or federal regulatory agency or securities industry self-regulatory organization; or (ii) in response to a validly issued subpoena or court order. Unless otherwise prohibited by applicable law, regulation or court order, prior to making any disclosure in accordance with items ( iii ) and/or ( iv ) of this paragraph, Employee shall provide his/her District Manager with notice of the request, subpoena or court order, so that Morgan Stanley may have the opportunity to answer, object or otherwise respond to it.

_____          4/25/08_____
Employee's Signature                          Date


MORGAN STANLEY & CO. INCORPORATED


By: _____          4/25/08_____
        Branch Manager                        Date

By: _____     2     04/28/08_____
        District Manager                      Date

# Exhibit B



Los Angeles    Chicago    New York    London    Frankfurt    Hong Kong    Tokyo    Sydney
08:00    10:00    11:00    16:00    17:00    23:00    00:00    01:00

Home    Feedback    Corporate Directory    Search

i Work Here > Working Relationships > CARE Program > CARE: Guidebook

Expand Information
Hide Menu

Career Development
Services & Facilities
Business Expenses
**Working Relationships**
Compliance
Community Involvement
Recruiting/Interviewing
Relocation
Safety & Security

CARE Program

CARE: Guidebook

Conflict, misunderstanding, and disagreement. It´s difficult to imagine not encountering any of these, at least occasionally, in our work or personal lives. Conflict has always been a fact of life. At MSDW, we know that conflict sometimes occurs in the work environment and we want to ensure that we can respond to that conflict promptly and effectively. We view conflict as an opportunity to bring to light issues affecting our business and our employees. Our vision is to maintain a positive and productive work environment to allow our employees to succeed. To help achieve this vision, we are pleased to introduce you to MSDW´s Employment Dispute Resolution Program, CARE (Convenient Access to Resolutions for Employees).

This guidebook introduces you to CARE. It provides you with information regarding what to do when you encounter conflict in your work environment. The guidebook describes the program and walks you through each of the dispute resolution options that are available to you. The guidebook sets forth the rules related to CARE that are binding upon you and the Company.

If, after reading through the guidebook, you have any questions regarding the Program, we invite you to contact the Program Administrator at the CARE Office toll-free number: 1-866-CARE-123. The Program Administrator will serve as a resource for conflict resolution at MSDW by guiding employees through the options made available under CARE, answering questions, and overseeing the Program.

Who is the CARE Program Administrator?
How has MSDW traditionally handled work-related issues?
What is CARE?

Why is MSDW offering CARE?
Is CARE available to me?
Can I address any work-related issues through
CARE?
Registered employees are required to utilize
arbitration for claims other than statutory
employment discrimination or harassment claims
Issues not covered by CARE
Will MSDW make sure that I do not get into trouble
for using CARE?
When does CARE become available to me?
How does CARE affect my right to file a claim with
a federal or state agency?
Is my participation in CARE kept confidential?
Your easy-to-follow guide to using CARE
Informal resolution
Mediation

**Guidebook Continues. For information on
Arbitration and Important notes regarding
CARE,** click on "MORE" at the bottom of the
page

---

Who is the CARE Program Administrator?

The CARE Program Administrator is an experienced
conflict resolution specialist who, as mentioned
above, coordinates and oversees CARE´s daily
operations. The Program Administrator:

- Guides employees to their manager and/or HR
  representative

- Provides information on each available option
  of CARE

- Serves as a resource for managers, HR, and
  employees

- Coaches employees on speaking to managers
  or HR

- Acts as a neutral third-party

Back to Top

---

How has MSDW traditionally handled work-related
issues?

MSDW has always offered you the option of
working with managers or Human Resources (HR)
representatives to address workplace concerns.
These internal options have been and continue to be
very effective in resolving most issues quickly and to

the satisfaction of the parties involved. These options are still available to you under CARE.

In addition, until now, if a problem was not resolved internally, litigation or mandatory arbitration were the only options available to employees trying to resolve their claims. But now, the CARE program provides you and MSDW with more opportunities to address and resolve work-related issues in an effort to avoid the cost, time, and dissatisfaction associated with resolving issues in court.

   * *A registered employee is one who is required to register with the National Association of Securities Dealers or other Self Regulatory Organization because he/she is a representative of a broker-dealer, investment adviser, or issuer of securities. Representatives are persons associated with MSDW who are engaged in the investment banking or securities business for MSDW including the functions of supervision, solicitation or conduct of business in securities or who are engaged in the training of persons associated with a member for any of these functions.*

Back to Top

What is CARE?

CARE broadens our options for dispute resolution by providing a comprehensive program with a Program Administrator serving as a resource for employees. As mentioned above, CARE does not alter the traditional ways in which disputes have been addressed internally. Rather, it provides you with new, external options when the traditional methods of working with your manager or HR representative are unsuccessful.

CARE provides you with three distinct processes for resolving disputes: informal resolution, mediation and arbitration. Informal resolution is the process known as our traditional dispute resolution methods (i.e. working with your manager or HR representative). If the dispute is not resolved through informal resolution or the Program Administrator, two external processes are now available for certain eligible claims. Mediation utilizes the skills of an independent third-party neutral who works with the parties to attempt to resolve the issues at hand. It is a non-binding process unless you and the Company reach a settlement and sign a written agreement. If mediation does not result in a settlement of the

matter, arbitration is available. Arbitration utilizes the skills of an independent third-party decision maker who is empowered to make a final decision that is binding on the parties. Binding arbitration is optional for all employees with statutory discrimination claims, whether registered or not.

In addition, there is a Program Administrator who will work with you to keep lines of communication open with the Company. The Program Administrator is available to answer any questions you may have, explore other avenues for resolution, and provide guidance through the external processes available through CARE.

Back to Top

---

Why is MSDW offering CARE?

CARE is designed to mutually benefit both you and MSDW. The goals of the Program are to resolve employment disputes impartially and as quickly, fairly, inexpensively and amicably as possible so that we can all focus our energies on our core business: being an outstanding leader in the financial services industry. Other companies that have implemented similar programs have been able to realize these benefits. We are confident that this Program will increase your satisfaction level in handling work-related disputes that you may encounter at MSDW.

Back to Top

---

Is CARE available to me?

CARE is available to all current U.S. employees of MSDW and its domestic subsidiaries. The Program is also available to former U.S. employees of MSDW and its domestic subsidiaries who were employed on or after January 1, 2001.

Back to Top

---

Can I address any work-related issues through CARE?

CARE offers you help in resolving work-related disputes that may arise between you and your supervisors, managers, coworkers, and the Company. You may raise any work-related issues, questions or concerns that you have through informal resolution. The Program Administrator is also available to you at any time to assist you in your exploration of options for resolution. Mediation and arbitration are

available solely for employment claims against MSDW involving legal rights (such as breach of contract, wrongful discharge, discrimination, harassment, retaliation, and other legally protected rights) which arise on or after January 1, 2001.

Back to Top

Registered employees are required to utilize arbitration for claims other than statutory employment discrimination or harassment claims

Because of recent regulatory changes, registered and non-registered employees are subject to differing guidelines if an employee decides to take his or her claim to arbitration. Binding arbitration is optional for all non-registered employees for all claims and for registered employees for statutory discrimination claims. Registered employees will continue to be required to utilize binding arbitration under their Form U-4 Agreement for claims involving legally protected rights, other than statutory employment discrimination or harassment claims.

Back to Top

Issues not covered by CARE

There are certain types of issues that **are not covered** under CARE. These claims are not covered either because there are other remedies that are already available to you or for policy reasons. The issues that **are not covered** include:

- worker´s compensation;

- unemployment compensation;

- claims expressly excluded from mediation or arbitration by statute;

- benefits claims and other claims under or relating to the Company´s pension or welfare employee benefit plans; and

- claims by MSDW or an employee for injunctive relief for unfair competition, use of trade secrets, confidential or proprietary information, or to enforce the terms of a non-compete agreement.

In addition, those issues that are otherwise handled through the Employee Assistance Plan (EAP) are not addressed by CARE. We recognize that those issues

can affect you both at work and at home. The EAP is experienced in and better suited for assisting you with those types of issues.

Back to Top

Will MSDW make sure that I do not get into trouble for using CARE?

MSDW wants you to feel comfortable raising your work-related concerns. Therefore, MSDW prohibits retaliation against you when you report, in good faith, a job-related concern or complaint, or otherwise support an investigation of such reports. Anyone who retaliates against you for reporting a job-related concern or complaint will be subject to disciplinary action, up to and including termination. The Company will not retaliate against you in any way for using any aspect of CARE.

Back to Top

When does CARE become available to me?

CARE will be available to you for resolving work-related disputes arising on or after January 1, 2001.

Back to Top

How does CARE affect my right to file a claim with a federal or state agency?

MSDW strongly encourages all employees to use CARE. While MSDW hopes that CARE will effectively handle all employment-related conflicts to everyone´s satisfaction, CARE does not prevent you from filing a claim with a federal or state administrative agency in accordance with the regulatory or statutory requirements. If an employee does not exhaust informal resolution and mediation before proceeding to arbitration or filing a claim or complaint with a federal or state agency or court, it is MSDW´s intent to ask the arbitrator, agency, or court to suspend the proceedings until informal resolution and mediation under the Program have been exhausted.

Back to Top

Is my participation in CARE kept confidential?

All proceedings and documents prepared in connection with informal resolution, mediation, and

arbitration under CARE will be kept confidential to the utmost extent possible. Unless otherwise provided by law, no employment dispute resolution proceedings or documents shall be disclosed to any person other than to the participants in those proceedings, their attorneys, witnesses, the mediator, the arbitrator, and, if applicable, the court and/or government agency. MSDW wants you to feel comfortable addressing your concerns through CARE.

Back to Top

Your easy-to-follow guide to using CARE

As mentioned earlier, vital to the success of the CARE Program is your ability to access it easily when you encounter a conflict at work. If at any time you have questions or concerns regarding the Program, you can always contact the Program Administrator at 1-866-CARE-123. The Administrator is available to address any questions or concerns you may have. Set forth below are detailed instructions for accessing your options under CARE.

Back to Top

Informal resolution

There are neither forms to complete nor special procedures to follow in order to address your work-related concerns through informal resolution. All you need to do is discuss your concerns with your supervisor or your Human Resources representative. You may raise your concerns by telephone, in person, or in writing, whichever is most comfortable for you. Often, working with others through open and honest communication resolves issues quickly and effectively. To encourage such open and honest communication, the Company **will not** retaliate against any employee in any way for using informal resolution or any other aspect of CARE in good faith.

While we strongly support your speaking directly with your supervisor on issues of concern, we also recognize that at times you may not feel comfortable doing so. If this is the case, you do have other options. Feel free to raise your concerns with your supervisor´s immediate supervisor, your department head, the Human Resources Department, or the Program Administrator at 1-866-CARE-123. If you do raise your issue with your supervisor, your

supervisor is encouraged to contact the appropriate Human Resources representative to assist in resolving the issue. Human Resources representatives are a key internal resource for resolving disputes; they have received training in and are experienced in dispute resolution.*

It is our hope that informal resolution will be successful in resolving your work-related concerns. However, it is possible that informal resolution will not always resolve every concern. Mediation may be hlpful.

*A special note regarding allegations of harassment, discrimination, and hostile work environment:*

*MSDW is committed to providing a professional work environment that maintains employee equality, dignity and respect. In keeping with this commitment, and as detailed in the Non-Discrimination and Anti-Harassment Policy, MSDW strictly prohibits and will not tolerate any form of sexual harassment, discrimination or hostile work environment. In the event that your concern relates to any job-related discrimination or harassment, you should directly and immediately report the matter to your supervisor (if appropriate), the Program Administrator, your Human Resources Employee Relations coverage officer, or any representative designated in the Non-Discrimination and Anti-Harassment Policy. Any reported allegations of harassment or discrimination will be investigated promptly. Confidentiality will be maintained throughout the investigation process to the extent consistent with adequate investigation and appropriate corrective action. Any misconduct will be dealt with as the Company deems appropriate under the circumstances, including remedial action or disciplinary action, up to and including termination.*

* *Employees at Discover Financial Services Operations Centers must discuss their work-related issue with the Employee Relations Department in Riverwoods as part of informal resolution.*

Back to Top

_____

Mediation

What is mediation?

Mediation is a dispute resolution process that relies upon the assistance and expertise of a mediator, who

is an outside, neutral third party. A mediator is specifically trained to help you and the Company understand your needs and interests. During the mediation, you and the Company will have the opportunity to share your perspectives on the dispute. The mediator will help the parties try to reach an agreement by identifying issues, exploring possible areas for agreement, and attempting to identify a solution that is mutually satisfactory. It is important to remember that the mediator is not a decision maker or judge. The mediator will meet with each of the parties, together and/or separately, and assist the parties in resolving their own issues.

Because mediation is a problem-solving process as opposed to an adversarial process, third party witnesses and testimony are usually not presented to the mediator.

What are some of the advantages of mediation?

Mediation has many advantages in the employment environment. First, an objective, neutral third party, who you will help select, facilitates the mediation session. This person will have no interest in the outcome of the dispute, and will be able to assist you and the Company to work through the situation. This often leads to a greater feeling of fairness than can result in court because both you and the Company will be heard, and a third party will help you and the Company to understand each other´s perceptions. In addition, the discussions during the mediation are held privately and are confidential. Because both parties come to the mediation table in good faith trying to resolve their differences, the environment is non-adversarial and more conducive to resolving problems than arbitration or court. Another benefit of mediation is that you and the Company maintain control of the outcome because neither party is required to accept any solution proposed at the mediation. Of course, parties frequently reach a resolution to their issues as a result of the mediation process. If you and the Company are able to reach an agreement in mediation, the agreement will be outlined in writing and then both you and the Company will sign the document. Once signed, the agreement will be final and binding on both parties. Finally, mediation is less expensive and much faster than taking claims to arbitration or court.

How can I access mediation?

Since mediation is a process that relies on external assistance by a mediator, there are a number of steps that need to be followed. First, to access mediation,

you must have attempted to address your concerns through informal resolution. You will then need to contact the Program Administrator, who will talk with you about your experience with informal resolution and answer any questions you may have, review your options, and provide guidance through the other processes available under the Program.

What claims are eligible for mediation?

Only employment claims against MSDW that could be brought under the laws of the United States or state or local laws, including common law, which arise on or after January 1, 2001, are eligible for mediation under CARE. Claims involving a legally protected right that can be mediated pursuant to this Agreement ("Mediatable Claims") include, but are not limited to, the following:

1. Claims based upon alleged breach of contract. These claims include alleged breach of written or oral agreements, whether express or implied;

2. Claims based in tort;

3. Claims based upon allegations of unlawful discrimination (these claims include all bases of discrimination under federal law and under the law of the state or municipality in which employee works, including, for example, age, color, disability, national origin, race, religion, and sex. Some of the statutes that provide for such claims are Title VII of the Civil Rights Act, the Age Discrimination in Employment Act and the Americans With Disabilities Act,); and

4. Claims based upon any other alleged breach of a right created by constitution, statute, regulation, ordinance or common law.

Claims that **are not** eligible for mediation are listed under **"Issues not covered by CARE"** in this Guidebook.

To proceed to mediation, the Program Administrator will provide you with a Request for Mediation form that you must complete and submit. Since the issues that can be brought to mediation are more limited than those that can be addressed through informal resolution, the Program Administrator will review your mediation request and notify you if your concern is eligible for mediation. You must initiate the mediation within the time provided by applicable

law for commencing an action against MSDW on your claim. Once mediation is agreed to by you and the Company, an Agreement to Mediate is signed before the mediation process begins. If your claim is not eligible for mediation, the Company will continue to work with you to attempt resolution through the appropriate internal channels at MSDW.

Who will administer the mediation?

To ensure fairness, the mediation will be administered by either Judicial Arbitration and Mediation Service (JAMS), the Private Adjudication Center (PAC), an affiliate of Duke University or the American Arbitration Association (AAA), all nationally recognized, independent organizations that provide mediators and arbitrators. All of these organizations are well recognized for their neutrality and for the quality and diversity of the mediators they provide. You and the Company may also mutually agree upon some other mediation organization or independent mediator. To learn more about JAMS, PAC or AAA, please contact the CARE Program Administrator.

How will a mediator be chosen?

You and the Company will reach an agreement about which neutral organization to utilize, JAMS, PAC, AAA or another mutually agreed upon organization. You and the Company will then jointly select a mediator who will assist in resolving the dispute. This joint selection helps to ensure the fairness of the process. JAMS, PAC and AAA will provide a list of mediators from which you and the Company will select a mediator. It is likely that you and the Company will be able to agree on the mediator to use. However, if an agreement on a mediator cannot be reached, the administering dispute resolution organization will have the authority to choose the mediator.

Should I hire a lawyer to help me through the mediation process?

Legal representation at the mediation is optional for both you and the Company. If you decide to bring an attorney to the mediation, the Company will bring one as well. The Company reserves the right to bring an attorney to mediation at any time. Of course, any legal fees and expenses you incur will be your own responsibility.

Does the mediation follow a set of rules?

Although mediation is less formal than arbitration or court, the mediation process itself follows a particular set of rules to ensure that the process is fair and effective. Mediation under CARE will follow this CARE Guidebook and the American Arbitration Association National Rules for the Resolution of Employment Disputes (including Mediation and Arbitration Rules) ("AAA Rules") which are in effect at the time of the mediation, regardless of the organization from which the mediator may be selected. Any exceptions are noted below or in the Agreement to Mediate which is signed by both you and the Company prior to the mediation session.

You are encouraged to review this Guidebook and the AAA Rules prior to participating in mediation. For a copy of the AAA Rules, please see the Program Administrator. This Guidebook and the AAA Rules supersede the rules and procedures of JAMS and PAC. In the event of a conflict between anything contained in this Guidebook and the AAA Rules, this Guidebook is controlling. The Mediation Rules in the AAA Rules are modified as follows by this Guidebook:

1. Any references to the administrative or neutral fees of AAA are inapplicable, unless you and the Company choose AAA on a particular case as a "mutually acceptable neutral provider."

2. All references to the AAA as administrator should be read as the "Designated Mediation Provider," meaning JAMS or PAC, unless you and the Company choose AAA or some other mutually acceptable mediation provider as administrator for a particular case.

3. The MSDW Program Administrator will assist the employee in deciding whether to utilize JAMS, PAC, AAA or some other mutually acceptable neutral provider.

4. The mediation will be held in or near the city where the claim arose, unless the parties mutually agree on another location.

5. The mediation will be scheduled not less than 30 calendar days and not more than 60 calendar days after MSDW´s receipt of the Request for Mediation.

6. No pre-mediation submissions are required beyond the initial request for mediation, which will be filed with the MSDW Program

Administrator and the Designated Mediation Provider. A party who wishes to do so may provide the mediator with a brief position paper on the claims that need to be resolved, together with copies of any relevant documents. This submission must be made at least five (5) business days prior to the scheduled mediation session and must be served via registered mail on all parties to the mediation. No reply to any pre-mediation submission shall be allowed without permission of the mediator.

7. The mediator will be chosen by the parties from a list provided by the Designated Mediation Provider. All mediators on the list will be knowledgeable about or have received training in employment law and have experience or training in the securities industry. The Designated Mediation Provider will be available to act as a facilitator in the selection process and to otherwise assist the parties in choosing a mutually acceptable mediator. If the parties are unable to agree on a mediator within 10 calendar days of their receipt of the list of potential mediators, the Designated Mediation Provider will appoint an experienced mediator from the pool from which the Designated Mediation Provider generated the list provided to the parties. Each party to the mediation will have the right to challenge a mediator selected by the Designated Mediation Provider on grounds of partiality or bias. The Designated Mediation Provider will rule on any challenge to the mediator.

8. Once the mediation is completed, the mediator will destroy all documents provided to him or her as well as any notes that the mediator made concerning the mediation.

9. There will be no record of the mediation process, except for the fact that the mediation was held, the name of the Designated Mediation Provider, the identity of the parties to the mediation, whether the case settled during the mediation process, and if the case was resolved, the terms of the resolution.

10. If an employee intends to have an attorney present at the mediation, the employee must provide MSDW with written notice that an attorney will be present at least ten (10) business days before the mediation.

The Agreement to Mediate, signed by both the Company and the Employee prior to entering into the mediation process, may also modify the AAA Rules and will supersede these Rules in the event of a conflict.

The AAA, founded in 1926, is an independent public service, not-for-profit organization that offers a wide range of dispute resolution services to individuals, businesses, associations, and government. These services include the administration of dispute resolution methods such as mediation. The AAA is not connected with MSDW.

How much does mediation cost?

MSDW does not want mediation costs to create an obstacle to resolving disputes through mediation. Therefore, MSDW will pay for the administrative fees and expenses associated with mediation under CARE. Any legal fees and other expenses you incur, however, will be your own responsibility.

In addition, if you or the Company request a postponement of the mediation and administrative or mediator fees result from the postponement, the party requesting the postponement will be responsible for those fees.

What if mediation does not resolve the dispute?

It is our hope that mediation will be successful in resolving your work-related concerns that were left unresolved by informal resolution. However, MSDW recognizes that mediation may not be able to resolve every concern. Arbitration is designed to bring finality to issues that could not be resolved through informal resolution or mediation.

Back to Top

---

**Guidebook Continues...**
**For information on Arbitration and Important notes regarding CARE click here -->  More**

# Exhibit C

ADD-184

| From: | Human Resources <human-260.resources@morganstanley.com> |
|---|---|
| Sent: | Wednesday, September 2, 2015 4:19 PM |
| To: | matthew.shafer@morganstanley.com |
| Subject: | Expansion of CARE Arbitration Program |

HUMAN RESOURCES                                    Morgan Stanley

## Expansion of CARE Arbitration Program

September 2, 2015

More than 10 years ago, Morgan Stanley launched CARE (Convenient Access to Resolutions for Employees), the Firm's internal employee dispute resolution program. CARE provides employees with a quick and neutral way to raise and address workplace concerns. By combining internal (informal resolution) and external (mediation and arbitration) dispute resolution mechanisms, CARE promotes open and honest communication, increases mutual respect, and resolves employment-related concerns swiftly, fairly and economically.

Current registered employees are required to arbitrate most workplace claims under existing FINRA rules, and given the success of the CARE program, Morgan Stanley is announcing the expansion of CARE and modifications to related Firm policies and programs to extend arbitration obligations for all US employees – registered and non-registered. Effective October 2, 2015, arbitration under the CARE Arbitration Program will be mandatory for all employees in the U.S., and all covered claims between the Firm and employees will be resolved through final and binding arbitration on a non-class, non-collective and non-representative action basis as more fully described in the Arbitration Agreement and CARE Guidebook. Please review the Arbitration Agreement and the CARE Guidebook. It is important that you read and understand the Arbitration Agreement and the CARE Guidebook as they describe the terms, features and details of this program.

**Next Steps**

By continuing your employment with Morgan Stanley, you accept and agree to, and will be covered and bound by the terms of the Arbitration Agreement and the arbitration provisions of the CARE Guidebook, unless you elect to opt out of the CARE Arbitration Program by completing, signing and submitting an effective CARE Arbitration Program Opt-Out Form by October 2, 2015. Employees on approved leaves of absence will have up to 30 days from their return to active employment to

1

ADD-185

submit a CARE Arbitration Program Opt-Out Form. If you remain employed and do not timely complete, sign and submit an effective CARE Arbitration Program Opt-Out Form, the Firm's records will reflect that you have consented and agreed to the terms of the Arbitration Agreement and the arbitration provisions of the CARE Guidebook. You will not have an opportunity to opt out at a later date.

Importantly, should you choose to opt out of the Arbitration Agreement and CARE Arbitration Program, you will continue to be bound by the terms of any other arbitration agreement or obligation applicable to you. Your decision to opt out of the Arbitration Agreement and the CARE Arbitration Program will not adversely affect your employment status with the Firm.

If you have questions about the Arbitration Agreement or the arbitration provisions in the CARE Guidebook, email carebox@morganstanley.com.

v2

2

ADD-186

# Exhibit D

ADD-187

**CARE:  Guidebook**

**Morgan Stanley's Open Door Policy**

At Morgan Stanley, we know that conflict sometimes occurs in the work environment and we want to ensure that we can respond to that conflict promptly, fairly and effectively.  Our vision is to maintain a positive and productive work environment that allows our employees to succeed.

There are neither forms to complete nor special procedures to follow in order to address your work-related concerns through informal resolution.  All you need to do is discuss your concerns with your manager, HR or through the Firm's alternative dispute resolution program, CARE (Convenient Access to Resolutions for Employees) (see below).  You may raise your concerns by telephone, in person, or in writing, whichever is most comfortable for you.  Often, working with others through open and honest communication resolves issues quickly and effectively.

While we strongly support your speaking directly with your supervisor on issues of concern, we also recognize that at times you may not feel comfortable doing so.  If this is the case, you do have other options.  Feel free to raise your concerns with your supervisor's immediate supervisor, your department head, the Human Resources Department, or CARE (see below).  As part of the informal resolution process, CARE Employee Relations Specialists are also available to review a workplace conflict as neutral third parties.

*********************************

**NOTE Regarding The Integrity Hotline:**

As set forth in the Code of Conduct, all employees are responsible for reporting conduct that potentially violates the law, a regulation or Firm policy to their manager, Human Resources, or the Legal & Compliance Division. The Integrity Hotline provides an additional mechanism to report misconduct in cases where the employee believes the concern has not been appropriately resolved, or where the employee would prefer to report the concern through another channel. Employees utilizing the Integrity Hotline may do so anonymously and confidentially, as appropriate. The Integrity Hotline may be used to report concerns regarding potentially unlawful,

improper or questionable conduct by other employees, management, clients, counterparties, consultants or other contingent workers, suppliers/vendors or other third parties.

The Integrity Hotline can be reached at 1-866-448-8434. The Hotline is available 24 hours a day, 7 days a week.

The Firm takes allegations of misconduct seriously. Upon receiving a report of potential misconduct, the matter will be referred to the Legal & Compliance Division for follow-up and will be dealt with promptly and discreetly. Retaliation against any employee for reports made in good faith is prohibited.

**************************************

**HOW CARE WORKS.**

CARE is designed to benefit both you and Morgan Stanley. CARE aims to resolve employment disputes impartially and as quickly, fairly and amicably as possible so that we can all focus our energies on our core business:  being an outstanding leader in the financial services industry. CARE provides simple, fair, and low cost alternatives to litigation, and benefits employees and the Firm alike because it helps reduce both the time it takes to resolve issues and disputes, and the expenses associated with prolonged litigation, while at the same time providing all parties with the benefits of a less public process than court litigation.

In the event that you or the Firm decline to raise your concerns through informal resolution or are unable to resolve your concerns through informal resolution, CARE provides you and the Firm with the option of mediating the dispute. Mediation utilizes the skills of an independent, neutral third-party who works with the parties to attempt to resolve the issues at hand. It is a non-binding process unless you and the Firm reach a settlement and sign a written agreement.

If either you or the Firm decline to mediate or mediation of the dispute fails to achieve a resolution, then in order to proceed, the matter must be submitted to mandatory and binding arbitration in accordance with and subject to the rules, procedures, terms and conditions set forth below.

ADD-189

Arbitration utilizes the skills of an independent third-party decision maker who is empowered to make a final decision that is binding on the parties and cannot be appealed, except in rare circumstances.  Binding arbitration is mandatory for both the Firm and all U.S. employees, whether registered or not.

This guidebook provides you with details regarding the CARE framework and sets forth the rules related to CARE that are binding upon you and the Firm.  If, after reading through the guidebook, you have any questions regarding the Program, we invite you to contact CARE at 1-866-CARE-123.  CARE personnel will serve as a resource for conflict resolution at Morgan Stanley by guiding employees through the options made available under CARE.

**COVERED CLAIMS.**

Only claims by you or Morgan Stanley involving legally protected rights and based on, arising out of, or which arose out of or in any way relate to your employment, compensation, and terms and conditions of employment with Morgan Stanley[1] anywhere in the world, or the termination thereof, and claims based on, arising out of, or which arose out of, or in any way relate to your recruitment or application for employment and hiring, that could be brought under any federal, state or local law, including common law, are "Covered Claims" eligible for mediation and arbitration under CARE.  Covered Claims include all such legal claims between you and Morgan Stanley or any of Morgan Stanley's current, former and future parents, subsidiaries, affiliates, partners, predecessors, successors, assigns, and affiliated or related corporations or business entities, and any of its or their current, former, and future directors, officers, employees, agents, managers, shareholders, and other representatives, and all such claims based on, arising out of, or which arose out of or in any way relate to acts and omissions that occurred before the effective date of this Guidebook, but excludes the "Excluded Claims" listed below.  Covered Claims involving a legally protected right that can be mediated and must be arbitrated pursuant to this Agreement include, but are not limited to, the following:

---

[1] For purposes of CARE, Morgan Stanley includes Morgan Stanley and all of its current, former and future domestic parents, subsidiaries, affiliates, partners, predecessors, successors, and affiliated or related corporations or business entities, including without limitation Morgan Stanley Smith Barney LLC.  In addition, although access to CARE is limited to U.S. employees of Morgan Stanley, CARE applies to all Covered Claims regardless of what country you were working in at the time the claim arose.

1.      Claims based upon alleged breach of contract.  These claims include claims for alleged breach of written or oral agreements, whether express or implied, promissory estoppel claims, detrimental reliance claims, and quasi contract claims;

2.      Claims based in tort, defamation, breach of fiduciary duty and other common law claims;

3.      Claims based upon allegations of unlawful discrimination, harassment or retaliation (these claims include all bases of discrimination under or based on any federal, state or local law or regulation, including, for example, discrimination based on age, color, disability, national origin, race, religion, and gender.  Some of the statutes that provide for such claims are Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, the Equal Pay Act, and the Americans With Disabilities Act,);

4.      Claims under, based on, or in any way relating to any federal, state or local wage and hour law or regulation, including, without limitation, the Fair Labor Standards Act;

5.      Claims under, based on, or in any way relating to any federal, state or local constitution, statute or regulation of any country, state or municipality, including, without limitation, the Worker Adjustment and Retraining Notification Act, the Family and Medical Leave Act, and any other federal, state or local employment law, and any and all other federal, state, or local constitutional, statutory, regulatory, or common law claims or causes of action now or hereafter recognized;

6.      Claims based on, arising out of, or which arose out of or in any way relate to recruitment, applications for employment, and hiring; and

7.      Any other recognized legal claims based on, arising out of, or which arose out of or in any way relate to your employment, compensation, and terms and conditions of employment with Morgan Stanley anywhere in the world, or the termination thereof, except for Excluded Claims (as defined below).

**EXCLUDED CLAIMS.**

There are certain types of claims and issues that **are not covered** or subject to arbitration under CARE ("Excluded Claims"). These Excluded Claims are not covered or subject to arbitration under CARE either because there are other, exclusive procedures or remedies that are already available or for law or policy reasons. The following Excluded Claims are not covered or eligible for mediation or arbitration under CARE:

- Claims for worker's compensation benefits, but not retaliation claims arising out of or relating to claims for worker's compensation benefits;
- Claims for unemployment compensation benefits;
- Claims expressly precluded from mediation or arbitration by federal statute;
- Claims under the National Labor Relations Act, as amended, within the exclusive jurisdiction of the National Labor Relations Board;
- Applications by Morgan Stanley or you for temporary or preliminary injunctive relief in aid of arbitration or for the maintenance of the status quo pending arbitration;
- Claims brought by or against an employee who was employed as of May 20, 2015 and who previously opted-out of the Arbitration Agreement within the time period afforded that employee to do so; and
- Claims previously filed in court naming the employee as an individual plaintiff, defendant or other party before the date on which the employee first received the Arbitration Agreement.

**MEDIATION.**

*What is mediation?*

Mediation is a dispute resolution process that relies upon the assistance and expertise of a mediator, who is an outside, neutral third party. A mediator is specifically trained to help you and the Firm understand your needs and interests. During the mediation, you and the Firm will have the opportunity to share your perspectives on the dispute. The mediator will help the parties try to reach an agreement by identifying issues, exploring possible areas for agreement, and attempting to identify a solution that is mutually satisfactory. It is important to remember

that the mediator is not a decision maker or judge.  The mediator will meet with each of the parties, together and/or separately, and assist the parties in resolving their own issues.

Because mediation is a problem-solving process as opposed to an adversarial process, third party witnesses and testimony are usually not presented to the mediator.

*What are some of the advantages of mediation?*

Mediation has many advantages in the employment context.  First, an objective, neutral third party, who you will help select, facilitates the mediation session.  This person will have no interest in the outcome of the dispute, and will be able to assist you and the Firm to work through the situation.  This often leads to a greater feeling of fairness than can result in arbitration or court because both you and the Firm will be heard, and a third party will help you and the Firm to understand each other's perceptions.  In addition, the discussions during the mediation are held privately and are confidential.  Because both parties come to the mediation table in good faith trying to resolve their differences, the environment is non-adversarial and more conducive to resolving problems than arbitration or court.  Another benefit of mediation is that you and the Firm maintain control of the outcome because neither party is required to accept any solution proposed at the mediation.  Parties frequently reach a resolution to their issues as a result of the mediation process, and that is the overriding goal.  If you and the Firm are able to reach an agreement in mediation, the agreement will be outlined in writing and then both you and the Firm will sign the document.  Once signed, the agreement will be final and binding on both parties.  Finally, mediation is less expensive and much faster than taking claims to arbitration or court.

*How can I access mediation?*

Since mediation is a process that relies on external assistance by a mediator, there are a number of steps that need to be followed.  First, to access mediation, you must have attempted to address your concerns through informal resolution.  If those efforts are unsuccessful, you will then need to contact CARE in order to explore the possibility of mediation. A CARE representative will provide you with a Request for Mediation form that you must complete and submit to CARE. Since the issues that can be brought to mediation are more limited than those that can be addressed through informal resolution, the CARE representative will review your mediation

request and notify you if your concern is eligible for mediation.  You must initiate the mediation by submitting your completed Request for Mediation form to CARE within the time provided by applicable law for commencing an action against Morgan Stanley on your claim.  If mediation is agreed to by you and the Firm, an Agreement to Mediate is signed before the mediation process begins.

*Who will administer the mediation?*

To ensure fairness, the mediation will be administered by Judicial Arbitration and Mediation Service (JAMS), a nationally recognized, independent organization that provides mediators and arbitrators.  JAMS is well recognized for its neutrality and for the quality and diversity of the mediators and arbitrators it provides.  To learn more about JAMS, please contact CARE or go to the JAMS website (www.jamsadr.com).

*How will a mediator be chosen?*

You and the Firm will jointly select a mediator who will assist in resolving the dispute.  This joint selection helps to ensure the fairness of the process.  JAMS will provide a list of mediators from which you and the Firm will select a mediator.

*Should I hire a lawyer to help me through the mediation process?*

Legal representation at the mediation is optional for both you and the Firm.  If you decide to bring an attorney to the mediation, the Firm will bring one as well.  The Firm reserves the right to bring an attorney to mediation at any time.  Of course, any legal fees and expenses you incur will be your own responsibility, except as provided by law and as provided below for statutory claims in arbitration.

*Can I still go to arbitration if I have already tried mediation?*

Yes.  If no settlement was reached in mediation, you can move forward with your claim in arbitration, if that is allowed.  However, if a settlement was reached at the mediation, that agreement is binding on both you and the Firm.

If you have filed a proceeding in arbitration before requesting CARE mediation, you may still pursue CARE mediation provided you either dismiss the arbitration proceeding or agree to stay that proceeding pending the outcome of the CARE mediation.

*Does the mediation follow a set of rules?*

Although mediation is less formal than arbitration or court, the mediation process itself follows a particular set of rules to ensure that the process is fair and effective.  Mediation under CARE will follow this CARE Guidebook, the JAMS Mediation Guide, and the Agreement to Mediate which is signed by both you and the Firm prior to the mediation session.

You are encouraged to review this CARE Guidebook, the JAMS Mediation Guide and the Agreement to Mediate prior to signing the Agreement to Mediate and participating in mediation. For a copy of the JAMS Mediation Guide and the Agreement to Mediate, please contact CARE at 1-866-CARE-123.  You can also obtain a copy of the JAMS Mediation Guide and other information concerning mediation before JAMS by going to the JAMS website (www.jamsadr.com).  In the event of a conflict between anything contained in this CARE Guidebook and the JAMS Mediation Guide, this CARE Guidebook will supersede the JAMS Mediation Guide and be controlling.  In the event of a conflict between anything contained in this CARE Guidebook and the Agreement to Mediate signed by both you and Morgan Stanley prior to entering into the mediation process, the Agreement to Mediate will supersede and be controlling.

The following Rules shall apply to any mediation under CARE:

1.     The mediation will be held in the county of your current or last principal place of employment with Morgan Stanley or, if not practicable, in the county closest to your current or last principal place of employment with Morgan Stanley where the mediation can be held, unless the parties mutually agree on another location.  If your current or last principal place of employment with Morgan Stanley is outside of the U.S., the mediation shall be held in New York, New York, unless the parties mutually agree on another location.

2.      The mediation will be scheduled not less than 30 calendar days and not more than 60 calendar days after the Request for Mediation is received by CARE, unless you and Morgan Stanley agree otherwise.

3.      The mediator will be chosen by the parties from a list provided by JAMS.  All mediators on the list will be knowledgeable about or have received training in employment law and have experience or training in the securities industry.  JAMS will be available to act as a facilitator in the selection process and to otherwise assist the parties in choosing a mutually acceptable mediator.  Each party to the mediation will have the right to challenge a mediator selected by JAMS on grounds of partiality or bias, and any such challenge will be ruled on by JAMS.

5.      Once the mediation is completed, the mediator will destroy all documents provided to him or her as well as any notes that the mediator made concerning the mediation.

6.      There will be no record of the mediation process, except for the fact that the mediation was held, the name of the mediator, the identity of the parties to the mediation, whether the case settled during the mediation process, and if the case was resolved, the terms of the resolution.

7.      If you intend to have an attorney present at the mediation, you must provide Morgan Stanley with written notice that an attorney will be present at least ten (10) business days before the mediation.

*How much does mediation cost?*

Morgan Stanley does not want mediation costs to create an obstacle to resolving disputes through mediation.  Therefore, Morgan Stanley will pay for the administrative fees and expenses associated with mediation under CARE.  This includes mediator and facilities fees.  Any legal fees and other expenses you incur, however, will be your own responsibility, except as provided by law and as provided below for statutory claims in arbitration.

In addition, if you or the Firm request a postponement of the mediation and administrative or mediator fees result from the postponement, the party requesting the postponement will be responsible for those fees.

*What if mediation does not resolve the dispute?*

It is our hope that mediation will be successful in resolving your work-related concerns that were left unresolved by informal resolution. However, Morgan Stanley recognizes that mediation may not be able to resolve every concern. Arbitration is designed to bring finality to issues that could not be resolved through informal resolution or mediation.

**ARBITRATION.**

**If you or Morgan Stanley want to pursue a Covered Claim (as defined herein) that is not submitted or resolved through informal resolution or mediation, that Covered Claim must be resolved by final and binding arbitration in accordance with and subject to the rules, procedures, terms and conditions set forth below and in the Arbitration Agreement between you and Morgan Stanley to which this CARE Guidebook is annexed. This includes all Covered Claims, whether arbitration is initiated by you or Morgan Stanley, and whether or not the Covered Claim was submitted for informal resolution or mediation, and excludes all Excluded Claims (as defined herein). To the extent any of the rules, procedures, terms and conditions set forth below conflict with those set forth in the Arbitration Agreement between you and Morgan Stanley to which this CARE Guidebook is annexed, the rules, procedures, terms and conditions of that Arbitration Agreement shall govern.**

*What is arbitration?*

Like mediation, arbitration is a dispute resolution process that relies on the skills and expertise of an arbitrator, who is also an outside, neutral third party. Unlike a mediator, however, an arbitrator renders a final and binding decision after your employment dispute is presented to the arbitrator. While the arbitration process is not as formal as a court proceeding, it is much more formal than the mediation process. Initially, an arbitration hearing date at a neutral location will be arranged. In preparation for the hearing, documents may be exchanged and, in some cases, testimony in front of a court reporter may be taken. During the arbitration process, each party has the right to subpoena witnesses and documents, present evidence and arguments, and hear and challenge the other party's evidence and witnesses under the rules of arbitration. Typically

within thirty (30) days following the hearing, the arbitrator will issue a written final decision that is binding on both you and the Firm and cannot be appealed, except in rare circumstances.

*Advantages of arbitration*

Arbitration has many advantages over traditional litigation in court.  For one thing, it is a less public process than court litigation.  Also, you and the Firm have equal input into the selection of the arbitrator.  Additionally, arbitration is much faster and less expensive than court litigation, which can disrupt careers and generate a tremendous amount of stress and worry.  Just like court litigation, however, you do have the right to be represented by an attorney at the arbitration.  The arbitrator's decision is final and binding on you and the Firm and cannot be appealed, except in rare circumstances.  By agreeing to arbitrate, you and Morgan Stanley are, to the fullest extent permitted by law, giving up your and its right to a jury trial in any forum.

*Are both Morgan Stanley and I required to arbitrate?*

Yes.  The arbitration provisions of CARE are mandatory for all U.S. employees of Morgan Stanley[2] and apply to all Covered Claims, whether arbitration is initiated by you or Morgan Stanley.

*Arbitration Forums*

**Registered Employees:**  Except as specified herein or in the Arbitration Agreement between you and Morgan Stanley to which this CARE Guidebook is annexed, any arbitration of Covered Claims between registered employees or associated persons and Morgan Stanley or any of Morgan Stanley's current, former and future domestic parents, subsidiaries, affiliates, partners, predecessors, successors, assigns, and affiliated or related corporations or business entities, or any of its or their current, former, and future directors, officers, employees, agents, managers, shareholders, and other representatives, will be conducted under the auspices and rules of the Financial Industry Regulatory Authority ("FINRA") in accordance with the FINRA Code of

[2] For purposes of the arbitration provisions of CARE, Morgan Stanley includes Morgan Stanley and all of Morgan Stanley's current, former and future domestic parents, subsidiaries, affiliates, partners, predecessors, successors, and affiliated or related corporations or business entities, including without limitation Morgan Stanley Smith Barney LLC.

11

Arbitration Procedure for Industry Disputes ("FINRA Arbitration Rules")[3].  If a Covered Claim may not be arbitrated before FINRA or is ineligible for or otherwise excluded from or not subject to arbitration before FINRA, then such Covered Claim will be resolved by final and binding arbitration conducted under the auspices and rules of JAMS in accordance with and subject to the JAMS Employment Arbitration Rules and Procedures and the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness ("JAMS Arbitration Rules"),[4] except as specified herein or in the Arbitration Agreement between you and Morgan Stanley to which this CARE Guidebook is annexed.  In addition, employment discrimination claims under, based on, or in any way relating to any federal, state or local law (including claims of harassment and retaliation under those laws) will be resolved by final and binding arbitration conducted under the auspices and rules of JAMS in accordance with and subject to the JAMS Arbitration Rules, except as specified herein or in the Arbitration Agreement between you and Morgan Stanley to which this CARE Guidebook is annexed.

**Non-Registered Employees**:  Except as specified herein or in the Arbitration Agreement between you and Morgan Stanley to which this CARE Guidebook is annexed, any arbitration of Covered Claims between non-registered employees (who are also not associated persons) and Morgan Stanley or any of Morgan Stanley's current, former and future domestic parents, subsidiaries, affiliates, partners, predecessors, successors, assigns, and affiliated or related corporations or business entities, or any of its or their current, former, and future directors, officers, employees, agents, managers, shareholders, and other representatives, will be conducted under the auspices and rules of JAMS in accordance with and subject to the JAMS Arbitration Rules.[5]  Thus, if you are a current or former employee who was neither registered nor an associated person during your employment with Morgan Stanley and you wish to pursue a Covered Claim, you must proceed to arbitration of such Covered Claim before JAMS.

All Covered Claims between you and Morgan Stanley or any of Morgan Stanley's current, former and future domestic parents, subsidiaries, affiliates, partners, predecessors, successors, assigns, and affiliated or related corporations or business entities, or any of its or their current, former, and future directors, officers, employees, agents, managers, shareholders, and other

---

[3] Information about FINRA, including its arbitration rules, can be found at FINRA's website (www.finra.org).
[4] Information about JAMS, including its arbitration rules, can be found at JAMS' website (www.jamsadr.com).
[5] Information about JAMS, including its arbitration rules, can be found at JAMS' website (www.jamsadr.com).

representatives, shall be heard together in a single arbitration forum with authority to hear all such claims. Thus, for example, if you are a registered employee or an associated person and you seek to pursue arbitration before JAMS or FINRA for one or more Covered Claims and you also seek to pursue arbitration of other Covered Claims before the other arbitration forum (or you seek to pursue any Covered Claims in court in violation of the terms of this arbitration agreement), Morgan Stanley may request that all of your Covered Claims be consolidated and heard together in a single arbitration forum with authority to hear all such claims.

*NOTE REGARDING ADDITIONAL EXCLUDED CLAIMS:*

In addition to those claims listed above as Excluded Claims, arbitration under CARE and this Arbitration Agreement does not cover claims that are expressly precluded from arbitration by federal statute or that are expressly required by federal statute to be arbitrated under a different procedure.

*How do I initiate arbitration?*

Since arbitration, like mediation, is an external process, there are a number of steps that need to be followed if you wish to initiate arbitration. You can obtain information about how to initiate arbitration before FINRA from FINRA's website (www.finra.org) and about how to initiate arbitration before JAMS from JAMS's website (www.jamsadr.com). Information about how to initiate arbitration before other SROs is available from the individual SROs.

Any arbitration must be initiated within the time provided by applicable law for commencing a legal action, if allowed, on the claims in dispute. Once you or Morgan Stanley brings one or more claims in an arbitration forum, no Covered Claim may be brought in any other forum, unless that claim is not eligible for arbitration in the first forum. In addition, so that all arbitrable claims will be heard together in one arbitration, both you and Morgan Stanley may request that all claims be consolidated and heard together in one arbitration forum with authority to hear all of such claims.

*Who will administer the arbitration?*

To ensure fairness, the arbitration will be administered by the Designated Arbitration Provider before which the arbitration is heard (i.e., JAMS, FINRA, or another selected SRO). To learn

more about JAMS, FINRA, or other SROs and their respective arbitration rules, please contact CARE.

Information about JAMS, including its arbitration rules, can be found at the JAMS website (www.jamsadr.com).  Information about FINRA, including its arbitration rules, can be found at FINRA's website (www.finra.org).  Information about other SROs and their arbitration rules are available from the individual SROs.

*How will an arbitrator be chosen?*

You and the Firm will jointly select the arbitrator(s) who will be resolving your dispute.  This joint participation in arbitrator selection helps to ensure the fairness of the process.  The outside dispute resolution organization will provide a list of arbitrators from which you and the Firm will select an arbitrator or, where required, a panel of three arbitrators, using the dispute resolution organization's rules.  It is likely that you and the Firm will be able to successfully reach agreement on the arbitrator(s) to use.  However, if no agreement on an arbitrator or panel can be reached, the administering dispute resolution organization will have the authority to designate the arbitrator(s).

*Where will the arbitration take place?*

Arbitration shall be held in the county of your current or last principal place of employment with Morgan Stanley or, if not practicable, in the county closest to your current or last principal place of employment with Morgan Stanley where the arbitration can be held.  If your current or last principal place of employment with Morgan Stanley is outside of the U.S., the arbitration shall be held in New York, New York.

*Does arbitration follow a set of rules?*

The arbitration process, like the mediation process, follows a particular set of rules to ensure that the process is fair and effective.

Except as specified herein or in the Arbitration Agreement between you and Morgan Stanley to which this CARE Guidebook is annexed, arbitration before FINRA, or any other SRO of which Morgan Stanley is a member (to the extent the dispute is arbitrable under the rules of that SRO),

will be governed by the FINRA Code of Arbitration Procedure for Industry Disputes ("FINRA Arbitration Rules") or the rules and procedures of the applicable SRO, or any successor rules or, if none exist, the FINRA or applicable SRO rules most applicable to employment claims and disputes and, if the forum no longer exists, the rules of the successor forum or, if neither the forum nor a successor forum exists, the rules most applicable to employment claims and disputes of a similar forum. FINRA's arbitration rules are available from CARE or FINRA, and can be found at FINRA's website (www.finra.org). The arbitration rules of other SROs are available from CARE or the individual SROs.

Except as specified herein or in the Arbitration Agreement between you and Morgan Stanley to which this CARE Guidebook is annexed, arbitration before JAMS will be governed by the rules and procedures set forth in this CARE Guidebook and the JAMS Employment Arbitration Rules and Procedures and the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness ("JAMS Arbitration Rules") in effect at the time of the arbitration, or any successor rules or, if none exist, the JAMS rules most applicable to employment claims and disputes and, if JAMS no longer exists, the rules of the successor forum or, if neither the forum nor a successor forum exists, Arbitration Rules in the American Arbitration Association's National Rules for the Resolution of Employment Disputes in effect at the time of the arbitration, or any successor rules or, if none exist, the rules most applicable to employment claims and disputes of a similar forum. You are encouraged to review this Guidebook and the JAMS Arbitration Rules prior to participating in arbitration before JAMS. You may obtain a copy of the JAMS Arbitration Rules through the JAMS's website (www.jamsadr.com) or through CARE.

To the extent any of the terms, conditions or requirements of this CARE Guidebook conflict with the JAMS Arbitration Rules or FINRA Arbitration Rules or the rules and procedures of the applicable SRO, the terms, conditions or requirements of this CARE Guidebook shall govern. And to the extent any of the terms, conditions or requirements of this CARE Guidebook conflict with those set forth in the Arbitration Agreement between you and Morgan Stanley to which this CARE Guidebook is annexed, the terms, conditions or requirements of that Arbitration Agreement shall govern.

*Awards and Remedies*

Arbitrators are required to issue written awards and, subject to the parties' right to appeal or seek vacatur under applicable law, their awards shall be final and binding. Any judgment or award issued by an arbitrator may be entered in any court of competent jurisdiction, and any judicial review of an arbitration award shall be subject to and in accordance with applicable law. No arbitration award or decision will have any preclusive effect as to any issues or claims in any other arbitration or court proceeding unless each of the parties in such proceeding was also a named party in the arbitration.

Arbitrators are authorized to award any party the full remedies that would be available to such party if the Covered Claim had been filed in a court of competent jurisdiction, including attorneys' fees and costs where authorized by law. Thus, for example, you shall be entitled to recover attorney's fees and costs in any arbitration in which you assert and prevail on any statutory claims or counterclaims to the same extent as you could in court. As part of your costs, you may recover expert fees incurred by you to the same extent as you could in court.

*Modifications to JAMS Arbitration Rules*[6]

The JAMS Arbitration Rules are modified by this Guidebook and the Arbitration Agreement between you and Morgan Stanley to which this CARE Guidebook is annexed (and may be further modified by any  separate Arbitration Agreement entered into by you and the Firm prior to the arbitration hearing) as follows:

1.      Joinder of Claims and Counterclaims:  Any party who submits a claim or counterclaim to arbitration before JAMS must join with said claim or counterclaim and submit for resolution before JAMS any and all related Covered Claims concerning employment with Morgan Stanley that are eligible for submission to arbitration under CARE. In other words, once a party submits a claim or counterclaim to arbitration before JAMS, that party may not bring any related claim or counterclaim in any other forum.

3.      Answer and Counterclaims:  Each respondent must file and serve his or its answering statement within thirty (30) calendar days after his or its receipt of the Request for Arbitration and Statement of Claim. Likewise, the claimant must file an Answer to

---

[6] These rule modifications apply only to arbitration before JAMS and do not apply to FINRA rules, the rules of any other SRO, or to arbitration before FINRA or any other SRO.

Counterclaim within thirty (30) calendar days after the date of the claimant's receipt of the Answer and Counterclaims and simultaneously serve the Answer to Counterclaims on each respondent.

4.      Amendments of Claims or Other Pleadings:  A party may amend its Statement of Claim, Answer, Counterclaims, or Answer to Counterclaims only if the party does so before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted, within twenty (20) calendar days after it was served.

5.      Case Management Issues for Arbitration Management Conference:  The arbitrator and parties should discuss and resolve any issues regarding the following:

      a.      Pre-hearing briefs;

      b.      Subpoenas;

      c.      Post-hearing briefs;

      d.      Transcripts/Records of Proceedings; and

      e.      Discovery.

7.      Arbitration in the Absence of a Party or Representative:  The arbitration may proceed in the absence of a party or representative who, after due notice, fails or refuses to be present.  An award shall not be made solely on the default of a party.  The arbitrator shall require the party who is present to submit such evidence as the arbitrator may require for the making of an award, and such evidence may be accepted by telephone or by affidavit, in the arbitrator's sole discretion.

8.      Governing Law, Remedies, Motions, and Rules:  In any arbitration before JAMS, the arbitrator will apply the federal or state substantive law that would have governed the employment dispute had it been heard in the appropriate federal or state court (including, but not limited to, the applicable statutes of limitation, the applicable order and burdens of proof, and the applicable remedies).  The arbitrator may not grant remedies that would have been unavailable if the dispute had been heard in federal or state court.  Also, the parties may file and the arbitrator shall hear and decide at any point in the proceedings any motion permitted by the Federal Rules

of Civil Procedure, including but not limited to motions to compel discovery, motions for protective orders, motions to dismiss, motions for summary judgment, and motions in limine.  In addition, the arbitration shall be subject to the same rules of evidence, burdens of proof and statutes of limitations as if the Covered Claim was being heard in the appropriate federal or state court.

9.      Arbitrators:  Any arbitration of Covered Claims before JAMS shall be conducted before a single arbitrator, unless all parties to the arbitration agree in writing to conduct the arbitration before a panel of three arbitrators.

10.     Arbitration Fees:  Except as provided by law and as provided below for statutory claims and counterclaims, in any arbitration before JAMS, you shall be responsible for any filing fee required to initiate arbitration or to assert any counterclaims up to the amount of the filing fee you would have incurred had you filed such claims in court, and Morgan Stanley shall be responsible for all additional arbitration filing fees, forum fees, arbitrator fees, and other administrative fees and costs of the arbitration forum.

11.     Awards:  JAMS Arbitrators are required to issue a written award, which shall include a reasoned and detailed decision stating the reasons upon which it is based and supported by essential facts and conclusions of law, and such awards shall be final and binding, and any judgment or award issued by an arbitrator or a panel of three arbitrators may be entered in a court of competent jurisdiction.  No arbitration award or decision will have any preclusive effect as to any other issues or claims in any other arbitration or court proceeding unless each of the parties in such proceeding was also a named party in the arbitration.

*Should I hire a lawyer to help me through the arbitration process?*

You do have a right to be represented by an attorney of your choosing during any stage of the arbitration process, including at the arbitration hearing.  If you do elect to be represented by an attorney in the arbitration, you will be responsible for paying his or her fees and related expenses, except as provided by law and as provided below for statutory claims.  The Firm will have an attorney present at the arbitration hearing.

***Additional provisions applicable to arbitration of Statutory Claims or Counterclaims.***

Subject to any applicable statutory fee-shifting provisions, if you assert any statutory claims or counterclaims in arbitration with JAMS, FINRA or another SRO, you shall be responsible for any filing fee required to initiate arbitration of such claims or to assert such counterclaims up to the amount of the filing fee if any you would have incurred had you filed such claims in court, and Morgan Stanley shall be responsible for all additional arbitration filing fees, forum fees, arbitrator fees, and other administrative fees and costs of the arbitration forum.  In addition, you shall be entitled to recover attorney's fees and costs (including reasonable expert fees) in any such arbitration in which you prevail on your statutory claims or counterclaims to the same extent as you could in court.

**CLASS ACTION, COLLECTIVE ACTION, AND REPRESENTATIVE ACTION WAIVERS.**

**TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, YOU AND MORGAN STANLEY AGREE THAT NO COVERED CLAIMS MAY BE INITIATED, MAINTAINED, HEARD OR DETERMINED ON A CLASS ACTION, COLLECTIVE ACTION, OR REPRESENTATIVE ACTION BASIS EITHER IN COURT OR IN ARBITRATION, AND THAT YOU ARE NOT ENTITLED TO SERVE OR PARTICIPATE AS A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION MEMBER OR REPRESENTATIVE OR TO RECEIVE ANY RECOVERY FROM A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION INVOLVING COVERED CLAIMS EITHER IN COURT OR IN ARBITRATION**.

You further agree that if you are included within any class action, collective action, or representative action in court or in arbitration involving a Covered Claim, you will take all steps necessary to opt-out of the action or refrain from opting in, as the case may be.

Any issue concerning the validity or enforceability of any of the class action, collective action, and representative action waivers contained in this CARE Guidebook ("Waivers") shall be governed by and determined under and in accordance with the Federal Arbitration Act, and shall be decided by a court of competent jurisdiction, and not by an arbitrator.  Any issue concerning arbitrability of a particular issue or claim pursuant to the arbitration agreement in this CARE Guidebook (except for issues concerning the validity or enforceability of the class action,

collective action, or representative action Waivers) must be resolved by the arbitrator, not the court.

Insofar as any Covered Claim is permitted by a court of competent jurisdiction to proceed on a class action, collective action, or representative action basis, it must do so only in a court of competent jurisdiction and not in arbitration.

Insofar as any Covered Claim is not eligible for arbitration or otherwise is excluded from or not subject to arbitration, for any reason, the class action, collective action, and representative action Waivers apply and remain valid and enforceable with respect to such Covered Claim.

Nothing in this Guidebook shall preclude you from pursuing or participating in any claim, including any class action, collective action, or representative action in court where your claim is based solely on your status as a customer or an investor and does not arise out of or in any way relate to your employment relationship with Morgan Stanley.

*Will Morgan Stanley make sure that I am not retaliated against for using CARE?*

Morgan Stanley wants you to feel comfortable raising your work-related concerns.  Therefore, Morgan Stanley prohibits retaliation against you when you report, in good faith, a job-related concern or complaint, or when you participate in or otherwise support an investigation of any such reports, concerns, or complaints.  Anyone who retaliates against you for reporting in good faith a job-related concern or complaint will be subject to disciplinary action, up to and including termination.

*How does CARE affect my right to file a claim with a federal or state agency?*

Morgan Stanley strongly encourages all employees to use CARE.  While Morgan Stanley hopes that CARE will effectively handle all employment-related conflicts to everyone's satisfaction, nothing in the CARE program or this CARE Guidebook prohibits you from filing a charge, complaint or claim or communicating or cooperating with, providing information to, or participating in an investigation by the U.S. Equal Employment Opportunity Commission, the National Labor Relations Board, the U.S. Department of Labor, the Occupational Safety and Health Commission, or any other federal, state, or local administrative agency.

**Important notes regarding CARE**

*Your employment relationship with Morgan Stanley*

CARE creates more options for resolving your employment-related issues, but it does not create a contract of employment, express or implied, for any period of time or guarantee that your employment will end only under certain conditions.  CARE does not alter or modify the "at will" employment relationship that exists between you and the Firm.

*Law governing the CARE Program*

The provisions set forth above in this CARE Guidebook relating to arbitration, including the class action, collective action, and representative action Waiver provisions, shall be governed by and interpreted in accordance with the Federal Arbitration Act ("FAA").  All other provisions of the CARE Program and this Guidebook, shall be governed by and interpreted in accordance with the laws of the State of New York without regard to conflicts of law principles.

You have the right to challenge the validity of the terms and conditions of the CARE Program, including the provisions relating to arbitration set forth herein and the Arbitration Agreement to which this Guidebook is annexed on any grounds that may exist in law and equity, and Morgan Stanley shall not discipline, discharge, or engage in any retaliatory actions against you in the event you choose to do so or engage in other protected legal activity.  Morgan Stanley, however, reserves the right to enforce the terms and conditions of the CARE Program, this Guidebook, and the Arbitration Agreement in any appropriate forum.

*Severability*

The provisions of this Guidebook shall be severable and, if any provision hereof shall be determined to be legally unenforceable or void, such unenforceable or void provision shall not affect the legality, validity or enforceability of the remaining provisions hereof and may be severed from the remaining provisions as appropriate, to the extent permitted by law, except that, in the event any of the class action, collective action, or representative action Waivers set forth in the arbitration agreement are determined to be invalid, unenforceable or void with respect to a particular Covered Claim, that Covered Claim and only that Covered Claim shall proceed in a court of competent jurisdiction and not in arbitration (and such court shall be the exclusive forum

for such claim) and the Waivers shall remain effective and enforceable with respect to all other Covered Claims.  If a court of competent jurisdiction determines that a particular provision of this Guidebook is invalid, unenforceable or void under the applicable law in a particular jurisdiction, such provision will not be enforced in that jurisdiction but shall remain effective and enforceable in all other jurisdictions.

ADD-209

# Exhibit E

ADD-210

## ARBITRATION AGREEMENT

By entering into this Arbitration Agreement, you and Morgan Stanley ("Morgan Stanley" or the "Firm") agree as set forth below.  For purposes of this Arbitration Agreement, "Morgan Stanley" and "Firm" shall include Morgan Stanley & Co. LLC, Morgan Stanley Smith Barney, and any and all of its and their  former, existing, and future domestic parents, subsidiaries, partners, predecessors, successors and affiliate corporations and business entities.

1.    **Binding Mutual Arbitration.**  You and Morgan Stanley agree that any Covered Claims (defined below) will be resolved by final and binding arbitration as set forth in this Arbitration Agreement and in the arbitration provisions of the CARE Guidebook, a copy of which is annexed hereto.  This Arbitration Agreement, including the Waivers set forth in paragraph 4 of this Arbitration Agreement, shall be governed by and interpreted in accordance with the Federal Arbitration Act ("FAA").  This Arbitration Agreement applies with respect to all Covered Claims, whether initiated by you or Morgan Stanley, and makes arbitration the required and exclusive forum for the resolution of all Covered Claims.   By entering into this Arbitration Agreement, you and Morgan Stanley each acknowledge and agree that, to the fullest extent permitted by law, you and Morgan Stanley are giving up your and its right to a jury trial in any forum.

2.    **Covered Claims.**  Except for the Excluded Claims (defined below), and to the fullest extent permitted by law, Covered Claims include any and all claims or disputes between you and Morgan Stanley or any of its current, former, and future directors, officers, employees, agents, managers, shareholders, based on, arising out of, or which arose out of or in any way relate to your employment, compensation, and terms and conditions of employment with Morgan Stanley anywhere in the world, or the termination thereof, and claims based on, arising out of, or which arose out of or in any way relate to your recruitment or application for employment and hiring.  Covered Claims include but are not limited to contract, tort, defamation, breach of fiduciary duty and other common law claims, wage and hour claims, statutory discrimination, harassment and retaliation claims, and claims under, based on, or relating to any federal, state or local constitution, statute or regulation of any country, state or municipality, including, without limitation, the Fair Labor Standards Act ("FLSA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), the Worker Adjustment and Retraining Notification Act ("WARN"), the Equal Pay Act ("EPA"), the Americans With Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), and any other federal, state or local wage and hour, discrimination or employment law, and any and all other federal, state, or local constitutional, statutory, regulatory, or common law claims or causes of action now or hereafter recognized.  **This Arbitration Agreement applies to all Covered Claims, including any Covered Claims based on, arising out of, or which arose out of or in any way relate to acts and omissions that occurred before you and Morgan Stanley entered into this Arbitration Agreement.**

3.    **Excluded Claims.**  The following claims and disputes are not subject to this Arbitration Agreement:  (i) applications by any party for temporary or preliminary injunctive relief in aid of arbitration or for the maintenance of the status quo pending arbitration, (ii) claims for workers' compensation benefits, but not retaliation claims arising out of or relating to claims for workers' compensation benefits, (iii) claims for unemployment compensation benefits, (iv) claims under the National Labor Relations Act, as amended within the exclusive jurisdiction of the National Labor Relations Board, (v) any claim filed in court in which you are individually named as a plaintiff, opt-in plaintiff, defendant or other named party before the date on which this Agreement was sent to you, and (vi) any claim that is expressly precluded from arbitration by a federal statute.  In addition, if you are

individually named as a plaintiff, opt-in plaintiff, defendant or other named party in a court action before the date on which this Agreement was sent to you as provided in subsection (v) of this paragraph, then this Arbitration Agreement shall not apply to your claims in such action, and shall also not apply to any claim brought on your behalf in any other certified or uncertified class, collective, or representative action pending in court at the time this Agreement was sent to you. Please see the attached Notice of Pending Class, Collective and/or Representative Action Claims for further information about certain pending claims and how your ability to assert claims in such actions may be affected by this Agreement. Nothing in this Arbitration Agreement shall prohibit you from filing a charge, complaint or claim or communicating or cooperating with, providing information to, or participating in an investigation by the U.S. Equal Employment Opportunity Commission, the National Labor Relations Board, the U.S. Department of Labor, the Occupational Safety and Health Commission, or any other federal, state, or local administrative agency. You also have the right to challenge the validity of the terms and conditions of this Arbitration Agreement on any grounds that may exist in law and equity, and Morgan Stanley shall not discipline, discharge, or engage in any retaliatory actions against you in the event you choose to do so or engage in other protected legal activity. Morgan Stanley, however, reserves the right to enforce the terms and conditions of this Agreement in any appropriate forum.

4.      **WAIVERS. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, YOU AND MORGAN STANLEY AGREE THAT NO COVERED CLAIMS MAY BE INITIATED, MAINTAINED, HEARD OR DETERMINED ON A CLASS ACTION, COLLECTIVE ACTION, OR REPRESENTATIVE ACTION BASIS EITHER IN COURT OR IN ARBITRATION, AND THAT YOU ARE NOT ENTITLED TO SERVE OR PARTICIPATE AS A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION MEMBER OR REPRESENTATIVE OR TO RECEIVE ANY RECOVERY FROM A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION INVOLVING COVERED CLAIMS EITHER IN COURT OR IN ARBITRATION**. You further agree that if you are included within any class action, collective action, or representative action in court or in arbitration involving a Covered Claim, you will take all steps necessary to opt-out of the action or refrain from opting in, as the case may be. Any issue concerning the validity or enforceability of any of the class action, collective action, and representative action waivers contained in this Arbitration Agreement ("Waivers") shall be governed by and determined under and in accordance with the FAA, and shall be decided by a court of competent jurisdiction, and not by an arbitrator. Any issue concerning arbitrability of a particular issue or claim pursuant to this Arbitration Agreement (except for issues concerning the validity or enforceability of the class action, collective action, or representative action Waivers) must be resolved by the arbitrator, not the court. Insofar as any Covered Claim is permitted to proceed on a class action, collective action, or representative action basis, it must do so in a court of competent jurisdiction and not in arbitration. Insofar as any Covered Claim is not eligible for arbitration or otherwise is excluded from or not subject to arbitration, for any reason, the class action, collective action, and representative action Waivers apply and remain valid and enforceable with respect to such Covered Claim. For the sake of clarity, nothing in this Arbitration Agreement shall preclude you from pursuing or participating in any claim, including any class action, collective action, or representative action in court where your claim is based solely on your status as a customer or an investor and does not arise out of or in any way relate to your employment relationship with Morgan Stanley.

5.      **Selection and Rules.** Except as specified herein, the applicable arbitration rules will be the rules of the selected arbitration forum as indicated below, or any successor rules or, if none exist, the rules most applicable to employment claims and disputes and, if the forum no longer exists, the

ADD-212

successor forum or, if neither the forum nor a successor forum exists, the rules most applicable to employment claims and disputes of a similar forum.

    a.   **Forum:**

       i.   **FINRA & JAMS:**

**Registered Employees:**  Except as specified herein or in the CARE Guidebook, any arbitration of a Covered Claim will be conducted under the auspices and rules of the Financial Industry Regulatory Authority ("FINRA") in accordance with the FINRA Code of Arbitration Procedure for Industry Disputes ("FINRA Arbitration Rules")[1].  If a Covered Claim may not be arbitrated before FINRA or is ineligible for or otherwise excluded from or not subject to arbitration before FINRA, then such Covered Claim will be resolved by final and binding arbitration conducted under the auspices and rules of JAMS in accordance with and subject to the JAMS Employment Arbitration Rules and Procedures and the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness ("JAMS Arbitration Rules"),[2] except as specified herein or in the CARE Guidebook.  In addition, employment discrimination claims under or based on any federal, state or local law (including claims of harassment and retaliation under those laws) will be resolved by final and binding arbitration conducted under the auspices and rules of JAMS in accordance with and subject to the JAMS Arbitration Rules, except as specified herein or in the CARE Guidebook.  To the extent any of the terms, conditions or requirements of this Arbitration Agreement conflict with the CARE Guidebook or the JAMS Arbitration Rules or FINRA Arbitration Rules, the terms, conditions or requirements of this Arbitration Agreement shall govern.

**Non-Registered Employees:**  Except as specified herein or in the CARE Guidebook, any arbitration of a Covered Claim will be conducted under the auspices and rules of JAMS in accordance with and subject to the JAMS Arbitration Rules.  To the extent any of the terms, conditions or requirements of this Arbitration Agreement conflict with the CARE Guidebook or the JAMS Arbitration Rules, the terms, conditions or requirements of this Arbitration Agreement shall govern.

    b.  **Hearing Location**

Arbitration shall be held in the county of your current or last principal place of employment with Morgan Stanley or, if not practicable, in the county closest to your current or last principal place of employment with Morgan Stanley.  If your current or last principal place of employment with Morgan Stanley is outside of the U.S., the arbitration shall be held in New York, New York.

    c.  **Awards**

Arbitrators are required to issue a written award and, subject to the parties' right to appeal or seek vacatur under applicable law, their awards shall be final and binding, and any judgment or award issued by an arbitrator may be entered in any court of competent jurisdiction.  No arbitration award or decision will have any preclusive effect as to any issues or claims in any other arbitration or court proceeding unless each of the parties in such proceeding was also a named party in the arbitration.

---

[1] Information about FINRA, including its arbitration rules, can be found at FINRA's website (www.finra.org).
[2] Information about JAMS, including its arbitration rules, can be found at JAMS' website (www.jamsadr.com).

ADD-213

d. **Remedies**

Arbitrators are authorized to award any party the full remedies that would be available to such party if the Covered Claim had been filed in a court of competent jurisdiction, including attorneys' fees and costs. Thus, for example, you shall be entitled to recover attorney's fees and costs in any arbitration in which you assert and prevail on any statutory claims or counterclaims to the same extent as you could in court.

e. **Additional Provisions Applicable to Arbitration at JAMS[3]**

(i) **Arbitrators**

Any arbitration of Covered Claims before JAMS shall be conducted before a single arbitrator, unless all parties to the arbitration agree in writing to conduct the arbitration before a panel of three arbitrators.

(ii) **Procedure**

The parties may file and the arbitrator shall hear and decide at any point in the proceedings any motion permitted by the Federal Rules of Civil Procedure, including but not limited to motions to compel discovery, motions for protective orders, motions to dismiss, motions for summary judgment, and motions in limine. In addition, the arbitration shall be subject to the same rules of evidence, burdens of proof and statutes of limitations as if the Covered Claim was being heard in the appropriate federal or state court.

(iii) **Awards**

The Award shall include a reasoned and detailed decision stating the reasons upon which it is based and supported by essential facts and conclusions of law.

(iv) **Arbitration Fees**

Except as provided by law and as provided below for statutory claims and counterclaims, in any arbitration before JAMS, you shall be responsible for any filing fee required to initiate arbitration or to assert any counterclaims up to the amount of the filing fee if any you would have incurred had you filed such claims in court, and Morgan Stanley shall be responsible for all additional arbitration filing fees, forum fees, arbitrator fees, and other administrative fees and costs of the arbitration forum.

f. **Additional Provisions Applicable to Statutory Claims and Counterclaims**

Subject to any applicable fee-shifting provisions, if you initiate arbitration of statutory claims with FINRA or JAMS or assert any statutory claims as counterclaims, you shall be responsible for the filing fee required to initiate arbitration of such claims or to assert such counterclaims up to the amount of the filing fee you would have incurred had you filed such claims in court and Morgan Stanley shall be responsible for all additional arbitration filing fees, forum fees, arbitrator fees, and other administrative fees and costs of the arbitration forum.

6.     **Severability.**  The provisions set forth herein shall be severable and, if any provision of this Arbitration Agreement shall be determined to be legally unenforceable or void, such unenforceable or void provision shall not affect the legality, validity or enforceability of the remaining provisions hereof

---

[3] The provisions in this paragraph 5.e. only apply to arbitration at JAMS.  They do not apply to arbitration at FINRA.

ADD-214

and may be severed from the remaining provisions as appropriate, to the extent permitted by law.  In the event any of the Waivers set forth in paragraph 4 above are determined to be invalid, unenforceable or void with respect to a particular Covered Claim, that Covered Claim and only that Covered Claim shall proceed in a court of competent jurisdiction and not in arbitration (and such court shall be the exclusive forum for such claim) and the Waivers set forth in paragraph 4 above shall remain effective and enforceable with respect to all other Covered Claims.  If a court of competent jurisdiction determines that a particular provision set forth herein is invalid, unenforceable or void under the applicable law in a particular jurisdiction, such provision will not be enforced in that jurisdiction but shall remain effective and enforceable in all other jurisdictions.

7.    **Employment at will.**  Nothing herein constitutes, or may be construed as constituting, a guarantee of employment for any length of time.  Your employment with Morgan Stanley is on an "at will" basis.  Accordingly, your employment can be terminated with or without cause at the option of either you or Morgan Stanley.

8.    **Governing Law**.  The provisions set forth herein, including the Waivers set forth in paragraph 4, shall be governed by and interpreted in accordance with the FAA.

9.    **Acknowledgement.**  You acknowledge and agree that, before agreeing to this Arbitration Agreement, you have had the opportunity and a reasonable period of time to review and consider this Arbitration Agreement and the CARE Guidebook, to review and discuss this Arbitration Agreement and the CARE Guidebook with counsel of your choice, and to raise any questions you wish of Morgan Stanley.

NOTICE OF PENDING CLASS, COLLECTIVE AND/OR REPRESENTATIVE ACTION CLAIMS

The following are the pending class, collective and/or representative action claims known to MSSB, which assert employment-related claims on behalf of employees of MSSB and in which your participation may be impacted by the Arbitration Agreement, as described below and in that Agreement:

**In Re: Morgan Stanley Smith Barney LLC Wage and Hour Litigation,** US District Court for the District of New Jersey, MDL 2280, Master Case No. 11-3121(**Pontilena**: lead case); Consolidated Case Nos. 11-6062 (**Otten**); 11-6063 (**Kuhn**); 11-6177 (**Rosenblatt**):  These are four consolidated matters which assert claims on behalf of MSSB Financial Advisors ("FAs") employed since April 21, 2008 alleging that FAs should be classified as non-exempt employees and be eligible for overtime pay.

One of the legal claims in this case is brought under a federal law known as the Fair Labor Standards Act, and this claim is brought on behalf of all FAs in all states.  It is possible that a class of FAs will be certified for this case.  The Court has not yet determined whether a class of plaintiffs should be conditionally certified for this claim.  If you are or were an FA that worked more than 40 hours, you may be a potential member of the class that may be certified for this case.  If you have already opted-in or joined in the collective class, your right to continue to pursue your federal claim in this case will not be affected, regardless of whether you do or do not opt-out of the Arbitration Agreement.  If you have not already opted into or joined in the collective class, in order to pursue such a claim in this case, you must opt-out of the instant Arbitration Agreement.  If you do not opt-out of this Arbitration Agreement, you will, however, be able to pursue any such federal claim in an arbitration proceeding.

This case also asserts claims on behalf of "putative" or potential class or classes of unnamed FAs for alleged overtime under New Jersey, New York, and Connecticut law.  It is possible that a class or classes of FAs will be certified for these state law overtime claims.  If you are or were an FA in the states of New Jersey, New York or Connecticut, you may be a potential member of the class or classes that may be certified for these claims.  In order to be able to pursue such a claim in this case, you must opt-out of the instant Arbitration Agreement.  If you do not opt-out of this Arbitration Agreement, you will, however, be able to pursue any such claim in an individual arbitration proceeding.

**Devries, et al. v. Morgan Stanley & Co. LLC, et al.,** US District Court for the Southern District of Florida, Case No. 9:12-cv-81223-KAM:  This lawsuit is brought by Fred Devries and other former pre-production Financial Advisor Associates, and involves claims that during the "pre-production" period of the Financial Advisor Associates Program they were not paid overtime in all weeks in which they worked more than 40 hours.

One of the legal claims in this case is brought under a federal law known as the Fair Labor Standards Act.  A class of plaintiffs has been conditionally certified by the Court for this claim.  If you have already opted-in or joined in this collective class, your right to continue to pursue your federal claim in this case will not be affected, regardless of whether you do or do not opt-out of this arbitration agreement.

This case also asserts claims on behalf of "putative" or potential class or classes of unnamed Financial Advisor Associates for alleged unpaid overtime under Illinois, New Jersey, New York, and Pennsylvania law.  It is possible that a class or classes of Financial Advisor Associates will be certified for these state law overtime claims.  If you are or were a Financial Advisor Associate that worked more than 40 hours during the pre-production period of the Financial Advisor Associate Program in

the states of Illinois, New Jersey, New York or Pennsylvania, you may be a potential member of the class or classes that may be certified for these claims.  In order to be able to pursue such a claim in this case, you must opt-out of the instant Arbitration Agreement.  If you do not opt-out of this Arbitration Agreement, you will, however, be able to pursue any such claim in an individual arbitration proceeding.

**Hix v. Morgan Stanley & Co. LLC, et al.,** U.S. District Court for the District of Maryland, Case No. 15-cv-01157-MJG.  This lawsuit is brought by Shelley Hix, a former Operations Associate and Service Associate, and asserts a claim under a federal law known as the Fair Labor Standards Act ("FLSA") on behalf of MSSB Operations Associates, Service Associates, Senior Service Associates, Senior Registered Service Associates, and Registered Service Associates (collectively "Service Associates") employed since January 13, 2012 alleging that they were not paid overtime in all weeks in which they worked more than 40 hours.

Plaintiff brings her FLSA claim in this case on behalf of all Service Associates nationwide.  It is possible that a class of Service Associates will be certified for this case.  The Court has not yet determined whether a class of plaintiffs should be conditionally certified for this claim.  If you are or were a Service Associate that worked more than 40 hours, you may be a potential member of the class that may be certified for this case.  If you have already opted-in or joined in the collective class, your right to continue to pursue your FLSA claim in this case will not be affected, regardless of whether you do or do not opt-out of the Arbitration Agreement.  If you have not already opted into or joined in the collective class, in order to pursue such a claim in this case, you must opt-out of the instant Arbitration Agreement.  If you do not opt-out of this Arbitration Agreement, you will, however, be able to pursue any such FLSA claim in an individual arbitration proceeding.

**Johnson v. Morgan Stanley & Co. LLC, et al.,** U.S. District Court for the Southern District of New York, Case No. 15-cv-04865-RJS.  This lawsuit is brought by Darlene Johnson and Sally Kolkmeyer, former Client Service Associates, and asserts a claim under a federal law known as the Fair Labor Standards Act ("FLSA") on behalf of MSSB Client Service Associates, Portfolio Associates, Senior Client Service Associates, Registered Associates, and Senior Registered Associates (collectively "CSAs") employed since June 23, 2012 alleging that they were not paid overtime in all weeks in which they worked more than 40 hours.

Plaintiff brings her FLSA claim in this case on behalf of CSAs nationwide.  It is possible that a class of CSAs will be certified for this case.  The Court has not yet determined whether a class of plaintiffs should be conditionally certified for this claim.  If you are or were a CSA that worked more than 40 hours, you may be a potential member of the class that may be certified for this case.  If you have already opted-in or joined in the collective class, your right to continue to pursue your FLSA claim in this case will not be affected, regardless of whether you do or do not opt-out of the Arbitration Agreement.  If you have not already opted into or joined in the collective class, in order to pursue such a claim in this case, you must opt-out of the instant Arbitration Agreement.  If you do not opt-out of this Arbitration Agreement, you will, however, be able to pursue any such FLSA claim in an individual arbitration proceeding.

Copies of the complaints and other matters filed before the court in the actions referenced above can be accessed through http://www.pacer.gov/

Except as provided below, unless you opt-out of the Arbitration Agreement, you will no longer be able to participate in any of these actions as a class, collective, or representative action member, or to file

any Covered Claims (as defined in the Arbitration Agreement) on a class, collective, or representative basis whether in court or in arbitration, but you will be able to bring your individual Covered Claims in arbitration.  If you were individually named as a plaintiff or opt-in plaintiff in any of the above-listed actions before the date on which this Agreement was sent to you, then this Agreement shall not apply to your claims in such action, and shall also not apply to any claim brought on your behalf in any other certified or uncertified class, collective, or representative action pending in court at the time this Agreement was sent to you.

ADD-218

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| MATTHEW T. SHAFER, SHERI HAUGABOOK, PETER HEIDT, JEFFREY SHOVER, MACE TAMSE, GEORGE LIVANOS, MARK LOFTUS, JEFFREY SAMSEN, JEFFREY SHERESKY, STEVE SHERESKY, STEVE NADLER, AND SANDY JUKEL, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>-against-<br><br>MORGAN STANLEY, MORGAN STANLEY SMITH BARNEY LLC, MORGAN STANLEY COMPENSATION MANAGEMENT DEVELOPMENT AND SUCCESSION COMMITTEE, and John/Jane Does 1-20,<br><br>Defendants. | Civil Action No. 1:20-cv-11047-PGG |

### REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION AND TO STAY PROCEEDINGS

Meaghan VerGow
Brian D. Boyle (*pro hac vice*)
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone:  (202) 383-5300
mvergow@omm.com
bboyle@omm.com

Pamela A. Miller
Karen Gillen
Times Square Tower
7 Times Square
New York, New York 10036
Telephone:  (212) 326-2000
pmiller@omm.com
kgillen@omm.com

*Attorneys for Defendants Morgan Stanley,*
*Morgan Stanley Smith Barney LLC, and*
*Morgan Stanley Compensation*
*Management Development and*
*Succession Committee*

June 29, 2022

ADD-220

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I.     ANY DISAGREEMENT ABOUT THE ARBITRABILITY OF PLAINTIFFS'
       CLAIMS IS EXPRESSLY RESERVED FOR THE ARBITRATOR............................. 2

II.    THE ARBITRATION AGREEMENTS ENCOMPASS ALL OF PLAINTIFFS'
       CLAIMS ........................................................................................................................ 3

III.   PLAINTIFFS CANNOT AVOID ARBITRATION BASED ON THE MSCIP
       PLAN DOCUMENT ...................................................................................................... 6

IV.    THIS COURT SHOULD STAY PROCEEDINGS PENDING ARBITRATION
       OF PLAINTIFFS' CLAIMS........................................................................................... 9

CONCLUSION ..................................................................................................................... 10

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Applied Energetics, Inc. v. NewOak Capital Mkts., LLC,*
 645 F.3d 522 (2d Cir. 2011)..................................................................... 8

*Barnum v. Millbrook Care Ltd. P'ship,*
 850 F. Supp. 1227 (S.D.N.Y. 1994)....................................................... 8

*Berry v. Wells Fargo & Co.,*
 2018 WL 9989754 (D.S.C. Oct. 9 2018) ............................................... 6

*Bird v. Shearson Lehman/Am. Express, Inc.,*
 926 F.2d 116 (2d Cir. 1991) ................................................................... 6

*Browe v. CTC Corp.,*
 15 F.4th 175 (2d Cir. 2021) ................................................................ 4, 5

*CleanSpark, Inc. v. Disc. Growth Fund, LLC,*
 485 F. Supp. 3d 494 (S.D.N.Y. 2020)................................................... 9

*Convergen Energy LLC v. Brooks,*
 2020 WL 4500184 (S.D.N.Y. Aug. 5, 2020).......................................... 6

*Cooper v. Ruane Cunniff & Goldfarb Inc.,*
 990 F.3d 173 (2d Cir. 2021)................................................................ 3, 4

*Coregis Ins. Co. v. Am. Health Found., Inc.,*
 241 F.3d 123 (2d Cir. 2001) ................................................................... 4

*Frommert v. Conkright,*
 433 F.3d 254 (2d Cir. 2006) ................................................................... 5

*Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.,*
 764 F.3d 210 (2d Cir. 2014).............................................................. 8, 9

*Hahn v. Nat'l Westminster Bank, N.A.,*
 99 F. Supp. 2d 275 (E.D.N.Y. 2000) ..................................................... 7

*Hawkins v. Cintas Corp.,*
 32 F.4th 625 (6th Cir. 2022) ................................................................... 5

*Int'l Multifoods Corp. v. Com. Union Ins. Co.,*
 309 F.3d 76 (2d Cir. 2002)...................................................................... 4

*Lawyers' Fund for Client Protection v. Bank Leumi Tr. Co.,*
 727 N.E.2d 563 (N.Y. 2000)................................................................... 4

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Lipstein v. UnitedHealth Grp.*,
    296 F.R.D. 279 (D.N.J. 2013)................................................................. 6

*Midland Walwyn Cap. Inc. v. Spear, Leeds & Kellogg*,
    1992 WL 249914 (S.D.N.Y. Sept. 22, 1992)....................................... 10

*Moore v. Interacciones Glob., Inc.*,
    1995 WL 33650 (S.D.N.Y. Jan. 27, 1995) .......................................... 10

*Murphy v. Can. Imperial Bank of Com.*,
    709 F. Supp. 2d 242 (S.D.N.Y. 2010)................................................... 6

*NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*,
    770 F.3d 1010 (2d Cir. 2014) (cited at Opp. 10 n.11) ........................... 3

*Offshore Expl. & Prod., LLC v. Morgan Stanley Private Bank N.A.*,
    626 F. App'x 303 (2d Cir. 2015) .......................................................... 9

*Pol'y Admin. Sols., Inc. v. QBE Holdings, Inc.*,
    2019 WL 4126464 (S.D.N.Y. Aug. 30, 2019)...................................... 9

*TAPCO Underwriters, Inc. v. Catalina London Ltd.*,
    2014 WL 7228711 (S.D.N.Y. Dec. 8, 2014) ........................................ 9

*UBS Fin. Servs., Inc. v. Carilion Clinic*,
    706 F.3d 319 (4th Cir. 2013) ................................................................ 8

*Winter Invs., LLC v. Panzer*,
    2015 WL 5052563 (S.D.N.Y. Aug. 27, 2015)................................. 9, 10

**Statutes**

29 U.S.C. § 1132(a)(1)(B) ............................................................................. 5

## INTRODUCTION

Plaintiffs undisputedly entered into valid agreements to arbitrate that included an agreement to present disputes about arbitrability to the arbitrator.  In their opposition ("Opp."), plaintiffs concentrate on their arguments against arbitrability, and breeze past their agreement to present such disputes to the arbitrator.  But the agreement is clear, and burying this issue in a footnote, as plaintiffs do, does not make it go away.

Plaintiffs' claims are covered by their arbitration agreements in any event:

*First,* the text of plaintiffs' agreement extends to any claim relating to or arising from their employment.  *See* Mem. Law Supp. Defs.' Mot. Compel ("Mot.") at 3-6.[1]  The scope of that broad agreement easily encompasses plaintiffs' claims that they were wrongfully denied deferred compensation when they left Morgan Stanley's employment.  Plaintiffs contend that they may nevertheless litigate claims on behalf of the "plan," but they do not seek benefits *for* the plan.  Plaintiffs bring claims on their *own* behalf, seeking the payment of money *from* the "plan" *to plaintiffs*.  That is a claim for individual benefits, and it may undisputedly be arbitrated.

*Second*, plaintiffs assert that the Morgan Stanley Compensation Incentive Plan ("MSCIP") gives New York courts jurisdiction over a participant's rights under the Plan.  But most of the plaintiffs expressly agreed to arbitrate their disputes after the MSCIP was in effect, and the MSCIP's jurisdictional provision is harmonious with all of plaintiffs' agreements to arbitrate in any case.

*Last*, plaintiffs argue that this case should not be stayed even if some of their claims must be arbitrated.  The Court can quickly reject that argument too.  If plaintiffs prevail in arbitration, their relief will be complete, and there will be nothing else for this Court to decide—and

---

[1] This reply memorandum uses the same conventions and short-form citations defined in Morgan Stanley's opening memorandum.

1

similarly, if plaintiffs fail, it will necessarily be on grounds that equally preclude all of their

claims.  There is no legal or practical basis to conduct litigation in tandem with arbitrations that

will completely resolve this action.

The Court should accordingly compel plaintiffs to submit their claims to arbitration

pursuant to the FAA, 9 U.S.C. § 1 *et seq*., and stay this action pending the outcome of those

arbitrations pursuant to 9 U.S.C. § 3.

## ARGUMENT

### I.   ANY DISAGREEMENT ABOUT THE ARBITRABILITY OF PLAINTIFFS' CLAIMS IS EXPRESSLY RESERVED FOR THE ARBITRATOR

Two concessions resolve this motion at the outset: plaintiffs do not dispute the validity of

their arbitration agreements, or that the agreements provide that issues concerning the

arbitrability of a particular issue or claim must be resolved by the arbitrator.  2015 Arbitration

Agreement § 7(d); 2014 Arbitration Agreement § 7(d); 2015 CARE Arbitration Agreement § 4;

Nadler Employment Agreement § 7.1.  Because plaintiffs have agreed to arbitrate arbitrability,

the Court need not—and should not—reach arbitrability itself.

Plaintiffs' only response is in a footnote: plaintiffs contend that the parties "did not

clearly and unmistakably commit questions [of] arbitrability" to the arbitrator because the

provision reserves for the court "issues concerning the validity or enforceability" of their

representative action waivers.  Opp. 10 n.11.  But the validity of plaintiffs' representative action

waiver is not at issue.  The parties do not dispute whether plaintiffs have waived the right to

bring a representative action—they dispute whether plaintiffs' claims seeking individual benefits

must be arbitrated.  The agreements clearly and unmistakably commit such questions to the

arbitrator, and plaintiffs have identified no arbitrability issue reserved to the court that "at least

arguably covers the present dispute." *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1031 (2d Cir. 2014) (cited at Opp. 10 n.11).

## II.   THE ARBITRATION AGREEMENTS ENCOMPASS ALL OF PLAINTIFFS' CLAIMS

Plaintiffs' claims are, in any case, "Covered Claims" subject to plaintiffs' broad agreements to arbitrate "any controversy or claim" "based on, arising out of, or which arose out of or in any way relate to" the employee's "employment, compensation, and terms and conditions of employment," 2015 CARE Arbitration Agreement § 2; 2015 Arbitration Agreement § 7(a); 2014 Arbitration Agreement § 7(a); or "[a]ny controversy or claim arising out of or relating to" the employee's "employment by Morgan Stanley" or the employee's agreement with Morgan Stanley, Nadler Employment Agreement § 7.1.  Plaintiffs' agreements are paradigmatically broad, and *Cooper v. Ruane Cunniff & Goldfarb Inc.*, 990 F.3d 173 (2d Cir. 2021), does not support plaintiffs' arguments to the contrary.[2]

Plaintiffs' claims "arise out of" and "relate to" their employment: plaintiffs are seeking the payment of deferred compensation awarded in the course of their employment that was not earned because plaintiffs left Morgan Stanley's employment.  *Cooper* is inapt because it did not involve the plaintiff-employees personally at all.  Rather, it involved a plan's fiduciary-breach claims regarding an investment manager's mismanagement of plan assets, seeking to restore assets *to* the plan based on the alleged mismanagement.  The Second Circuit unremarkably held

---

[2] Plaintiffs note that the CARE Arbitration Agreement and 2015 Arbitration Agreement define "Covered Claims" that are arbitrable and list seven statutes, of which ERISA is not one. *See* Opp. 3-4.  But that argument is a non-starter.  The agreements expressly state that "Covered Claims" include "*but are not limited to* ... claims under, based on, or relating to any *federal*, state or local constitution, *statute* or regulation of any country, state or municipality, including, without limitation, [the enumerated statutes]." 2015 CARE Arbitration Agreement § 2 (emphasis added); *accord* 2015 Arbitration Agreement § 7(a).  ERISA, of course, is a federal statute and claims brought under ERISA are "Covered Claims."

that the plan's claims against the investment manager did not relate to the plan participants' employment.  Here, plaintiffs are seeking individual relief *from* the deferred compensation plans, and their employment—including the terms of the compensation in dispute—is factually inextricable from their claims.  The "merits of [plaintiffs'] claim[s] involve facts particular to [each] individual plaintiff's own employment."  *Cooper,* 990 F.3d at 184.  Plaintiffs are asserting their own claims, not the plans'.

Moreover, plaintiffs' arguments ignore that their agreements include language the court did not consider in *Cooper*: their claims *arise out of* their employment, as well as relate to it.  Plaintiffs argue that "arising out of" is subsumed in "relating to" (Opp. 9), but in *this* agreement——where the terms are used together—they are necessarily distinct.  *See, e.g., Lawyers' Fund for Client Protection v. Bank Leumi Tr. Co.*, 727 N.E.2d 563, 566-67 (N.Y. 2000) (an "interpretation [that] would render [contractual terms] superfluous" is "unsupportable under standard principles of contract interpretation"); *accord Int'l Multifoods Corp. v. Com. Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002) (applying New York law).  Plaintiffs' claims "arise out of" their employment as a causal matter regardless whether they also "relate to" that employment.  *See, e.g., Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 128 (2d Cir. 2001) (explaining that "'arising out of' is usually interpreted as 'indicating a causal connection'" (alteration omitted)).

Plaintiffs insist that the "parties did not agree to arbitrate claims brought in [p]laintiffs' representative capacity."  Opp. 10.  But plaintiffs do *not* actually bring these claims in a representative capacity, *see* Mot. 14, and plaintiffs' reliance on *Cooper* and *Browe v. CTC Corp.*, 15 F.4th 175, 183 (2d Cir. 2021), is accordingly misplaced.  In *Cooper* and *Browe*, the plaintiffs sought money on behalf of the plan, to restore losses to the plan—in *Cooper* for the mismanagement of funds and in *Browe* when plan funds were used to pay company expenses.  In

4

both cases, where plaintiffs prevailed *the plan* would recover funds.  Here, plaintiffs seek the recovery of alleged benefits that were not paid *to them*, and their claims "fall[] comfortably within the scope of § 502(a)(1)(B), which allows a plan participant 'to recover benefits due to him,'" *Frommert v. Conkright*, 433 F.3d 254, 270 (2d Cir. 2006) (quoting 29 U.S.C. § 1132(a)(1)(B)).  *Cooper* and *Browe* do not support treating plaintiffs' individual benefit claims as representative, *see Browe*, 15 F.4th  at 205-06 (plaintiffs could seek payments *from* the plan only through "denial of benefits claims"), and plaintiffs cannot avoid their agreements to arbitrate their individual claims by slapping a "representative" label on them.

Plaintiffs contend that "the plan itself never agreed to arbitrate" their claims, Opp. 13, but this argument fails for the same reason: the plan need not agree to arbitrate claims that plaintiffs bring on their own behalf.  That distinguishes this case from *Hawkins v. Cintas Corp.*, 32 F.4th 625 (6th Cir. 2022), where the plaintiffs argued that a plan sponsor "breached its fiduciary duties by offering higher-cost investment options and charging excessive recordkeeping fees." *Id.* at 634.  Such claims are properly brought on behalf of a plan, because the "alleged breaches do not impact the Plaintiffs specifically; the harm (and the recovery) is to the Plan." *Id.*  By way of illustration, if different plaintiffs had brought the claim in *Hawkins*, "nothing material in the complaint would need to be changed" because the complaint alleged "injuries to the Plan as a whole." *Id.* at 635.  The complaint here, by contrast, alleges injuries that are personal to *these* plaintiffs; the complaint individually describes each plaintiff's tenure at Morgan Stanley and the deferred compensation each purportedly "earned" in that time and now seeks.  FAC ¶¶ 11-22. Seeking "plan-wide relief" is not the same as seeking relief on behalf of the plan, and plaintiffs' claims seeking benefits *from* the plan cannot "*belong to*" the plan.  Opp. 13 (emphasis added); *see Hawkins*, 32 F.4th at 635 (explaining that "some suits masquerading as § 502(a)(2) claims

should instead be brought" as individual benefits claims).  Plaintiffs' claims "belong to" themselves, not the "plan," and the plan has no say in whether to arbitrate them.

Plaintiffs' "prospective waiver" argument (Opp. 16-21) suffers from the same fundamental defect.  Plaintiffs do not and could not dispute that individual claims for benefits may be arbitrated.  *See, e.g.*, *Murphy v. Can. Imperial Bank of Com.*, 709 F. Supp. 242, 247 (S.D.N.Y. 2010).  Plaintiffs can obtain complete relief, if any, through their individual claims for benefits.  It makes no difference that plaintiffs purports to seek benefits on behalf of a putative class—plaintiffs' agreements to arbitrate their claims do not deprive any other putative class members of their ability to seek complete relief through their own § 502(a)(1)(B) claims (which are not suitable for class treatment anyway, *see Lipstein v. UnitedHealth Grp.*, 296 F.R.D. 279, 289 (D.N.J. 2013)).  Arbitration of plaintiffs' claims accordingly does not frustrate *anyone*'s ability to obtain any ERISA remedy that they may be due.  *See generally Bird v. Shearson Lehman/Am. Express, Inc.*, 926 F.2d 116, 121 (2d Cir. 1991) (arbitration agreements do not compromise "ERISA's remedial nature").[3]

## III.    PLAINTIFFS CANNOT AVOID ARBITRATION BASED ON THE MSCIP PLAN DOCUMENT

Plaintiffs do not dispute that the parties entered valid arbitration agreements, but contend that the MSCIP plan document forum selection clause has "superseded" the arbitration agreement as to certain claims, and requires "disputes [concerning deferred compensation] to be

---

[3] Plaintiffs also suggest that the possibility of inconsistent arbitration awards could disfavor arbitration.  Opp. 18-21.  But the FAA does not permit a court to "suspend an arbitration merely because it might result in inefficiency or the risk of inconsistent judgments."  *Convergen Energy LLC v. Brooks*, 2020 WL 4500184, at *7 (S.D.N.Y. Aug. 5, 2020).  Plaintiffs' citation of *Berry v. Wells Fargo & Co.*, 2018 WL 9989754 (D.S.C. Oct. 9 2018), is thus inapposite.  There, the court considered only whether a § 502(a)(2) claim could satisfy Rule 23 and be certified as a class action, *id.* at *4-5, not whether § 502(a)(1)(B) claims (or others) could be arbitrated.  And in any case, the denial of deferred compensation to one claimant in an arbitration would in no way interfere with an award in favor of a claimant in another.

resolved in court." Opp. 13-15. Plaintiffs, in other words, do not dispute the existence of valid agreements to arbitrate, but argue that the MSCIP plan document altered the *scope* of the arbitration agreements. Not so.

To start, for nine of the ten plaintiffs, the agreements containing plaintiffs' arbitration agreements—the 2015 Bonus Agreement (Shafer), 2014 Bonus Agreements (Tamse and Loftus), and CARE (Haugabook, Heidt, Livanos, Shover, Samsen, J. Sheresky, S. Sheresky, and Jukel)— not the MSCIP, are the later, controlling agreements. The clause on which plaintiffs rely was adopted when the MSCIP was established in 2008. Thereafter, plaintiffs subsequently agreed to arbitrate disputes relating to and arising from their compensation and employment. Plaintiffs provide no support for the contention that an award of discretionary incentive compensation to be held in the MSCIP overrides their later-in-time broad agreements to arbitrate.

In any event, this issue is illusory for every plaintiff because the MSCIP and plaintiffs' arbitration agreement provisions are complementary. The MSCIP plan document provides that New York law will apply to the parties' relations under that document, and further provides that New York courts will have jurisdiction over disputes arising in that connection. But plaintiffs here assert claims under ERISA, which by definition are not encompassed by the New York law disputes addressed in the MSCIP plan document. Indeed, the MSCIP plan document itself states that the MSCIP is not an ERISA plan. Opp. Decl. Ex. 2 § 8(b); *see Hahn v. Nat'l Westminster Bank, N.A.*, 99 F. Supp. 2d 275, 279 (E.D.N.Y. 2000) (a plan's self-description "is entitled to weight when determining the nature of the plan"). It is a non sequitur to argue that the parties agreed to New York court jurisdiction in a MSCIP plan document over claims that the MSCIP plan document denies exist: plaintiffs' action seeks to create *new* federal-law rights contrary to the plain intention of the plan, not to determine the New York law contours of rights that already

exist under that plan. *Cf. Barnum v. Millbrook Care Ltd. P'ship*, 850 F. Supp. 1227, 1236

(S.D.N.Y. 1994) (only "a subsequent contract regarding *the same matter* will supersede the prior

contract" (emphasis added)).  Moreover, nothing in the MSCIP plan document precludes

participants from separately agreeing to arbitrate disputes as they choose (as they have done

here).

      Even if there were a conflict between the two provisions, and even if the MSCIP plan

document could counterfactually be cast as a later-in-time agreement for every plaintiff, the

MSCIP plan document *still* would not displace the plaintiffs' arbitration agreements.  A later

agreement supersedes a broad arbitration agreement only if it evinces an intent to do so, but the

MSCIP plan document is silent as to the purportedly displaced arbitration agreement—and "one

would reasonably expect that a clause designed to supersede, displace, or waive arbitration

would *mention arbitration*."  *UBS Fin. Servs., Inc. v. Carilion Clinic*, 706 F.3d 319, 329 (4th Cir.

2013) (emphasis added).  The MSCIP plan document lacks any other indicia of intent to displace

a broad arbitration agreement, such as a merger clause.  *See Applied Energetics, Inc. v. NewOak

Capital Mkts., LLC*, 645 F.3d 522, 523-24 (2d Cir. 2011) (merger clause provided that certain

documents, none containing an arbitration agreement, "constitute the entire understanding and

agreement between the parties" and that "no [other] agreements or understandings" apply);

*Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.*, 764 F.3d 210, 216 (2d Cir. 2014)

("[A]s in *Applied Energetics*, the later-executed agreements have a merger clause stating that

they 'contain the entire agreement between the parties relating to the subject matter hereof.'").

And the MSCIP provision lacks the expansive scope necessary for a later-in-time forum

selection clause to override an earlier broad arbitration agreement.  *See Applied Energetics*, 645

F.3d at 525 ("Both provisions are all-inclusive, both are mandatory, and neither admits the

possibility of the other."); *Goldman, Sachs*, 764 F.3d at 216 (later provision was "all-inclusive"). Where, as here, "the forum selection clause is not all-inclusive or mandatory … it should … be read as complementary; the parties merely consented to the jurisdiction of courts in New York for those disputes … that they did not [separately] agree to arbitrate … ." *Offshore Expl. & Prod., LLC v. Morgan Stanley Private Bank N.A.*, 626 F. App'x 303, 307 (2d Cir. 2015).

As before, any doubt on this score would be a question for the arbitrator to resolve in the first instance. And because plaintiffs do not argue that their arbitration agreements are invalid, but rather only that the agreements do not reach *some* claims, the decisionmaker "need not pause on the threshold question" of whether an arbitration agreement "remains in force" and may "instead proceed[] directly to the question of scope." *CleanSpark, Inc. v. Disc. Growth Fund, LLC*, 485 F. Supp. 3d 494, 504 n.10 (S.D.N.Y. 2020); *see also Pol'y Admin. Sols., Inc. v. QBE Holdings, Inc.*, 2019 WL 4126464, at *6 (S.D.N.Y. Aug. 30, 2019). In this context, "[w]hether the forum-selection clause in a later-in-time agreement supersedes the arbitration clause[] in the earlier agreement[] presents a question of arbitrability"—a question the parties expressly delegated to the arbitrator. *CleanSpark*, 485 F. Supp. 3d at 504 (quoting *TAPCO Underwriters, Inc. v. Catalina London Ltd.*, 2014 WL 7228711, at *2 (S.D.N.Y. Dec. 8, 2014)).

## IV.    THIS COURT SHOULD STAY PROCEEDINGS PENDING ARBITRATION OF PLAINTIFFS' CLAIMS

Plaintiffs acknowledge that a stay is mandatory if the Court compels arbitration of all claims, Opp. 21, and because all claims are subject to arbitration, that resolves the issue. The same result should follow even if it were proper—contrary to the law outlined above—to compel arbitration of only some of plaintiffs' claims. *See* Mot. 15-16. "A discretionary stay" of this kind "is particularly appropriate where there is significant factual overlap between the remaining claims and the arbitrated claims." *Winter Invs., LLC v. Panzer*, 2015 WL 5052563, at *11

(S.D.N.Y. Aug. 27, 2015).  There is such significant factual overlap here, as plaintiffs concede.

Opp. 21 ("Plaintiffs agree that their claims involve common issues of fact and law.").  Plaintiffs

cite no authority supporting the assertion that this "shows why individual arbitrations and a stay

would not be appropriate," *id.*, nor could they—that assertion defies established case law in this

Circuit.  *See, e.g.*, *Winter*, 2015 WL 5052563, at *11; *Moore v. Interacciones Glob., Inc.*, 1995

WL 33650, at *7 (S.D.N.Y. Jan. 27, 1995) ("It is well-settled that claims are appropriately stayed

when they involve common issues of fact and law with those subject to arbitration."); *Midland*

*Walwyn Cap. Inc. v. Spear, Leeds & Kellogg*, 1992 WL 249914, at *2 (S.D.N.Y. Sept. 22, 1992)

("The courts in this district have consistently granted stays pending arbitration where the

nonarbitrable issues overlap the arbitrable issues.").  Because arbitration of any one of each

plaintiff's claims will fully resolve all of them—if plaintiffs prevail in arbitration, their relief will

be complete, and if they fail, that determination will be on grounds that apply equally to all of

their claims—there is no basis for proceeding simultaneously with arbitration and litigation.

## CONCLUSION

The parties agreed that any issues regarding arbitrability be decided by the arbitrator.  For

this and the reasons set forth in Morgan Stanley's motion to compel and herein, Morgan Stanley

respectfully asks the Court to compel arbitration of plaintiffs' claims and to stay proceedings

pending resolution of arbitration.

Dated: Washington, D.C.

June 29, 2022

Respectfully submitted,

O'MELVENY & MYERS LLP

By: /s/ Meaghan VerGow
Meaghan VerGow
Brian D. Boyle (*pro hac vice*)
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone:  (202) 383-5300
Facsimile:  (202) 383-5414
mvergow@omm.com
bboyle@omm.com

Pamela A. Miller
Karen Gillen
Times Square Tower
7 Times Square
New York, New York 10036
Telephone:  (212) 326-2000
Facsimile:  (212) 326-2061
pmiller@omm.com
kgillen@omm.com

*Attorneys for Defendants Morgan Stanley,
Morgan Stanley Smith Barney LLC, and
Morgan Stanley Compensation
Management Development and
Succession Committee*

ADD-234

O'Melveny

O'Melveny & Myers LLP     T: +1 202 383 5300
1625 Eye Street, NW        F: +1 202 383 5414
Washington, DC 20006-4061  omm.com

June 29, 2022

**VIA ECF**

Meaghan VerGow
D: +1 202 383 5504
mvergow@omm.com

Hon. Paul G. Gardephe
Thurgood Marshall
United States Courthouse
40 Foley Square
New York, NY 10007

**Re:**   ***Shafer v. Morgan Stanley, et al., Case No. 1:20-cv-11047***
        ***Oral Argument on Motion to Compel Arbitration***

Dear Judge Gardephe:

Pursuant to Rule IV(D) of this Court's individual rules, defendants in the above-referenced matter respectfully request oral argument on defendants' Motion to Compel Arbitration, served on plaintiffs on May 9, 2022, and filed today.  Defendants believe that oral argument would be beneficial to the Court's consideration of the motion and the parties' arguments in relation to the same.

Sincerely,

*/s/ Meaghan VerGow*
Meaghan VerGow

ADD-235

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MATTHEW T. SHAFER, SHERI HAUGABOOK, PETER HEIDT, JEFFREY SHOVER, MACE TAMSE, GEORGE LIVANOS, MARK LOFTUS, JEFFREY SAMSEN, JEFFREY SHERESKY, STEVE SHERESKY, STEVE NADLER, AND SANDY JUKEL, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, | Civil Action No. 1:20-cv-11047-PGG |
| Plaintiffs, | CLASS ACTION |
| vs. | |
| MORGAN STANLEY, MORGAN STANLEY SMITH BARNEY LLC, MORGAN STANLEY COMPENSATION MANAGEMENT DEVELOPMENT AND SUCCESSION COMMITTEE, and John/Jane Does 1-20, | |
| Defendants. | June 8, 2022 |

### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION AND TO STAY PROCEEDINGS

**TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................... 1

II.     BACKGROUND ....................................................................................... 1

        A.      The Deferred Compensation Program ..................................... 1

        B.      The Bonus Agreements (Shafer, Tamse, and Loftus)............... 3

        C.      The Employment Agreement (Nadler) ..................................... 4

        D.      The CARE Program (Haugabook, Heidt, Livanos, Shover, Samsen, J. Sheresky, S. Sheresky, and Jukel)....................................... 5

III.    LEGAL STANDARD ............................................................................... 5

IV.     ARGUMENT ............................................................................................ 6

        A.      The parties never agreed to arbitrate Plaintiffs' claims. .......... 6

                1.      Plaintiffs' claims are not "Covered Claims" under the arbitration agreements................................................. 6

                        a.      Plaintiffs' claims do not "arise from or relate to their employment" because they do not involve facts particular to them. ................................ 7

                        b.      The parties did not agree to arbitrate claims brought in Plaintiffs' representative capacity................. 10

                        c.      The ERISA plan did not agree to arbitrate Plaintiffs' claims. ................................................ 13

                2.      Even if Plaintiffs' claims are "Covered Claims" under the arbitration agreements, those agreements were superseded by the MSCIP. .............. 13

        B.      Even if the parties agreed to arbitrate Plaintiffs' claims in individual arbitrations, those arbitration agreements are unenforceable as "prospective waiver[s] of a party's right to pursue statutory remedies" under ERISA § 502.................................................................................. 16

        C.      The Court should not grant a partial stay for the same reasons it should not compel arbitration. .............................................. 21

V.      CONCLUSION.......................................................................................... 22

## TABLE OF AUTHORITIES

**Cases**

*Alday v. Raytheon Co.*,
   619 F. Supp. 2d 726 (D. Ariz. 2008) ................................................................. 21

*Alghanim v. Alghanim*,
   828 F. Supp. 2d 636 (S.D.N.Y. 2011) ................................................................ 9

*Am. Express Co. v. Italian Colors Rest.*,
   570 U.S. 228 (2013) ................................................................................. 5, 16

*Applied Energetics, Inc. v. NewOak Capital Mkts., LLC*,
   645 F.3d 522 (2d Cir. 2011) ...................................................................... 14, 15

*Archer & White Sales, Inc. v. Henry Schein, Inc.*,
   935 F.3d 274 (5th Cir. 2019) ..................................................................... 11

*Archer & White Sales, Inc. v. Henry Schein, Inc.*,
   139 S. Ct. 524 (2019) .............................................................................. 11

*Baker & Taylor, Inc. v. AlphaCraze.com Corp.*,
   602 F.3d 486 (2d Cir. 2010) ...................................................................... 14

*Banyai v. Mazur*, No. 00-cv-9806,
   2007 WL 959066 (S.D.N.Y. Mar. 29, 2007) ....................................................... 12

*Berry v. Wells Fargo & Co.*, No. 3:17-cv-304,
   2018 WL 9989754 (D.S.C. Oct. 9, 2018) ...................................................... 20, 21

*Bird v. Shearson Lehman/Am. Express, Inc.*,
   926 F.2d 116 (2d Cir. 1991) ...................................................................... 18

*Browe v. CTC Corp.*,
   15 F.4th 175 (2d Cir. 2021) .............................................................. 12, 13, 16, 20

*Cedeno v. Argent Trust Co.*, No. 20-cv-9987,
   2021 WL 5087898 (S.D.N.Y. Nov. 2, 2021) .................................................... 16

*Citigroup Global Mkts. Inc. v. All Children's Hosp. Inc.*,
   5 F. Supp. 3d 537 (S.D.N.Y. 2014) ............................................................. 15

*Coan v. Kaufman*,
   457 F.3d 250 (2d Cir. 2006) .............................................................. 11, 13, 17

*Conkright v. Frommert*,
   559 U.S. 506 (2010) ......................................................................... 18, 19, 20

*Cooper v. Ruane Cunniff & Goldfarb Inc.*,
    990 F.3d 173 (2d Cir. 2021) ................................................ 5, 7, 8, 9, 10, 11, 17, 18

*Coregis Ins. Co. v. Am. Health Found., Inc.*,
    241 F.3d 123 (2d Cir. 2001) ................................................................................ 9

*Credit Suisse Sec. (USA) LLC v. Tracy*,
    812 F.3d 249 (2d Cir. 2016) .............................................................................. 18

*Egelhoff v. Egelhoff*,
    532 U.S. 141 (2001) .......................................................................................... 19

*Ferguson v. Ruane Cuniff & Goldfarb Inc.*, No. 17-cv-6685,
    2021 WL 3667979 (S.D.N.Y. Aug. 17, 2021) .................................... 11, 13, 17

*Goldman Sachs & Co. v. Golden Emp. Schools Fin. Auth.*,
    764 F.3d 210 (2d Cir. 2014) ...................................................................... 14, 15

*Hawkins v. Cintas Corp.*,
    32 F.4th 625 (6th Cir. 2022) ..................................................................... 13, 21

*In re Am. Exp. Fin. Advisors Sec. Litig.*,
    672 F.3d 113 (2d Cir. 2011) .............................................................................. 14

*Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*,
    555 U.S. 285 (2009) .......................................................................................... 18

*LaRue v. DeWolff, Boberg & Assocs., Inc.*,
    552 U.S. 248 (2008) .......................................................................................... 16

*Laurent v. Pricewaterhouse Coopers LLP*,
    945 F.3d 739 (2d Cir. 2019) .............................................................................. 12

*Mass. Mut. Life Ins. Co. v. Russell*,
    473 U.S. 134 (1985) .......................................................................................... 16

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985) .......................................................................................... 16

*Moore v. Interacciones Glob., Inc.*, No. 94-cv-4789,
    1995 WL 33650 (S.D.N.Y. Jan. 27, 1995) ....................................................... 22

*Munro v. Univ. of S. Cal.*,
    896 F.3d 1088 (9th Cir. 2018) .................................................................... 11, 21

*NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*,
    770 F.3d 1010 (2d Cir. 2014) ..................................................................... 10, 11

*Ruiz v. New Avon LLC*, No. 18-cv-9033,
　2019 WL 4601847 (S.D.N.Y. Sept. 22, 2019) ........................................................ 15

*Sec'y U.S. Dep't of Labor v. Koresko*,
　646 F. App'x 230 (3d Cir. 2016) ........................................................................... 20

*Smith v. Bd. of Directors of Triad Mfg., Inc.*,
　13 F.4th 613 (7th Cir. 2021) ................................................................................. 16

*Winter Invs., LLC v. Panzer*, No. 14-cv-6852,
　2015 WL 5052563 (S.D.N.Y. Aug. 27, 2015) ....................................................... 21

*Z.D. v. Group Health Coop.*, No. 11-cv-1119,
　2012 WL 1977962 (W.D. Wash. June 1, 2012) .................................................... 19

## **Statutes**

9 U.S.C. § 3 ................................................................................................................. 21

ERISA § 203(a)(2)(B), 29 U.S.C. § 1053(a)(2)(B) ...................................................... 2

ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1) .............................................................. 18

ERISA § 402(b)(4), 29 U.S.C. § 1102(b)(4) .............................................................. 18

ERISA § 409(a), 29 U.S.C. § 1109(a) ....................................................................... 16

ERISA § 409, 29 U.S.C. § 1109 ........................................................... 11, 12, 16, 20

ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) ....................................... 7, 8, 11, 12, 13, 16

ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) ................................. 8, 11, 12, 16, 17, 19

## **Rules**

29 C.F.R. § 2560.503-1(b)(5) ............................................................................. 19, 21

Plaintiffs submit this Memorandum of Law in opposition to Morgan Stanley's Motion to Compel Arbitration and to Stay Proceedings, dated May 9, 2022.[1]

## I.  INTRODUCTION

Plaintiffs are former Morgan Stanley Financial Advisors ("FAs") who seek to remedy a feature of Morgan Stanley's deferred compensation plan—the "Cancellation Rule"—that violates ERISA's vesting and anti-forfeiture requirements and, in turn, to recover deferred compensation that Morgan Stanley wrongfully caused them and other FAs to forfeit when they left Morgan Stanley. As their claims are inherently representative in nature, Plaintiffs brought this case as a class action. Morgan Stanley seeks to compel individual arbitrations under employment arbitration agreements. The motion should be denied for four reasons. First, Plaintiffs' claims are not "Covered Claims" under the arbitration agreements; therefore, the arbitration provisions do not apply. Second, Plaintiffs' claims are governed by the forum selection clause in the plan document. Third, the ERISA plan at issue did not agree to arbitrate Plaintiffs' claims. Finally, even if the parties agreed to arbitrate Plaintiffs' claims in individual arbitrations, the arbitration agreements would be unenforceable as "prospective waiver[s] of a party's right to pursue statutory remedies."

## II.  BACKGROUND

### A.    The Deferred Compensation Program

Plaintiffs received compensation in multiple components under Morgan Stanley's "Financial Advisor/Private Wealth Advisor Compensation Plan" (the "FA Compensation Plan").[2] ECF No. 58, Amended Class Action Complaint ("Compl."), ¶ 27. The component at issue here is

---

[1] Defendants Morgan Stanley, Morgan Stanley Smith Barney LLC, Morgan Stanley Compensation Management Development Succession Committee, and John/Jane Does 1-20 are referred to collectively herein as "Morgan Stanley."

[2] The 2015 version of the FA Compensation Plan, dated January 12, 2015, is attached as Exhibit A to the Declaration of Keith Porco that accompanies Defendants' Memorandum of Law.

deferred compensation. Morgan Stanley provides FAs deferred compensation as a percentage of the revenue generated by their clients' investment activities (the "FA Deferred Compensation Program"). Compl., ¶ 2. Awards are credited each year to a combination of the Morgan Stanley Compensation Incentive Plan ("MSCIP") and the Morgan Stanley Equity Incentive Compensation Plan ("EICP"). Compl., ¶ 23. The terms—but not the percentage or amount—of deferred compensation are "set forth in the applicable award documentation." FA Compensation Plan § 1.2.2. This documentation includes Award Certificates and the MSCIP and the EICP plan documents.[3] Compl., ¶¶ 32, 56.

Subject to certain exceptions, Morgan Stanley cancels certain awards of deferred compensation when an FA leaves Morgan Stanley (the "Cancellation Rule"). *See* Compl., ¶¶ 2, 41-46, 51-52. When Plaintiffs left Morgan Stanley, Morgan Stanley invoked the Cancellation Rule, which caused Plaintiffs to forfeit previously awarded deferred compensation benefits. The FA Deferred Compensation Program—which includes the MSCIP and the EICP—is an ERISA plan. The Cancellation Rule violates ERISA by cancelling awards that were fully vested under ERISA, based upon Plaintiffs' years of service. Compl., ¶¶ 53-71; *see also* ERISA § 203(a)(2)(B), 29 U.S.C. § 1053(a)(2)(B).

Section 17 of the MSCIP plan document states that the "courts of New York shall have exclusive jurisdiction over the Plan and any dispute arising in connection with the Plan, a

---

[3] As examples, a copy of the Award Certificate from January 2016 is attached as **Exhibit 1** to the accompanying Declaration of Mathew P. Jasinski. A copy of the MSCIP plan document then in effect is attached as **Exhibit 2**.

Participant's participation in the Plan or rights under the Plan." Jasinski Decl. Ex. 2, § 17.[4] Accordingly, Plaintiffs filed in the correct venue.

### B. The Bonus Agreements (Shafer, Tamse, and Loftus)

A bonus program is another component of the FA Compensation Plan, but it's not at issue here. The bonus program is covered in § 2.1 of the 2015 Compensation Plan, entitled "Growth Award." FA Compensation Plan § 2.1. It is separate from the "Deferred Compensation" in § 1.2.2 of FA Compensation Plan. For Plaintiffs Shafer, Tamse, and Loftus, Morgan Stanley bases its motion on identical arbitration clauses in their Bonus Agreements.[5]

The Bonus Agreements provide that "Covered Claims" should be arbitrated. Covered Claims under the 2015 Bonus Agreement include claims arising out of or relating to an FA's "employment, compensation, and terms and conditions of employment with Morgan Stanley," or the FA's "recruitment or application for employment and hiring." 2015 Bonus Agreement § 7(a). The 2015 Bonus Agreement specifically lists seven statutes subject to arbitration: (1) the Fair Labor Standards Act; (2) Title VII of the Civil Rights Act of 1964; (3) the Age Discrimination in Employment Act; (4) the Worker Adjustment and Retraining Notification Act; (5) the Equal Pay Act; (6) the Americans with Disabilities Act; and (7) the Family and Medical Leave Act. *Id*. It does not mention ERISA, which is the only statute relevant to this case. The 2015 Bonus Agreement also provides that Covered Claims may not be "initiated, maintained, heard or determined on a class action, collective action, or representative basis . . . ." *Id.* § 7(d). And if "any

---

[4] The plan documents for the EICP, to which approximately 25% of the deferred compensation was allocated, do not appear to include either a forum selection clause or an arbitration clause.

[5] Plaintiff Shafer signed a bonus agreement in 2015 ("2015 Bonus Agreement"), while Plaintiffs Tamse and Loftus signed bonus agreements in 2014 ("2014 Bonus Agreement"). Porco Decl., ¶¶ 8-11. The 2015 Bonus Agreement is attached as Exhibit B to the Porco Declaration; the 2014 Bonus Agreement is attached as Exhibits C and D to the Porco Declaration.

claim is permitted to proceed on a class action, collective action, or representative action basis, it must do so in a court of competent jurisdiction and not in arbitration." *Id.*

Similarly, "Covered Claims" under the 2014 Bonus Agreement include claims arising out of or relating to the FA's "employment." 2014 Bonus Agreement § 7(a). It further provides that "any Covered Claim that arises in connection with an employee benefit plan subject to [ERISA] will be subject to the dispute resolution procedures set forth in the applicable ERISA plan document[6] and paragraph 7(c) through 7(e) below." *Id.* (footnote added). The 2014 Bonus Agreement also waives class actions, collective actions, and representative actions, and provides that if such waiver is unenforceable, any class action, collective action, or representative action shall be heard in court. *Id.* §§ 7(c)-(d).

### C.    The Employment Agreement (Nadler)

For Plaintiff Nadler, Morgan Stanley bases its motion on an arbitration clause in his employment agreement ("Nadler Agreement"). The Nadler Agreement, dated April 24, 2008, is attached as Exhibit A to the Declaration of Jessica Krentzman that accompanies Defendants' Memorandum of Law. It applies to "[a]ny controversy or claim arising out of or relating to" Nadler's "employment by Morgan Stanley," but expressly excludes claims that are covered under Morgan Stanley's CARE program.[7] *See* Nadler Agreement §§ 7.1-7.2. Nadler, however, opted out of the CARE program. Krentzman Decl. ¶ 31.

---

[6] As noted above, the MSCIP plan document states that the "courts of New York shall have exclusive jurisdiction over the Plan and any dispute arising in connection with the Plan, a Participant's participation in the Plan or rights under the Plan." Jasinski Decl. Ex. 2, § 17.

[7] "CARE" stands for "Convenient Access to Resolution for Employees." Krentzman Decl. ¶ 20.

- 4 -

### D.    The CARE Program (Haugabook, Heidt, Livanos, Shover, Samsen, J. Sheresky, S. Sheresky, and Jukel)

For Plaintiffs Haugabook, Heidt, Livanos, Shover, Samsen, J. Sheresky, S. Sheresky, and Jukel, Morgan Stanley bases its motion on the CARE program's arbitration agreement (the "CARE Agreement").[8] The CARE Agreement covers claims "arising out of, or which . . . relate to" an FA's "employment, compensation, and terms and conditions of employment with Morgan Stanley," or the FA's "recruitment or application for employment and hiring." CARE Agreement § 2. It lists the same seven statutes as the 2015 Bonus Agreement: (1) the Fair Labor Standards Act; (2) Title VII of the Civil Rights Act of 1964; (3) the Age Discrimination in Employment Act; (4) the Worker Adjustment and Retraining Notification Act; (5) the Equal Pay Act; (6) the Americans with Disabilities Act; and (7) the Family and Medical Leave Act. *Id*. It does not mention ERISA. Like the Bonus Agreements, the CARE Agreement provides that Covered Claims may not be "initiated, maintained, heard or determined on a class action, collective action, or representative action basis . . . ." *Id.* § 4. And if "any Covered Claim is permitted to proceed on a class action, collective action, or representative action basis, it must do so in a court of competent jurisdiction and not in arbitration." *Id.*

## III.   LEGAL STANDARD

There is a two-part inquiry for determining the arbitrability of a dispute: "(1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement encompasses the claims at issue." *Cooper v. Ruane Cunniff & Goldfarb Inc.*, 990 F.3d 173, 179 (2d Cir. 2021) (internal quotation marks omitted). An arbitration agreement, however, is invalid and unenforceable if it operates "as a prospective waiver of a party's right to pursue statutory remedies." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 235 (2013).

-------------------

[8] The CARE Agreement is attached as Exhibit E to the Krentzman Declaration.

## IV.    ARGUMENT

The Court should deny Morgan Stanley's motion to compel arbitration because: (1) Plaintiffs' claims are not "Covered Claims" under the arbitration agreements; (2) even if Plaintiffs' claims were "Covered Claims," the arbitration agreements were superseded by the MSCIP plan document, which provides that "the courts of New York shall have exclusive jurisdiction" over Plaintiffs' claims; (3) the deferred compensation plan did not agree to arbitrate Plaintiffs' claims; and (4) the arbitration agreements are unenforceable because they operate as "a prospective waiver of a party's right to pursue statutory remedies" and, therefore, violate public policy. Even if individual, arbitrable issues do exist, the Court should deny Morgan Stanley's request for a discretionary stay, given that any arbitrable issues are necessarily derivative of common, plan-wide issues that must first be decided by the Court.

### A.    The parties never agreed to arbitrate Plaintiffs' claims.

#### 1.    Plaintiffs' claims are not "Covered Claims" under the arbitration agreements.

Morgan Stanley wrongly contends that Plaintiffs' claims are arbitrable because Plaintiffs agreed to arbitrate all claims arising out of or relating to their "employment," language common to each arbitration agreement.[9] *See* Defs.' Mem. at 12. But Plaintiffs' claims are not "Covered Claims" for three reasons. First, they do not arise from or relate to Plaintiffs' employment under

---

[9] The 2015 Bonus Agreement and CARE Agreement elaborate by referencing "employment, compensation, and terms and conditions of employment with Morgan Stanley . . . or the termination thereof." 2015 Bonus Agreement § 7(a); CARE Agreement § 2. Morgan Stanley seems to suggest that 2014 Arbitration Agreement also shares this language, Defs.' Mem. at 12, but it and the Nadler Agreement omit the words "compensation, and terms and conditions of employment." *Compare id.*, *with* Nadler Agreement § 7.1, 2014 Bonus Agreement § 7(a). Importantly, however, Morgan Stanley does not contend that this language expands the meaning of the 2015 Bonus and CARE Agreements beyond that of the 2014 Bonus Agreement and Nadler Agreement. *See* Defs.' Mem. at 12 (describing arbitration provisions as "materially indistinguishable").

the Second Circuit's decision in *Cooper v. Ruane Cunniff & Goldfarb Inc*. Second, because Plaintiffs' claims are representative in nature, they must be litigated in court. Third, even if Plaintiffs agreed to arbitrate their claims, the plan did not.

> **a.    Plaintiffs' claims do not "arise from or relate to their employment" because they do not involve facts particular to them.**

In *Cooper*, the Second Circuit held that an arbitration agreement covering "all legal claims arising out of or relating to employment" did not encompass the plaintiff's claims under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), even though they involved a profit-sharing plan that was part of the plaintiff's compensation. 990 F.3d at 179. The plaintiff in *Cooper* alleged that the plan's fiduciary breached its fiduciary duties by not diversifying the plan's assets, resulting in catastrophic losses to the plan. *Id*. at 176-77. Although the Second Circuit noted that "compensation is, of course, a feature of his employment," *id*. at 180, the court held that, "in the context of an employment arbitration agreement, a claim will 'relate to' employment only if the merits of that claim ***involve facts particular to an individual plaintiff's own employment*.**" *Id*. at 184 (emphasis added).

The Second Circuit concluded that the claims in *Cooper*, which "hinge[d] entirely on the investment decisions made by [the defendant]," did not involve facts particular to the plaintiff's own employment, because these claims had "no connection to [the plaintiff's] own work performance, his evaluations, his treatment by supervisors, the amount of his compensation, the condition of his workplace, or any other fact particular to [the plaintiff's] individual experience at [his employer]." *Id*. at 183. Indeed, other employees could have brought the same claims for the losses to their plan accounts. *See id*. at 183-84.

Here, the arbitration provisions, like the arbitration agreement in *Cooper*, pertain to Plaintiffs' employment. But, as in *Cooper*, the merits of Plaintiffs' claims do not involve facts

- 7 -

particular to their employment. The claims do not concern Plaintiffs' work performance, evaluations, working conditions, amount of compensation, or any other fact particular to their individual experiences at Morgan Stanley. Rather, Plaintiffs' claims concern whether the MSCIP and EICP are governed by ERISA and, if so, whether the Cancellation Rule violates ERISA. *See* Compl., ¶ 90. Nothing about these claims "***involve facts particular to an individual plaintiff's own employment***." To the contrary, the relevant facts apply equally to every FA who forfeited deferred compensation, and each such FA can bring the same claims. Indeed, even the Secretary of Labor could do so. *See Cooper*, 990 F.3d at 183-84; *see also* ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) (allowing claims by participant, beneficiary, fiduciary, or Secretary of Labor); ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) (allowing claims by participant, beneficiary, or fiduciary).

*Cooper* did not, as Morgan Stanley suggests, involve "narrower arbitration language" or a "different kind of claim." Defs.' Mem. at 13. First, both cases involve employment arbitration agreements. *Compare Cooper*, 990 F.3d at 178 (covering "employment, application for employment, or termination of employment"), *with* 2015 Bonus Agreement § 7(a) (covering "employment, compensation, and terms and conditions of employment Morgan Stanley . . . or the termination thereof"), CARE Agreement § 2 (same), 2014 Bonus Agreement § 7(a) (covering "employment with Morgan Stanley or termination thereof), Nadler Agreement § 7.1 (covering "employment by Morgan Stanley").[10] Morgan Stanley observes that the defendant in *Cooper* did

---

[10] In contrast to the 2015 Bonus and CARE Agreements, the arbitration agreement in *Cooper* did not expressly extend to claims arising out of or relating to "compensation." *Cooper*, 990 F.3d at 178. Nevertheless, the Second Circuit noted that "compensation is, of course, a feature of . . . employment," *id*. at 180, and the arbitration agreement in *Cooper* separately stated that the covered claims included "overtime or other compensation disputes." *Id*. at 181-82 n.8. Like the 2015 Bonus and CARE Agreements, the arbitration provision in *Cooper* also covered statutory claims in general. But the Second Circuit *rejected* the defendant's argument that it therefore covered claims under ERISA. *Id.* at 182. And here, ERISA is conspicuously absent from the

not argue "that the claims 'arose out of' the plaintiff's employment," Defs.' Mem. at 13, but this observation is irrelevant because the phrase "relating to" is *broader* than the phrase "arising out of." *See Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 128-29 (2d Cir. 2001) (describing "relating to" as "broader in scope than the term 'arising out of'"); *Alghanim v. Alghanim*, 828 F. Supp. 2d 636, 652 (S.D.N.Y. 2011) ("[a]n arbitration clause covering claims 'relating to' a contract is broader than a clause covering claims 'arising out of' a contract"). If the claims in *Cooper* did not "relate to" the plaintiff's employment, then they did not "arise out of" it.

Second, "in the context of an employment arbitration agreement, a claim will 'relate to' employment only if the merits of that claim involve facts particular to an individual plaintiff's own employment." *Cooper*, 990 F.3d at 184. In *Cooper*, the plaintiff argued that the defendant breached ERISA's fiduciary duties by overconcentrating a plan's assets. 990 F.3d at 177. Here, Plaintiffs allege that Defendants breached ERISA's fiduciary duties by enforcing the Cancellation Rule that violated ERISA's vesting requirements. *See* Compl., ¶¶ 68-71, 113. The claims in *Cooper* are materially like those in this case, as neither set of claims involves facts unique to an individual plaintiff's employment. *See Cooper*, 990 F.3d at 184.

Morgan Stanley argues that Plaintiffs seek "additional compensation . . . [which] plainly implicates facts particular to them, including the terms and circumstances of their agreements." Defs.' Mem. at 13. But Morgan Stanley correctly calculated deferred compensation using a "Grid" formula, which applies equally to each FA. Compl., ¶¶ 27-34. Plaintiffs do not contend that Morgan Stanley wrongly applied the "Grid" or that they are entitled to "additional compensation"

_____

comprehensive list of employment-related statutes in the 2015 Bonus and CARE Agreements. *See* 2015 Bonus Agreement § 7(a); CARE Agreement § 2. As in *Cooper*, these arbitration provisions "describe[] the covered claims as 'not limited to' those listed," but those that are listed are "personal to the employee." *See* 990 F.3d at 181-82 n.8.

- 9 -

under the Grid. Rather, Plaintiffs contend that the MSCIP and EICP are governed by ERISA, not state law, that their (previously awarded) deferred compensation is subject to ERISA's vesting rules, and that Morgan Stanley violated ERISA's vesting rules in applying the Cancellation Rule. Like in *Cooper*, Plaintiffs' claims do not implicate their individual employment terms or compensation. Although the losses to each participant's individual plan account may differ, their claims and the core material facts that support them are the same for all participants. *See* Compl., ¶¶ 93, 100-101, 104, 107, 116-117.

In sum, because Plaintiffs' claims are not personal to Plaintiffs, they are not "Covered Claims" under the arbitration provisions, and for that reason alone, their claims are not arbitrable.

> **b.   The parties did not agree to arbitrate claims brought in Plaintiffs' representative capacity.**

Three of the four arbitration provisions purport to waive the right to pursue a Covered Claim "on a class action, collective action, or representative action basis." 2015 Bonus Agreement § 7(d); CARE Agreement § 4; *accord* 2014 Bonus Agreement § 7(d). To the extent that any such claim is allowed to proceed, it must do so in court. *See id*. Moreover, "[a]ny issue concerning the validity or enforceability of any of the class action, collective action, and representative action waivers . . . shall be decided by a court of competent jurisdiction, and not by an arbitrator." *Id*. Thus, contrary to Morgan Stanley's argument that any disagreement about the arbitrability of Plaintiffs' claims is reserved for the arbitrator, Defs.' Mem. at 14-15, the Court—not an arbitrator—must decide whether Plaintiffs' claims must be allowed to proceed on a class-action or representative-action basis, such that they are not subject to arbitration.[11]

---

[11] "The law generally treats arbitrability as an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1031 (2d Cir. 2014) (internal quotation marks omitted). Here, the language delegating questions of arbitrability to the arbitrator is subject to qualification: "Any issue

Plaintiffs' claims under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), can be brought *only* in a representative capacity on behalf of the plan. ERISA § 409, 29 U.S.C. § 1109; *Cooper*, 990 F.3d at 184; *Coan v. Kaufman*, 457 F.3d 250, 257 (2d Cir. 2006); *see also Ferguson v. Ruane Cuniff & Goldfarb Inc.*, No. 17-cv-6685, 2021 WL 3667979, at *4 (S.D.N.Y. Aug. 17, 2021) (explaining that claims "for fiduciary breaches that impair the value of plan assets in a participant's individual account . . . are still on behalf of the plan" (internal quotation marks omitted)). Thus, these claims must proceed in court under the terms of the arbitration provisions, which prohibit the arbitration of representative actions.

The law compels the same result. In *Munro v. University of Southern California*, 896 F.3d 1088 (9th Cir. 2018), the Ninth Circuit held that an agreement between an employer and employee to arbitrate "all claims" did not cover a claim for breach of fiduciary duty under ERISA § 502(a)(2) because "a plaintiff bringing a suit for breach of fiduciary duty . . . seeks recovery only for injury done to the plan." 896 F.3d at 1093. As the *Munro* court explained, the agreement to arbitrate "claims . . . that Employee may have" "does not extend to claims that other entities," such as the plan, may have. *Id*. at 1092.

Plaintiffs also assert claims in a representative capacity under ERISA § 502(a)(3). For example, they seek a declaration that ERISA governs the FA Deferred Compensation Program and, in particular, the MSCIP and the EICP, and that the Cancellation Rule violates ERISA's

_____

concerning arbitrability of a particular issue or claim pursuant to this Arbitration Agreement (*except for issues concerning the validity or enforceability of the class action, collective action, or representative action Waivers*) must be resolved by the arbitrator, not the court." 2015 Bonus Agreement § 7(d); 2014 Bonus Agreement § 7(d); CARE Agreement § 4 (emphasis added). Thus, the parties did not clearly and unmistakably commit questions about the arbitrability of Plaintiffs' inherently representative ERISA claims to an arbitrator. *See NASDAQ*, 770 F.3d at 1032; *accord Archer & White Sales, Inc. v. Henry Schein, Inc.*, 935 F.3d 274, 281 (5th Cir. 2019) (on remand from Supreme Court decision, 139 S. Ct. 524 (2019), cited on page 14 of Morgan Stanley's brief).

- 11 -

vesting and anti-forfeiture requirements—equitable relief that must apply to all FAs on a plan-wide basis. *See* Compl., ¶¶ 100-101. Plaintiffs seek an order reforming the FA Deferred Compensation Program—again, relief that applies to all FAs and the plan as a whole—to comply with ERISA's vesting and anti-forfeiture requirements. *See id*., ¶¶ 103-107. In *Laurent v. Pricewaterhouse Coopers LLP*, 945 F.3d 739, 748 (2d Cir. 2019), the court held that "§ 502(a)(3) authorizes district courts to grant equitable relief—including reformation—to remedy violations of subsection I of ERISA," such as breaches of fiduciary duty. *Cf. Banyai v. Mazur*, No. 00-cv-9806, 2007 WL 959066, at *3 (S.D.N.Y. Mar. 29, 2007) ("nothing suggests that section 502(a)(3) authorizes only individual relief, thereby precluding suits seeking 'other appropriate equitable relief' . . . *on behalf of the plan*" (emphasis added)).

Plaintiffs' claims are like those in *Browe v. CTC Corp.*, 15 F.4th 175 (2d Cir. 2021), in which the plaintiffs sought a declaration under ERISA § 502(a)(3) that their benefits were subject to ERISA's vesting rules and sued for breach of fiduciary under ERISA §§ 409 and 502(a)(2). *Id*. at 188. The Second Circuit affirmed the district court's declaration that the plan's terms violated ERISA's vesting rules. *Id*. at 194-97, 203 ("Courts must interpret plans to adhere to ERISA's requirements."). Although *Browe* was not a class action, the Second Circuit made clear that the relief that flowed from this determination applied to all participants, not just the named plaintiffs. In remanding the case to the district court to craft a remedial scheme to distribute benefits, the Second Circuit stated that the distribution must include a way for "[p]lan participants not parties to this suit to receive any benefits to which they may be entitled." *Id*. at 206. In other words, the court's conclusion that the plan's terms violated ERISA applied to ***all plan participants***, and each plan participant was entitled to receive benefits calculated under ERISA's vesting schedules.

- 12 -

The same is true here, as Plaintiffs seek a declaration for the benefit of all plan participants that ERISA's vesting rules apply to the plan and seek a way for all participants, including those "not parties to this suit[,] to receive any benefits to which they may be entitled." *Id*. at 206. These representative claims should not be litigated in individual arbitrations.

**c.   The ERISA plan did not agree to arbitrate Plaintiffs' claims.**

Finally, Plaintiffs' claims are not "Covered Claims" under the arbitration agreements because the plan itself never agreed to arbitrate them. In *Hawkins v. Cintas Corp.*, 32 F.4th 625 (6th Cir. 2022), the Sixth Circuit affirmed the denial of a motion to compel arbitration because the ERISA plan never agreed to arbitrate the plaintiffs' claims under ERISA § 502(a)(2). 32 F.4th at 632-33. The plaintiffs had each signed employment agreements in which they agreed to individually arbitrate all claims "arising out of or in any way related to" their employment, including ERISA claims. *Id*. at 633. But the ERISA plan never agreed to arbitrate any claims, and plaintiffs' § 502(a)(2) claims, which sought plan-wide relief, were representative claims that really belonged to the ERISA plan. 32 F.4th at 635-36. Thus, "because § 502(a)(2) claims 'belong' to the Plan, an arbitration agreement that binds only individual participants cannot bring such claims into arbitration."[12] *Id*. at 632-33. Similarly, here, because Plaintiffs' § 502(a)(2) claims "belong" to the FA Deferred Compensation Program, including the MSCIP and EICP, Plaintiffs' individual arbitration agreements do not cover them.

**2.   Even if Plaintiffs' claims are "Covered Claims" under the arbitration agreements, those agreements were superseded by the MSCIP.**

Even if the arbitration agreements applied to Plaintiffs' claims, they were superseded by the MSCIP plan document, which specifically requires disputes about the plan to be resolved in

---

[12] Notably, in *Ferguson*, Judge Andrew L. Carter, Jr. of this District went a step further, concluding that even an arbitration agreement adopted by the plan cannot be construed to bar class certification without "run[ning] afoul" of *Coan*. *Ferguson*, 2021 WL 3667979, at *4.

- 13 -

court, ***not*** arbitration. Plaintiffs earned deferred compensation under the FA Compensation Plan each month that they worked at Morgan Stanley, with Morgan Stanley granting to them each January the total from the previous calendar year. Compl., ¶¶ 27, 31-32. The terms and conditions of each year's FA Compensation Plan are determined by the Compensation Committee and "set forth in the applicable award documentation." *Id*. at ¶ 32. This "applicable award documentation" includes the MSCIP plan document, which expressly provides that "***the courts of New York shall have exclusive jurisdiction*** over the Plan and any dispute arising in connection with the Plan, a Participant's participation in the Plan or rights under the Plan." Jasinski Decl. Ex. 2 § 17 (emphasis added). Accordingly, when Morgan Stanley awarded deferred compensation each year, it specifically affirmed that it would resolve award disputes in New York courts.

"Under New York law, it is well established that a subsequent contract regarding the same matter will supersede the prior contract." *Applied Energetics, Inc. v. NewOak Capital Mkts., LLC*, 645 F.3d 522, 526 (2d Cir. 2011). This principle applies to arbitration agreements. *Baker & Taylor, Inc. v. AlphaCraze.com Corp.*, 602 F.3d 486, 490 (2d Cir. 2010). A prior arbitration agreement may be superseded by a subsequent contract containing a forum selection clause that precludes arbitration. *Goldman Sachs & Co. v. Golden Emp. Schools Fin. Auth.*, 764 F.3d 210, 215 (2d Cir. 2014). To do so, "there is no requirement that the forum selection clause mention arbitration." *Applied Energetics*, 645 F.3d at 523-24. The later agreement must only say that a specific court or venue has exclusive jurisdiction of the parties' future disputes. *Id*. at 526; *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 132 (2d Cir. 2011) (parties can have "different or additional contractual arrangements" that supersede an earlier arbitration agreement).

To the extent that the arbitration agreements apply, the MSCIP plan document supersedes them. The MSCIP Plan was part of the "applicable award documentation" that applied to Plaintiffs'

awards of deferred compensation, which were all granted after Shafer signed the 2015 Bonus Agreement, Tamse and Loftus signed the 2014 Bonus Agreements, Nadler signed his Employment Agreement in April 2008, and Haugabook, Heidt, Livanos, Shover, Samsen, J. Sheresky, S. Sheresky, and Jukel allegedly received notice of the CARE Arbitration Agreement in September 2015.

The MSCIP plan document's use of the phrases "shall have exclusive jurisdiction" and "any dispute" are exactly the kinds of "all-inclusive" and "mandatory" language that supersede an earlier agreement. In *Applied Energetics*, for example, the parties' contract stated that "[a]ny dispute arising out of this Agreement shall be adjudicated in the Supreme Court, New York County or in the . . . Southern District of New York." 645 F.3d at 523. That provision required the parties to litigate their claims in court because "the clause's use of the obligatory verb 'shall' precludes the resolution of the parties' dispute by any [other] means . . . ." *Id*. at 525.

Likewise, in *Golden Empire*, the parties' dispute was not arbitrable because their contract stated that "all actions and proceedings . . . shall be brought in the Southern District of New York." 764 F.3d at 216. And in *Citigroup Global Markets. Inc. v. All Children's Hospital Inc.*, 5 F. Supp. 3d 537 (S.D.N.Y. 2014), the court denied a motion to compel arbitration when an agreement stated that "all actions and proceedings . . . shall be brought in New York court." *Id*. at 540. Finally, in *Ruiz v. New Avon LLC*, No. 18-cv-9033, 2019 WL 4601847 (S.D.N.Y. Sept. 22, 2019), the plaintiff agreed to arbitrate any future dispute with her employer. *Id*. at *2. The parties later entered into an agreement that stated that New York courts had "sole exclusive jurisdiction" over "all actions and controversies" between them. *Id*. at *7. The court denied the employer's motion to compel arbitration because the later agreement superseded the earlier agreement. *Id*. at *9.

**B.     Even if the parties agreed to arbitrate Plaintiffs' claims in individual arbitrations, those arbitration agreements are unenforceable as "prospective waiver[s] of a party's right to pursue statutory remedies" under ERISA § 502.**

Arbitration agreements are unenforceable on public-policy grounds if they act as a "'prospective waiver of a party's right to pursue statutory remedies.'" *Italian Colors*, 570 U.S. at 236 (2013) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985)). Here, if applied to Plaintiffs' claims, the arbitration provisions would eliminate Plaintiffs' right to pursue statutory remedies provided for under sections 502(a)(2) and 502(a)(3) of ERISA. *See Smith v. Bd. of Directors of Triad Mfg., Inc.*, 13 F.4th 613, 621 (7th Cir. 2021) (barring application of arbitration provision that prohibited plan-wide remedies available in claim under ERISA § 502(a)(2)); *Cedeno v. Argent Trust Co.*, No. 20-cv-9987, 2021 WL 5087898, at *5 (S.D.N.Y. Nov. 2, 2021).

Plaintiffs' claims under ERISA § 502(a)(2) are "brought in a representative capacity on behalf of the plan as a whole," in the interest of the "financial integrity" of the plan. *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 n.9 (1985); *see LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 256 (2008) ("although § 502(a)(2) does not provide a remedy for individual injuries distinct from plan injuries, that provision does authorize recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account"). As discussed above, ERISA § 502(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, which provides that a fiduciary who breaches its duties is "liable to make good to such plan any losses to the plan resulting from each such breach . . . and shall be subject to such other equitable or remedial relief as the court may deem appropriate. . . ." ERISA § 409(a), 29 U.S.C. § 1109(a). Thus, relief under ERISA § 409 "is available wherever it would advance the protection of the entire plan." *Cedeno*, 2021 WL 5087898, at *4; *see also Browe*, 15 F.4th at

- 16 -

205-206 ("the remedies available under ERISA for fiduciary breaches are intended to provide relief to the subject plan as a whole, as opposed to any individual participant (or her beneficiary)").

In *Cooper*, the Second Circuit stated that ERISA § 502(a)(2) "require[s] parties suing on behalf of a plan to demonstrate their suitability to serve as representatives of the interests of other plan stakeholders." 990 F.3d at 184 (citing *Coan*); *see also Ferguson*, 2021 WL 3667979, at \*4 (rejecting construction of arbitration provision that "applies to all claims arising out of or relating to the Plan" to bar class certification because doing so would "run[] afoul of *Coan*"). If the arbitration provisions prohibited Plaintiffs from bringing that claim in a representative basis, then it would "make it impossible to bring an ERISA fiduciary action that satisfies both the [arbitration provisions] and the *Coan* representative adequacy requirement, potentially rendering at least this part of the [arbitration provisions] unenforceable" and denying Plaintiffs the right to pursue that statutory remedy. *See Cooper*, 990 F.3d at 184-85. Like the Second Circuit did in *Cooper*, this Court should "decline to adopt an unnecessary reading [of the arbitration provisions] that casts its enforceability into doubt, in derogation of ERISA's protective purposes." *Id*. at 185.

The same is true for Plaintiffs' claims under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). Plaintiffs seek relief for all FAs and the plan as a whole concerning whether the plan's terms are covered by ERISA and, if so, whether they violate ERISA. Am. Compl. at ¶¶ 98-107. The plan cannot be subject to ERISA's vesting rules for some participants but not others. *Coan* addressed this issue, finding that ERISA must be read to work hand-in-hand with a court's procedural rules, namely Rule 23, to help ensure that all plan participants are adequately represented. *Coan*, 457 F.3d at 256-57. Here, Plaintiffs must bring this claim in a representative capacity, and it would be manifestly unjust for them to litigate whether the plan terms must be changed for everyone in secret, individual arbitrations, where other plan participants receive no notice, much less an

opportunity to participate. Even worse, plan participants would not know how any arbitration might affect them because "[t]he publicly available arbitration award . . . typically contains little helpful information." *Credit Suisse Sec. (USA) LLC v. Tracy*, 812 F.3d 249, 256 (2d Cir. 2016).

Although Morgan Stanley is correct that ERISA does not preclude the arbitration of all statutory claims, Defs.' Mem. at 13, the question here is whether Plaintiffs' claims must be arbitrated. In *Bird v. Shearson Lehman/Am. Express, Inc.*, 926 F.2d 116 (2d Cir. 1991), the court merely considered whether, as a general rule, ERISA statutory claims may be arbitrated. *See id.* at 118-22. The court did not conduct the more case-specific analysis that occurred in *Cooper*.[13]

*Bird* is distinguishable on at least three additional grounds. First, in *Bird*, the trustee of the plan was a party to the arbitration agreement. *See Bird*, 926 F.2d at 117. Thus, *Bird* is more akin to cases where the plan document contains an arbitration provision. As discussed above, the plan in this case was not a party to any arbitration agreement. *See supra* part IV.A.1.c. Second, *Bird* concerned the imprudent investment of trust assets, *id.* at 117-18, a fact-bound inquiry suitable for arbitration. This case, in contrast, concerns pure issues of ERISA law that go to the heart of whether and how ERISA applies to the plan and all plan participants. Third, the arbitration agreement in *Bird* did not include a representative-action waiver that required any such actions—to the extent permitted—to proceed in court.

Moreover, one of ERISA's goals is to promote uniformity in benefits administration.[14] *Conkright v. Frommert*, 559 U.S. 506, 517 (2010). To that end, the ERISA requirement that plan

---

[13] The same is true of the out-of-circuit cases cited by Morgan Stanley. Defs.' Mem. at 13.

[14] All plans must be "established and maintained pursuant to a written instrument" that "specif[ies] the basis on which payments are made. . . from the plan." ERISA §§ 402(a)(1), (b)(4), 29 U.S.C. §§ 1102(a)(1), (b)(4). These requirements provide plan participants "a clear set of instructions" about how and when benefits will be paid. *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 555 U.S. 285, 301 (2009).

- 18 -

provisions be "applied consistently with respect to similarly situated claimants," 29 C.F.R. § 2560.503-1(b)(5), was not an issue in *Bird*. "Uniformity is impossible, however, if plans are subject to different legal obligations in different [venues]." *Egelhoff v. Egelhoff*, 532 U.S. 141, 148 (2001). The Cancellation Rule cannot be legal for some participants but illegal for others. *See, e.g.*, *Conkright*, 559 U.S. at 517 (discussing problems that would arise under ERISA if participants were "entitled to different benefits depending on where they live, or perhaps where they bring a legal action").

Individual arbitrations about whether the Cancellation Rule violates ERISA would undermine the uniform remedies that ERISA provides to participants. Different arbitrators could reach different results on whether the plan is governed by ERISA, whether ERISA's vesting provisions apply, and whether the Cancellation Rule violates those provisions. For example, in this case, twelve former Morgan Stanley FAs assert the same claims, and Plaintiffs' counsel have been approached by other similarly situated participants. All are entitled under ERISA to have the plan provisions applied to them uniformly. ERISA's vesting rules cannot apply to some FAs but not others. The FA Deferred Compensation Plan cannot be reformed for some FAs but not others. Whether an individual participant may recover benefits *cannot* be based on the "luck of the draw" in arbitrator selection. Accordingly, the arbitration provisions operate as a prospective waiver of the uniform statutory remedies Plaintiffs seek under ERISA § 502.

In *Z.D. v. Group Health Coop.*, No. 11-cv-1119, 2012 WL 1977962 (W.D. Wash. June 1, 2012), the plaintiffs sought declaratory and injunctive relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), to prevent the defendant from denying coverage for a particular medical treatment. *Id*. at *2. In certifying the class, the court recognized that ERISA required the plan to act in a similar fashion toward all beneficiaries. *Id*. at *7. If the named plaintiffs were to prevail in an

individual suit, another court might reach a different result in a different suit, putting the defendants in an "inescapable legal quagmire" of not being able to comply with one judgment without violating another—a "truly unwinnable position." *Id*. at *7*. The same is true here. The individual arbitrations that Morgan Stanley seeks would ***create*** "a patchwork of different interpretations of a plan" that the Supreme Court held should be avoided in *Conkright* and deny all FAs their substantive right to have the plan applied consistently to all participants.

Plaintiffs have also requested that the fiduciaries be ordered to make good to the plan any losses resulting from the fiduciary's breach of duty, and to restore to the plan any profits the fiduciary made using the plan's assets. Compl., ¶ 114; ERISA § 409, 29 U.S.C. § 1109. "The purpose of disgorgement of profits is deterrence, which is undermined if the fiduciary is able to retain proceeds from his own wrongdoing." *Sec'y U.S. Dep't of Labor v. Koresko*, 646 F. App'x 230, 245 (3d Cir. 2016). If disgorgement were limited in arbitration to an individual participant's losses, it would not only risk inconsistent results, it would also impermissibly curtail ERISA's remedial structure that makes breaching fiduciaries liable "to the subject plan as a whole." *Browe*, 15 F.4th at 205.

The court in *Berry v. Wells Fargo & Co.*, No. 3:17-cv-304, 2018 WL 9989754 (D.S.C. Oct. 9, 2018), recognized these principles in a similar case involving whether Wells Fargo's deferred compensation plan for financial advisors violated ERISA's vesting rules. In granting class certification under Rule 23(b)(1)(A), the court observed:

> This case's central issue is whether the Deferral Plan . . . must comply with ERISA's vesting, anti-forfeiture, and funding provisions. . . . Separate lawsuits over these issues could result in different outcomes, making it impossible for the Deferral Plan's administrator to treat similarly situated participants alike as required by ERISA.

*Berry*, 2018 WL 9989754, \*12. Although *Berry* addressed these issues on class certification, the same overarching principle—namely, that plan administrators must "treat all similarly situated participants in a consistent manner"—applies here. *Alday v. Raytheon Co.*, 619 F. Supp. 2d 726, 736 (D. Ariz. 2008). To hold otherwise would result in the inevitable violation of 29 C.F.R. § 2560.503-1(b)(5) and deny all participants their right under ERISA to the consistent application of plan terms.

> **C.    The Court should not grant a partial stay for the same reasons it should not compel arbitration.**

If the Court were to compel the arbitration of *all* of Plaintiffs' claims, then a stay of the entire action would be mandatory. 9 U.S.C. § 3. Recognizing that courts have expressly declined to compel arbitration of ERISA fiduciary duty claims, *see, e.g.*, *Munro*, 896 F.3d at 1092-93; *Hawkins*, 2021 WL 274341, at \*7, Morgan Stanley argues that a discretionary stay of all claims "would be warranted even if the Court determined to compel arbitration of only some of plaintiffs' claims." Defs.' Mem. at 15. Its reasoning is that Plaintiffs' claims "involve common issues of fact and law, and arbitration as to any of the claims is likely to dispose issues common to all claims." Defs.' Mem. at 16 (internal quotation marks omitted).

Plaintiffs agree that their claims involve common issues of fact and law. But the presence of these common issues shows why individual arbitrations and a stay would not be appropriate. In *Winter Invs., LLC v. Panzer*, No. 14-cv-6852, 2015 WL 5052563 (S.D.N.Y. Aug. 27, 2015), for example, a stay was warranted because the arbitration was "likely to have preclusive effect over some or all of the claims not subject to arbitration." *See id*. at \*11. Here, it's the opposite. To the extent that individual, arbitrable issues exist, they are necessarily derivative of common, plan-wide issues that must first be adjudicated in court—such as whether the plan is governed by ERISA, whether ERISA's vesting rules apply, and whether the Cancellation Rule violates those provisions.

Consequently, "arbitration as to any of the claims" is *not* "'likely to dispose [of] issues common to' all claims." Defs.' Mem. at 16 (quoting *Moore v. Interacciones Glob., Inc.*, No. 94-cv-4789, 1995 WL 33650, at *7 (S.D.N.Y. Jan. 27, 1995)). The issues common to Plaintiffs' claims cannot be decided in multiple, individual arbitrations, without risking inconsistent and conflicting decisions on those common issues. It bears repeating: the Cancellation Rule cannot be legal for some participants but not for others. Thus, if anything, all issues *not* subject to arbitration—i.e., all those common to the class—should be litigated first in this class action, and then any remaining arbitrable, individual issues could be resolved in individual arbitrations.

## V.    CONCLUSION

Because the arbitration provisions do not—and cannot—apply to Plaintiffs' claims, Defendants' Motion to Compel Arbitration and to Stay Proceedings should be denied.

Dated:  June 8, 2022                          Respectfully submitted,

Robert A. Izard (*pro hac vice*)              By: */s/ Mathew P. Jasinski*
Douglas P. Needham                               William H. Narwold
IZARD, KINDALL & RAABE LLP                       Mathew P. Jasinski
29 South Main Street, Suite 305                  MOTLEY RICE LLC
West Hartford, CT 06107                          27 Church Street, 17th Floor
Tel: (860) 493-6292                              Hartford, CT 06103
Fax: (860) 493-6290                              Telephone: (860) 882-1681
rizard@ikrlaw.com                                Facsimile: (860) 882-1682
mkindall@ikrlaw.com                              bnarwold@motleyrice.com
dneedham@ikrlaw.com                              mjasinski@motleyrice.com

David S. Siegel (*pro hac vice*)              *New York Office*:
John S. "Jack" Edwards, Jr. (*pro hac vice*)     777 Third Avenue, 27th Floor
Dona Szak (*pro hac vice*)                       New York, New York 10017
AJAMIE LLP
Pennzoil Place - South Tower                     Thomas R. Ajamie
711 Louisiana, Suite 2150                        AJAMIE LLP
Houston, TX 77002                                460 Park Avenue, 21st Floor
Telephone: (713) 860-1600                        New York, NY 10022
Facsimile: (713) 860-1699                        Telephone: (713) 860-1600
dsiegel@ajamie.com                               Facsimile: (713) 860-1699
jedwards@ajamie.com                              tajamie@ajamie.com
dszak@ajamie.com
                                              *Counsel for Plaintiffs*

- 22 -

## CERTIFICATE OF SERVICE

I certify that on June 8, 2022, a copy of the foregoing *Memorandum of Law in Opposition to Defendants' Motion to Compel Arbitration and to Stay Proceedings* was served on Defendants' counsel by email, as agreed by the parties.

<u>/s/ Mathew P. Jasinski</u>
Mathew P. Jasinski

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| MATTHEW T. SHAFER, SHERI HAUGABOOK, PETER HEIDT, JEFFREY SHOVER, MACE TAMSE, GEORGE LIVANOS, MARK LOFTUS, JEFFREY SAMSEN, JEFFREY SHERESKY, STEVE SHERESKY, STEVE NADLER, AND SANDY JUKEL, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, | Civil Action No. 1:20-cv-11047-PGG |
| Plaintiffs, | CLASS ACTION |
| vs. | |
| MORGAN STANLEY, MORGAN STANLEY SMITH BARNEY LLC, MORGAN STANLEY COMPENSATION MANAGEMENT DEVELOPMENT AND SUCCESSION COMMITTEE, and John/Jane Does 1-20, | |
| Defendants. | June 8, 2022 |

**DECLARATION OF MATHEW P. JASINSKI IN OPPOSITION TO DEFENDANTS'**
**MOTION TO COMPEL ARBITRATION AND TO STAY PROCEEDINGS**

MATHEW P. JASINSKI, an attorney duly admitted to practice in the Southern District of New York, declares under penalty of perjury as follows:

1.      I am a member of the law firm of Motley Rice LLC and am one of the attorneys who represents Plaintiffs in the above-captioned matter.

2.      I submit this declaration in opposition to the motion of Defendants Morgan Stanley, Morgan Stanley Smith Barney LLC, and the Morgan Stanley Compensation Management Development and Succession Committee (collectively, "Morgan Stanley") to compel arbitration, dated May 9, 2022.

3.     Attached as **Exhibit 1** is a true and correct copy of a document titled Morgan Stanley Compensation Incentive Plan Wealth Management Financial Advisor / Private Wealth Adviser Awards 2016 Discretionary Retention Awards Award Certificate.

4.     Attached as **Exhibit 2** is a true and correct copy of a document titled Morgan Stanley Compensation Incentive Plan document. Upon information and belief, this document has been in effect since 2008 and part of the "applicable award documentation" when participants' deferred compensation is credited to their account each January.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on:   June 8, 2022                    _/s/ Mathew P. Jasinski_
              Hartford, Connecticut          Mathew P. Jasinski

ADD-265

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 8, 2022, a copy of the foregoing *Declaration of Mathew P.*

*Jasinski in Opposition to Defendants' Motion to Compel Arbitration and to Stay Proceedings*

was served on Defendants' counsel by email, as agreed by the parties.

<u>/s/ Mathew P. Jasinski</u>
Mathew P. Jasinski

# Exhibit 1

ADD-267

# MORGAN STANLEY

## MORGAN STANLEY COMPENSATION INCENTIVE PLAN

## WEALTH MANAGEMENT

## FINANCIAL ADVISER / PRIVATE WEALTH ADVISER AWARDS

## 2016 DISCRETIONARY RETENTION AWARDS AWARD CERTIFICATE

### TABLE OF CONTENTS FOR AWARD CERTIFICATE

1. Your award generally............................................................................3
2. Vesting schedule and payment............................................................3
3. Special provision for certain employees. ...........................................4
4. Death, Disability and Retirement/Full Career Retirement..........................5
5. Involuntary termination by the Firm. ................................................5
6. Governmental Service..........................................................................6
7. Specified employees. ..........................................................................6
8. Cancellation of Applicable Account Value under certain circumstances....7
9. Tax and other withholding obligations. .............................................7
10. Obligations you owe to the Firm. .......................................................8
11. Nontransferability. ..............................................................................8
12. Designation of a beneficiary. ..............................................................8
13. No entitlements. ..................................................................................9
14. Consents under local law. ...................................................................9
15. Award modification. ............................................................................9
16. Governing law.....................................................................................10
17. Defined terms......................................................................................10

MORGAN STANLEY

**MORGAN STANLEY COMPENSATION INCENTIVE PLAN**

**2016 DISCRETIONARY RETENTION AWARDS
AWARD CERTIFICATE**

Morgan Stanley has granted you an award under the Morgan Stanley Compensation Incentive Plan (the "***Plan***") as part of your incentive compensation for services provided during 2016 and as an incentive for you to remain in Employment and provide services to the Firm through the Scheduled Vesting Date. This Award Certificate sets forth the general terms and conditions of your 2016 award under the Plan. The initial value of your 2016 award has been communicated to you independently.

If you are employed outside the United States, you will also receive an "***International Supplement***" that contains supplemental terms and conditions for your 2016 award. You should read this Award Certificate in conjunction with the International Supplement, if applicable, and the Plan in order to understand the terms and conditions of your 2016 award.

Your 2016 award is made pursuant to the Plan. References to Applicable Account Value in this Award Certificate mean only the Applicable Account Value related to your 2016 award, and the terms and conditions herein apply only to such award. If you receive any other award under the Plan or another incentive compensation plan, it will be governed by the terms and conditions of the applicable award documentation, which may be different from those herein.

The purposes of the 2016 award are, among other things, to facilitate the allocation of a portion of your above-base compensation for 2016 to the notional investment opportunities afforded by the Plan, to reward you for your continued Employment and service to the Firm in the future and your compliance with the Firm's policies (including the Code of Conduct), to protect the Firm's interests in non-public, confidential and/or proprietary information, products, trade secrets, customer relationships, and other legitimate business interests, and to ensure an orderly transition of responsibilities. In view of these purposes, you will earn your 2016 award only if you (1) remain in continuous Employment through the Scheduled Vesting Date (subject to limited exceptions set forth below), (2) do not engage in any Prohibited Activity ***and*** (3) satisfy obligations you owe to the Firm as set forth in Section 10 below. Even if your award has vested, you will have no right to your award if you engage in any Prohibited Activity. As Morgan Stanley deems appropriate, Morgan Stanley will require you to provide a written certification or other evidence, from time to time in its sole discretion, to confirm that no Prohibited Activity has occurred, including upon a termination of Employment and/or during a specified period of time prior to the Scheduled Distribution Date. If you fail to provide any required certification or other evidence, Morgan Stanley will cancel your award. It

2

is your responsibility to provide the Executive Compensation Department with your up-to-date contact information.

Capitalized terms used in this Award Certificate that are not defined in the text have the meanings set forth in Section 17 below. Capitalized terms used in this Award Certificate that are not defined in the text or in Section 17 below have the meanings set forth in the Plan.

1. **Your award generally.**

(a) ***Applicable Account Value.*** This Award Certificate uses the term "Applicable Account Value" to refer to your 2016 award under the Plan and the notional return (positive or negative) thereon based on the performance of the Notional Investments to which your Account is notionally allocated. If you receive another award under the Plan (for example, an award for a future year), your total Account Value under the Plan will include the Applicable Account Value of your 2016 award and the applicable Account Value of such other award(s).

(b) ***Notional allocation of Account.*** The notional allocation of your Applicable Account Value is subject to the ultimate discretion of the Firm and is made exclusively for the purpose of determining your Applicable Account Value from time to time in accordance with the Plan. You may notionally allocate your Applicable Account Value to any one fund, or any combination of funds, offered as Notional Investments under the Plan with respect to your 2016 award.

2. **Vesting schedule and payment.**

(a) ***Vesting schedule.*** Except as otherwise provided in this Award Certificate, your Applicable Account Value will vest on the Scheduled Vesting Date. Except as otherwise provided in this Award Certificate, your Applicable Account Value will vest only if you continue to provide future services to the Firm by remaining in continuous Employment through the Scheduled Vesting Date and providing value added services to the Firm during this timeframe. The special vesting terms set forth in Sections 4, 5 and 6 of this Award Certificate apply (i) if your Employment terminates by reason of your death or Disability, (ii) upon your Retirement or Full Career Retirement (as applicable), (iii) if the Firm terminates your employment in an involuntary termination under the circumstances described in Section 5 or (iv) upon a Governmental Service Termination. The vested portion of your Applicable Account Value remains subject to the cancellation and withholding provisions set forth in this Award Certificate.

(b) ***Payment.*** Except as otherwise provided in this Award Certificate, your Applicable Account Value will, to the extent vested, be paid in cash (minus applicable tax and other withholding liabilities) on the Scheduled Distribution Date; *provided* that, subject to Section 2(d), your Applicable Account Value may be paid to you following the Scheduled Distribution Date on the next administratively practicable payroll date. The special payment provisions set forth in Sections 4(a), 4(b), 4(d) and 6 of this Award Certificate apply (i) if your Employment terminates by reason of your death or you die after termination of your Employment, (ii) upon your Retirement or Full Career Retirement (as applicable) under the circumstances set forth in Section 4(d) or (iii) upon your Governmental Service Termination or

3

your employment at a Governmental Employer following your termination of employment with the Firm under circumstances set forth in Section 6(b).

(c) *Accelerated payment.* Morgan Stanley shall have no right to accelerate the payment of any portion of your Applicable Account Value, except to the extent that such acceleration is not prohibited by Section 409A and would not result in your being required to recognize income for United States federal income tax purposes prior to the distribution of your Applicable Account Value or your incurring additional tax or interest under Section 409A.  If any portion of your Applicable Account Value is paid prior to the Scheduled Distribution Date pursuant to this Section 2(c), Morgan Stanley may condition such payment on your agreement that if you engage in any Prohibited Activity within the applicable period of time that would have resulted in cancellation of all or a portion of your Applicable Account Value (had it not been paid pursuant to this Section 2(c)), you will be required to repay to Morgan Stanley an amount equal to the payment you received (before taking account of any withholding) in respect of the portion of your Applicable Account Value that would have been canceled upon the occurrence of such Prohibited Activity, plus interest on such amount at the average rate of interest Morgan Stanley paid to borrow money from financial institutions during the period from the date such portion of your Applicable Account Value was paid through the date preceding the repayment date.

(d) *Rule of construction for timing of payment.* Whenever this Award Certificate provides for all or a portion of your Applicable Account Value to be paid on the Scheduled Distribution Date or upon a different specified event or date, such payment will be considered to have been timely made, and neither you nor any of your beneficiaries or your estate shall have any claim against the Firm for damages based on a delay in the payment of your Applicable Account Value, and the Firm shall have no liability to you (or to any of your beneficiaries or your estate) in respect of any such delay, as long as payment is made by December 31st of the year in which occurs the Scheduled Distribution Date or such other specified event or date or, if later, by the 15th day of the third calendar month following such specified event or date.  Similarly, neither you nor any of your beneficiaries or your estate shall have any claim against the Firm for damages, and the Firm shall have no liability to you (or to any of your beneficiaries or your estate), based on any acceleration of the payment of your Applicable Account Value pursuant to Section 2(c).

3. __Special provision for certain employees.__

Notwithstanding the other provisions of this Award Certificate, if Morgan Stanley considers you to be one of its executive officers at the time provided for the payment of the vested portion of your Applicable Account Value and determines that your compensation may not be fully deductible by virtue of Section 162(m) of the Internal Revenue Code, Morgan Stanley shall delay payment of the nondeductible portion of your compensation, including delaying payment of your Applicable Account Value to the extent nondeductible, unless the Administrator, in its sole discretion, determines not to delay such payment.  This delay will continue until your Separation from Service or, to the extent permitted under Section 409A, the end of the first earlier taxable year of the Firm as of the last day of which you are no longer an executive officer (subject to earlier payment in the event of your death as described below).

**4.** **Death, Disability and Retirement/Full Career Retirement.**

The following special vesting and payment terms apply to your award:

**(a)** ***Death during Employment.*** If your Employment terminates due to death, the unvested portion of your Applicable Account Value will vest on the date of your death. Your Applicable Account Value will be paid to the beneficiary you have designated pursuant to Section 12 or the legal representative of your estate, as applicable, upon your death, *provided* that your estate or beneficiary notifies the Firm of your death within 60 days following your death. After your death, the cancellation provisions set forth in Section 8(c) will no longer apply.

**(b)** ***Death after termination of Employment.*** If you die after the termination of your Employment but prior to the Scheduled Distribution Date, the vested portion of your Applicable Account Value that you held at the time of your death will be paid to the beneficiary you have designated pursuant to Section 12 or the legal representative of your estate, as applicable, upon your death, *provided* that your estate or beneficiary notifies the Firm of your death within 60 days following your death. After your death, the cancellation provisions set forth in Section 8(c) will no longer apply.

**(c)** ***Disability.*** If your Employment terminates due to Disability, your unvested Applicable Account Value will vest on the date your Employment terminates. Your Applicable Account Value will be paid on the Scheduled Distribution Date. The cancellation and withholding provisions set forth in this Award Certificate will continue to apply until the Scheduled Distribution Date.

**(d)** ***Retirement/Full Career Retirement.*** If your Employment terminates as a result of your Retirement or Full Career Retirement (as applicable), (i) your unvested Applicable Account Value will vest on the date your Employment terminates and (ii) your Applicable Account Value will be paid, and the cancellation provisions will lift, on the Scheduled Distribution Date; *provided* that, if you satisfy the conditions for a Retirement or Full Career Retirement (as applicable) upon your Separation from Service, 50% of your Applicable Account Value will be paid, and the cancellation provisions with respect to such amounts will lift, on the first anniversary of your Separation from Service and the remaining portion of your Applicable Account Value will be paid, and the cancellation provisions with respect to such amounts will lift, on the second anniversary of your Separation from Service, subject to earlier payment on the Scheduled Distribution Date.

**5.** **Involuntary termination by the Firm.**

If the Firm terminates your employment under circumstances not involving any Prohibited Activity, your unvested Applicable Account Value will vest on the date your employment with the Firm terminates and your Applicable Account Value will be paid on the Scheduled Distribution Date, *provided* that you sign an agreement and release satisfactory to the Firm. If you do not sign such an agreement and release satisfactory to the Firm within the timeframe set by the Firm in connection with your involuntary termination as described in this Section 5, any portion of your Applicable Account Value that was unvested immediately prior to

5

your termination shall be canceled.  The cancellation and withholding provisions set forth in this Award Certificate will continue to apply until the Scheduled Distribution Date.

**6.**     **Governmental Service.**

        **(a)**     ***General treatment of awards upon Governmental Service Termination.*** If your Employment terminates in a Governmental Service Termination and not involving any Prohibited Activity, then, *provided* that you sign an agreement satisfactory to the Firm relating to your obligations pursuant to Section 6(c), your unvested Applicable Account Value will vest on the date of your Governmental Service Termination.  Your vested Applicable Account Value will be paid on the date of your Governmental Service Termination.

        **(b)**     ***General treatment of vested awards upon acceptance of employment at a Governmental Employer following termination of Employment.***     If your Employment terminates other than in a Governmental Service Termination and not involving any Prohibited Activity and, following your termination of Employment, you accept employment with a Governmental Employer, then, *provided* that you sign an agreement satisfactory to the Firm relating to your obligations pursuant to Section 6(c), your outstanding vested Applicable Account Value will be paid upon your commencement of such employment, *provided* you present the Firm with satisfactory evidence demonstrating that as a result of such employment the divestiture of your continued interest in your Applicable Account Value is reasonably necessary to avoid the violation of U.S. federal, state or local or foreign ethics law or conflicts of interest law applicable to you at such Governmental Employer.

        **(c)**     ***Repayment obligation.***     If any Prohibited Activity occurs within the applicable period of time that would have resulted in cancellation of all or a portion of your Applicable Account Value had it not been paid pursuant to Sections 6(a) or 6(b) above, you will be required to repay to Morgan Stanley the amount distributed to you pursuant to Sections 6(a) or 6(b) above that would have been canceled upon the occurrence of such Prohibited Activity (before taking account of any withholding), plus interest on such amount at the average rate of interest Morgan Stanley paid to borrow money from financial institutions during the period from the date of such payment through the date preceding the repayment date.

**7.**     **Specified employees.**

        Notwithstanding any other terms of this Award Certificate, if Morgan Stanley considers you to be one of its "specified employees" as defined in Section 409A at the time of your Separation from Service, payment of any portion of your Applicable Account Value that otherwise would be made upon your Separation from Service (including, without limitation, any payments that were delayed due to Section 162(m) of the Internal Revenue Code, as provided in Section 3) will be delayed until the first business day following the date that is six months after your Separation from Service; *provided, however*, that in the event that your death, your Governmental Service Termination or your employment at a Governmental Employer following your termination of employment with the Firm under circumstances set forth in Section 6(b) occurs at any time after the Date of the Award, payment will be made in accordance with Section 4(a), 4(b) or 6, as applicable.

6

8.     **Cancellation of Applicable Account Value under certain circumstances.**

(a)     ***Cancellation of unvested Applicable Account Value.***   Any unvested portion of your Applicable Account Value will be canceled if your Employment terminates for any reason other than death, Disability, a Retirement, an involuntary termination by the Firm described in Section 5 or a Governmental Service Termination.

(b)     ***General treatment of vested Applicable Account Value.***   Except as otherwise provided in this Award Certificate, your vested Applicable Account Value will be paid on the Scheduled Distribution Date.  The cancellation and withholding provisions set forth in this Award Certificate will continue to apply until the Scheduled Distribution Date.

(c)     ***Cancellation of Applicable Account Value under certain circumstances.***  This Section 8(c) is designed, among other things, to incentivize compliance with the Firm's policies (including the Code of Conduct), to protect the Firm's interests in non-public, confidential and/or proprietary information, products, trade secrets, customer relationships, and other legitimate business interests, and to ensure an orderly transition of responsibilities.  This Section 8(c) shall apply notwithstanding any other terms of this Award Certificate (except where sections in this Award Certificate specifically provide that the cancellation events set forth in this Section 8(c) no longer apply).

Your Applicable Account Value, even if vested, is not earned until the Scheduled Distribution Date (and until you satisfy all obligations you owe to the Firm as set forth in Section 10 below) and, unless prohibited by applicable law, will be canceled in full, or in the case of clause (3) of a Clawback Cancellation Event, in full or in part, until the Scheduled Distribution Date if any Prohibited Activity occurs.

The Firm may retain custody of your Applicable Account Value following the Scheduled Distribution Date pending any investigation or other review that impacts the determination as to whether your Applicable Account Value is cancellable and, in such an instance, your Applicable Account Value shall be forfeited in the event the Firm determines that the Applicable Account Value was cancellable.

9.     **Tax and other withholding obligations.**

Any vesting, whether on the Scheduled Vesting Date or some other date, of all or a portion of your Applicable Account Value, and any payment of all or a portion of your Applicable Account Value shall be subject to the Firm's withholding of all required United States federal, state, local and foreign income and employment/payroll taxes (including Federal Insurance Contributions Act taxes).  You authorize the Firm to withhold such taxes from any payroll or other payment or compensation to you, including by canceling or accelerating payment of a portion of your Applicable Account Value in an amount not to exceed such taxes imposed upon such vesting or distribution and any additional taxes imposed as a result of such cancellation or acceleration, and to take such other action as the Firm may deem advisable to enable it and you to satisfy obligations for the payment of withholding taxes and other tax obligations, assessments, or other governmental charges, whether of the United States or any other jurisdiction, relating to the vesting or payment of your Applicable Account Value.

7

However, the Firm may not deduct or withhold such sum from any payroll or any other payment or compensation (including from your Applicable Account Value), except to the extent it is not prohibited by Section 409A and would not cause you to recognize income for United States federal income tax purposes prior to the distribution of your Applicable Account Value or to incur interest or additional tax under Section 409A.

**10.** **Obligations you owe to the Firm.**

As a condition to the earning, payment or distribution of your award, the Firm may require you to pay such sum to the Firm as may be necessary to satisfy any obligation that you owe to the Firm.  Notwithstanding any other provision of this Award Certificate, your award, even if vested, is not earned until after such obligations and any tax withholdings or other deductions required by law are satisfied.  Notwithstanding the foregoing, Morgan Stanley may not reduce the amount of your Applicable Account Value to be distributed to satisfy obligations that you owe to the Firm except (i) to the extent authorized under Section 9, relating to tax and other withholding obligations or, otherwise, (ii) to the extent such reduction is not prohibited by Section 409A and would not cause you to recognize income for United States federal income tax purposes prior to the distribution of your Applicable Account Value or to incur additional tax or interest under Section 409A.  Morgan Stanley's determination of any amount that you owe the Firm shall be conclusive.

**11.** **Nontransferability.**

You may not sell, pledge, hypothecate, assign or otherwise transfer your Applicable Account Value, other than as provided in Section 12 (which allows you to designate a beneficiary or beneficiaries in the event of your death) or by will or the laws of descent and distribution.  This prohibition includes any assignment or other transfer that purports to occur by operation of law or otherwise.  During your lifetime, payments relating to your Applicable Account Value will be made only to you.

Your personal representatives, heirs, legatees, beneficiaries, successors and assigns, and those of Morgan Stanley, shall all be bound by, and shall benefit from, the terms and conditions of your award.

**12.** **Designation of a beneficiary.**

You may make a written designation of beneficiary or beneficiaries to receive all or part of the amounts to be distributed in respect of your Applicable Account Value in the event of your death.  To make a beneficiary designation, you must complete and submit the Beneficiary Designation form on the Executive Compensation website.

Any portion of your Applicable Account Value that becomes payable upon your death, and as to which a designation of beneficiary is not in effect, will be distributed to your estate.

If you previously filed a designation of beneficiary form for your award(s) under the Plan with the Executive Compensation Department, such form will also apply to all of your

8

awards under the Plan, including this 2016 award.  You may replace or revoke your beneficiary designation at any time.  If there is any question as to the legal right of any beneficiary to receive your Applicable Account Value, Morgan Stanley may determine in its sole discretion to distribute the amounts in question to your estate.  Morgan Stanley's determination shall be binding and conclusive on all persons and it will have no further liability to anyone with respect to such amounts.

**13.    No entitlements.**

(a)    *No right to continued Employment.*  This award is not an employment agreement, and nothing in this Award Certificate, the International Supplement, if applicable, or the Plan shall alter your status as an "at-will" employee of the Firm or your employment status at a Related Employer.  None of this Award Certificate, the International Supplement, if applicable, or the Plan shall be construed as guaranteeing your employment by the Firm or a Related Employer, or as giving you any right to continue in the employ of the Firm or a Related Employer, during any period (including without limitation the period between the Date of the Award and the Scheduled Vesting Date or Scheduled Distribution Date, or any portion of any of these periods), nor shall they be construed as giving you any right to be reemployed by the Firm or a Related Employer following any termination of Employment.

(b)    *No right to future awards.*  This award, and all other awards under the Plan, are discretionary.  This award does not confer on you any right or entitlement to receive another award under the Plan or any other award under any other incentive compensation plan of Morgan Stanley at any time in the future or in respect of any future period.

(c)    *No effect on future employment compensation.*  Morgan Stanley has made this award to you in its sole discretion.  This award does not confer on you any right or entitlement to receive compensation in any specific amount for any future year, and does not diminish in any way the Firm's discretion to determine the amount, if any, of your compensation. This award is not part of your base salary or wages and will not be taken into account in determining any other employment-related rights you may have, such as rights to pension or severance pay.

**14.    Consents under local law.**

Your award is conditioned upon the making of all filings and the receipt of all consents or authorizations required to comply with, or required to be obtained under, applicable local law.

**15.    Award modification.**

Morgan Stanley reserves the right to modify or amend unilaterally the terms and conditions of your award, without first asking your consent, or to waive any terms and conditions that operate in favor of Morgan Stanley.  These amendments may include (but are not limited to) changes that Morgan Stanley considers necessary or advisable as a result of changes in any, or the adoption of any new, Legal Requirement.  Morgan Stanley may not modify your award in a manner that would materially impair your rights in your award without your consent; *provided*,

*however*, that Morgan Stanley may, but is not required to, without your consent, amend or modify your award in any manner that Morgan Stanley considers necessary or advisable to (i) comply with any Legal Requirement, (ii) ensure that your award does not result in an excise or other supplemental tax on the Firm under any Legal Requirement, or (iii) ensure that your award is not subject to United States federal, state or local income tax or any equivalent taxes in territories outside the United States prior to payment or distribution.  Morgan Stanley will notify you of any amendment of your award that affects your rights.  Any amendment or waiver of a provision of this Award Certificate (other than any amendment or waiver applicable to all recipients generally), which amendment or waiver operates in your favor or confers a benefit on you, must be in writing and signed by the Chief Human Resources Officer (or if such position no longer exists, by the holder of an equivalent position) to be effective.

**16.**   **Governing law.**

This Award Certificate and the related legal relations between you and Morgan Stanley will be governed by and construed in accordance with the laws of the State of New York, without regard to any conflicts or choice of law, rule or principle that might otherwise refer the interpretation of the award to the substantive law of another jurisdiction.

**17.**   **Defined terms.**

For purposes of this Award Certificate, the following terms shall have the meanings set forth below:

**(a)**   "***Board***" means the Board of Directors of Morgan Stanley.

**(b)**   "***Cause***" means:

**(1)**   any act or omission which constitutes a breach of your obligations to the Firm, including, without limitation, (A) your failure to comply with any notice or non-solicitation restrictions that may be applicable to you or (B) your failure to comply with the Firm's compliance, ethics or risk management standards, or your failure or refusal to perform satisfactorily any duties reasonably required of you;

**(2)**   your commission of any dishonest or fraudulent act, or any other act or omission, which has caused or may reasonably be expected to cause injury to the interest or business reputation of the Firm; or

**(3)**   your violation of any securities, commodities or banking laws, any rules or regulations issued pursuant to such laws, or rules or regulations of any securities or commodities exchange or association of which the Firm is a member or of any policy of the Firm relating to compliance with any of the foregoing;

*provided,* that an act or omission shall constitute "Cause" for purposes of this definition if the Firm determines, in its sole discretion, that such action or omission is described in clause (3) of Clawback Cancellation Event set forth below and is deliberate, intentional or willful.

10

(c)     "*Clawback Cancellation Event*" means you take any action, or you fail to take any action (including with respect to direct supervisory responsibilities), where such action or omission:

(1)     causes a restatement of the Firm's consolidated financial results;

(2)     constitutes a violation by you of the Firm's Global Risk Management Principles, Policies and Standards (where prior authorization and approval of appropriate senior management was not obtained) whether such action results in a favorable or unfavorable impact to the Firm's consolidated financial results; or

(3)     causes a loss in the current year on a trade or transaction originating in the current year or in any prior year for which revenue was recognized and which was a factor in your award determination, and violated internal control policies that resulted from your:

(a) violation of business unit, product or desk specific risk parameters;

(b) use of an incorrect valuation model, method, or inputs for transactions subject to the "STAR" approval process;

(c) failure to perform appropriate due diligence prior to a trade or transaction or failure to provide critical information known at the time of the transaction that might negatively affect the valuation of the transaction; or

(d) failure to timely monitor or escalate to management a loss position pursuant to applicable policies and procedures.

In the event that the Firm determines, in its sole discretion, that your action or omission is as described in clause (3) and you do not engage in any other Prohibited Activity described herein, your 2016 award will be reduced by a fraction, the numerator of which is the amount of the pre-tax loss, and the denominator of which is the total revenue originally recognized by the Firm which was a factor in your award determination.

(d)     "*Competitive Services*" means services with respect to any line of business in which the Firm is engaged, including but not limited to: securities, commodities, financial futures, insurance, tax advantaged investments and mutual funds.

(e)     "*Date of the Award*" means January 18, 2017.

(f)     You will be deemed to have made "*Defamatory or Disparaging Comments*" about the Firm if, at any time, you make, publish, or issue, or cause to be made, published or issued, in any medium whatsoever to any person or entity external to the Firm, any derogatory, defamatory or disparaging statement regarding the Firm, its businesses or strategic plans, products, practices, policies, personnel or any other Firm matter.  Nothing contained herein is intended to prevent you from testifying truthfully or making truthful statements or

11

submissions in litigation or other legal, administrative or regulatory proceedings or internal investigations.

(g)    "**_Disability_**" means termination of Employment due to a medically determinable physical or mental incapacity which is reasonably expected to be of long-term duration or result in death.  The determination of the Firm shall be conclusive on all parties as to whether you are Disabled.

(h)    "**_Employed_**" and "**_Employment_**" refer to employment with the Firm and/or Related Employment.

(i)    The "**_Firm_**" means Morgan Stanley (including any successor thereto) together with its subsidiaries and affiliates.  For purposes of the definitions of "Cause," "Defamatory or Disparaging Comments," "Non-Public Privileged or Confidential Information or Trade Secrets" and "Unauthorized Disclosures" set forth in this Award Certificate, references to the "Firm" shall refer severally to the Firm as defined in the preceding sentence and your Related Employer, if any.  For purposes of the definition of "Prohibited Activity" set forth in this Award Certificate, references to the "Firm" shall refer to the Firm as defined in the second preceding sentence or your Related Employer, as applicable.

(j)    If you are a Private Wealth Management Private Wealth Advisor, "**_Full Career Retirement_**" means the termination of your Employment by you or by the Firm for any reason other than under circumstances involving any Prohibited Activity, and other than due to your death, a Governmental Service Termination or pursuant to a Qualifying Termination, on or after the date on which:

(1)    you have attained age 50 and completed at least 12 years of service as a Managing Director of the Firm or equivalent officer title; or

(2)    you have attained age 50 and completed at least 15 years of service as an officer of the Firm at the level of Vice President or equivalent officer title or above; or

(3)    you have completed at least 20 years of service with the Firm; or

(4)    you have attained age 55 and have completed at least 5 years of service with the Firm and the sum of your age and years of service equals or exceeds 65.

For the purposes of the foregoing definition, service with the Firm will include any period of service with the following entities and any of their predecessors:

(i)    AB Asesores ("**_ABS_**") prior to its acquisition by the Firm (_provided_ that only years of service as a partner of ABS shall count towards years of service as an officer);

(ii)    Morgan Stanley Group Inc. and its subsidiaries ("**_MS Group_**") prior to the merger with and into Dean Witter, Discover & Co.;

       (iii)     Miller Anderson & Sherrerd, L.L.P. prior to its acquisition by MS Group;

       (iv)     Van Kampen Investments Inc. and its subsidiaries prior to its acquisition by MS Group;

       (v)     FrontPoint Partners LLC and its subsidiaries prior to its acquisition by the Firm;

       (vi)     Lend Lease Corporation Limited and its subsidiaries prior to the acquisition of certain of its assets by the Firm; and

       (vii)     Dean Witter, Discover & Co. and its subsidiaries ("**DWD**") prior to the merger of Morgan Stanley Group Inc. with and into Dean Witter, Discover & Co.;

*provided* that, in the case of an employee who has transferred employment from DWD to MS Group or vice versa, a former employee of DWD will receive credit for employment with DWD only if he or she transferred directly from DWD to Morgan Stanley & Co. Incorporated or its affiliates subsequent to February 5, 1997, and a former employee of MS Group will receive credit for employment with MS Group only if he or she transferred directly from MS Group to Morgan Stanley DW Inc. or its affiliates subsequent to February 5, 1997.

       **(k)**     "***Governmental Employer***" means a governmental department or agency, self-regulatory agency or other public service employer.

       **(l)**     "***Governmental Service Termination***" means the termination of your Employment due to your commencement of employment at a Governmental Employer; *provided* that you have presented the Firm with satisfactory evidence demonstrating that as a result of such new employment, the divestiture of your continued interest in your Applicable Account Value is reasonably necessary to avoid the violation of U.S. federal, state or local or foreign ethics law or conflicts of interest law applicable to you at such Governmental Employer.

       **(m)**     "***Internal Revenue Code***" means the United States Internal Revenue Code of 1986, as amended, and the rules, regulations and guidance thereunder.

       **(n)**     "***Legal Requirement***" means any law, regulation, ruling, judicial decision, accounting standard, regulatory guidance or other legal requirement.

       **(o)**     "***Non-Public, Privileged or Confidential Information or Trade Secrets***" means the Firm's books and records; holding book or customer book pages; the names, addresses, telephone numbers and assets and obligations carried in the account of the Firm's customers; computer software or hardware for use in computer or word processing equipment; all training material provided to you; documents or computer programs prepared or generated by you through use of Firm records and any information that is classified as confidential in the Firm's Global Policy on Confidential Information; *provided*, *however*, that "Non-Public, Privileged or Confidential Information or Trade Secrets" shall include, without limitation, any

books, papers, records, electronic communications, videotapes or recordings related to any of the foregoing, including copies.

    **(p)**    "***Prohibited Activity***" means you:

    **(1)**    at any time prior to the Scheduled Distribution Date, (a) use for the benefit of any person or entity other than the Firm, or disclose to any third party, any Non-Public, Privileged or Confidential Information or Trade Secrets; (b) remove Non-Public, Privileged or Confidential Information or Trade Secrets from the premises of the Firm in either original or copied form, except in the ordinary course of conducting business for, and subject to approval by, the Firm; (c) engage in any other conduct in violation of any contractual or legal obligations to the Firm; or (d) following termination of Employment, fail or refuse to cooperate with or assist the Firm in connection with any investigation, regulatory matter, lawsuit or arbitration in which the Firm is a subject, target or party and as to which you may have pertinent information;

    **(2)**    at any time prior to the Scheduled Distribution Date, (a) are terminated for Cause; or (b) engage in conduct constituting Cause (either during or following Employment and whether or not your Employment has been terminated as of the Scheduled Distribution Date); or (c) following termination of your Employment, the Firm determines that you could have been terminated for Cause;

    **(3)**    without the written consent of the Firm, before the earlier to occur of one year after your termination of Employment due to your resignation and the Scheduled Distribution Date, enter into an employment or consulting relationship with a firm offering Competitive Services to work, within one hundred (100) miles from any office to which you were assigned within the last three years preceding your termination of Employment, in any capacity in a retail branch or in a retail sales or product representative position;

    **(4)**    without the written consent of the Firm, before the earlier to occur of two years after your termination of Employment and the Scheduled Distribution Date, solicit or attempt to solicit, directly or indirectly, for a firm engaging in Competitive Services (with or without the use or disclosure of Non-Public, Privileged or Confidential Information or Trade Secrets) (a) any of the Firm's customers who were serviced by you while employed by the Firm; or (b) any of the Firm's customers whose names or accounts became known to you while employed by the Firm and who live or work within a radius of one hundred (100) miles from any office to which you were assigned within the last three years preceding your termination of Employment;

    **(5)**    without the written consent of the Firm, before the earlier to occur of three years after your termination of Employment and the Scheduled Distribution Date, solicit or attempt to solicit, directly or indirectly, any Firm employee for employment or other business relationship with any other firm engaging in Competitive Services (if the employee became known to you as a result of being employed by the Firm);

14

**(6)** at any time prior to the Scheduled Distribution Date, without the written consent of the Firm, make Unauthorized Disclosures or Defamatory or Disparaging Comments about the Firm; or

**(7)** at any time prior to the Scheduled Distribution Date, engage in a Clawback Cancellation Event.

**(q)** "*Related Employment*" means your employment with an employer other than the Firm (such employer, herein referred to as a "Related Employer"), *provided* that: (i) you undertake such employment at the written request or with the written consent of Morgan Stanley's Chief Human Resources Officer (or if such position no longer exists, the holder of an equivalent position); (ii) immediately prior to undertaking such employment you were an employee of the Firm or were engaged in Related Employment (as defined herein); and (iii) such employment is recognized by the Firm in its discretion as Related Employment; and, *provided further,* that the Firm may (1) determine at any time in its sole discretion that employment that was recognized by the Firm as Related Employment no longer qualifies as Related Employment, and (2) condition the designation and benefits of Related Employment on such terms and conditions as the Firm may determine in its sole discretion; and *provided further*, the Firm will not provide for Related Employment except to the extent such treatment is not prohibited by Section 409A and would not cause you to recognize income for United States federal income tax purposes prior to the distribution of your Applicable Account Value or to incur interest or additional tax under Section 409A. The designation of employment as Related Employment does not give rise to an employment relationship between you and the Firm, or otherwise modify your and the Firm's respective rights and obligations.

**(r)** If you are a Financial Advisor, "*Retirement*" means the termination of your Employment by you or by the Firm for any reason other than under circumstances involving any Prohibited Activity, and other than due to your death or a Governmental Service Termination, on or after the date:

**(1)** on which you have attained age 65;

**(2)** on which you qualify for the payment of any retirement benefit under Section 5 or Section 8 of the Morgan Stanley Employee Retirement Plan (as in effect on December 31, 2015), whether or not you are a participant therein; or

**(3)** otherwise specified by written agreement between you and the Firm as in effect on December 31, 2015, or if you were hired by the Firm after such date, as in effect 30 days following your commencement of employment (*provided* that the agreement has been approved by the Committee or its delegee).

**(s)** "*Scheduled Distribution Date*" means January 23, 2023.

**(t)** "*Scheduled Vesting Date*" means January 23, 2023.

**(u)** "*Section 409A*" means Section 409A of the Internal Revenue Code and any regulations thereunder.

15

ADD-283

(v)    "*Separation from Service*" means a separation from service with the Firm for purposes of Section 409A determined using the default provisions set forth in Treasury Regulation §1.409A-1(h) or any successor regulation thereto.  For purposes of this definition, Morgan Stanley's subsidiaries and affiliates include (and are limited to) any corporation that is in the same controlled group of corporations (within the meaning of Section 414(b) of the Internal Revenue Code) as Morgan Stanley and any trade or business that is under common control with Morgan Stanley (within the meaning of Section 414(c) of the Internal Revenue Code), determined in each case in accordance with the default provisions set forth in Treasury Regulation §1.409A-1(h)(3).

(w)    You will be deemed to have made "*Unauthorized Disclosures*" about the Firm if, while Employed or following the termination of your Employment, without having first received written authorization from the Firm, you disclose, or participate in the disclosure of or allow disclosure of, any information about the Firm or its present or former clients, customers, executives, officers, directors, or other employees or Board members, or its business or operations, or legal matters involving the Firm and resolution or settlement thereof, or any aspects of your Employment with the Firm or termination of such Employment (which, for the avoidance of doubt, does not prevent you from confirming your employment status with the Firm), whether written, oral or in electronic format, to any reporter, author, producer or similar person or entity or to any general public media in any form (including, without limitation, books, articles or writings of any other kind, as well as film, videotape, television or other broadcasts, audio tape, electronic/Internet or blog format or any other medium).

**IN WITNESS WHEREOF**, Morgan Stanley has duly executed and delivered this Award Certificate as of the Date of the Award.

**MORGAN STANLEY**

/s/ Jeffrey Brodsky
Jeffrey Brodsky
Chief Human Resources Officer

16

ADD-284

# Exhibit 2

## MORGAN STANLEY COMPENSATION INCENTIVE PLAN

## PLAN DOCUMENT

This plan document sets forth the terms and conditions of the Morgan Stanley Compensation Incentive Plan ("**MSCIP**" or the "**Plan**").  The Plan provides for the establishment of Accounts for Participants, for administration purposes only, which Accounts shall at all times represent contingent and unsecured contractual obligations of Morgan Stanley.

As described herein, the Administrator may from time to time create, terminate, expand or limit programs under the Plan with respect to certain groups of employees and add or expand programs under the Plan for other groups of employees. Any program under the Plan may, if the Administrator so determines, be structured and maintained to qualify as a Top Hat Plan.  Unless otherwise noted, references herein to MSCIP or the Plan include any program created under the Plan from time to time.

Capitalized terms used herein without definition have the meanings set forth in Section 19 or the applicable Award Certificate.

### 1.   Purposes and General Provisions.

MSCIP is a long-term incentive plan.  The Plan is intended to attract, retain and motivate employees and to compensate them for their contributions to the Firm.  The Plan may also be used as a vehicle to increase the alignment of the interests of certain designated employees of the Firm with the interests of the Firm's clients and shareholders in Firm funds by providing for long-term incentive awards that are notionally invested in referenced funds organized or managed by the Firm.  Subject to the terms and conditions of the Plan set forth herein and of the applicable Award Certificate, Eligible Employees in certain programs under the Plan may be able to express a preference as to how they would like their Account Value to be notionally allocated among the Notional Investments available under the Plan for purposes of measuring the increase or decrease in the value of their Account.

### 2.   Administration.

(a)   Authority.

(i)   Morgan Stanley is the sponsor of the Plan.  The Compensation Committee is responsible for administering the Plan, including, without limitation, adopting rules and procedures for determining the Notional Investments offered, determining the terms and conditions of a Participant's Award or Account Value and interpreting the Plan provisions, Award Certificates and any Descriptive Materials.  The Compensation Committee may, in its sole discretion, delegate some or all of its authority and responsibilities under to the Plan to a committee of the Firm or to one or more senior officers of the Firm, such as Morgan Stanley's Chief Administrative Officer, and may provide that any committee of the Firm to which, or any senior officer of the Firm to whom, it

delegates authority to administer the Plan may further delegate such authority to one or more officers of the Firm.

(ii)     The Compensation Committee and any committee of the Firm to which, or any officer of the Firm to whom, authority to administer the Plan is delegated pursuant to Section 2(a)(i), and all members of any such committee are referred to herein, insofar as they are acting pursuant to authority granted or delegated pursuant to the Plan, as the "***Administrator***".  Each interpretation, determination or other action made or taken pursuant to the Plan by the Administrator from time to time shall be made or taken in its sole discretion and shall be final, binding and conclusive on all persons.

(b)     <u>No Liability</u>.  The Administrator shall not be liable for anything whatsoever in connection with the administration of the Plan, including, without limitation, any interpretation, determination or other action taken or not taken in administering the Plan, except the Administrator's own willful misconduct.  In the performance of its functions with respect to the Plan, the Administrator shall be entitled to rely upon information and advice furnished by the Firm's officers, the Firm's accountants, the Firm's counsel and any other party the Administrator deems necessary or advisable to consult, and the Administrator shall not be liable for any interpretation, determination or other action taken or not taken in reliance upon any such advice.

### 3.     <u>Eligibility.</u>

The Administrator will determine the eligibility criteria applicable for each Award granted under the Plan and Awards granted under any program under the Plan.  In the case of any program that is intended to qualify as a Top Hat Plan, the Administrator may establish or adjust eligibility criteria that in its judgment are appropriate to maintain such qualification.

### 4.     <u>Awards.</u>

The Administrator will determine the type and quantum of each Award. Each such determination may, in the sole discretion of the Administrator, apply with respect to an individual Participant, certain categories of Participants or Participants in certain programs under the Plan.

The Administrator may permit some or all Eligible Employees to express a preference to allocate a portion of their compensation to MSCIP in a manner prescribed by the Administrator.  Any such allocation preferences shall be made by a date specified by the Administrator and shall be subject to revocation or reduction by the Administrator, provided that any such revocation or reduction shall be made by the allocation preference deadline applicable to the Eligible Employee unless making such revocation or reduction at a later time would not result in the imposition of interest or additional tax under Section 409A.

2

**5.**    **Vesting and Other Terms.**

The Administrator will determine the vesting schedule, as well as any other restrictions, applicable to a Participant's Account Value (which may include, without limitation, the effects of termination of employment and cancellation of the Account Value under specified circumstances). The Administrator may also establish other terms and conditions applicable to a Participant's Account Value, including, without limitation, the consequences of a Participant's death. The vesting schedule and any such other restrictions or terms and conditions will be set forth in the applicable Award Certificate.

**6.**    **Accounts.**

(a)    <u>Credits and Charges to a Participant's Account</u>. A Participant's Award shall be credited to the Participant's Account as of a date determined by the Administrator. A Participant's Account shall also be credited (or debited) with returns (or losses) on the Participant's Notional Investments following the date on which the Participant's Awards are credited. A Participant's Account Value shall be reduced to reflect any distributions to the Participant or any of the Participant's Beneficiaries.

(b)    <u>Notional Allocation Parameters</u>.

(i)    The Administrator will establish rules for how a Participant's Account Value shall be notionally allocated among the available Notional Investments. These rules may vary for certain categories of Participants or Participants in certain programs under the Plan. The Administrator may determine that, for certain categories of Participants or Participants in certain programs under the Plan, the entire Account Value will be notionally allocated to a single Notional Investment or notionally allocated in fixed percentages among two or more referenced Notional Investments. The Administrator may also determine for certain categories of Participants, or Participants in certain programs under the Plan, minimum and/or maximum percentages of their Account Value that must be notionally allocated to referenced Notional Investments. The notional allocation requirements applicable to a Participant will be communicated to the Participant by means of the applicable Award Certificate or the Descriptive Materials or through such other means of communication as the Administrator may select.

(ii)    To the extent that the notional allocation rules established by the Administrator permit a Participant to request changes to the notional allocation of all or a portion of the Participant's Account Value among the Notional Investments then available under the Plan, any such request shall be made in accordance with procedures and at such times as established by the Administrator from time to time. In this regard, it is noted specifically that the Administrator may determine, and may change from time to time, (i) the frequency of permitted notional reallocations and (ii) the minimum percentage of the Account Value that is required, and the maximum percentage of the Account Value that is permitted,

3

to be notionally allocated to one or more Notional Investments, and, in each case, such changes may apply to existing as well as future notional allocations to Notional Investments. Without limiting the generality of the preceding sentence, the Administrator may make changes in order, among other things, to reflect limitations or restrictions that would apply to actual investors in the Referenced Funds. No notional reallocation that a Participant requests shall be honored to the extent that it would conflict with the minimum and/or maximum notional allocation requirements that the Administrator may establish from time to time.

(c)  <u>Notional Allocations Generally</u>.  The notional allocation of a Participant's Account Value will remain at the ultimate discretion of the Firm and will be made exclusively for the purpose of determining the Participant's Account Value from time to time in accordance with the Plan. Participant Accounts will not be invested in the Referenced Funds, and Participants will not become direct investors in any of the Referenced Funds by virtue of their participation in the Plan.

(d)  <u>Determination of Account Value</u>.  The Administrator shall from time to time calculate each Participant's Account Value based on the Participant's Awards and the deemed notional allocation of the Participant's Account among the Notional Investments available to the Participant. Subject to the terms and conditions of the Plan, the rate of return of any Notional Investment over the relevant measurement period will track the performance of the relevant Referenced Fund. Calculation of the Participant's Account Value as of any given date will be based on the information available to the Administrator as of the date of determination, which information may include estimates, and, where information about a specific Notional Investment is not available to the Administrator, may be based on information, including estimates, relating to other investment vehicles that the Administrator determines to be reasonably similar to the Notional Investment in question. Following the commencement of distribution of a Participant's Account Value to the Participant, the Administrator shall continue to calculate the Participant's Account Value from time to time in the manner described above, taking into account distributions from the Participant's Account. The Firm's valuation of a Participant's Account Value shall be conclusive and binding.

(e)  <u>Selection of Notional Investments; Conflicts of Interest</u>.

(i)  The Administrator shall choose the Notional Investments available under the Plan. The Notional Investments available from time to time will be indicated on the Executive Compensation Department website or through other means that the Administrator shall determine and communicate to Participants from time to time. The Firm may provide a Participant with a description of the Referenced Funds and their historical returns; *provided*, *however*, that the Firm shall not be responsible for the accuracy of any such description that the Firm obtains from a Referenced Fund or a party acting on its behalf or bases on information obtained from a Referenced Fund or a party acting on its behalf. Under no circumstances will the Firm be responsible for actions, statements or performance of any Referenced Fund.

4

(ii)   The Administrator may choose the Notional Investments available under the Plan based on a variety of factors, which may include, without limitation, the Firm's own business interests and its relations with the Referenced Funds or parties affiliated with the Referenced Funds.  Participants should be aware of the existence of actual and potential conflicts of interest with the Firm and are considered to waive any claim with respect to the existence of any conflict of interest.  The Administrator may require each Participant to affirmatively make such acknowledgment and waiver.

(iii)   The performance of each Notional Investment shall reflect all of the fees and costs of the Referenced Fund, including, without limitation, brokerage and other fees, which the Referenced Fund may pay to the Firm if the Firm provides certain services to the Referenced Fund.  The Firm may also act as the investment advisor or provide other services to the Referenced Fund and receive fees for providing these services.  Fees paid by a Referenced Fund will reduce the performance of the Referenced Fund (and accordingly the performance of the Notional Investment) and, therefore, will reduce the Firm's payment obligations to Participants under the Plan.

(f)   Right to Change Notional Investments and Notional Allocations Thereto.  The Administrator may, from time to time in its sole discretion, change the Notional Investments available to Participants or notionally allocate a Participant's Account to different Notional Investments than those requested by the Participant. Among other things, this means that the Firm has the absolute right to replace a Participant's Notional Investments with different Notional Investments and/or impose additional investment conditions and restrictions on the Notional Investments (including restrictions on a Participant's ability to notionally allocate into, or notionally reallocate away from, a Notional Investment).   Nothing in this plan document, any Award Certificate or any Descriptive Materials shall be construed to confer on a Participant the right to continue to have any particular Notional Investment available for purposes of measuring the value of the Participant's Account.

(g)   Amounts at Risk.  The value of a Participant's Account is subject to risk at all times based upon the performance of the Notional Investments to which the Participant's Account is notionally allocated and based upon currency fluctuation.  If the value of a Participant's Notional Investments decreases in the future, the value of the Participant's Account may be lower than the Participant's original Awards.  Although a Participant will not be an investor in the Referenced Funds underlying the Notional Investments, a Participant's Account will be subject to gains and losses attributable to the performance of the Notional Investments to which the Participant's Account Value is notionally allocated.  Participants will be subject to the risks that an actual investor in such Notional Investments would incur.  To the extent that an actual investor in any such Notional Investment would incur costs in connection therewith, the Firm may adjust the return on a Participant's Notional Investments to reflect these costs.  Payment of the Participant's Account is also subject to the risks associated with the Participant's status as an unsecured general creditor of Morgan Stanley as described in Section 9.

(h)      <u>Administration Fees</u>.   In the discretion of the Administrator, Awards may be subject to a one-time set-up fee and Account Values may be subject to a periodic administration fee (collectively, the "***Administration Fees***") determined by the Administrator from time to time and set forth in the applicable Award Certificate or Descriptive Materials.  The Administration Fees are separate from any fees and costs of the related Referenced Funds that affect the performance of the related Notional Investments and are reflected in the net returns credited to a Participant's Account. Without limiting the generality of the two preceding sentences, in connection with any hedge funds, hedge fund indices and other alternative Notional Investments that may be offered under the Plan, to the extent offerings of such Notional Investments result in unpredictable expenses or costs to the Firm, the Firm has the absolute right to impose additional fees on a Participant's Account Value.

(i)      <u>Other Plans</u>.   If a Participant becomes eligible to participate in MSCIP or a program similar to MSCIP with respect to any other award, or if a Participant has already received awards pursuant to another incentive plan, the Firm may, for administrative convenience, maintain a single Account to record a Participant's awards delivered under such plans or programs (and amounts credited to or debited from such awards) under MSCIP and any similar programs.  The portion of a Participant's Account corresponding to each Award shall be governed by the terms and conditions applicable to each such Award.

### 7.      <u>Manner of Payment.</u>

(a)      <u>Form of Payment</u>.   Unless the Administrator determines otherwise in its sole discretion, all payments under the Plan to a Participant (or a Participant's Beneficiary) shall be made in the Participant's (or Beneficiary's) local currency.

(b)      <u>Payment Date</u>.   Payments of a Participant's Account will be made at such time or times as the Administrator shall determine at the time the Award is granted.  The Administrator may provide for a different payment schedule for certain Participants or certain categories of Participants (such as Participants in a designated program or designated programs) based on such considerations as the Administrator considers appropriate (which may include the liquidity of the Referenced Funds to which the Account Values of such Participants are indexed).

(c)      <u>Required Notional Reallocations</u>.   The Administrator shall determine the value of all distributions under the Plan.  Prior to any distribution, the Administrator may require a Participant to notionally reallocate a portion of the Account Value out of the Participant's current Notional Investments during the next notional reallocation period into other designated Notional Investment(s) in order to ensure that the Participant's distribution payment(s) can be made in full and on time.   The Administrator may notionally reallocate a Participant's Account Value to ensure that the Participant satisfies this Section 7(c).

(d)     <u>No Withdrawals or Loans</u>.   Except for distributions made in accordance with the terms of the Plan, a Participant shall have no rights to make withdrawals from, or to borrow against, the Participant's Account for any reason.

## 8.     **Termination and Amendment.**

(a)     The Administrator may, at any time, terminate the Plan or any program under the Plan in whole or in part as to some or all Participants.   No further Awards shall be granted to affected Participants after the effective date of any termination.   Termination of the Plan shall not result in early distributions to Participants, and distributions shall instead be made to Participants on the same schedule as if the Plan had not been terminated; *provided*, *however*, that to the extent that early distribution of all or a portion of a Participant's Account Value would not result in the imposition of interest or additional tax under Section 409A, the Administrator may require or permit such early distributions to the extent and in the manner permitted under Section 409A.

(b)     The Administrator may also alter, amend or modify the Plan, any program under the Plan or any Award Certificate at any time in its sole discretion.   These amendments may include (but are not limited to) changes that the Administrator considers necessary or advisable (i) as a result of changes in any, or the adoption or interpretation of any new, Legal Requirement or (ii) to ensure that Morgan Stanley is not subject to registration or regulation as a "commodity pool" operator under the Commodity Exchange Act, as amended, and the rules of the Commodity Futures Trading Commission promulgated thereunder, with respect to its operation of MSCIP or any program under MSCIP, and that neither MSCIP nor any program under MSCIP is treated as an "employee benefit plan" under ERISA.   Notwithstanding anything to the contrary in any Descriptive Materials, the Administrator may not amend or modify the Plan, any program under the Plan or any Award Certificate in a manner that would materially impair a Participant's rights, if any, in the Participant's Account without the Participant's consent; *provided*, *however*, that the Administrator may, without a Participant's consent, amend or modify the Plan, any program under the Plan or any Award Certificate in any manner that the Administrator considers necessary or advisable to comply with any Legal Requirement or to ensure that neither the entirety nor any part of a Participant's Account Value is subject to United States federal, state or local income tax or any equivalent taxes in territories outside the United States prior to payment or to any interest or penalty tax. To the extent necessary or advisable to comply with the Legal Requirements of any non-U.S. jurisdiction in which the Firm implements the Plan, the Firm may supplement the Plan and/or any Award Certificate with an International Supplement.

(c)     The Administrator shall notify Participants of any termination of the Plan or any amendment of the Plan that is material, and shall notify affected Participants of any amendment that affects such Participants' rights, if any.   Any amendment or waiver of a provision of the Plan or any Award Certificate (other than any amendment or waiver applicable to all Participants generally), which amendment or waiver operates in a Participant's favor or confers a benefit on a Participant, must be in writing   and   signed   by   the   Global   Director   of   Human   Resources   or   the   Chief

Administrative Officer of Morgan Stanley (or if such positions no longer exist, by the holder of an equivalent position) to be effective.

### 9.   MSCIP Unfunded.

MSCIP is an unfunded incentive plan.  A Participant's Account represents at all times an unfunded, contingent and unsecured contractual obligation of Morgan Stanley.  Each Participant and Beneficiary is an unsecured general creditor of Morgan Stanley with respect to all obligations owed under the Plan.  Amounts payable under the Plan shall be satisfied solely out of the general assets of Morgan Stanley, subject to the claims of its creditors.  A Participant and a Participant's Beneficiaries will not have any interest in any fund or in any specific asset of Morgan Stanley of any kind by reason of any amount credited to the Participant under the Plan, nor shall a Participant or any Beneficiary or any other person have any right to receive any distribution under the Plan except as, and to the extent, expressly provided in this plan document or the Award Certificate.  Morgan Stanley will not segregate any funds or assets to provide for the distribution of a Participant's Account Value or issue any notes or securities for the payment thereof.

### 10.   No Investment Obligation.

The Firm has no obligation to invest amounts corresponding to a Participant's Awards or Account Value and/or any appreciation thereon (including, without limitation, in the Referenced Funds tracked by the Notional Investments to which a Participant's Account is indexed).  If the Firm invests amounts corresponding to Awards or Account Values in any Referenced Fund, such investment shall not confer on a Participant any right or interest in any such Referenced Fund.  Participants will have no ownership or other interest in any financial or other instrument or arrangement that Morgan Stanley may acquire or enter into to hedge its obligations under the Plan.

### 11.   Taxes and Withholding; Other Obligations.

(a)   Taxes and Withholding.  Any vesting, payment, distribution or award made under the Plan shall be subject to the Firm's withholding of all required United States federal, state and local and foreign income and employment/payroll taxes, including without limitation Federal Insurance Contributions Act ("**FICA**") taxes (Social Security and Medicare), and all such payments, distributions, or awards shall be net of such tax withholding.  In addition to withholding such taxes from any payment, distribution, or award to which such taxes relate, subject to the immediately following sentence, Participants authorize the Firm to withhold such taxes from any payroll or other payment or compensation to the Participant and to take such other action as the Firm may deem advisable to enable the Firm and Participants to satisfy obligations for the payment of withholding taxes and other tax obligations, assessments, or other governmental charges, whether of the United States or any other jurisdiction, relating to the vesting, payment, distribution, or award.  However, the Firm may not deduct or withhold such sum from any payroll or other payment or compensation, except to the extent it is not prohibited by Section 409A and would not cause the Participant to recognize income for

United States federal income tax purposes prior to the time of payment of any amount hereunder or to incur interest or additional tax under Section 409A.  In the discretion of the Firm, the Firm may accelerate the payment of any amount under the Plan to the extent necessary to pay (i) any FICA taxes imposed on such amount prior to the scheduled payment thereof and (ii) any income tax withholding imposed as a result of accelerated payment pursuant to the preceding clause (i).

(b)   <u>Other Obligations</u>.  The Firm shall have no authority to withhold any amount from a payment or distribution pursuant the Plan for the purpose of satisfying all or any part of an obligation that a Participant owes to the Firm, except (i) to the extent authorized under Section 11(a) relating to tax and other withholding obligations or (ii) otherwise, to the extent such withholding is not prohibited by Section 409A and would not cause the Participant to recognize income for United States federal income tax purposes prior to the time of payment of any amount hereunder or to incur interest or additional tax under Section 409A.

## 12.   <u>Nontransferability.</u>

A Participant may not assign, sell, garnish, transfer, pledge or encumber the Participant's interests in the Plan, other than as provided in Section 13 (which allows a Participant to designate a Beneficiary or Beneficiaries in the event of the Participant's death) or by will or the laws of descent and distribution.  This prohibition includes any assignment or other transfer that purports to occur by operation of law or otherwise. During a Participant's lifetime, payments shall be made only to the Participant.  The terms and conditions of the Plan are binding on, and shall benefit, Morgan Stanley and its successors and assigns, and the Participants, their Beneficiaries, heirs, legatees and personal representatives.

## 13.   <u>Designation of a Beneficiary.</u>

A Participant may designate a Beneficiary or Beneficiaries to receive all or part of the Participant's MSCIP payments to be paid under the Plan in the event of the Participant's death.  To designate a Beneficiary, a Participant must complete and submit a designation of beneficiary form with the Executive Compensation Department pursuant to procedures the Administrator may establish from time to time.  A Participant may revoke or change the Participant's designation at any time.

## 14.   <u>Claims Procedure.</u>

The Administrator may establish procedures from time to time pursuant to which the Administrator will process claims by Participants with respect to the Plan.

## 15.   <u>No Right to Continued Employment or Participation.</u>

Neither the Plan nor any interpretation, determination or other action taken or omitted to be taken pursuant to the Plan shall be construed as guaranteeing a Participant's employment with the Firm, a discretionary bonus or any particular level of bonus, compensation or benefits or as giving a Participant any right to continued

employment, during any period, nor shall they be construed as giving a Participant any right to be reemployed by the Firm following any termination of employment.   In addition, neither the Plan nor any interpretation, determination or other action taken or omitted to be taken pursuant to the Plan shall be deemed to create or confer on a Participant any right to participate in MSCIP, or in any similar program that may be established by the Firm, in respect of any Fiscal Year or other period.

### 16.   Conflicts.

In the event of any conflict or inconsistency between the MSCIP plan document and any Award Certificate or any of the Descriptive Materials, the plan document shall govern and the Award Certificate and any Descriptive Materials shall be interpreted to minimize or eliminate any such conflict or inconsistency; *provided*, *however*, that to the extent the Administrator amends or modifies any term or definition set forth herein in accordance with Section 19, such modified term or definition will be communicated to the Participant in the applicable Award Certificate and shall govern; and, *provided*, *further*, that to the extent the Administrator amends or modifies any term or definition set forth herein in accordance with Section 8(b) to comply with the Legal Requirements of any non-U.S. jurisdiction in which the Firm implements the Plan, such modified term or definition will be communicated to the Participant in the applicable International Supplement and shall govern.

### 17.   Governing Law and Exclusive Jurisdiction.

MSCIP and the related legal relations between a Participant and the Firm shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to any conflicts or choice of law rule or principle that might otherwise refer the interpretation of the Award or Account Value to the substantive law of another jurisdiction. Following the timely and proper exhaustion of applicable internal claims and appeals procedures, the courts of New York shall have exclusive jurisdiction over the Plan and any dispute arising in connection with the Plan, a Participant's participation in the Plan or rights under the Plan.

### 18.   Construction.

The headings in this plan document have been inserted for convenience of reference only and are to be ignored in any construction of MSCIP.  Use of one gender includes the other, and the singular and plural include each other.

### 19.   Defined Terms.

Unless determined otherwise by the Administrator and set forth in the applicable Award Certificate, the following terms shall have the indicated meanings:

(a)   "*Account*" means the bookkeeping account maintained on the books and records of Morgan Stanley in a Participant's name to record Awards and credits or debits thereto in accordance with the Plan.  An Account is established only for

purposes of tracking Notional Investments and not to segregate assets or to identify assets that may be used to make payments under the Plan.

(b) "*Account Value*" means the amount reflected on the books and records of Morgan Stanley as the value of a Participant's Account at any date of determination, as determined in accordance with the Plan.

(c) "*Award*" means the initial value of an incentive award granted to a Participant under the Plan.

(d) "*Award Certificate*" means a written or electronic document which, for each specified Award and related Account Value, sets forth those terms and conditions of the Plan that, pursuant to the terms of this plan document, are to be communicated in an Award Certificate, including terms and definitions that are not otherwise set forth herein or that the Administrator has determined to modify from those set forth herein. With respect to Participants employed outside the United States, references in this Plan to an Award Certificate shall include the International Supplement.

(e) "*Beneficiary*" means the person designated by a Participant pursuant to Section 13 to receive any payments under the Plan in the event of the Participant's death.

(f) "*Compensation Committee*" means the Compensation, Management Development and Succession Committee of the Board of Directors of Morgan Stanley.

(g) "*Descriptive Materials*" means any term sheets, brochures or other materials relating to MSCIP, whether in written or electronic form, that are distributed to or made available to Eligible Employees.

(h) "*Eligible Employees*" means employees of the Firm whom the Administrator determines pursuant to Section 3 to be eligible for an Award under the Plan.

(i) "*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder.

(j) "*Executive Compensation Department*" means Morgan Stanley's Executive Compensation Department or any other department of Morgan Stanley that succeeds to the functions of the Executive Compensation Department.

(k) The "*Firm*" means Morgan Stanley (including any successor thereto), together with its subsidiaries and other affiliates.

(l) "*Fiscal Year*" means a fiscal year of Morgan Stanley.

(m) "*International Supplement*" means a written or electronic document that amends, deletes or supplements the terms and conditions of the Plan or an

Award Certificate with respect to Participants employed outside the United States.   With respect to Participants employed outside the United States, references in this Plan to an Award Certificate shall include the International Supplement.

(n)     "***Legal Requirement***" means any law, regulation, ruling, judicial decision, accounting standard, regulatory guidance or other legal requirement.

(o)     "***Notional Investments***" means the Referenced Funds or other investment vehicles used to measure the return (positive or negative) to be attributed to Awards.  For the avoidance of doubt, a Participant's interest in any Notional Investment shall be notional.

(p)     "***Participant***" means an Eligible Employee who receives an Award under the Plan.

(q)     "***Referenced Fund***" means the fund(s) or other investment vehicle(s) to which a Notional Investment relates.

(r)     "***Section 409A***" means Section 409A of the Internal Revenue Code of 1986, as amended, and the rules, regulations and guidance thereunder (or any successor provisions thereto).

(s)     "***Top Hat Plan***" means a plan, including a program under MSCIP, that is intended to qualify as a plan maintained for a select group of highly compensated or management employees within the meaning of ERISA.